**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: <br><br> HUMANIGEN, INC.,[1] <br><br> Debtor. | Chapter 11 <br><br> Case No. 24-10003 (___) |

**DECLARATION OF HENRY MADRID, SENIOR VICE PRESIDENT OF FINANCE OF THE DEBTOR, IN SUPPORT OF CHAPTER 11 PETITION AND <u>FIRST DAY PLEADINGS</u>**

I, Henry Madrid, hereby declare under penalty of perjury:

1.  I am the Senior Vice President of Finance ("**I**" or "**Declarant**") of Humanigen, Inc., the debtor and debtor in possession in the above captioned case (the "**Debtor**"). I have served as the Senior Vice President of Finance since March 2021. In addition to my role with the Debtor, I have biopharmaceutical experience as a Senior Finance Consultant and experience as a Chief Financial Officer for High Technology companies. I am a former certified public accountant.

2.  In my capacity as Senior Vice President of Finance, I have personal knowledge of, and am familiar with, the business affairs, day-to-day operations, books and records, and financial condition of the Debtor, and I am authorized to submit this declaration (the "**Declaration**") on behalf of the Debtor. Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtor's employees, agents, consultants, attorneys, and advisors, the accuracy and completeness of which information I relied upon to provide this Declaration.

---

[1] The Debtor's mailing address in this chapter 11 case is 533 Airport Boulevard, Suite 400, Burlingame, CA 94010 and the last four digits of the Debtor's federal tax identification number are 7236.

90939633.9

3.     I submit this Declaration to assist the Court and parties in interest in understanding the circumstances that led to the commencement of the above-captioned chapter 11 case (the "**Chapter 11 Case**") and in support of: (a) the Debtor's voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") filed on the date hereof (the "**Petition Date**") in the United States Bankruptcy Court for the District of Delaware (the "**Court**"); and (b) the relief that the Debtor has requested from the Court pursuant to the motions and pleadings described herein (collectively, the "**First Day Pleadings**"). I have reviewed the First Day Pleadings or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to the uninterrupted operation of the Debtor's business and to the success of the Chapter 11 Case.

4.     The Debtor remains in possession of its assets and continues to operate its business as a debtor-in-possession pursuant to Bankruptcy Code sections 1107 and 1108.

5.     References to the Bankruptcy Code, the chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel or from my personal experience. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

6.     To familiarize the Court with the Debtor and the relief the Debtor seeks early in the Chapter 11 Case, this Declaration is organized into four sections. <u>Section I</u> provides an introduction to the Debtor and detailed information on the Debtor's corporate history and business operations. <u>Section II</u> provides an overview of the Debtor's prepetition capital structure. <u>Section III</u> describes the circumstances leading to the commencement of the Chapter 11 Case and the objectives of the Chapter 11 Case. <u>Section IV</u> describes the First Day Pleadings filed in connection with the Chapter 11 Case, which the Debtor believes are critical to administering the Chapter 11

Case and preserving and maximizing the value of the Debtor's estate. With respect to Section IV of this declaration, capitalized terms not otherwise defined therein shall have the same meanings as defined in the relevant First Day Pleading being discussed.

**I.     Overview of the Debtor's Business**

7.     The Debtor is a clinical-stage biopharmaceutical company, developing a portfolio of proprietary anti-inflammatory immunology and immuno-oncology monoclonal antibodies. The Debtor was incorporated in 2000 in California under the name KaloBios Pharmaceuticals, Inc. ("**KaloBios**") and reincorporated in Delaware under that name in 2001. The company completed its initial public offering in 2013, listing its shares of common stock on the Nasdaq Stock Market ("**Nasdaq**").

8.     In December 2015, KaloBios filed a voluntary petition for relief under chapter 11 of Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (15-12628-LSS). In June 2016, KaloBios confirmed a plan of reorganization, the confirmed plan went effective, and KaloBios emerged from its chapter 11 bankruptcy. *In re KaloBios Pharm., Inc.*, Case No. 15-12628-LSS (Bankr. D. Del. June 2016) [Docket Nos. 581 and 626]. The Debtor's shares were delisted from Nasdaq in connection with these bankruptcy proceedings. In 2017, KaloBios announced a change to the company's name to Humanigen, Inc., which name change took effect on August 7, 2017.

