## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| HUMANIGEN, INC.,[1] | Case No. 24-10003 (___) |
| Debtor. | |

**MOTION OF DEBTOR FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTOR TO OBTAIN POST-PETITION FINANCING,
GRANTING SENIOR POST-PETITION SECURITY INTERESTS AND ACCORDING
SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS PURSUANT TO
SECTIONS 364(c) AND 364(d) OF THE BANKRUPTCY CODE, (II) MODIFYING
THE AUTOMATIC STAY, AND (III) GRANTING RELATED RELIEF**

Humanigen, Inc., as debtor and debtor in possession (the "**Debtor**") in the above-captioned

chapter 11 case (the "**Chapter 11 Case**"), hereby respectfully submits this motion (the "**Motion**")[2]

for entry of an interim order (the "**Interim DIP Order**") substantially in the form attached hereto

as <u>Exhibit A</u> and a final order (the "**Final Order**") pursuant to sections 105(a), 362, 363, 364, and

507 of title 11 of the United States Code (the "**Bankruptcy Code**"),[3] Rules 2002, 4001, 6003, and

9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 2002-

1(b) and 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States

Bankruptcy Court for the District of Delaware (the "**Local Rules**"), *inter alia*:

(i)    authorizing the Debtor to obtain senior secured post-petition financing (the

"**DIP Financing**") on a superiority basis consisting of a senior secured superpriority term loan

---

[1] The Debtor's mailing address in this chapter 11 case is 533 Airport Boulevard, Suite 400, Burlingame, CA 94010 and the last four digits of the Debtor's federal tax identification number are 7236.

[2] Capitalized terms used but not defined in this Motion shall have the meanings ascribed to such terms in the First Day Declaration (defined herein), or the applicable DIP Loan Documents (defined herein), as applicable.

[3] Unless otherwise noted, all statutory references are to the Bankruptcy Code.

facility in the aggregate principal amount of up to $2,000,000 (the "**DIP Loan**") pursuant to the terms and conditions set forth in the DIP Loan Documents (defined herein)*,* by and among the Debtor, as borrower, and Taran Therapeutics, Inc. as lender ("**Taran**," and in such capacity, the "**DIP Lender**"), substantially in the form attached as <u>Exhibit 2</u> to the Interim DIP Order (as the same may be amended, restated, supplemented, or otherwise modified from time to time, the "**DIP Term Sheet**" and together with the DIP Orders, the "**DIP Loan Documents**");

    (ii) granting the DIP Superpriority Claims and the DIP Liens (each as defined below) to the DIP Lender on all of the DIP Collateral (as defined below) to secure the DIP Loan and all obligations owing and outstanding thereunder and under the DIP Term Sheet and the DIP Orders, as applicable (collectively, the "**DIP Obligations**"), subject only to Senior Third Party Liens and the Carve Out (in each case, as defined below).

    (iii) modifying the automatic stay imposed by Section 362 of the Bankruptcy Code solely to the extent necessary to provide the DIP Lender with the relief necessary to implement and effectuate the terms and provisions of the DIP Loan Documents;

    (iv) scheduling a final hearing for an order approving the Motion on a final basis (the "**Final DIP Order**", and together with the Interim DIP Order, the "**DIP Orders**"); and

    (v) granting related relief.

## PRELIMINARY STATEMENT

1. As set forth in the First Day Declaration (defined below), the Debtor commenced this Chapter 11 Case to effectuate a Section 363 Sale of substantially all of the Debtor's assets. To that end, over one year ago, the Debtor engaged SC&H Group ("**SC&H**") to conduct an extensive and comprehensive marketing process. SC&H contacted over 150 strategic and financial investors regarding potential transactions. Of those parties, fourteen (14) signed nondisclosure agreements

and two (2) submitted indicative non-binding term sheets. In connection with that process, the Debtor appointed two independent directors and established a special committee of the Debtor's Board of Directors (the "**Special Committee**") to negotiate with competing bidders in a sale process as well as any post-petition financing.  The Special Committee's duties were later broadened to encompass all decision-making related to the preparation, filing, and prosecution of the Chapter 11 Case.  Ultimately, the Debtor, through the Special Committee, determined in its business judgment that the DIP Lender's offer to submit a stalking horse bid for substantially all of the Debtor's assets, coupled with its agreement to provide post-petition financing on terms described herein, was the most value-maximizing opportunity available to the Debtor.

2.      Immediately prior to the Petition Date, the Debtor entered into that certain asset purchase agreement by and between Taran (in such capacity, the "**Stalking Horse Bidder**"), an acquisition vehicle created by the Debtor's chief executive officer, Cameron Durrant, as the purchaser, and the Debtor, as seller (the "**APA**") for the sale of substantially all of its assets. The APA, among other things, contemplates a value-maximizing purchase price for the Purchased Assets (as defined therein) of not less than $2,000,000, consisting of a credit bid, new cash consideration, certain earnout payments (if any), and the assumption of certain liabilities set forth in the APA, and stands as the highest and best offer for the Purchased Assets as of the Petition Date.

3.      The DIP Lender is an insider as that term is defined in section 101(31) of the Bankruptcy Code because it is controlled by the Debtor's current Chief Executive Officer and Chairman of the Board. As mentioned, the Debtor formed the Special Committee that consists of two independent directors, one of which is a former Bankruptcy Judge. The DIP Lender/Stalking Horse Purchaser is not part of, or subject to the discussions of, the Special Committee. The Debtor

has taken all reasonable corporate precautions to, on one hand, maximize the value of the business as a going concern and, on the other hand, provide the corporate separateness between the insider and the Special Committee.

4.      In addition, on or about the date hereof, the Debtor filed a motion for entry of orders, among other things: (i) approving certain bidding and auction procedures, (ii) designating the Stalking Horse Bidder and approving related bidder protections, and (iii) authorizing the sale of substantially all of the Debtor's assets to the Stalking Horse Bidder or another successful bidder (the "**Proposed Sale**").

5.      It is imperative that the Debtor has access to the DIP Loan to continue operating its business in the ordinary course and preserve its going concern value until the Proposed Sale is completed. While the Debtor has no pre-petition secured debt, it has limited—and dwindling— unencumbered cash on hand. Moreover, any liquidity gap at this critical stage of the Chapter 11 Case would be devastating on the Debtor's ability to pay necessary operating expenses to preserve the enterprise value of the business and consummate the Proposed Sale. As such, the Debtor has an immediate and present need to enter into the $2,000,000 DIP Loan requested through this Motion, but has agreed to only make draws in excess of $1,000,000 to the extent that the insurance proceeds are fully-exhausted on operating expenses. Absent approval of the DIP Loan, the Debtor's estate will suffer immediate and irreparable harm.

## JURISDICTION AND VENUE

6.      The United States Bankruptcy Court for the District of Delaware (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference of the United States District Court for the District of Delaware* dated as February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2),

and the Debtor confirms its consent pursuant to Local Rule 9013-1(f) to the entry of an order by the Court in connection with the Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

7.      Venue of this chapter 11 case in this District is proper under 28 U.S.C. §§ 1408 and 1409.

8.      The statutory and legal bases for the relief requested in this Motion are sections 105(a), 361, 362, 363, 364, and 507 of the Bankruptcy Code; Bankruptcy Rules 2002, 4001, 6003, and 9014; and Local Rule 4001-5.

## BACKGROUND

9.      On January 3, 2024 (the "**Petition Date**"), the Debtor filed with this Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

10.      The Debtor is authorized to operate its businesses and manage its properties as a debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. As of the date hereof, no trustee, examiner, or official committee of unsecured creditors has been appointed in this Chapter 11 Case.

11.      Additional information about the Debtor's business and operations is set forth in the *Declaration of Henry Madrid, Senior Vice President Finance of the Debtor, in Support of Debtor's Chapter 11 Petition and First Day Motions* (the "**First Day Declaration**"), incorporated herein by reference.

**A.      Pre-Petition Secured Indebtedness**

12.      As of the Petition Date, the Debtor had no secured debt. The Debtor estimates that general unsecured creditors are currently owed approximately $40 million. General unsecured creditors include non-insider trade creditors and vendors, as well as litigation counterparties.

**B.      The Catalent Settlement and the Insurance Payment**

13.      In December 2022, the Debtor entered into a settlement agreement with Catalent Pharma Solutions, LLC ("**Catalent**") resolving certain disputes between the parties that arose under the Debtor's agreement with Catalent to manufacture lenzilumab. The settlement agreement provides for a mutual release of claims and a payment by the Debtor to Catalent of approximately $12 million. The losses resulting from the lenzilumab manufacturing issues also resulted in an insurance payment to the Debtor of approximately $1,500,000 (the "**First Insurance Payment**"), which the Debtor received on September 18, 2023.

14.      Receipt of the First Insurance Payment drastically changed the Debtor's short-term liquidity position and allowed it to negotiate to conclusion the APA and DIP Loan in order to bridge to a value-maximizing post-petition sale process. The Debtor expects to receive another insurance payment of approximately $800,000 (the "**Second Insurance Payment**") related to the dispute with Catalent but the timing of the Second Insurance Payment is uncertain.

15.      Accordingly, the Debtor has agreed that, to the extent it receives the Second Insurance Payment, the cash received from the Second Insurance Payment shall be exhausted prior to the Debtor's utilization of any Subsequent Advance under the DIP Facility.  However, as set forth in the Budget (as defined herein), the Debtor anticipates that it will need to draw on the DIP Loan prior to closing of the Proposed Sale.

**C.      The Debtor's Need for Post-Petition Financing**

16.      As detailed in the First Day Declaration and the *Declaration of Matt LoCascio in Support of the Motion of Debtor for Entry of Interim and Final Orders (I) Authorizing the Debtor to Obtain Post-Petition Financing, Granting Senior Post-Petition Security Interests and According Superpriority Administrative Expense Status Pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code, (II) Modifying the Automatic Stay, and (III) Granting Related Relief* (the "**DIP Declaration**"),[4] facing tightening liquidity, the Debtor, at the direction of the Special Committee and in consultation with legal and financial advisors, determined, in its business judgment, to commence the Chapter 11 Case to pursue a sale of substantially all of the Debtor's assets. The Debtor was left with minimal options given its liquidity issues and the Special Committee ultimately determined, with the assistance of the Debtor's advisors and professionals, that post-petition financing was necessary to sustain operations between the filing of a Chapter 11 petition and the Potential Sale.

17.      The Debtor was unable, even with the assistance of SC&H, to obtain (i) adequate unsecured credit allowable either (a) under sections 364(b) and 503(b)(1) of the Bankruptcy Code, or (b) under section 364(c)(1) of the Bankruptcy Code, or (ii) secured credit under section 364(c)(2) of the Bankruptcy Code from sources other than the DIP Lender on terms more favorable than the terms of the DIP Loan. Indeed, even with respect to the DIP Lender, the DIP Loan is available only with the Debtor's agreement to grant the DIP Lender a first priority senior lien on the DIP Collateral, subject and junior only to (a) the Carve-Out and (b) valid, enforceable, properly perfected, and unavoidable prepetition Liens (the "**Senior Third Party Liens**").

---

[4] The DIP Declaration is filed contemporaneously herewith.

18.     Moreover, as a condition to the extension of credit under the DIP Loan, the DIP Lender and the Debtor have agreed that proceeds of any advance made under the DIP Loan shall be used exclusively in a manner consistent with the agreed Budget (as defined herein). No portion of the proceeds of any advance under the DIP Loan or any cash collateral shall be used, directly or indirectly, to make any payment or prepayment that is prohibited under the DIP Term Sheet. A copy of the initial 13-week budget, agreed to between the Debtor and the DIP Lender, is annexed to the proposed Interim DIP Order as <u>Exhibit 1</u> (as the same now exists or may hereafter be amended, modified, extended or replaced in accordance with the DIP Loan Documents, the "**Budget**").