9.     The Debtor operates its business virtually but with a principal business address in Burlingame, California.

10.    Since 2017, the Debtor has focused its operations on preventing and treating an immune hyper-response called "cytokine storm"; a cytokine storm is a physiological reaction where a person's immune system causes an uncontrolled and excessive release of pro-inflammatory signaling molecules called cytokines. The sudden release of large quantities of

3

cytokines can lead to multisystem organ failure and even death. The Debtor's lead product candidate, lenzilumab, is under development as a treatment for cytokine storm in various potential indications as well as other biological mechanisms related to overproduction of granulocyte-macrophage colony-stimulating factor ("**GM-CSF**").

11. Lenzilumab is a first-in class antibody that binds to and neutralizes GM-CSF. Preclinical modeling has indicated GM-CSF is an upstream regulator of many inflammatory cytokines and chemokines involved in the cytokine storm.

12. Early in the COVID-19 pandemic, published scientific research indicated that high levels of GM-CSF secreting T cells were associated with disease severity and intensive care unit admission. In response, the Debtor designed and conducted a Phase 3, multi-center, double-blind, placebo-controlled potential registrational trial for hospitalized, hypoxic patients with COVID-19 pneumonia (the "**LIVE-AIR study**") to test a hypothesis that early intervention with lenzilumab may prevent consequences of a full-blown cytokine storm in hospitalized patients with COVID-19.[2] Lenzilumab also was selected to be part of the ACTIV-5 "Big Effect Trial" ("**ACTIV-5/BET**"), which was sponsored by the National Institutes of Health ("**NIH**"). ACTIV-5/BET was designed to determine whether certain approved therapies or investigational drugs in late-stage clinical development showed promise against COVID-19 and, therefore, merited advancement into larger clinical trials. ACTIV-5/BET evaluated lenzilumab with remdesivir, compared to placebo and remdesivir, in hospitalized COVID-19 patients. The Debtor provided lenzilumab for the study, which was fully funded by NIH.

---

[2] *See generally*, Temesgen, Zelalem et al., *Lenzilumab in Hospitalised Patients with COVID-19 Pneumonia (LIVE-AIR): A Phase 3, Randomised, Placebo-controlled Trial*, 10 THE LANCET RESPIRATORY MEDICINE 237 (2022); Kilcoyne, Adrian, et al., *Clinical and Economic Benefits of Lenzilumab Plus Standard of Care Compared with Standard of Care Alone for the Treatment of Hospitalized Patients with COVID-19 in the United States from the Hospital Perspective*, 25, Journal of Medical Economics 160 (2022).

13. The Debtor's LIVE-AIR study and its participation in ACTIV-5/BET-B was of significant interest to the investment community. Even though the Debtor generated only nominal revenues and had not been approved to commercialize lenzilumab in any jurisdiction, the Debtor was able to raise gross proceeds of approximately $71.8 million in a private placement of its common stock completed in June 2020, and gross proceeds of approximately $78.2 million in an underwritten offering of shares of its common stock completed in September 2020. The Debtor's common stock again became listed on Nasdaq in connection with the pricing of the September 2020 public offering, permitting the Debtor to raise additional proceeds from sales of its common stock and other subsequent financings. Proceeds from these financings were used to retire certain indebtedness, including significant accounts payable, to fund the completion of the LIVE-AIR study and to support the Debtor's manufacturing, production and commercial preparation activities relating to lenzilumab as a potential therapy for COVID-19 patients, as well as for working capital and other general corporate purposes.

14. During 2020, the Debtor entered into agreements with several contract manufacturing organizations ("**CMOs**") for the manufacture of bulk drug substance ("**BDS**") for its lenzilumab clinical trial activities in COVID-19 as well as for a potential launch of lenzilumab in anticipation of an EUA in 2021. The Debtor also entered into agreements for filling, finishing, and packaging of lenzilumab. These agreements, with parties including Catalent Pharma Solutions, LLC, Lonza Sales AG, Patheon Biologics LLC (a division of Thermo Fisher) and Avid BioSolutions, Inc., represented large financial commitments for the Debtor, including upfront amounts prior to commencement of manufacturing and progress payments through the course of the manufacturing process, and included payments for the initial technology transfer. In addition, during 2020 and 2021 the Debtor entered into sales and marketing arrangements to outsource the

entirety of its sales and marketing function related to lenzilumab, with Eversana Life Science Services, LLC and Cardinal Health.