## SUMMARY OF PRINCIPAL TERMS OF DIP LOAN

19.     Pursuant to Bankruptcy Rule 4001(b)-(d) and Local Rule 4001-2(a), the following is a concise summary of the proposed material terms of the DIP Loan.[5]

| SUMMARY OF MATERIAL TERMS OF DIP LOAN | | |
|---|---|---|
| *Term* | *Summary* | *Source* |
| **Borrower** <br> *Bankruptcy Rule 4001(c)(1)(B)* | Humanigen, Inc. | DIP Term Sheet p. 1 |
| **Guarantors** <br> *Bankruptcy Rule 4001(c)(1)(B)* | N/A | - |
| **DIP Lender** <br> *Bankruptcy Rule 4001(c)(1)(B)* | Taran Therapeutics, Inc. | DIP Term Sheet p. 2 |

---

[5] Capitalized terms used in this summary but not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Term Sheet. This statement is qualified in its entirety by reference to the applicable provisions of the DIP Term Sheet. To the extent there is any inconsistency between this concise statement and the provisions of the DIP Term Sheet, the provisions of the DIP Term Sheet shall control.

| SUMMARY OF MATERIAL TERMS OF DIP LOAN | | |
|---|---|---|
| *Term* | *Summary* | *Source* |
| **Fees**<br>*Bankruptcy Rule 4001(c)(1)(B)* | DIP Lender shall be entitled to an exit fee equal to 5% of the DIP Obligations only if the DIP Obligations are paid in full by the Debtor and not converted to a Credit Bid.<br><br>DIP Lender shall be entitled to payment of its actual and necessary attorney's fees and expenses for all services rendered prior to and after the Petition Date through the Maturity Date. | DIP Term Sheet p. 1; Interim DIP Order ¶ 7 |
| **Borrowing Limits**<br>*Bankruptcy Rule 4001(c)(1)(B)* | $2,000,000.00 | DIP Term Sheet p. 1 |
| **Budget**<br>*Bankruptcy Rule 4001(c)(1)(B)* | The Budget is attached to the Interim DIP Order as Exhibit A. | - |
| **Interest Rate**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Non-default:  5.0%, which shall be accrued and payable upon maturity of the DIP Loans.<br><br>Default:  An additional 2.0% payable in cash monthly in arrears | DIP Term Sheet p. 2 |

| | | |
|---|---|---|
| **Carve Out**<br>*Bankruptcy Rule 4001(c)(1)(B)* | The DIP Liens and DIP Superpriority Claims shall be subject to right of payment of the following expenses (the following subparagraphs, collectively, the "**Carve Out**,"):<br><br>A.    unpaid post-petition fees and expenses of the Clerk of the Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930;<br><br>B.    subject to the limits set forth in this Interim DIP Order, accrued and unpaid post-petition fees and expenses of professionals of the Debtor and professionals of a Statutory Committee (if any), which are retained by an order of the Court pursuant to sections 327, 328, 363 or 1103(a) of the Bankruptcy Code (the "**Chapter 11 Professionals**"), but only to the extent such fees and expenses are (i) incurred prior to a Termination Event, (ii) within the amounts set forth in the Budget approved by the DIP Lender for such Chapter 11 Professional as of the date of the Termination Event, and (iii) subsequently allowed by the Bankruptcy Court under sections 330, 331, or 363 of the Bankruptcy Code, which Chapter 11 Professional fees will be advanced by the DIP Lender into escrow on a weekly basis pursuant to the amounts set forth in the Budget for the benefit of the professionals; and<br><br>C.    post-petition fees and expenses of the Chapter 11 Professionals incurred after a Termination Event in an aggregate amount not to exceed $50,000, to the extent such fees and expenses are subsequently allowed by the Bankruptcy Court under sections 330, 331, or 363 of the Bankruptcy Code;<br><br><u>provided, however</u>, that (a) the Carve Out shall only be available to pay fees and expenses set forth herein to the extent that unencumbered funds are not otherwise available; and (b) in no event shall the Carve Out for each Chapter 11 Professional exceed the amounts for post-petition fees set forth for such Chapter 11 Professional in the Budget as of the applicable date of determination. | Interim DIP Order ¶ 13 |
| **Maturity Date** | The earlier to occur of: i) five (5) months after the Petition Date, (ii) the closing of a sale of | DIP Term Sheet p. 2 |

| SUMMARY OF MATERIAL TERMS OF DIP LOAN | | |
|---|---|---|
| *Term* | *Summary* | *Source* |
| *Bankruptcy Rule 4001(c)(1)(B)* | substantially all of the assets of the Debtor under the terms of the Purchase and Sale Documents, and (iii) the occurrence of any Event of Default. | |
| **DIP Lien Priority** *Bankruptcy Rule 4001(c)(1)(B)(i)* | The DIP Lien shall be a first priority senior lien on the DIP Collateral, subject and junior only to (a) the Carve Out and (b) valid, enforceable, properly perfected, and unavoidable prepetition Liens (including any Liens that are perfected after the Petition Date that are afforded priority due to the express relation back of the perfection of such lien to a date prior to the Petition Date as permitted by Bankruptcy Code section 546(b)). | Interim DIP Order ¶ 11 |
| **Use of DIP Proceeds** *Bankruptcy Rule 4001(c)(1)(B)(i)* | Advances under the DIP Loan will be used by the Debtor for working capital purposes and for other costs of the Debtor, including, but not limited to, all allowed administrative expenses through the Maturity Date, all in accordance with a rolling 13 week budget to be approved by the Lender in its sole and absolute discretion, and in accordance with the terms and conditions of the DIP Loan Documents and DIP Order. | DIP Term Sheet p. 2 |
| **Superpriority Claims** *Bankruptcy Rule 4001(c)(1)(B)* | Pursuant to sections 363 and 364(c) and (d), the DIP Loan funds advanced pursuant to the terms of the Interim DIP Order (collectively, the "**Interim Advances**") shall be allowed administrative expenses of the Debtor's estate, which shall have priority in payment over any other indebtedness and/or obligations now in existence or incurred hereafter by the Debtor and over all administrative expenses or charges against property arising in the Debtor's Chapter 11 case and any superseding Chapter 7 case including, without limitation, those specified in Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to the entry of the Final Order), 507(a), 507(b), 726, 1113 or 1114, subject and junior only to the Carve-Out (as hereinafter defined) (such claim, the "**DIP Superpriority Claim**"). | Interim DIP Order ¶ 5 |
| **Covenants** *Bankruptcy Rule 4001(c)(1)(B)* | None | - |

| SUMMARY OF MATERIAL TERMS OF DIP LOAN | | |
|---|---|---|
| *Term* | *Summary* | *Source* |
| **Events of Default**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Events of default include, without limitation, (a) failure to achieve a Bankruptcy Milestone as set forth below, (b) dismissal or conversion of the Chapter 11 Case, (c) the filing by Debtor and/or confirmation of a Plan in the Bankruptcy Case which is not approved by Lender, (d) the filing by Debtor and/or approval of a sale or licensing of any of the Collateral, including, without limitation, Debtor's IP rights, which is not subject to the 363 auction, (e) appointment of a Chapter 11 trustee, (f) entry of any order in the Bankruptcy Case granting a senior lien on the Collateral to any person or entity other than Lender, (g) failure to obtain a DIP Order as set forth below entered by the Bankruptcy Court, (h) judgment or settlement that results in more than $150,000 debit to the cash resources of the Debtor without the DIP Lender's consent, which shall not be unreasonably withheld. | DIP Term Sheet p. 2 |

| SUMMARY OF MATERIAL TERMS OF DIP LOAN | | |
|---|---|---|
| *Term* | *Summary* | *Source* |
| **Bankruptcy Milestones**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(iv)* | <ul><li>On or before January 5, 2024, the Debtor shall have signed the DIP Term Sheet;</li><li>On or before the Petition Date, Debtor shall have signed definitive documentation for the DIP Financing and Purchase and Sale Documents and filed its Chapter 11 Case and filed a Motion to approve the DIP Financing and Purchase and Sale Documents;</li><li>Entry of the Interim DIP Order within three (3) days of the Petition Date;</li><li>Entry of an order approving the procedures for bidding on substantially all of the assets of the Debtor on or before twenty-three (23) days from the Petition Date;</li><li>Bids for substantially all of the of the Debtor's assets on or before forty-five (45) days from the Petition Date;</li><li>Entry of the Final DIP Order on or before thirty-five (35) days from the Petition Date;</li><li>Entry of an order approving substantially all of the Debtor's assets on or before sixty (60) days after the Petition Date;</li><li>Closing of sale of substantially all of the assets of the Debtor on or before seventy (70) days after the Petition Date.</li></ul> | DIP Term Sheet p. 4 |
| **Prepayments**<br>*Bankruptcy Rule 4001(c)(1)(B)* | N/A | - |

| | | |
|---|---|---|
| **Conditions to Initial Borrowing**<br>*Bankruptcy Rule 4001(c)(1)(B)* | The closing of the DIP Financing (the date of such closing, the "**Closing Date**") shall be subject to the satisfaction (or waiver) of the following customary conditions precedent:<br><br>(i)　　The DIP Orders, in form and substance satisfactory to the DIP Lender, shall have been entered by the Bankruptcy Court, shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed.<br><br>(ii)　　Entry into a purchase agreement, and any other documents as DIP Lender may require in connection with the sale of substantially all the Debtor's assets as are appropriate for a transaction of this type, all of which shall be in form and substance acceptable to DIP Lender in its sole discretion.<br><br>(iii)　　A motion to approve the bidding procedures shall be filed in form and substance reasonably satisfactory to the DIP Lender.<br><br>(iv)　　No trustee or examiner having expanded powers shall have been appointed with respect to the Chapter 11 Case.<br><br>(v)　　Immediately prior to, and after giving effect to, the making of the DIP Loans, there shall exist no default under the DIP Loan Documents.<br><br>(vi)　　The Maturity Date shall not have occurred.<br><br>(vii)　　The making of the DIP Loans shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently.<br><br>(viii)　　The making of the DIP Loans shall not result in the aggregate outstanding obligations under the DIP Facility exceeding the amount authorized by orders entered by the Bankruptcy Court or the DIP Orders, as applicable. | DIP Term Sheet p. 2 |

| SUMMARY OF MATERIAL TERMS OF DIP LOAN | | |
|---|---|---|
| *Term* | *Summary* | *Source* |
| | (ix)     The Debtor shall have paid all fees and expenses payable pursuant to the DIP Loan Documents and incurred as of the Closing Date, which may be paid from proceeds of DIP Financing. | |
| **Parties with an Interest in Cash Collateral**<br>*Bankruptcy Rule 4001(b)(1)(B)(i)* | Upon entry of the Interim DIP Order, the DIP Lender will have an interest in the Debtor's cash collateral. | - |
| **Liens, Cash Payments, or Adequate Protection Provided for Use of Cash Collateral**<br>*Bankruptcy Rule 4001(b)(1)(B)(iv), 4001(c)(1)(B)(ii)* | N/A | - |
| **Determinations Regarding Prepetition Claims**<br>*Bankruptcy Rule 4001(c)(1)(B)(iii)* | N/A | - |
| **Liens on Avoidance Actions**<br>*Bankruptcy Rule 4001(c)(1)(B)(xi)* | The DIP Liens shall not encumber, and the DIP Collateral shall not include, any claims or causes of action under chapter 5 of the Bankruptcy Code or applicable state law equivalents (other than actions brought pursuant to section 549 of the Bankruptcy Code) (collectively, "Avoidance Actions"); provided, however, that subject to entry of a Final Order, the DIP Collateral shall include the proceeds of any Avoidance Actions. | Interim DIP Order ¶ 9 |
| **Effect of Debtor's Stipulations on Third Parties**<br>*Bankruptcy Rule 4001(c)(1)(B)(iii), (viii)* | N/A | - |
| **Waiver or Modification of the Automatic Stay**<br>*Bankruptcy Rule 4001(c)(1)(B)(iv)* | The automatic stay provisions of section 362 are modified to permit (a) the Debtor and the DIP Lender to implement and perform under the DIP Loan and the DIP Loan Documents, including with respect to the issuance of a Default Notice, and (b) the creation and perfection of all Liens granted or permitted by the Interim DIP Order. | Interim DIP Order ¶¶ 12, 18 |