15. In late March 2021, the Debtor announced preliminary, topline results from the LIVE-AIR study. As the Debtor considered the results to be favorable, the Debtor also announced plans to apply to the United States Food and Drug Administration (the "**FDA**") for authorization to commercialize lenzilumab for emergency use as a therapeutic for certain patients hospitalized with COVID-19. The Debtor also commenced efforts to secure a marketing approval of lenzilumab in the United Kingdom and European Union. These regulatory initiatives and the related manufacturing, production and commercial preparatory efforts were funded in part by proceeds from a secured term loan incurred by the Debtor in March 2021, and from an underwritten public offering which raised approximately $100.4 million of gross proceeds in April 2021.

16. On September 8, 2021, the FDA informed the Debtor that it had declined to issue an EUA for lenzilumab for patients hospitalized with COVID-19. The price of the Debtor's common stock dropped precipitously in the trading days following the Debtor's announcement of the FDA's decision. During 2021 the United Kingdom's regulatory body raised a number of questions as part of its review of the Debtor's application for marketing authorization. The Debtor continued to pursue its applications for EUA and marketing authorization, on the assessment that the results from the ACTIV-5/BET-B trial being conducted by NIH, if confirmatory of certain of the findings from the LIVE-AIR study, may support the issuance of EUA or marketing authorization. However, in its 2021 Form 10-K filed with the Securities and Exchange Commission (the "**SEC**"), the Debtor cautioned that unfavorable results from ACTIV-5/BET-B likely would have a material and adverse impact on the Debtor's stock price and ability to obtain future financing needed to continue as a going concern.

17. In July 2022, the Debtor was informed by NIH of topline initial data from ACTIV-5/BET-B which showed that lenzilumab had failed to meet the primary endpoint of that study on the statistical analysis performed on the data to hand. The Debtor's announcement of this failure again resulted in a significant decline in the price of the Debtor's common stock, such that the Debtor fell out of compliance with certain of the requirements for continued listing on Nasdaq. Unfortunately, the failure of the study did not relieve the Debtor from any of the manufacturing commitments it incurred in 2020 and 2021.

18. Following the announcement of the ACTIV-5/BET-B results, the Debtor announced a strategic realignment plan to develop lenzilumab and the Debtor's other monoclonal antibodies for other immune-oncology indications, while pursuing new financing to enable the Debtor to remain a going concern. The effectiveness of lenzilumab is being explored and it could be developed as a treatment for other inflammatory conditions – such as acute Graft versus Host Disease in patients undergoing allogeneic hematopoietic stem cell transplantation, eosinophilic asthma, and rheumatoid arthritis. Further, the Debtor focuses on studying the effectiveness of lenzilumab for patients with chronic myelomonocytic leukemia exhibiting RAS pathway mutations. The Debtor is working on two other monoclonal antibodies – ifabotuzumab, which binds to EphA3, and HGEN005, which targets EMR1. Ifabotuzumab has been evaluated in a Phase 1 study of glioblastoma multiforme and HGEN005 is being considered as a treatment for a range of eosinophilic diseases.

19. The Debtor seeks chapter 11 relief to accomplish several goals: (a) to maintain the commitment to developing its product pipeline and stave off a race to the courthouse; (b) maximize the going concern value of its assets; and (c) explore its strategic alternatives, which consist of a sale of substantially all of its assets pursuant to Bankruptcy Code section 363(f).

### B. Business Operations

#### (1) Financial Performance

20. With nominal revenues and heavy research and development and manufacturing costs, the Debtor recognized net losses of $236,649,000 in the year ended December 31, 2021, and $70,730,000 in the year ending on December 31, 2022.

21. The Debtor relied on third party capital raised through public and private equity offerings and debt financings to support its operations. In 2021, the company received net proceeds of approximately $94.2 million from an underwritten public offering, $65.7 million from the issuance of common stock under a sales agreement with Cantor Fitzgerald & Co. (the "**Cantor Sales Agreement**"), and $24.4 million from a term loan with Hercules Capital. In 2022, the company received net proceeds of $41.8 million from the issuance of common stock under the Cantor Sales Agreement, and repaid the term loan with Hercules Capital in full, in an attempt to reduce its future cash payments for interest and enhance its ability to generate additional liquidity from its intellectual property.