| SUMMARY OF MATERIAL TERMS OF DIP LOAN | | |
|---|---|---|
| *Term* | *Summary* | *Source* |
| **Waiver or Modification of Authority to File a Plan, Extend Time to File Plan, Request Use of Cash Collateral, or Request Authority to Obtain Credit** <br> *Bankruptcy Rule 4001(c)(1)(B)(v)* | The following actions, among others, taken by the Debtor in the Chapter 11 Case would constitute an Event of Default under the DIP Term Sheet: <br><br> • the filing by Debtor and/or confirmation of a Plan in the Chapter 11 Case which does not provide for payment in full of this DIP Facility <br><br> • entry of any order in the Chapter 11 Case granting a senior lien on the Collateral to any person or entity other than DIP Lender | DIP Term Sheet p. 2 |
| **Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection or Enforcement of a Lien** <br> *Bankruptcy Rule 4001(c)(1)(B)(vii)* | The Debtor and the DIP Lender shall not be required to enter into any additional security agreements to create, memorialize, and/or perfect any such liens, or to file UCC financing statements, mortgages, or other instruments with any other filing authority or take any other action to perfect any such Liens, which shall be and are deemed valid, binding, enforceable and automatically perfected by the docket entry of this Interim DIP Order by the Clerk of the Court. | Interim DIP Order ¶ 12 |
| **Release, Waivers or Limitation on any Claim or Cause of Action** <br> *Bankruptcy Rule 4001(c)(1)(B)(viii)* | Upon the earlier to occur of (i) the indefeasible payment, in full, in cash, of all DIP Obligations and (ii) Conversion of the DIP Obligations to a credit bid in accordance with the DIP Term Sheet, the DIP Lender shall be released from any and all obligations, actions, duties, responsibilities, and causes of action arising or occurring in connection with or related to the DIP Loan Documents. | Interim DIP Order ¶ 20 |
| **Indemnification** <br> *Bankruptcy Rule 4001(c)(1)(B)(ix)* | N/A | - |

| SUMMARY OF MATERIAL TERMS OF DIP LOAN | | |
|---|---|---|
| **Term** | **Summary** | **Source** |
| **Section 506(c) Waiver**<br>*Bankruptcy Rule 4001(c)(1)(B)(x)* | Subject to the entry of the Final Order, effective as of the time of commencement of the Debtor's bankruptcy case on the Petition Date, no costs or expenses of administration which have or may be incurred in the Chapter 11 Case at any time shall be charged against or recovered from the DIP Lender, its respective claims or the DIP Collateral pursuant to Section 506(c) of the Bankruptcy Code without the prior written consent of the DIP Lender, and no such consent shall be implied from any other action, inaction or acquiescence by the DIP Lender. | Interim DIP Order ¶ 16A |
| **Section 552(b) Waiver**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Subject to the entry of the Final Order, effective as of the time of commencement of the Debtor's bankruptcy case on the Petition Date, the DIP Lender shall be entitled to all of the rights and benefits of Section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under Section 552(b) of the Bankruptcy Code shall not apply to the DIP Lender with respect to proceeds, products, offspring or profits of any of the DIP Collateral. | Interim DIP Order ¶ 16C |
| **Waiver of Equitable Doctrine of "Marshalling"**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Subject to the entry of the Final Order, effective as of the time of commencement of the Debtor's bankruptcy case on the Petition Date, in no event shall the DIP Lender be subject to the equitable doctrine of "marshalling" or any similar doctrine with respect to the DIP Collateral. | Interim DIP Order ¶ 16C |

## <u>HIGHLIGHTED PROVISIONS UNDER LOCAL RULE 4001-2</u>

20.    Pursuant to Local Rule 4001-2, the DIP Loan contains the following provisions:

| SUMMARY OF MATERIAL TERMS OF DIP LOAN | | |
|---|---|---|
| **Term** | **Summary** | **Source** |
| **Summary of Essential Terms**<br>*Local Rule 4001-2(a)(i)* | See table *supra*. | - |

17

| SUMMARY OF MATERIAL TERMS OF DIP LOAN | | |
|---|---|---|
| *Term* | *Summary* | *Source* |
| **Amount of credit the Debtor seeks to obtain, including committed amount and amount of funding available to Debtor** <br> *Local Rule 4001-2(a)(i)(A)* | See table *supra* ("Borrowing Limits") | DIP Term Sheet p. 7 |
| **Pricing and Economic Terms** <br> *Local Rule 4001-2(a)(i)(B)* | See table *supra* ("Fees"; "Interest Rate") | DIP Term Sheet p. 2; Interim DIP Order ¶ 7 |
| **Specific Limits on Court's Power or Discretion to Enter Future Orders** <br> *Local Rule 4001-2(a)(i)(C)* | None | - |
| **Funding of non-Debtor Affiliates** <br> *Local Rule 4001-2(a)(i)(D)* | None | - |
| **Conditions to Closing and Borrowing, Including Budget Provisions** <br> *Local Rule 4001-2(a)(i)(E)* | See table *supra* ("Conditions to Initial Borrowing"; "Covenants"; "Use of DIP Proceeds"; "Budget") | DIP Term Sheet p. 3; Interim DIP Order ¶ 2 |
| **Carve-Outs** <br> *Local Rule 4001-2(a)(i)(F)* | See table *supra* ("Carve Out") | Interim DIP Order ¶ 13 |
| **Post-petition Liens on Unencumbered Assets** <br> *Local Rule 4001-2(a)(i)(G)* | See table *supra* ("DIP Lien Priority"; "Liens, Cash Payments, or Adequate Protection Provided for Use of Cash Collateral") | Interim DIP Order ¶ 10 |
| **Bankruptcy Milestones** <br> *Local Rule 4001-2(a)(i)(H)* | See table *supra* ("Bankruptcy Milestones") | DIP Term Sheet p. 4 |
| **Prepayment Provisions** <br> *Local Rule 4001-2(a)(i)(I)* | None | - |
| **Joint Liability** <br> *Local Rule 4001-2(a)(i)(J)* | None | - |
| **Payment of Fees and Expenses** <br> *Local Rule 4001-2(a)(i)(K)* | DIP Lender shall be entitled to an exit fee equal to 5% of the DIP Obligations only if the DIP Obligations are paid in full by the Debtor and not converted to a Credit Bid. <br><br> DIP Lender shall be entitled to payment of its actual and necessary attorney's fees and expenses for all services rendered prior to and after the Petition Date through the Maturity Date. | DIP Term Sheet p. 2; Interim DIP Order ¶ 7 |

| SUMMARY OF MATERIAL TERMS OF DIP LOAN | | |
|---|---|---|
| *Term* | *Summary* | *Source* |
| **Prohibitions on Use of Estate Funds to Investigate Prepetition Liens and Claims** <br> *Local Rule 4001-2(a)(i)(L)* | N/A | - |
| **Termination or Default Provisions** <br> *Local Rule 4001-2(a)(i)(M)* | See table *supra* ("Events of Default") | |
| **Cross-Collateralization or Elevation of Prepetition Debt** <br> *Local Rule 4001-2(a)(i)(N)* | None. | - |
| **Roll-Ups** <br> *Local Rule 4001-2(a)(i)(O)* | None. | - |
| **Nonconsensual Priming** <br> *Local Rule 4001-2(a)(i)(P)* | None. | - |
| **Challenge Period** <br> *Local Rule 4001-2(a)(i)(Q)* | None. | - |
| **Provisions Immediately Approving All Terms and Conditions of Underlying Loan Agreement** <br> *Local Rule 4001-2(a)(i)(R)* | None. | - |
| **Modification or Termination of the Automatic Stay to Permit the Lender to Enforce Remedies on Less Than 5 Days' Notice** <br> *Local Rule 4001-2(a)(i)(S)* | None. | - |
| **Limitations on Arguments of Parties in Interest at Emergency Hearing During Remedies Notice Period** <br> *Local Rule 4001-2(a)(i)(T)* | None. | - |
| **Grant of Liens to Prepetition Creditor on Avoidance Actions or Proceeds Thereof** <br> *Local Rule 4001-2(a)(i)(U)* | N/A | - |
| **Immediate 506(c) Waiver** <br> *Local Rule 4001-2(a)(i)(V)* | None | - |

| SUMMARY OF MATERIAL TERMS OF DIP LOAN | | |
|---|---|---|
| *Term* | *Summary* | *Source* |
| **Provisions that immediately seek to affect the Court's power to consider the equities of the case doctrine under section 552(b)(1) of the Bankruptcy Code**<br>*Local Rule 4001-2(a)(i)(W)* | N/A | - |
| **Provisions that immediately shield the lender from the equitable doctrine of "marshalling" or any similar doctrine**<br>*Local Rule 4001-2(a)(i)(X)* | None | - |

## BASIS FOR RELIEF

**I.      The Debtor Should be Authorized to Obtain Post-Petition Financing Pursuant to Section 364(c) of the Bankruptcy Code.**

> **A.      Entry into the DIP Loan is an Exercise of the Debtor's Sound Business Judgment.**

21.      The Court should authorize the Debtor, as an exercise of its sound business judgment, to enter into the DIP Term Sheet and obtain access to the DIP Loan. Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below. Courts grant a debtor in possession considerable deference in acting in accordance with its business judgment in obtaining post-petition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g., In re Trans World Airlines, Inc.,* 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a post-petition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC,* 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

22.      Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.,* 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.,* 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment

made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code.").

23.     The Debtor's decision to enter into the DIP Loan was the result of reasoned judgment informed by the advice of its seasoned professionals and advisors. More importantly, given that the DIP lender is an insider, the Debtor relied on its Special Committee, which the DIP Lender was not part of, as well as its independent directors, to approve the DIP Loan and the Potential Sale. Given the Debtor's immediate liquidity needs at this critical stage in the Chapter 11 Case, the Debtor believes that the DIP Loan represents the best—and only—viable source of available financing to maintain the enterprise value of the Debtor through the sale process. Accordingly, the Court should authorize the Debtor's entry into the DIP Loan, as it is a reasonable exercise of the Debtor's business judgment.

**B.      Entry into the DIP Loan Also Satisfies the Entire Fairness Standard.**

24.     The Court should authorize the Debtor to enter into the DIP Loan even though the DIP Lender is an "insider" as defined in Section 101(31) of the Bankruptcy Code. While some Bankruptcy Courts have subjected such arrangements to the heightened "entire fairness" standard, the Debtor does not believe that such treatment is appropriate or necessary under prevailing Third Circuit precedent. Moreover, given the seclusion of Dr. Durrant from the Debtor's decision-making, appointment of two independent directors and formation of the Special Committee, the Court should defer to the Debtor's business judgment in all respects.  Nevertheless, the Debtor's actions in negotiating and entering into the DIP Loan more that satisfy the entire fairness standard.

25.     The entire fairness standard consists of "two aspects, fair dealing and fair price, both of which must be examined together in resolving the ultimate question of entire fairness." *Rosenblatt v. Getty Oil Co.,* 493 A.2d 929, 937 (Del. 1985). Fair dealing "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the

directors, and how the approvals of the directors and the stockholders were obtained[.]" *Weinberger v. UP, Inc.*, 457 A.2d 701, 711 (Del. 1983). "Fair price can ... be established by demonstrating that no better alternatives were available." *In re Latam Airlines Grp. S.A.*, 620 B.R. 722, 791 (Bankr. S.D.N.Y. 2020). The Delaware District Court affirmed the Bankruptcy Court's approval of a bankruptcy sale to an insider under the "entire fairness" standard (assuming without deciding that the heightened standard actually applied) where the Bankruptcy Court found that "the sale process was fair and that no better price was available." *Zohar III Corp., et al. v. Tilton et al. (In re Zohar Corp.)*, 2022 WL 11110270, at *3 (D. Del. Oct. 19, 2022).