#### (2) Corporate Governance

22. The Debtor is governed by its Board of Directors (the "**Board**"), which is currently composed of four (4) members, including, the Chairman of the Board, Chief Executive Officer, and Acting Chief Financial Officer (Cameron Durrant); the Chief Scientific Officer (Dale Chappell), and two non-employee directors, one of whom is a former Bankruptcy Judge. Non-debtor subsidiary Humanigen, Ltd. is organized under the laws of the United Kingdom and located in England, non-debtor subsidiary Humanigen Australia Pty, Ltd. is organized under the laws of the United Kingdom and located in the Commonwealth of Australia, and non-debtor Humanigen Europe, Ltd. is organized under the laws of the Republic of Ireland and located in the Republic of Ireland. A copy of the corporate organizational structure is attached hereto as Exhibit A.

## II. Prepetition Capital Structure

23. As of the Petition Date, the Debtor owes creditors a total of approximately $44.1 million consisting of unsecured obligations (collectively, the "**Debt Obligations**").

### A. Secured Debt

24. As of the Petition Date, the Debtor has no outstanding secured debt.

### B. Unsecured Debt

25. As of the Petition Date, the Debtor estimates that general unsecured claims total approximately $44.1 million. Its general unsecured creditors include non-insider trade creditors and vendors, some of which are litigation counterparties.

## III. Events Leading to Chapter 11 Filing

26. The Debtor's financial distress is due in large part to the FDA's rejection of the Debtor's EUA request for lenzilumab. Further, litigation and arbitration taking place in federal and state courts across the United States, resulting, in pertinent part, from the Debtor's inability to pay primarily for manufacturing, as well as sales and marketing services rendered pursuant to agreements executed by the various parties in 2020 and 2021, has also strained the Debtor's financial resources. Unfortunately, after the FDA's rejection of the Debtor's application for EUA, a securities class action suit began in the District of New Jersey, which was followed by a breach of fiduciary duty complaint based on the same allegations. Similarly, in litigation pending with a commercial partner in a California state court, the Debtor's financial distress led to an escalation in the litigation tactics employed by the litigation counterparty against the Debtor, which included seeking a writ of attachment against all of the Debtor's corporate assets.

27. On September 22, 2023, a stipulation of settlement (the "**Securities Settlement**") was filed in the securities class action suit pending in the District of New Jersey, by and among (i) Co-Lead Plaintiffs Dr. Scott Greenbaum and Joshua Mailey and Plaintiff Alejandro Pieroni,

individually and on behalf of the settlement class (collectively, the "**Securities Plaintiffs**"); and (ii) Defendants Humanigen, Inc., Cameron Durrant, and Dale Chappell (collectively, the "**Securities Defendants**," and together with Plaintiffs, the "**Securities Lawsuit Parties**"), through their respective counsel. The Securities Settlement is currently pending approval by the U.S. District Court for the District of New Jersey. The Debtor will file a motion pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), seeking approval of the Securities Settlement, as well as a motion for relief from the automatic stay to allow insurance proceeds to be used to fund the settlement.