26.    Ordinarily, the party seeking to consummate the challenged transaction bears the burden of proving entire fairness. *See Kahn v. Lynch Comm'ns Sys., Inc.,* 638 A.2d 1110, 1117 (Del. 1994). But, that burden "shifts . . . entirely" to the challenging party where the challenged transaction was approved by an independent committee of directors. *Rosenblatt,* 493 A.2d at 937. Where a controlling shareholder did not dictate the terms of the transaction and an independent negotiator had real bargaining power which was exercised on an arm's-length basis, the burden to prove unfairness falls to the challenging party. *Kahn,* 638 A.2d at 1117. Indeed, the business judgment rule is set aside only upon a showing that the debtor's directors were uninformed, grossly negligent, or lacking independence. *See In re Los Angeles Dodgers LLC,* 457 B.R. 308, 313 (Bank. D. Del. 2011); *In re Mid-State Raceway, Inc.,* 323 B.R. 40, 58 (Bankr. S.D.N.Y. 2005) ("To overcome the business judgment rule, the entity opposing the decision by the directors must establish that they acted in bad faith or with fraudulent intent.").

27.    Here, the DIP Lender was represented by separate counsel for purposes of negotiating the terms of the DIP Loan and Stalking Horse Bid. More importantly, the Debtor's Special Committee, consisting of two independent directors, one of which is a former Bankruptcy

Judge, approved the DIP Loan. The process that led the Debtor to agree to the DIP Loan was at all times conducted in good faith and at arm's length, the terms of the DIP Loan are likewise fair, and entry into the DIP Loan is in the best interest of the Debtor's estate. The Special Committee, with the assistance of SC&H and the Debtor's legal advisors, tried to obtain a better price for the financing, yet there was no better price to be had under the circumstances.  Moreover, the interest rate and fees associated with the DIP Loan are below market, indicating the arm's-length nature of the negotiations. Given that the proposed financing was the only and best game in town, the Debtor utilized its best corporate precautions to cleanse the sale and financing process through the independent special committee. Accordingly, the Debtor's entry into the DIP Loan satisfies the entire fairness standard to the extent such standard applies.

**C.      The Debtor Should be Authorized to Grant the Liens and Superpriority Claims.**

28.      The Debtor proposes to obtain financing under the DIP Loan by providing the DIP Liens pursuant to Section 364(c)(2) of the Bankruptcy Code. The statutory requirement for obtaining post-petition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c). *See In re Crouse Grp., Inc.,* 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

29.      Courts have articulated a three-part test to determine whether a debtor may obtain financing under section 364(c) of the Bankruptcy Code:

   i.     The debtor is unable to obtain unsecured credit under section 364(b) (i.e., by granting a lender administrative expense priority);

   ii.    the credit transaction is necessary to preserve the assets of the estate; and

> iii.   the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*See In re Los Angeles Dodgers LLC*, 457 B.R. 308 (Bankr. D. Del. 2011); *In re Ames Dep't Stores*, 115 B.R. 34, 37-40 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp.*, 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); *Crouse Grp.,* 71 B.R. at 549.

30.    As described above and as set forth in the DIP Declaration, the DIP Lender was unwilling to provide post-petition financing on an unsecured basis or an administrative expense basis. Absent the DIP Loan, which will provide certainty that the Debtor will have sufficient liquidity to administer the Chapter 11 Case through the Proposed Sale, the value of the Debtor's estate would be significantly impaired to the detriment of all stakeholders, as the DIP Loan is critical to ensuring that the Debtor continues to have sufficient cash to fund its operations, administer the Chapter 11 Case, and preserve its going-concern value. Given the circumstances, the Debtor believes that the terms of the DIP Loan, as set forth in the DIP Term Sheet, are fair, reasonable, and adequate, all as more fully set forth below. For all these reasons, the Debtor submits that it has met the standard for obtaining post-petition financing.

**(i)      The Debtor could not obtain financing on more favorable terms.**

31.    A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.,* 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.,* 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *In re Snowshoe Co.,* 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.,* 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy

court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met). Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989). This is especially true where time is of the essence. *See In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987).

32.    The Debtor does not believe that alternative sources of financing are reasonably available given the exhaustive efforts of SC&H and the Debtor and its advisors to locate such alternative sources of funding. Moreover, the proposed DIP Loan will provide the Debtor with necessary liquidity on terms and conditions more favorable than can be obtained by third-party financing sources. For example, the interest on the DIP Loan is below market and the Debtor is not required to pay certain customary lender and facility fees to obtain the DIP Loan, including upfront fees or commitment fees, that would reduce the amount available to the Debtor.[6] Additionally, the DIP Lender has agreed to serve as the Stalking Horse Bidder for substantially all of the Debtor's assets, which will further maximize the value of the Debtor's estate for the benefit of creditors above and beyond the that will be provided by the DIP Lender.

**(ii)    The proposed financing is necessary to preserve the assets of the Debtor's estate.**

33.    As described above, the Debtor intends to operate its business in the ordinary course while it completes the auction and sale process over the next sixty days. While the Debtor believes that the Proposed Sale is the most value-maximizing strategy moving forward (particularly given

---

[6] The DIP Lender will be entitled to an exit fee equal to 5% of the DIP Obligations only if the DIP Obligations are paid in full by the Debtor and not converted to a Credit Bid.

the existence of the Stalking Horse Bidder), effectuating the Proposed Sale is not without cost. The Debtor cannot operate unless it can fund payments for post-petition rent, payroll, critical services and other operating expenses. Missing just one of these vital payments could have a devastating effect on the Debtor's going concern value and jeopardize the value that the Debtor has spent years creating. The DIP Loan thus is central to the Debtor's strategy in this Chapter 11 Case. Absent approval of the DIP Loan, the Debtor will quickly become administratively insolvent, leading to a conversion of the Chapter 11 Case to a case under Chapter 7 and depressed recoveries for all creditors.

**(iii)    The terms of the proposed financing are fair, reasonable, and appropriate.**

34.    In considering whether the terms of post-petition financing are fair and reasonable, courts consider the terms in light of the relative circumstances and disparate bargaining power of the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).

35.    The terms of the DIP Loan and the proposed DIP Orders were highly negotiated between the Debtor's special committee, with the assistance of the Debtor's advisors, and the DIP Lender, resulting in an agreement designed to permit the Debtor to obtain the needed liquidity to conduct the Proposed Sale. Despite the Debtor's dire liquidity situation, the DIP Lender has offered a lifeline to the Debtor in the form of the DIP Loan coupled with a value-creating Stalking Horse Bid. The Debtor believes that this offer from the DIP Lender is fair, reasonable and appropriate under the circumstances, and should therefore be approved.

**II.      The Scope of the Carve Out is Appropriate.**

36.      The DIP Liens granted under the DIP Loan are subject to the Carve Out. Without the Carve Out, the Debtor and other parties in interest may be deprived of certain rights and powers because the services for which professionals may be paid in these Chapter 11 Case would be restricted. *See In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). The Carve Out does not directly or indirectly deprive the Debtor's estate or other parties in interest of possible rights and powers. Additionally, the Carve Out protects against administrative insolvency during the course of this Chapter 11 Case by ensuring that assets remain for the payment of fees of the Clerk of the Court or the U.S. Trustee, and the estate's professional fees.

**III.      The DIP Loan was Negotiated in Good Faith and the DIP Lender Should Be Afforded the Protection of Section 364(e).**

37.      Under section 364(e) of the Bankruptcy Code, any reversal or modification on appeal of an authorization to obtain credit or incur debt or a grant of priority or a lien under section 364 of the Bankruptcy Code shall not affect the validity of the debt incurred or priority of the lien granted as long as the entity that extended credit "extended such credit in good faith." *See* 11 U.S.C. § 364(e).

38.      Courts generally hold that "good faith" in the context of post-petition financing means, consistent with the Uniform Commercial Code, honesty in fact in the conduct or transaction concerned. *See Ellingsen*, 834 F.2d at 363 (citing U.C.C. § 1-201(19)).

39.      Here, the terms of the DIP Loan were negotiated in good faith and at arm's length by separate representatives of, and counsel for, the Debtor's Special Committee and the DIP

Lender, and reflect the most advantageous terms (including availability, pricing, and fees) available to the Debtor in light of its financial circumstances and need to continue operations through the Proposed Sale. All of the DIP Obligations will be extended by the DIP Lender in good faith (as such term is used in section 364(e) of the Bankruptcy Code). No consideration is being provided to any party with respect to obligations arising under the DIP Term Sheet or in the DIP Orders other than as set forth herein. Moreover, the DIP Loan has been extended in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code and the DIP Lender is entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the Interim DIP Order, the Final DIP Order, or any provision thereof is vacated, reversed, or modified on appeal or otherwise.

**IV.    Modification of the Automatic Stay is Appropriate.**

40.    The proposed DIP Orders provide that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to permit (a) the Debtor and the DIP Lender to implement and perform under the DIP Loan and the DIP Loan Documents, and (b) the creation and perfection of all Liens granted or permitted under the DIP Loan Documents. Under the proposed DIP Orders, the DIP Lender may file any financing statements, security agreements, notices of liens, and other similar instruments and documents to validate and perfect the liens and security interests granted to it under the Interim DIP Order or Final DIP Order, as applicable. The proposed DIP Orders also provide that, following the occurrence of an Event of Default, the automatic stay shall be modified to the extent necessary to permit the DIP Lender to exercise all rights and remedies in accordance with the DIP Loan Documents. Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements, and, in the Debtor's business judgment, are reasonable and fair under the circumstances of the Chapter 11 Case.

## IMMEDIATE RELIEF IS NECESSARY

41.      Bankruptcy Rule 6003 provides that the relief requested in this Motion may be granted if the "relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003. The Debtor submits that for the reasons already set forth herein, the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtor.

## WAIVER OF ANY APPLICABLE STAY

42.      The Debtor also requests that the Court waive any applicable stay of the DIP Orders, including any stay that may be imposed by Bankruptcy Rule 4001(a)(3) and Bankruptcy Rule 6004(h). As described above, the relief that the Debtor seeks in this Motion is necessary for the Debtor to effectuate the Sale and preserve value for its estate. The exigent nature of the relief sought herein justifies immediate relief.[7]

## NOTICE

43.      Notice of this Motion has been or will be provided to: (a) the United States Trustee for the District of Delaware; (b) counsel to the DIP Lender; (c) the holders of the twenty (20) largest unsecured claims against the Debtor; (d) the Internal Revenue Service; (e) the United States Securities and Exchange Commission; (f) the Office of the United States Attorney for the District of Delaware; (g) the financial institutions at which the Debtor's bank accounts are maintained; (h) all parties which, to the best of the Debtor's knowledge, information, and belief, have asserted or may assert a lien in the Debtor's assets; and (i) all parties entitled to notice pursuant to Bankruptcy Rule 2002. Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m). In light of the nature of the relief requested herein, the Debtor submits that no other or further notice is necessary.

---

[7] The Debtor also seeks waiver of the notice requirements of Bankruptcy Rule 6004(a) to the extent applicable.

**WHEREFORE,** the Debtor respectfully requests entry of (i) the Interim DIP Order, substantially in the form attached hereto as <u>Exhibit A</u>, granting the relief requested herein, (ii) the Final DIP Order, and (iii) such other and further relief to the Debtor as is just and proper.