28. A chart summarizing the Debtor's recent litigation history is included below:

| Litigation Event | Litigation/ Settlement Date | Description of Litigation | Status | Case Caption |
|---|---|---|---|---|
| Arbitration with Eversana | May 19, 2022 | The arbitration with *Eversana Life Sciences, LLC* ("**Eversana**") relates to the termination of the initial statement of work for the commercialization support of lenzilumab for the treatment of COVID-19 in the United States. Eversana claims that the Debtor owes it approximately $4.5 million for services rendered from April 1, 2021 to September 30, 2021, while the Debtor disputes Eversana's claims. | Pending; stayed until 1/19/2024 or the filing of Bankruptcy | *Eversana Life Sciences, LLC v. Humanigen, Inc.* AAA Case No. 01-22-0002-1591 |
| Lawsuit and countersuit with Patheon/Thermo | October 24, 2022 | The lawsuit and countersuit with Patheon, a subsidiary of Thermo Fisher Scientific, Inc. ("**Thermo**"), relate to the manufacturing of drug product. Patheon claims that Humanigen owes it $25.9 million for unreleased batches of product that were allegedly out of specification, while Humanigen countersues for breach of contract and seeks more than $37.5 million for damages caused by Patheon's failure to perform its obligations under the agreement. | Pending | *Patheon Biologics, Inc. v. Humanigen, Inc.,* Case No. N22C-10-185 MMJ |
| Securities class action lawsuits | August 26, 2022 and October 17, 2022 | The securities class action lawsuits allege that Humanigen and certain of its officers and directors violated the federal securities laws by making false or misleading statements or omissions regarding the development and prospects of lenzilumab, the results of the ACTIV-5/BET-B trial, and the company's financial condition. The lawsuits seek damages on behalf of a class of investors who purchased or otherwise acquired Humanigen securities between March 30, 2021 and July 19, 2022. | Consolidated; settlement reached; preliminary approval of the settlement granted by the Court on 11/8/2023 | *Pieroni v. Humanigen Inc., et al.,* Case No. 22-cv-05258; and *Greenbaum v. Humanigen Inc., et al.,* Case No. 22-cv-06118 |

| Shareholder derivative lawsuit | January 19, 2023 | The derivative lawsuit alleges that the Debtor and certain of its officers and directors breached their fiduciary duties, unjustly enriched themselves, abused their control, grossly mismanaged the company, and wasted corporate assets by engaging in the same conduct as alleged in the securities class action lawsuits. The lawsuit seeks damages and other relief on behalf of the Debtor. | Pending; stayed pending resolution of the motion to dismiss in the class action | *In Chul Yang derivatively on behalf of Humanigen, Inc. v. Durrant, et al.*, Case No. 2:23-cv-00235 |

29.     Within months of adoption of its strategic realignment plan, on or around October 13, 2022, the Debtor engaged SC&H Group, Inc. (together with its subsidiaries and affiliates, "**SC&H**") to determine whether there was going concern interest in the Debtor and how to best maximize the value of the Debtor's assets, whether through further equity infusions, debt financing, or a sale of substantially all of the Debtor's assets. The Debtor and SC&H conducted a broad and robust marketing process using proprietary research tools and methods. Ultimately, this process identified 101 potential buyers based on their industry, size, acquisition history, and potential strategic angle. The list of potential buyers was supplemented with 55 potential buyers that management believed would have an interest in a transaction with the Debtor. SC&H prepared marketing materials and conducted an outreach campaign that involved direct calls and emails to the groups identified, sending non-disclosure agreement ("**NDAs**") to 113 prospective bidders. In total, 14 groups signed NDAs and management conducted meetings with nine separate groups at the JP Morgan Healthcare Conference in San Francisco, CA in January 2023. This led to additional in-person meetings and video calls with the more interested prospects. No transactions were proposed to the Debtor as a result of such meetings.

30.     During the first half of 2023, the Debtor was involved in exclusive negotiations relating to a proposed business combination with a privately held biopharmaceutical company (the "**Partner Company**"), which negotiations contemplated a tax-free stock-for-stock merger, that would result in the issuance of shares of Humanigen's capital stock to the Partner Company's

stockholders, representing roughly two times the number of Humanigen's outstanding shares of common stock. The proposed terms for the business combination were subject to conditions, including that the Debtor received binding commitments for investment of additional capital that would have been necessary to fund the operations of the combined company and enable it to maintain a listing on a national securities exchange. Such additional capital proved not to be available, and in July of 2023, the Debtor's negotiations with the Partner Company concluded without execution of a definitive agreement.

31. In addition, the Debtor had been unsuccessful in its attempt to identify and complete another strategic or equity financing transaction in the first half of 2023 on terms sufficient to enable the company to regain compliance with applicable Nasdaq listing requirements.

32. In light of these developments and the matters discussed above, which resulted in severe liquidity constraints, on July 21, 2023, the Debtor notified a Nasdaq Hearings Panel (the "**Panel**") that it did not expect to be able to demonstrate compliance with all applicable criteria for listing on the Nasdaq Capital Market by the Debtor's compliance deadline of August 21, 2023. As a result, the Panel suspended trading in the Debtor's shares beginning Wednesday, July 26, 2023, and delisted the shares of the Debtor from the Nasdaq Capital Market beginning October 11, 2023. The suspension from trading and delisting from the Nasdaq Capital Market had a significant, adverse effect on the liquidity of the Debtor's common stock and its ability to raise additional capital at a critical juncture.