Dated:   January 4, 2024        Respectfully submitted,
       Wilmington, Delaware

*/s/ Aaron H. Stulman*
M. Blake Cleary (No. 3614)
Aaron H. Stulman (No. 5807)
Brett M. Haywood (No. 6166)
Sameen Rizvi (No. 6902)
**POTTER ANDERSON & CORROON LLP**
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Facsimile:  (302) 658-1192
Email:  bcleary@potteranderson.com
       astulman@potteranderson.com
       bhaywood@potteranderson.com
       srizvi@potteranderson.com

*Proposed Counsel to the Debtor and Debtor in Possession*

**Exhibit A**

**(Proposed Interim DIP Order)**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| HUMANIGEN, INC.,[1] | Case No. 24-10003 (___) |
| Debtor. | Re: Docket No. ___ |

**INTERIM ORDER (I) AUTHORIZING THE DEBTOR TO OBTAIN
POST-PETITION FINANCING, (II) GRANTING SENIOR POST-PETITION
SECURITY INTERESTS AND ACCORDING SUPERPRIORITY ADMINISTRATIVE
EXPENSE STATUS PURSUANT TO SECTIONS 364(c) AND 364(d) OF THE
BANKRUPTCY CODE, (III) MODIFYING THE AUTOMATIC STAY, (IV)
SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

Upon the motion (the "**Motion**")[2] of the debtor and debtor in possession (the "**Debtor**") in
the above-captioned chapter 11 case (the "**Chapter 11 Case**"), for entry of an interim order (this
"**Interim DIP Order**") and final order (the "**Final Order**," and together with the Interim DIP
Order, collectively, the "**Orders**") pursuant to sections 105(a), 362, 363, 364, and 507 of title 11
of the United States Code (the "**Bankruptcy Code**"),[3] Rules 2002, 4001, 6003, and 9014 of the
Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 2002-1(b) and
4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy
Court for the District of Delaware (the "**Local Rules**"), *inter alia*:

      (i)      authorizing the Debtor to obtain senior secured post-petition financing on a
superpriority basis consisting of a senior secured superpriority term loan facility including an
interim advance of $1,000,000 which shall be available upon entry of the Interim DIP Order (the
"**Interim Advance**"), and in the aggregate principal amount of up to $2,000,000 available upon

---

[1] The Debtor's mailing address in this chapter 11 case is 533 Airport Boulevard, Suite 400, Burlingame, CA 94010 and the last four digits of the Debtor's federal tax identification number are 7236.

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Motion.

[3] Unless otherwise noted, all statutory references are to the Bankruptcy Code.

entry of the Final Order, subject to the terms of the DIP Term Sheet (the "**Subsequent Advance**," and together with the Interim Advance, collectively the "**DIP Loan**"), pursuant to the terms and conditions of the DIP Loan Documents, by and among the Debtor, as borrower, and Taran Therapeutics, Inc. as lender ("**Taran**," and in such capacity, the "**DIP Lender**"), substantially in the form attached hereto as <u>Exhibit 2</u> (as the same may be amended, restated, supplemented, or otherwise modified from time to time, the "**DIP Term Sheet**" and together with the DIP Order, the "**DIP Loan Documents**");

        (ii)    granting the DIP Superiority Claims and the DIP Liens (each as defined below) to the DIP Lender on all of the DIP Collateral (as defined below) to secure the DIP Loan and all obligations owing and outstanding thereunder and under the DIP Loan Documents, as applicable (collectively, the "**DIP Obligations**"), subject only to Senior Third Party Liens and the Carve Out (in each case, as defined below).

        (iii)    modifying the automatic stay imposed by Section 362 of the Bankruptcy Code solely to the extent necessary to provide the DIP Lender with the relief necessary to implement and effectuate the terms and provisions of the DIP Loan Documents;

        (iv)    scheduling a final hearing (the "**Final Hearing**") for an order approving the Final Order; and

        (v)    granting related relief.

The Court having considered the Motion, the exhibits attached thereto, the First Day Declaration, the *Declaration of Matt LoCascio in Support of Motion of Debtor for Entry of Interim and Final Orders (I) Authorizing the Debtor to Obtain Post-Petition Financing, (II) Granting Senior Post-petition Security Interests and According Superiority Administrative Expense Status Pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code, (III) Modifying the Automatic*

11080225v.12

*Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "**DIP Declaration**"), and the evidence submitted and argument made at the hearing to approve the Motion on an interim basis (the "**Hearing**"); and notice of the Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(c) and (d), and all applicable Local Rules; and the Hearing having been held and concluded; and all objections, if any, to the relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the relief requested in the Motion is necessary to avoid irreparable harm to the Debtor and its estate, and otherwise is fair and reasonable and in the best interests of the Debtor, its estate and all parties-in-interest, and is essential for the continued administration of the Debtor's estate; and it appearing that the Debtor's entry into the DIP Term Sheet is a sound and prudent exercise of the Debtor's business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[4]

A.      On January 3, 2024 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief pursuant to Chapter 11 of the Bankruptcy Code;

B.      The Debtor has continued in the management and operation of its business pursuant to sections 1107 and 1108, and no trustee or examiner has been appointed;

C.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference of the United States District Court for the District of Delaware* dated as February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtor confirms its consent pursuant to Local Rule 9013-1(f) to the entry of an order by the Court in connection with the Motion to the extent that it is later determined

---

[4] To the extent, any findings of fact constitute conclusions of law, they are adopted as such, and vice versa, pursuant to Fed. R. Bankr. P. 7052.

that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409;

D.      As of the date hereof, the United States Trustee for the District of Delaware (the "**U.S. Trustee**") has not yet appointed an official committee of unsecured creditors in this case pursuant to section 1102 (a "**Statutory Committee**");

E.      The Debtor reasonably and in good faith believes that the loans, advances, and other financial accommodations to be obtained pursuant to the DIP Loan are sufficient to fund all projected legitimate and allowable expenses of its Chapter 11 case from the Petition Date during the period to which the Budget (as approved by the DIP Lender) pertains; and

F.      The Debtor is a duly organized, validly existing corporation and has the requisite power and authority to own, lease, and operate its property, including, without limitation, the DIP Collateral. The Debtor has the requisite power and authority to enter into, execute, deliver, and perform its obligations under the DIP Loan Documents and this Interim DIP Order and to incur the obligations provided for thereon. Except as may be explicitly required in the DIP Loan Documents, no consent or waiver of, filing with, authorization, approval or other action by any shareholder, any federal, state, or other governmental authority or regulatory body or any other Person (other than the DIP Lender), which has not already been obtained or done, is required in connection with the execution, delivery and performance by the Debtor of any of the documents required as a condition to the validity or enforceability of the DIP Loan Documents, other than entry by this Court of this Interim DIP Order;

G.      The Debtor is unable to obtain unsecured credit allowable under section 503(b)(1) as an administrative expense necessary to maintain and conduct its business;

11080225v.12

H.       The Debtor is unable to obtain secured credit except under the terms and conditions provided in the DIP Term Sheet and this Interim DIP Order;

I.        All cash of the Debtor, in its possession or hereinafter acquired, wherever located on the Petition Date or thereafter, up to the amount of the DIP Obligations then outstanding, represents (i) proceeds of loans or other financial accommodations provided to the Debtor by the DIP Lender under the DIP Loan or (ii) proceeds of DIP Collateral (collectively, the "**Cash Collateral**").  Cash Collateral constitutes "cash collateral" within the meaning of section 363.

J.        It is in the best interest of the Debtor's estate that it be allowed to enter into the DIP Term Sheet to obtain post-petition secured financing from the DIP Lender, and use the Cash Collateral subject to and in accordance with the terms of this Interim DIP Order and the DIP Loan Documents, under the terms and conditions set forth herein and in the DIP Loan Documents, as such is necessary to avoid immediate and irreparable harm to the Debtor's estate pending the Final Hearing;

K.       The Debtor believes that the extension of credit and financial accommodations under the DIP Loan and DIP Loan Documents are fair, reasonable, in good faith, negotiated at arm's length, reflect the Debtor's exercise of prudent business judgment, and are supported by reasonably equivalent value and fair consideration and the DIP Lender is entitled to the protections of section 364(e);

L.       The Debtor requires access to the funding available under the DIP Loan and the DIP Loan Documents to satisfy administrative expenses associated with the operation of its business as a going concern and other costs relating to the administration of this chapter 11 case, and to avoid immediate and irreparable harm to the Debtor's estate pending the Final Hearing;

M.      After the Petition Date, the DIP Lender is unwilling to consent to use of the DIP Collateral and Cash Collateral by the Debtor, except under the terms of the DIP Loan Documents and this Interim DIP Order assuring that the liens and the various claims, superpriority claims, and other protections granted in this Interim DIP Order will not be affected by any subsequent reversal or modification of this Interim DIP Order or any other order, as provided in section 364(e), which is applicable to the post-petition financing arrangement contemplated in the DIP Loan Documents and the use of Cash Collateral contemplated this Interim DIP Order; and

N.      Good and sufficient cause exists for the issuance of this Interim DIP Order, to prevent immediate and irreparable harm to the Debtor's estate.

Based upon the foregoing, and after due consideration and good cause appearing therefor;

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED that:**

1.      The Motion is granted as set forth herein on an interim basis and all objections to the entry of this Interim DIP Order are, to the extent not withdrawn, hereby overruled.

2.      The Debtor is authorized, pursuant to sections 363 and 364, to enter into the DIP Loan Documents, to execute such other and additional documents necessary or desired to implement the DIP Loan or DIP Loan Documents, to obtain post-petition secured financing from the DIP Lender, and to use the Cash Collateral and the proceeds and products thereof solely in accordance with the Budget, pursuant to the terms and conditions of the DIP Loan Documents and this Interim DIP Order to avoid immediate and irreparable harm to the Debtor's estate pending the Final Hearing. The Debtor shall use the advances obtained under the DIP Loan and the DIP Collateral (including Cash Collateral) only for the purposes and in the amounts set forth in the DIP Term Sheet attached hereto as <u>Exhibit 2</u> and Budget attached hereto as <u>Exhibit 1</u>, subject to the terms and conditions set forth in the DIP Loan Documents. The DIP Lender shall have no

11080225v.12

obligation to make DIP Loan advances in excess of the amounts and times set forth in the Budget and DIP Loan Documents.

3.      Attached hereto as <u>Exhibit 1</u> is a budget with expense and cash flow projections for the Debtor for the 13-week period beginning on the Petition Date, to be updated every four (4) weeks on a rolling basis, with reconciliation on a line-item basis of actual results to projections, and with narrative explanations prepared by the Debtor of any material variances, to be certified by a responsible officer of the Debtor and approved in form and substance by the DIP Lender (once so approved, and subject to any update as may be approved by the DIP Lender, the "**Budget**"). With respect to the Budget, the Debtor's actual cash disbursements from operations shall each be adhered to, on a line item basis, on a weekly basis and a cumulative basis for the Budget period then ending; *provided, however*, that amounts not disbursed in a line item shall be deemed to roll over to subsequent weeks until the aggregate amount of such line item is exhausted and each line item shall be subject to the greater of (i) 10% variance measured on a two (2) week cumulative basis, or (ii) $10,000.

4.      No proceeds of the DIP Loan or Cash Collateral shall be used to (a) permit the Debtor or any other party-in-interest to challenge or institute any proceeding to determine (i) the validity, perfection, or priority of any security interests in favor of the DIP Lender or (ii) the enforceability of the Debtor's obligations under the DIP Loan Documents; (b) investigate, commence, prosecute or defend (or support any other person or entity in investigating, commencing, prosecuting, or defending) any claim, motion, proceeding or cause of action against the DIP Lender or any of its agents, attorneys, advisors or representatives, including, without limitation, claims or causes of action relating to lender liability or subordination claims; (c) investigate, commence, prosecute, or defend (or support any other person or entity in

7

investigating, commencing, prosecuting, or defending) any claim or proceeding or cause of action to disallow or challenge the obligations of the Debtor under the DIP Loan Documents, or (d) fund any acquisitions, capital expenditures, capital leases, or similar expenditures other than those specifically set forth in the Budget for this Paragraph 4(d).