33. Upon being delisted, in furtherance of its fiduciary duty to maximize value for all creditor constituencies, the Debtor turned its attention to one last-ditch effort to enter into a sales transaction to maximize the enterprise value of the Debtor. Accordingly, SC&H reached out to all interested parties and asked for submissions of final letters of intent ("**LOI**") to enter into a

transaction with the Debtor. At the conclusion of this process, the Debtor received two (2) LOIs. One LOI was from a strategic partner and the other LOI was from an insider entity affiliated with Cameron Durrant, the Chairman and Chief Executive Officer of the Debtor.

34. As a result of the insider LOI, the Debtor's Board met and determined to form a special committee (the "**Special Committee**") to oversee the negotiation of the LOI, which contemplated a debtor in possession financing facility to fund a chapter 11 bankruptcy that would fund a credit bid pursuant to section 363(k) of the Bankruptcy Code to purchase substantially all of the Debtor's assets.

35. The Special Committee tasked SC&H with negotiating with the two parties that submitted LOIs to get to the final and best terms that would allow the Debtor the required liquidity to prepare and file a chapter 11 case to run a sale and marketing process. During these negotiations, the non-insider LOI made a business decision to no longer pursue a transaction. Left with no other alternative and extremely limited liquidity, the Special Committee determined to move forward with finalizing a definitive term sheet with Taran Therapeutics, Inc. ("**Taran**"). Taran is an acquisition vehicle formed by Cameron Durrant.

36. After intense, arm's length negotiations between the Debtor's advisors, at the direction of the Special Committee, and Taran, the Debtor and Taran entered into a term sheet (the "**Taran Term Sheet**"), a copy of which is attached to the DIP Motion. Pursuant to the Taran Term Sheet, Taran would purchase substantially all of the Debtor's assets, carving out certain causes of action, cash on hand, claims related to the Madison JV, in consideration of a $2 million purchase price, which would include a credit bid pursuant to a to-be-provided debtor in possession loan in an amount up to $2 million.[3]

---

[3] Additional "Excluded Assets" are specified in the Taran APA (defined below).

37. I understand that since July of 2023, at all times relevant to the discussions and negotiations with Taran, the Special Committee negotiated on behalf of the Debtor. Ultimately, the Special Committee resolved to approve both a sale to Taran and a DIP financing arrangement with Taran as being the best—and only—alternative available to the Debtor to maximize value for all creditor constituencies. The Special Committee also determined that Cameron Durrant, the Chairman and Chief Executive Officer, should remain in his current positions with the Debtor during the pendency of the Chapter 11 Case until the closing of the Sale. Given his intimate familiarity with the Debtor's business and financial operations, and experience and expertise, as well as the lack of liquidity to seek other options, the Special Committee believed that continuity of the business operations through a sale to Taran was imperative to maintain the enterprise, going concern value of the Debtor.

38. Immediately prior to the Petition Date, the Debtor and Taran entered into an APA for Taran (the "**Taran APA**") to serve as the stalking horse purchaser, subject to approval by this Court. Taran also agreed to provide senior secured post-petition DIP financing on a superpriority basis consisting of a superpriority senior secured priming term loan facility (the "**DIP Loan**") pursuant to the terms and conditions of set forth in the DIP Loan Documents, by and among the Debtor, as borrower, and Taran, as the DIP Lender.[4]

39. As of the Petition Date, the Debtor has limited revenue, even more limited liquidity, and bare-bones operations to maintain the value of the assets through the sale process. It holds limited cash and cash equivalents and owns certain intellectual property, but owes unsecured obligations to its creditors that approximate $44.1 million. As a result, the Debtor recognized the

---

[4] The descriptions of these financings in this Declaration or any of the First Day Pleadings are provided for informational purposes only and the Debtor reserves all rights relating to the long-term loans and borrowings described herein. Capitalized terms used but not defined herein have the meanings ascribed to them in the DIP Motion.

need to seek the protection afforded by filing a petition for relief under Chapter 11 of the Bankruptcy Code. The Debtor believes that upon closing of the proposed transaction, or an alternative transaction to a higher and otherwise better bid, it will have enough cash, and future receivables in the form of insurance proceeds and claims and causes of action, that it hopes to be able to propose and confirm a liquidating chapter 11 plan that would form a liquidating trust to administer the remainder of these assets, as well as any funds that may be paid out pursuant to certain earn outs in the APA.