5.      Pursuant to sections 363 and 364(c) and (d), the Interim Advance shall be an allowed administrative expense of the Debtor's estate, which shall have priority in payment over any other indebtedness and/or obligations now in existence or incurred hereafter by the Debtor and over all administrative expenses or charges against property arising in the Debtor's Chapter 11 case and any superseding Chapter 7 case including, without limitation, those specified in Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to the entry of the Final Order), 507(a), 507(b), 726, 1113 or 1114, subject and junior only to the Carve Out (as hereinafter defined) (such claim, the "**DIP Superpriority Claim**").  The time of payment of the Interim Advance shall not be altered, extended or impaired without the consent of the DIP Lender by any plan or plans of reorganization that may hereafter be accepted or confirmed or any further orders of the Court which hereafter may be entered.

6.      The DIP Lender is authorized and directed to fund $1,000,000 in an Interim Advance upon entry of this Interim DIP Order with the remaining availability under the DIP Loan payable in accordance with the DIP Term Sheet.

7.      The DIP Fees are approved and shall be payable in accordance with the DIP Term Sheet.

8.      The DIP Lender shall be entitled to payment of its actual and necessary attorneys' fees and expenses incurred prior to the Petition Date immediately upon entry of the Interim DIP Order.  The DIP Lender shall be entitled to payment of its actual and necessary attorney's fees and

8

expenses incurred on or after the Petition Date by the Debtor with the proceeds of the DIP Loan; *provided*, that (a) the U.S. Trustee and the Committee, should one be appointed, shall have ten (10) days from receipt to review the summary legal invoices of such counsel to object, and (b) in the event the U.S. Trustee or Committee files with this Court an objection to any such legal invoice within ten (10) days of its receipt thereof, the undisputed portion of such legal invoice shall be paid without further order of the Court whereas the portion of such legal invoice subject to such objection shall not be paid until resolution of such objection by this Court, and (c) in the event neither the U.S. Trustee nor the Committee shall file with this Court an objection to any such legal invoice within ten (10) days of its receipt thereof, such legal invoice shall be paid without further order of the Court and shall not be subject to any further review, challenge or disgorgement.

9.      Pursuant to sections 363, 364(c), and 364(d) of the Bankruptcy Code, as security for the use of Cash Collateral, the Interim Advance, and other post-petition costs payable under the DIP Loan Documents, the Debtor is hereby authorized to and is hereby deemed to grant to the DIP Lender a valid, binding and enforceable lien, mortgage and/or security interest (a "**Lien**," and as so granted to the DIP Lender, the "**DIP Lien**") in all of the Debtor's presently owned or hereafter acquired property and assets, whether such property and assets were acquired before or after the Petition Date, of any kind or nature, whether real or personal, tangible or intangible, wherever located, and the proceeds and products thereof (collectively, the "**DIP Collateral**"), excluding any causes of action that could be brought pursuant to sections 544, 545, 547, 548 of the Bankruptcy Code, or any applicable state fraudulent transfer statutes (the "**Avoidance Actions**"); *provided*, *however*, that, subject to entry of the Final Order, the proceeds of (and property received in respect of) such Avoidance Actions ("**Avoidance Proceeds**") is included in the DIP Collateral on which the DIP Lender has a DIP Lien.

10.     Pursuant to sections 364(c) and (d), the DIP Lien shall be a first priority senior lien on the DIP Collateral, subject and junior only to (a) the Carve Out and (b) valid, enforceable, properly perfected, and unavoidable prepetition Liens (including any Liens that are perfected after the Petition Date that are afforded priority due to the express relation back of the perfection of such lien to a date prior to the Petition Date as permitted by Bankruptcy Code section 546(b)) ("**Senior Third Party Liens**").  The DIP Lien shall not be subject or subordinate to any Lien which is avoided and which would otherwise be preserved for the benefit of the Debtor's estate under section 551, and in no event shall any person or entity who pays (or causes to be paid) any of the DIP Obligations be subrogated, in whole or in part, to any rights, remedies, claims, privileges, liens or security interests granted to or in favor of, or conferred upon, the DIP Lender by the terms of the DIP Loan Documents until such time as the obligations under the DIP Loan Documents and this Interim DIP Order are indefeasibly paid in full, in cash. The DIP Lien shall not be subject or subordinate to Liens arising after the Petition Date, other than Liens granted pursuant to this Interim DIP Order to the extent set forth in this Interim DIP Order.

11.     All rents, income, profits, cash in accounts and deposits derived from the DIP Loan constitute Cash Collateral.  Provided that each of the conditions set forth in this Paragraph are satisfied, the Debtor shall be authorized to use the Cash Collateral only in accordance with the terms of the Budget, this Interim DIP Order, and the other DIP Loan Documents.  The satisfaction of each of the following conditions shall constitute a condition to the Debtor's authorization to use any Cash Collateral: (i) no Event of Default under (and as defined in the DIP Term Sheet) shall exist or be continuing; and (ii) the Maturity Date (as defined in the DIP Term Sheet) shall not have occurred.  If, on any date, any of such conditions is not satisfied, then the Debtor shall not be authorized to use any Cash Collateral.  Absent further order of the Court, if the Maturity Date

10

occurs, then the Debtor shall remit to the DIP Lender, subject to payment of the Carve Out, any Cash Collateral then in the Debtor's possession for application to the DIP Obligations.

12.     The automatic stay provisions of section 362 are hereby modified to permit (a) the Debtor and the DIP Lender to implement and perform under the DIP Loan and the DIP Loan Documents, and (b) the creation and perfection of all Liens granted or permitted by this Interim DIP Order.  The Debtor and the DIP Lender shall not be required to enter into any additional security agreements to create, memorialize, and/or perfect any such liens, or to file UCC financing statements, mortgages, or other instruments with any other filing authority or take any other action to perfect any such Liens, which shall be and are deemed valid, binding, enforceable and automatically perfected by the docket entry of this Interim DIP Order by the Clerk of the Court. If, however, the DIP Lender, in its sole and absolute discretion elects for any reason to enter into, file, record or serve any such financing statements or other documents with respect to any such Lien, then the Debtor shall execute same upon request and the filing, recording or service thereof (as the case may be) shall be deemed to have been made at the time and on the date of the docket entry of this Interim DIP Order by the Clerk of the Court.  The DIP Lender is hereby relieved of any requirement to file proofs of claim in the Debtor's bankruptcy case, but may in its sole and absolute discretion, file any such proof of claim.

13.     The DIP Liens and DIP Superpriority Claims shall be subject to right of payment of the following expenses (the following subparagraphs, collectively, the "**Carve Out**"):

A.     unpaid post-petition fees and expenses of the Clerk of the Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930;

B.     subject to the limits set forth in this Interim DIP Order, accrued and unpaid post-petition fees and expenses of professionals of the Debtor and professionals of a

11080225v.12

Statutory Committee (if any), which are retained by an order of the Court pursuant to sections 327, 328, 363 or 1103(a) of the Bankruptcy Code (the "**Chapter 11 Professionals**"), but only to the extent such fees and expenses are (i) incurred prior to a Termination Event, (ii) within the amounts set forth in the Budget approved by the DIP Lender for such Chapter 11 Professional as of the date of the Termination Event, and (iii) subsequently allowed by the Bankruptcy Court under sections 330, 331, or 363 of the Bankruptcy Code, which Chapter 11 Professional fees will be advanced by the DIP Lender into escrow on a weekly basis into a segregated account (the "**Funded Reserve Account**") held by Potter Anderson & Corroon LLP in trust for the benefit of the Chapter 11 Professionals pursuant to the amounts set forth in the Budget; and

C.      post-petition fees and expenses of the Chapter 11 Professionals incurred after a Termination Event in an aggregate amount not to exceed $50,000, to the extent such fees and expenses are subsequently allowed by the Bankruptcy Court under sections 330, 331, or 363 of the Bankruptcy Code; provided, however, that (a) the Carve Out shall only be available to pay fees and expenses set forth herein to the extent that unencumbered funds are not otherwise available; and (b) in no event shall the Carve Out for each Chapter 11 Professional exceed the amounts for post-petition fees set forth for such Chapter 11 Professional in the Budget as of the date of such Termination Event.  Any amounts paid from the DIP Collateral or the proceeds thereof, or funded by the DIP Lender with respect to the Carve Out prior to the entry of the Final Order shall be Interim DIP Advances and such obligations shall be secured by the DIP Lien.  As used in this Interim DIP Order, the term "**Termination Event**" shall mean the occurrence of the earlier of: (i) an Event of Default under the DIP Loan; or (ii) the Debtor's failure to comply with the terms of the

12

DIP Loan Documents (including, without limitation, its failure to comply with the Budget, subject to any approved variances).  Further, the payment of the fees or costs of any Chapter 11 Professional shall be subject to Court approval, and the DIP Lender reserves the right to object to any Chapter 11 Professional's application for payment.

14.    The Debtor shall use the funds held in the Funded Reserve Account exclusively to pay allowed fees of the Chapter 11 Professionals and other obligations included within the Carve-Out as they become allowed and payable pursuant to the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any interim or final orders of this Court.

15.    Neither the payment of any Chapter 11 Professional fees, nor the Carve Out shall include payment for any fees and expenses, if any, of the Chapter 11 Professionals incurred directly or indirectly, in respect of, arising from or relating to:

A.    the initiation, joinder or prosecution of any action contesting the indebtedness owed to DIP Lender, or the validity of any liens granted to the DIP Lender;

B.    preventing, hindering or otherwise delaying (or supporting any other person or entity in preventing, hindering or otherwise delaying), whether directly or indirectly, the exercise by DIP Lender of any of its rights and remedies under the DIP Order, Final Order, or DIP Loan Documents;

C.    the commencement, support, or prosecution of any action or proceeding of any claims, causes of action or defenses against the DIP Lender or any of its respective officers, directors, employees, agents, attorneys, affiliates, successors or assigns;

D.    any request to borrow money other than pursuant to the terms of the Interim DIP Order, the Final Order, or the DIP Loan Documents;

13

E.      with respect to the Debtor, any of the Debtor's Chapter 11 Professionals, or any of their successors or assigns (including, without limitation, any trustee, responsible officer, examiner, estate administrator or representative, or similar person appointed in a case for the Debtor under any chapter of the Bankruptcy Code) performing or commencing any investigation or litigation (whether threatened or pending) by the Debtor with respect to any matter to be released, waived or specified as not subject to challenge by the Debtor pursuant to this Interim DIP Order or the Final Order; or

F.      For any other purpose for which proceeds of the DIP Loan may not be used pursuant to the DIP Term Sheet.

16.     Subject to entry of the Final Order, effective as of the time of commencement of the Debtor's bankruptcy case on the Petition Date:

A.      No costs or expenses of administration which have or may be incurred in the Chapter 11 Case at any time shall be charged against or recovered from the DIP Lender, its respective claims or the DIP Collateral pursuant to Section 506(c) of the Bankruptcy Code without the prior written consent of the DIP Lender, and no such consent shall be implied from any other action, inaction or acquiescence by the DIP Lender;

B.      In no event shall the DIP Lender be subject to the equitable doctrine of "marshalling" or any similar doctrine with respect to the DIP Collateral, and the DIP Lender shall be entitled to all of the rights and benefits of Section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under Section 552(b) of the Bankruptcy Code shall not apply to the DIP Lender with respect to proceeds, products, offspring or profits of any of the DIP Collateral.