## IV.     Evidence in Support of First Day Pleadings

40.     Contemporaneously with the filing of the chapter 11 petition, the Debtor has filed the First Day Pleadings. The Debtor requests that each of the First Day Pleadings described below be granted, as they are critical to maintaining business operations with minimal disruption and maximizing the value of the Debtor's estate. The Debtor filed the First Day Pleadings contemporaneously with the filing of the chapter 11 petition. I am familiar with the information contained in each First Day Pleading and believe that the relief sought in each motion (a) is necessary to enable the Debtor to undertake certain post-petition activities in connection with its restructuring efforts, including effectuating one or more asset sales i to maximize value for the benefit of all stakeholders, (b) constitutes a critical element for the Debtor to successfully implement the foregoing chapter 11 objectives, and (c) best serves the Debtor's estates and creditors' interests. In my opinion, the granting of each First Day Pleading constitutes a critical element in achieving a successful and smooth transition to chapter 11.

41.     The First Day Pleadings seek relief aimed at, among other things: (i) maintaining employee morale; (ii) obtaining access to use of cash collateral and debtor-in-possession financing; (iii) ensuring the continuation of the Debtor's cash management system and other business operations without interruption; and (iv) establishing certain administrative procedures to facilitate

a smooth transition into, and uninterrupted operations throughout, the chapter 11 process. Overall, this relief is intended to stabilize the Debtor's business operations, facilitate the efficient administration of this Chapter 11 Case, and expedite a swift and smooth restructuring of the Debtor's balance sheet. On the Petition Date, the Debtor filed the following First Day Pleadings:

a. **DIP Motion**: Motion of Debtor for Entry of Interim and Final Orders (I) Authorizing the Debtor to Obtain Post-Petition Financing, Granting Senior Post-Petition Security Interests and According Superpriority Administrative Expense Status Pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code, (II) Modifying the Automatic Stay, and (III) Granting Related Relief.

b. **Claims Agent Application**: Application of Debtor for Entry of an Order (I) Approving the Retention and Appointment of Epiq Corporate Restructuring, LLC as the Claims and Noticing Agent to the Debtor, Effective as of the Petition Date, and (II) Granting Related Relief.

c. **PII Motion:** Motion of Debtor for Entry of Interim and Final Orders (I) Authorizing the Debtor to Redact Certain Personally Identifiable Information and (II) Granting Related Relief.

d. **Wages Motion**: Motion of Debtor for Entry of Interim and Final Order Authorizing Payment of (I) Certain Prepetition Employee Claims, Including Wages, Salaries, and Other Compensation, (II) Certain Employee Benefits and Confirming Right to Continue Employee Benefits on Post-Petition Basis, (III) Reimbursement to Employees for Prepetition Expenses, (IV) Withholding and Payroll-Related Taxes, (V) Workers' Compensation Obligations, and (VI) Prepetition Claims Owing to Administrators and Third-Party Providers.

e. **Cash Management Motion**: Motion of Debtor for Entry of Interim and Final Orders Authorizing (I) Continued Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks, and Business Forms, and (II) Continuation of Existing Deposit Practices.

42. The First Day Pleadings request authority to pay certain prepetition claims. I understand that Federal Rule of Bankruptcy Procedure 6003 provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm." In light of this requirement, the Debtor has narrowly tailored its requests for

immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtor and its estates. Other relief will be deferred for consideration at a later hearing. This Declaration illustrates the factors that warrant the relief requested in the First Day Pleadings.

43. I declare under penalty of perjury that the foregoing is true and correct:

Dated: January 3, 2024            */s/ Henry Madrid*
                                                   Henry Madrid
                                                   Senior Vice President of Finance of
                                                   Humanigen, Inc., the Debtor

11080209v.8

**EXHIBIT A**

# Organizational Structure



**Legend**

 In the process of dissolution

 Continuing operations