17.     So long as the DIP Obligations remain outstanding, unless consented to in writing by the DIP Lender, the Debtor shall not seek entry of any further orders in its Chapter 11 Case which authorize (a) under section 363 of the Bankruptcy Code, the use of Cash Collateral; (b) the obtaining of credit or the incurring of indebtedness pursuant to sections 364(c) or 364(d) of the Bankruptcy Code that does not repay the DIP Loan in full, in cash, (c) the return of goods pursuant to section 546(h) of the Bankruptcy Code to any creditor of the Debtor or to consent to any creditor taking any setoff against any of such creditor's prepetition indebtedness based upon any such return pursuant to section 553 of the Bankruptcy Code or otherwise, or (d) any other grant of rights against the Debtor and/or its estate that is secured by a Lien in the DIP Collateral or is entitled to superpriority administrative status that does not repay the DIP Loan in full, in cash.

18.     Upon the occurrence of: (i) an Event of Default (as such term is defined in the DIP Term Sheet); (ii) the Debtor's failure to comply with the terms of this Interim DIP Order or the Final Order (including, without limitation, its failure to comply with the Budget, subject to any approved variances); or (iii) the Debtor's failure to comply with any of the Milestones set forth in the DIP Term Sheet, unless waived in writing by the DIP Lender, and the giving of written notice thereof by the DIP Lender to counsel to the Debtor, the Statutory Committee (if any), and the U.S. Trustee (which notice may be given by any manner of electronic transmission, the automatic stay being deemed lifted for such purpose) (the "**Default Notice**"), then (i) the DIP Lender shall be fully authorized, in its sole discretion to cease making DIP Loan advances to the Debtor, (ii) the DIP Lender shall be fully authorized, in its sole discretion to terminate the Debtor's use of the DIP Collateral (including without limitation Cash Collateral) pursuant to this Interim DIP Order and the Budget, and/or (iii) the DIP Lender shall be fully authorized, in its sole discretion to

15

immediately terminate the DIP Loan and demand repayment of the DIP Obligations then outstanding.

19.     Further, upon the occurrence of an Event of Default and transmission of a Default Notice or upon the Termination Date, the Debtors, the Statutory Committee (if any), and the U.S. Trustee shall have five (5) business days from the date of transmission of the Default Notice (the "**Remedy Notice Period**") to obtain an order of the Court on notice to the DIP Lender (a) enjoining or restraining the DIP Lender from taking action or exercising rights and remedies based upon the Event of Default specified in the Default Notice; (b) challenging whether an Event of Default in the Default Notice has occurred or is continuing without cure; or (c) any other relief that the Court deems necessary and appropriate (a "**Restraint on Remedies**"). During the Remedy Notice Period, the DIP Lender shall refrain from exercising its rights and remedies under the Interim DIP Order.  Immediately upon expiration of the Remedy Notice Period unless a Restraint on Remedies has timely been obtained from the Court, or with respect to and upon the Maturity Date, immediately:  the DIP Lender shall have the right, free of the restrictions of section 362 or under any other section of the Bankruptcy Code or Bankruptcy Rules (including, without limitation, Bankruptcy Rule 4001(a)), to exercise contractual, legal and equitable rights and remedies as to all or such part of the DIP Collateral as it shall elect, and to apply the proceeds of the DIP Collateral to the repayment of the DIP Loan obligations.

20.     Upon the earlier to occur of (i) the indefeasible payment, in full, in cash, of all DIP Obligations and (ii) conversion of the DIP Obligations to a credit bid in accordance with the DIP Term Sheet, the DIP Lender shall be released from any and all obligations, actions, duties, responsibilities, and causes of action arising or occurring in connection with or related to the DIP Loan Documents.

21.     This Order shall be binding upon and inure to the benefit of the DIP Lender, the Debtor, and their respective successors and assigns, including, without limitation, any trustee, responsible officer, examiner, estate administrator or representative, or similar person appointed in a case for the Debtor under any chapter of the Bankruptcy Code. Except as set forth herein with respect to the Carve Out, no rights are created under this Interim DIP Order for the benefit of any creditor of the Debtor, any other party in interest in the Debtor's bankruptcy case, or any other persons or entities, or any direct, indirect or incidental beneficiaries thereof.

22.     Any order dismissing this Chapter 11 Case under section 1112 or otherwise shall be deemed to provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (a) the DIP Lender's DIP Liens and security interests in the DIP Collateral shall continue in full force and effect notwithstanding such dismissal until the DIP Obligations are indefeasibly paid and satisfied in full, in cash; and (b) this Court shall retain jurisdiction, to the extent permissible under applicable law, notwithstanding such dismissal, for the purposes of enforcing the DIP Superpriority Claim and the DIP Liens.

23.     To the extent that any of the provisions of this Interim DIP Order shall conflict with any provisions of the DIP Term Sheet, or with any order of the Court authorizing the Debtor to continue the use of prepetition bank accounts, cash management systems, business forms, or any similar orders, this Interim DIP Order is deemed to control and supersede the conflicting provisions therein, interpreted as most consistent with the terms and provisions of the DIP Loan Documents.

24.     The terms and conditions of this Interim DIP Order shall be effective and immediately enforceable upon its entry by the Clerk of the Court notwithstanding any potential application of Fed. R. Bankr. P. 6004(h) or otherwise. Furthermore, to the extent applicable, the

11080225v.12

notice requirements and/or stays imposed by Fed R. Bankr. P. 4001(a)(3), 6003(b), and 6004(a) are hereby waived for good and sufficient cause.

25.     Nothing in this Interim DIP Order shall preclude the Court from entering a Final Order containing provisions inconsistent with or contrary to the provisions of this Interim DIP Order; *provided, however*, that the DIP Lender shall be entitled to the benefits and protections of this Interim DIP Order, including the protections afforded pursuant to section 364(e), with respect to all loans, advances, and other financial, accommodations made by it pursuant to this Interim DIP Order.  The DIP Lien and the priority afforded the Interim Advance as set forth in this Interim DIP Order, shall be binding on the Debtor and any successor trustee or trustees even if this Interim DIP Order is reversed or modified on appeal with respect to all loans, advances, and other financial accommodations made by them pursuant to this Interim DIP Order. Except as provided herein, no Proceeds, Cash Collateral or Carve Out may be used by any party in interest seeking to modify any of the rights granted to DIP Lender hereunder or in the DIP Loan Documents.

26.     The Debtor and the DIP Lender may implement non-material modifications of the DIP Term Sheet without the need for notice or further approval of the Court; *provided, however*, that copies of such amendments will be provided to the U.S. Trustee and the Statutory Committee (if any).  The Debtor and the DIP Lender may implement material modifications of the DIP Term Sheet on at least seven (7) calendar days prior notice to the Statutory Committee (if any) and the U.S. Trustee, and any proposed material modification that is objected to within such period shall only be implemented to the extent approved by the Court.

27.     The Debtor is authorized to do and perform all acts, to make, execute and deliver all instruments and documents, and to pay all fees and expenses that may be required or necessary for the Debtor's performance under this Interim DIP Order or the DIP Loan Documents, including,

without limitation, (a) the execution of the DIP Loan Documents, (b) the payment of the fees and other expenses described herein or in the DIP Loan Documents as such become due.

28.     The Court has considered and determined the matters addressed herein pursuant to its powers under the Bankruptcy Code, including the power to authorize the Debtor to obtain credit on terms and conditions to which the Debtor and DIP Lender have agreed. Thus, each of the terms and conditions constitutes a part of the authorization under sections 364 of the Bankruptcy Code, and is, therefore, subject to the protections contained in section 364(e) of the Bankruptcy Code, regardless of (i) any stay, modification, amendment, vacation, or reversal of this Interim DIP Order or the DIP Loan Documents or any term hereunder or thereunder; (ii) the failure to obtain a final order pursuant to Bankruptcy Rule 4001(c)(2), or (iii) the dismissal or conversion of this Chapter 11 Case.

29.     Upon entry of the Final Order, the DIP Lender shall have the right to credit bid the DIP Obligations in connection with any sale of the DIP Collateral in which such parties hold a security interest conducted pursuant to a plan of reorganization subject to confirmation under section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code or pursuant to the provisions of section 363 of the Bankruptcy Code.  No sale of any DIP Collateral shall constitute a waiver by the DIP Lender of any deficiency claim under any applicable law, regardless of whether the DIP Lender consents to or opposes such sale and regardless of whether the DIP Obligations are credit bid in connection with such sale.

30.     <u>Reservations to Final Order</u>.  Notwithstanding language in this Interim Order that provides that certain relief is subject to or conditioned upon entry of a Final Order, such provisions are not intended to be automatically effective and are without prejudice to rights of parties-in-interest to object to the relief on a final basis and the Court's authority to determine the final relief.

31.     The Final Hearing with respect to the Motion is scheduled for _____**, 2024 at __:_0 _.m. (prevailing Eastern Time)**. The Debtor shall promptly mail copies of this Interim DIP Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing and to any other party that has filed a Rule 2002 request for service. Any party in interest objecting to the relief sought at the Final Hearing shall file written objections, and serve them on (i) the Debtor's proposed counsel, Potter Anderson & Corroon LLP, 1313 North Market Street, 6th Floor, Wilmington, Delaware 19801 (Attn: M. Blake Cleary (bcleary@potteranderson.com) and Aaron H. Stulman (astulman@potteranderson.com)); (ii) the DIP Lender's counsel, Pashman Stein Walder Hayden, P.C., 1007 North Orange Street, 4th Fl., #183, Wilmington, Delaware 19801 (Attn: Joseph C. Barsalona II (jbarsalona@pashmanstein.com) and Henry Jaffe (hjaffe@pashmanstein.com)); and (iii) the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801 (Attention: Hannah McCollum (Hannah.McCollum@usdoj.gov)), **on or before 4:00 p.m. (prevailing Eastern Time) on [●], 2024**.

**<u>Exhibit 1</u>**

**Interim Approved Budget**

(See Attached)

## Humanigen, Inc.
*Use of Proceeds $(000's)*

| | Bankruptcy Period through Closing | | | | | | | | Post Closing | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | W/E 01/05 | W/E 01/12 | W/E 01/19 | W/E 1/26 | W/E 2/2 | W/E 2/9 | W/E 2/16 | W/E 2/23 | W/E 3/1 | W/E 3/8 | W/E 3/15 | W/E 3/22 | W/E 3/29 | Total |
| Compensation Humanigen Inc | | $ 40 | | | $ 40 | | $ 40 | $ 22 | | | $ 14 | | $ 14 | $ 170 |
| Medical Premiums | 4 | 10 | | | | 4 | 10 | | | 2 | 3 | | | 33 |
| Legal Counsel | 100 | 50 | 50 | 50 | 50 | 50 | 50 | 100 | 10 | 10 | 10 | 10 | 10 | 550 |
| Cure Costs | | | | | | | | 490 | | | | | | 490 |
| DIP Loan Interest | | | | | | | | 5 | | | | | | 5 |
| DIP Lender Legal Counsel | 160 | | | | | | 50 | 60 | | | | | | 270 |
| Exit Fee | | | | | | | | | | | | | | - |
| Patent Legal Costs | 10 | | 20 | | 20 | | 20 | | | | | | | 70 |
| Claims Agent | | | | | | 50 | | 24 | | | | | 15 | 89 |
| Committee | | | | | 50 | | | 50 | | | | | | 100 |
| UST Fees | | | 20 | | | | | 20 | | | | | 10 | 50 |
| SC & H | | 20 | | | | 20 | | 200 | | | | | | 240 |
| Vendors - Ongoing Operations | | | 65 | | | 75 | 20 | | | | | | | 160 |
| Consultants | 5 | | 10 | | 5 | | 10 | 5 | | | | | 5 | 40 |
| Insurance | | | | | | | | | | | | | | - |
| Software & IT | | 2 | | | 2 | | 2 | 1 | | 2 | | | 2 | 11 |
| Other Dev & Infrastructure, Travel | | 5 | | | 5 | | 5 | 5 | | | 5 | | 5 | 30 |
| **Total Spend** | $ 279 | $ 127 | $ 165 | $ 50 | $ 172 | $ 249 | $ 157 | $ 982 | $ 10 | $ 14 | $ 32 | $ 10 | $ 61 | 2,308 |
| | | | | | | | | | | | | | | |
| **Beginning Cash** | $ 65 | $ 786 | $ 659 | $ 494 | $ 1,544 | $ 1,442 | $ 1,193 | $ 1,036 | $ 1,054 | $ 1,044 | $ 1,030 | $ 998 | $ 988 | $ 65 |
| | | | | | | | | | | | | | | |
| Insurance proceeds | | | | 1,100 | | | | | | | | | | 1,100 |
| DIP Loan/Repayment | 1,000 | | | | | | | (1,000) | | | | | | - |
| Delaware tax refund | | | | | 70 | | | | | | | | | 70 |
| Purchase Price | | | | | | | | 2,000 | | | | | | 2,000 |
| Use of Proceeds Above | (279) | (127) | (165) | (50) | (172) | (249) | (157) | (982) | (10) | (14) | (32) | (10) | (61) | (2,308) |
| | | | | | | | | | | | | | | |
| **Ending Cash** | $ 786 | $ 659 | $ 494 | $ 1,544 | $ 1,442 | $ 1,193 | $ 1,036 | $ 1,054 | $ 1,044 | $ 1,030 | $ 998 | $ 988 | $ 927 | 927 |

**Exhibit 2**

**DIP Term Sheet**

(See Attached)

## DIP FINANCING TERM SHEET

JANUARY 3, 2024

BORROWER:   Humanigen, Inc., in all capacities, including, but not limited to its capacity as debtor in possession (the "Debtor").

LENDER:   All references to "DIP Lender" in this term sheet means Taran Therapeutics Inc. or an affiliate thereof.

BANKRUPTCY CASE:   The voluntary Chapter 11 bankruptcy proceeding (the "Bankruptcy Case") that Debtor will commence in the United States Bankruptcy Court for the District of Delaware ("Bankruptcy Court") on or around January 3, 2024 (the "Petition Date").

FACILITY:   A superpriority senior secured priming term loan facility (the "DIP Facility," and the term loans to be made thereunder, the "DIP Loans") secured by the Collateral (defined below) in the maximum aggregate amount of $2,000,000.00 (the "DIP Facility Amount").

AVAILABILITY:   An advance of $1,000,000 (the "Initial Advance") shall be made available upon entry of an interim order approving the DIP Facility (the "Interim DIP Order").

After entry of a final order approving the DIP Facility (the "Final DIP Order," and with the Interim DIP Order, collectively the "DIP Orders"), subject to the Closing Conditions (defined below), the DIP Lender shall make a subsequent advance (the "Subsequent Advance") up to the DIP Facility Amount.  The DIP Facility Amount, plus all interest, fees and expenses, are hereinafter referred to as the "DIP Obligations".

INTEREST RATE:   Non-default:  5.0%, which shall be accrued and payable upon maturity of the DIP Loans.

Default:  An additional 2.0% payable in cash monthly in arrears.

DIP FEES:   EXIT FEE:  DIP Lender shall be entitled to an exit fee equal to 5% of the DIP Obligations only if the DIP Obligations are paid in full by the Debtor and not converted to a Credit Bid (as defined below).

ATTORNEYS' FEES AND EXPENSES: DIP Lender shall be entitled to payment of its actual and necessary attorney's fees and expenses in its capacity as DIP Lender under the terms of the DIP Orders for all services rendered prior to and after the Petition Date through the Maturity Date; provided, however, that any amounts sought by the DIP Lender above the amounts set forth in the Approved Budget that is attached to the DIP Motion shall be a deduction from the Cure Cap (as that term is defined in the asset purchase agreement between Taran Therapeutics Inc. and Debtor dated January 3, 2024.

| | |
|---|---|
| <u>PURPOSE</u>: | Subject to the Bankruptcy Court's approval, this is a <u>binding</u> term sheet between DIP Lender and the Debtor regarding debtor in possession financing ("<u>DIP Financing</u>") for the Debtor in a forthcoming Chapter 11 bankruptcy proceeding in the Bankruptcy Court. |
| | DIP Lender would provide the DIP Financing up to the DIP Financing Amount to provide working capital to the Debtor in accordance with the Approved Budget (as defined below). |
| <u>LOAN DOCUMENTS</u>: | This DIP Financing Term Sheet and the DIP Orders shall constitute the loan documents (the "<u>Loan Documents</u>") memorializing the DIP Financing. |
| <u>CREDIT BID</u>: | The DIP Lender (upon entry of the Final DIP Order) will have the unqualified right, in accordance with the terms of the Loan Documents, to credit bid up to the full amount of the DIP Obligations (each such bid, a "<u>Credit Bid</u>"), in each case pursuant to section 363(k) of the Bankruptcy Code, in any sale or transfer of Collateral authorized by the Bankruptcy Court pursuant to section 363, 725, or 1123 of the Bankruptcy Code. |
| <u>DIP FINANCING MATURITY</u>: | "Maturity Date" for the DIP Financing will be the earlier to occur of (i) five (5) months after the Petition Date, (ii) the closing of a sale of substantially all of the assets of the Debtor under the terms of the Purchase and Sale Documents, and (iii) the occurrence of any event of default to be set forth in the DIP Orders ("<u>Event of Default</u>") including, without limitation, (a) failure to achieve a Bankruptcy Milestone as set forth below, (b) dismissal or conversion of the Bankruptcy Case, (c) the filing by Debtor and/or confirmation of a Plan in the Bankruptcy Case which does not provide for payment in full of this DIP Facility, (d) the filing by Debtor of a sale motion and/or approval of a sale or licensing of any of the Collateral, including, without limitation, Debtor's IP rights, which is not subject to the 363 auction, (e) appointment of a Chapter 11 trustee, (f) entry of any order in the Bankruptcy Case granting a senior lien on the Collateral to any person or entity other than DIP Lender, (g) failure to obtain a DIP Order as set forth below entered by the Bankruptcy Court, and (h) judgment or settlement that results in more than $150,000 debit to the cash resources of the Debtor without the DIP Lender's consent, which shall not be unreasonably withheld. |
| <u>USE OF PROCEEDS</u>: | Advances under the DIP Financing will be used by the Debtor for working capital purposes and for other costs of the Debtor, including, but not limited to, all allowed administrative expenses through the Maturity Date, all in accordance with the Approved Budget (as defined below), and in accordance with the terms and conditions of the DIP Orders. |
| <u>COLLATERAL</u>: | The Loan Documents grant DIP Lender superpriority senior secured and priming security interests, mortgages, and/or deeds of trust, in and liens on, all real and personal property of the Debtor and its estate of any kind or nature whatsoever, tangible, intangible or mixed, now |

existing or hereafter acquired or created, whether existing before or arising after the commencement of the Bankruptcy Case including full rights to lenzilumab, ifabotuzumab and HGEN005 Assigned Assets (the "<u>Collateral</u>").

<table>
<tr><td><u>CONDITIONS<br>PRECEDENT<br>TO CLOSING DATE:</u></td><td>

The closing of the DIP Financing (the date of such closing, the "<u>Closing Date</u>") shall be subject to the satisfaction (or waiver) of the following customary conditions precedent (the "<u>Closing Conditions</u>"):

(i)   The DIP Orders, in form and substance satisfactory to the DIP Lender, shall have been entered by the Bankruptcy Court, shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed.

(ii)  Entry into a purchase agreement, and any other documents ("<u>Purchase and Sale Documents</u>") as DIP Lender may require in connection with the sale of substantially all the Debtors' assets as are appropriate for a transaction of this type, all of which shall be in form and substance acceptable to DIP Lender in its sole discretion.

(iii) A motion to approve the bidding procedures shall be filed in form and substance reasonably satisfactory to the DIP Lender.

(iv)  No trustee or examiner having expanded powers shall have been appointed with respect to the Bankruptcy Case.

(v)   Immediately prior to, and after giving effect to, the making of the DIP Loans, there shall exist no default under the Loan Documents.

(vi)  The Maturity Date shall not have occurred.

(vii) The making of the DIP Loans shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently.

(viii)   The making of the DIP Loans shall not result in the aggregate outstanding obligations under the DIP Facility exceeding the amount authorized by orders entered by the Bankruptcy Court or the DIP Orders, as applicable.

(ix)  The Debtor shall have paid all fees and expenses payable pursuant to the Loan Documents and incurred as of the Closing Date, which may be paid from proceeds of DIP Financing.

</td></tr>
<tr><td><u>CONDITIONS<br>PRECEDENT TO<br>SUBSEQUENT ADVANCE:</u></td><td>

The obligations of the DIP Lender to make the Subsequent Advance after entry of the Final DIP Order shall be subject to the satisfaction (or waiver) of the following customary conditions precedent:

</td></tr>
</table>

3

(i)   All Closing Conditions have been met.

(ii)  In the event the Debtor receives insurance payments as a result of impairments to lenzilumab product by Catalent (the "Catalent Insurance Payments"), the exhaustion in full of the Insurance Payments.

(iii) It is determined by December 31, 2023, that the Catalent Insurance Payments will not be made available to the Debtor.

BANKRUPTCY
MILESTONES:                Each of the following shall constitute a milestone (each, a "Bankruptcy Milestone"):

- On or before January 5, 2024, Debtor shall have signed this Term Sheet;
- On or before the Petition Date, Debtor shall have signed definitive documentation for the DIP Financing and Purchase and Sale Documents and filed its Chapter 11 case and filed a Motion to approve the DIP Financing and Purchase and Sale Documents;
- Entry of the Interim DIP Order within three (3) days of the Petition Date;
- Entry of an order approving the procedures for bidding on substantially all of the assets of the Debtor on or before 23 days from the Petition Date;
- Bids for substantially all of the of the Debtor's assets on or before 45 days from the Petition Date;
- Entry of the Final DIP Order on or before 35 days from the Petition Date;
- Entry of an order approving substantially all of the Debtor's assets on or before 60 days after the Petition Date;
- Closing of sale of substantially all of the assets of the Debtor on or before 70 days after the Petition Date.

DIP ORDERS:                The DIP Financing shall be subject to and contingent upon approval of the Bankruptcy Court in the DIP Orders, substantially in the form attached hereto as Exhibit A, and acceptable to DIP Lender in its sole and absolute discretion. The DIP Orders will, among other things, adjudicate (i) all indebtedness under the DIP Loans to have "super-priority" claim status under Bankruptcy Code §§ 364(c)(1) and 507(b), and (ii) the DIP Obligations to be fully secured as stated below under Bankruptcy Code §§ 364(c) and (d), with first priority liens on all of the Collateral.

APPROVED BUDGET
AND
REPORTING
COMPLIANCE:                A budget with expense and cash flow projections for the Debtor for the
                           13-week period beginning on the Petition Date, to be updated every
                           four (4) weeks on a rolling basis, with reconciliation on a line-item basis
                           of actual results to projections, and with narrative explanations
                           prepared by the Debtor of any material variances, to be certified by an
                           authorized person of the Debtor and approved in form and substance
                           by the DIP Lender (once so approved, and subject to any update as
                           may be approved by the DIP Lender, the "Approved Budget"). The
                           Debtor shall be required to comply with such Approved Budget in all
                           material respects for purposes of the DIP Facility in accordance with
                           the DIP Orders.

[*Signature Page to Follow*]

**FOR AND ON BEHALF OF DIP LENDER**

By:    *Cameron Durrant*
       DB460E2DF7BF4BB...

Name:    Cameron Durrant

Title/Affiliation:    Founder/CEO

Date:  January 3, 2024

**FOR AND ON BEHALF OF DEBTOR**

By:    *Ronald Barliant*
       ED273916A08F472...

Name: Ronald Barliant

Title/Affiliation: Independent Director
and Member of the Special Committee of
Humanigen, Inc.

Date: January 3, 2024

6