## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| HUMANIGEN, INC.,[1] | Case No. 24-10003 (____) |
| Debtor. | |

## MOTION OF DEBTOR FOR ENTRY OF (I) AN ORDER (A) APPROVING BID PROCEDURES IN CONNECTION WITH THE POTENTIAL SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS, (B) SCHEDULING AN AUCTION AND A SALE HEARING, (C) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (D) AUTHORIZING THE DEBTOR TO ENTER INTO THE STALKING HORSE AGREEMENT, (E) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES, AND (F) GRANTING RELATED RELIEF; AND (II) AN ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES, AND (C) GRANTING RELATED RELIEF

The above-captioned debtor and debtor in possession (the "**Debtor**") hereby moves (the "**Motion**") pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code (the "**Bankruptcy Code**"); Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (as amended from time to time, the "**Bankruptcy Rules**"); and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedures of the Bankruptcy Court for the District of Delaware (the "**Local Rules**"), for the entry of:

> (i) an order, substantially in the form attached hereto as <u>Exhibit B</u> (the "**Bid Procedures Order**"), (a) approving procedures in connection with the potential sale of substantially all of the Debtor's assets (the "**Bid Procedures**"),[2] (b) scheduling the related auction and hearing to consider approval of the Sale (as defined below), (c)

---

[1] The Debtor's mailing address in this chapter 11 case is 533 Airport Boulevard, Suite 400, Burlingame, CA 94010 and the last four digits of the Debtor's federal tax identification number are 7236.

[2] Capitalized terms used but not defined in this Motion shall have the meanings ascribed to them in the Bid Procedures or, if not defined therein, the First Day Declaration (defined below).

approving the form and manner of notice thereof, (d) authorizing the Debtor to enter into the Stalking Horse Agreement (as defined below), (e) approving procedures related to the assumption and assignment of certain of the Debtor's executory contracts and unexpired leases, and (f) granting related relief; and

(ii) an order (the "**Sale Order**"), (a) approving the Sale of the Assets (as defined below) free and clear of liens, claims, encumbrances, and other interests, (b) approving the assumption and assignment of certain of the Debtor's executory contracts and unexpired leases related thereto, and (c) granting related relief.

In support of the Motion, the Debtor relies upon the *Declaration of Henry Madrid, Senior Vice President Finance of the Debtor, in Support of Chapter 11 Petition and First Day Pleadings* (the "**First Day Declaration**") and the *Declaration of Matt LoCascio in Support of Bid Procedures and Sale Motion*, filed contemporaneously herewith (the "**LoCascio Declaration**"). In further support of the Motion, the Debtor, by and through its undersigned proposed counsel, respectfully represents:

## <u>JURISDICTION AND VENUE</u>

1.      This United States Bankruptcy Court for the District of Delaware (the "**Court**") has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012. This is a core proceeding under 28 U.S.C. § 157(b). Pursuant to Local Rule 9013-1(f), the Debtor consent to entry of a final order under Article III of the United States Constitution. Venue of this case and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested herein are Bankruptcy Code sections 105, 363, 365, 503, and 507, Bankruptcy Rules 2002, 6004, 6006, 9007, 9014 and Local Rules 2002-1, 6004-1, and 9013-1(m).

IMPAC 11080189v.8

## **BACKGROUND**

3.      On the date hereof (the "**Petition Date**"), the Debtor filed a voluntary petition in this Court commencing a case for relief under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Case**"). The factual background regarding the Debtor, including its business operations, capital and debt structure, and the events leading to the filing of the Chapter 11 Case, is set forth in detail in the First Day Declaration and fully incorporated herein by reference.

4.      The Debtor continues to manage and operate its business as debtor in possession pursuant to Bankruptcy Code sections 1107 and 1108. No trustee or examiner has been requested in the Chapter 11 Case.

5.      Subject to its right to determine an alternative course of action is preferable and subject to higher and better offers through a Court-approved bidding and sale process, the Debtor intends to sell substantially all of the Debtor's assets (collectively, the "**Assets")** in the Chapter 11 Case to Taran Therapeutics Inc. (the "**DIP Lender**" or "**Stalking Horse Bidder**"). The DIP Lender has, subject to certain conditions, agreed to extend postpetition financing to be used to fund the Chapter 11 Case pursuant to the terms of the interim order the Debtor has proposed to approve its postpetition financing (including as it may ultimately be entered on a final basis, the "**DIP Order**"). However, given the Debtor's very limited liquidity, the Debtor needs to complete the sale process as expeditiously as possible. The Debtor firmly believes that a sale of substantially all of its assets to the Stalking Horse Bidder or such other financial or strategic party that may re-start operations and continue the development of the Debtor's critical pharmaceutical products is in the best interests of the Debtor, its estate, all creditors, and the healthcare community at large.

IMPAC 11080189v.8

**RELIEF REQUESTED**

6.      By this Motion, first, the Debtor seeks entry of the Bid Procedures Order in

substantially the form attached hereto as Exhibit B:[3]

      a.      authorizing and approving the Bid Procedures attached to the Bid Procedures Order as Exhibit 1 in connection with the sale (the "**Sale**") of substantially all of the Debtor's assets (the "**Assets**");

      b.      scheduling an auction (the "**Auction**") and sale hearing (the "**Sale Hearing**") with respect to the Sale of the Assets;

      c.      approving the form and manner of notice of the Auction and the Sale Hearing, a copy of which is attached to the Bid Procedures Order as Exhibit 2 (the "**Sale Notice**");

      d.      to the extent set forth therein, authorizing the Debtor to enter into, and perform under, that certain Asset Purchase Agreement with the Stalking Horse Bidder, dated January 3, 2024 (including all schedules and exhibits attached thereto, as it may be amended from time to time in accordance with its terms), a copy of which is attached hereto as Exhibit A (the "**Stalking Horse Agreement**"), pursuant to which the Stalking Horse Bidder agrees to purchase the Assets (as defined in the Stalking Horse Agreement) from the Debtor on the terms and conditions set forth therein (the "**Stalking Horse Bid**"); and

      e.      granting related relief.

7.      Following entry of, and compliance with, the Bid Procedures Order, the Debtor

intends to seek entry of the Sale Order at the conclusion of the Sale Hearing:[4]

      a.      if an Auction is conducted, authorizing and approving the sale of the Assets to the Qualifying Bidder that the Debtor determines has made the highest or otherwise best Qualifying Bid for the Assets (the "**Successful Bidder**") (or, if the Successful Bidder fails to consummate the Sale, to the Qualifying Bidder with the next-highest or second-best Qualifying Bid at the Auction for the Assets (the "**Back-Up Bidder**")), free and clear of all liens, claims, encumbrances, and other interests other than Permitted Encumbrances and Assumed Liabilities (as such terms are defined in the Stalking Horse Agreement);

---

[3] By separate motion filed contemporaneously herewith, the Debtor seeks expedited consideration of the Bid Procedures Order.

[4] A proposed form of the Sale Order will be docketed following the Bid Deadline.

b.      if an Auction is not conducted, authorizing and approving the Sale of the Assets to the Stalking Horse Bidder free and clear of all liens, claims, encumbrances, and other interests other than Permitted Encumbrances and Assumed Liabilities;

c.      authorizing the assumption and assignment of the Contracts; and

d.      granting any related relief.

8.      The Debtor reserves the right to file and serve any supplemental pleading or declaration that the Debtor deems appropriate or necessary in its reasonable business judgment, including any pleading summarizing the competitive bidding and sale process and the results thereof, in support of its request for entry of the Sale Order before the Sale Hearing.[5]

## POSTPETITION MARKETING AND SALE PROCESS

9.      As described in further detail in the First Day Declaration and the LoCascio Declaration, the Debtor has determined that pursuing a sale of the Assets pursuant to Section 363 of the Bankruptcy Code is the best available method, if not only available method, for maximizing the value of those Assets for the benefit of all stakeholders. As part of the proposed postpetition sale process, the Debtor, through SC&H Group, Inc. (together with its subsidiaries and affiliates, "**SC&H**") and its other professionals, will continue the robust marketing effort for the Debtor's assets, which has been ongoing for the last year, commencing in October of 2022, continuing to contact both financial and strategic investors regarding a potential sale. Pursuant to these marketing efforts, all interested parties are given the opportunity to execute a confidentiality agreement (a "**Confidentiality Agreement**") and be given access to the data room maintained by SC&H on behalf of the Debtor. Those parties that execute a Confidentiality Agreement will be provided with substantial due diligence information concerning, and access to, the Debtor,

---

[5] A proposed form of the Sale Order will be made available to potential bidders in the Data Room.

including, without limitation, presentations by the Debtor and its advisors, and access to financial, operational, and other detailed information.

10.     The Debtor has undertaken several actions prior to commencing the Chapter 11 Case to ensure that the sale process yields a value-maximizing transaction. Specifically, the Debtor has conducted an extensive prepetition marketing process that culminated in entry into the Stalking Horse Agreement, subject to the Debtor's receipt of higher or better offers at the Auction. The Stalking Horse Agreement offers the Debtor and its stakeholders certainty by establishing a minimum purchase price for the Assets, as well as funding to administer this Chapter 11 Case, and signaling to other potential bidders the prevailing market value of the Assets, while also affording the Debtor an opportunity to seek higher or otherwise better offers.

11.     The Stalking Horse Bidder is led by Dr. Cameron Durrant, the current Chief Executive Officer and Chairman of the Board of the Debtor. Given this dual role, the Debtor engaged in its best business judgment to separate Dr. Durrant from the sale and financing process. First, the Debtor appointed two independent directors to the Board, one of whom, Ronald Barliant, is a former bankruptcy judge.  Then, on or about July 18, 2023, the Board designated a special committee of the Board (the "**Special Committee**") consisting of the two independent directors to negotiate with competing bidders in a sale process as well as any postpetition financing.  The Special Committee's duties were later broadened to encompass all decision-making related to the preparation, filing, and prosecution of the Chapter 11 Case.

12.     The Stalking Horse Agreement was the product of arms' length, good faith negotiations among the Special Committee, on behalf of the Debtor, and the Stalking Horse Bidder. The negotiation of the Stalking Horse Agreement on behalf of the Debtor was led by a Special Committee of the Debtor's Board, in consultation with SC&H and the Debtor's other

advisors. On January 3, 2023, the Debtor adopted resolutions authorizing the Debtor to enter into the Stalking Horse Agreement.  The Stalking Horse Agreement embodies the highest and best offer for the Purchased Assets (as defined in the Stalking Horse Agreement) as of the Petition Date.

13.     As noted, the Stalking Horse Bidder is an affiliate of a syndicate led by Dr. Cameron Durrant, the Debtor's Chairman, Chief Executive Officer, and Acting Chief Financial Officer. In furtherance of the sale process, the Stalking Horse Bidder has offered debtor in possession ("**DIP**") financing, as an integral component of the Stalking Horse Bid, and the DIP financing will ensure the Debtor has the necessary liquidity required to adequately run the process contemplated in the Bid Procedures and close a value-maximizing transaction.

## THE STALKING HORSE AGREEMENT

14.     The key terms of the proposed transaction can be found in the Stalking Horse Agreement attached hereto as <u>Exhibit A</u>. The material terms of the Stalking Horse Agreement, including those provisions required to be highlighted pursuant to Local Rule 6004-1(b)(iv), are as follows:[6]

| Provision | Summary |
|---|---|
| **Purchase Price / Consideration** | The Stalking Horse Agreement provides for the following consideration in exchange for the Assets: |
| | The aggregate consideration (the "**Purchase Price**") to be paid by Purchaser for the purchase of the Acquired Assets shall be: |
| | (i) the assumption of Assumed Liabilities; |
| | (ii) a cash payment (the "**Cash Payment**") of Two Million Dollars ($2,000,000), which Cash Payment will be reduced on a dollar-for- |

---

[6] Capitalized terms used as defined terms herein but not otherwise defined shall have the meanings ascribed to them in the Stalking Horse Agreement.  To the extent there are any conflicts between this summary and the Stalking Horse Agreement, the terms of the Stalking Horse Agreement shall govern..

| Provision | Summary |
|-----------|---------|
|  | dollar basis by all amounts due, owing and chargeable to the Seller or its bankruptcy estate in connection with the debtor-in-possession loan (the "**DIP Loan**") provided, or to be provided, by Purchaser to Seller and approved by one or more orders of the Bankruptcy Code (the "**DIP Orders**" and, together all agreements, term sheets, notes and other documents related to the DIP Loan, the "**DIP Loan Documents**"), including all outstanding interest, fees, costs, charges and other amounts due from Seller (or its bankruptcy estate) to Purchaser what-soever under or in connection with the DIP Loan or the DIP Loan Documents (collectively, the "**DIP Obligations**"), which DIP Loan will be in the maximum principal amount of $2,000,000.  The Purchaser shall be permitted and authorized to apply all DIP Obligations as one or more credit bids under section 363(k) of the Bankruptcy Code in connection with any sale of the Acquired Business or any portion thereof (the "**Credit Bid**"), including as follows with respect to the sale contemplated hereunder; |
|  | A.      to the extent that, as of the date of the Auction, the amount of the then-outstanding DIP Obligations is less than $2,000,000, the Purchaser shall be deemed to have submitted an initial Credit Bid in the amount of the then-existing amount of DIP Obligations pursuant to section 363(k) of the Bankruptcy Code (which Credit Bid amount shall apply to any subsequent bid it may make at the Auction), together with a commitment to pay a Cash Payment for the balance of the Purchase Price at Closing; |
|  | B.      to the extent that, as of the date of the Auction, the amount of the then-outstanding DIP Obligations exceeds $2,000,000, the Purchaser shall be deemed to have submitted an initial Credit Bid of $2,000,000 for the purchase of the Acquired Assets pursuant to section 363(k) of the Bankruptcy Code and shall be permitted to apply any outstanding DIP Obligations in excess of $2,000,000 as a Credit Bid (or Credit Bid portion) to any subsequent bid it may later make at such Auction with respect to the Acquired Assets; and |
|  | C.      Notwithstanding anything to the contrary in Subsections 2.1(a)(ii)(A) and (B) of this Agreement: (a) the Purchaser shall not be required to make any cash deposit prior to the Auction and shall, for all purposes relevant to this Agreement be deemed a Qualified Bidder at such Auction (should it occur) without the |

| Provision | Summary |
|---|---|
| | need to provide any further information or assurances; and (b) at Closing, the Purchaser shall be permitted to apply the actual amount of the DIP Obligations existing as of the Closing (or any portion thereof) as a Credit Bid against the Purchase Price; <br><br> (iii) the Milestone Payments (if any); and <br><br> (iv) Cure Costs to the extent Cure Costs exceed the Cure Cap. <br><br> Stalking Horse Agreement § 2.1(a). |
| **Acquired Assets** | Pursuant to the Bankruptcy Code, including sections 105, 363 and 365 of the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules, and on the terms and subject to the conditions set forth herein and in the Sale Order, at the Closing, Seller shall sell, transfer, assign, convey and deliver to Purchaser, and Purchaser shall purchase, acquire and accept from Seller, free and clear of all Encumbrances (other than Permitted Encumbrances), all of Seller's right, title and interest in and to all assets and property of the Seller (including Seller's bankruptcy estate) whatsoever and wherever located, including but not limited to all assets Related to (or constituting) the Acquired Business (but excluding the Excluded Assets), including the following assets (collectively, the "**Acquired Assets**"): <br><br> (a)   the Executory Contracts listed on Schedule 1.1(a) (the "**Assigned Contracts**"), which schedule may be updated prior to Closing as set forth in this Agreement, and all claims, rights, defenses, actions, causes of action and rights of set-off and recoupment arising under any Assigned Contract; <br><br> (b)   all Contracts entered into by Seller after the Petition Date and that are not expressly identified by Purchaser as an Excluded Asset on or prior to Closing (the "**Post-Petition Contracts**"); <br><br> (c)   all Documents Related to the Acquired Business (including, without limitation, all documents related to the Acquired Assets or Assigned Contracts or Assumed Liabilities); <br><br> (d)   all tangible assets (including Equipment) of Seller, wherever located, including all inventories of the HGEN Products, together with all bulk drug substance and drug product, intermediates, other raw materials, component parts, work in process, finished drug product |

| Provision | Summary |
|-----------|---------|
| | either distributed or available to be distributed, and packaging materials; |
| | (e)    all of Seller's equity interest in Foreign Subsidiary; |
| | (f)    all Intellectual Property of Seller, including, without limitation, those assets listed on <u>Schedule 1.1(f)</u> (the "**Acquired Intellectual Property**"), and all rights and obligations under non-disclosure or confidentiality, invention or other Intellectual Property assignment agreements, restrictive covenant agreements, and other similar arrangements.  For purposes of clarity, Purchaser shall acquire all Intellectual Property of the Seller pursuant to this Agreement notwithstanding the omission of any particular Intellectual Property right of the Seller from Schedule 1.1(f); |
| | (g)    all Governmental Authorizations required for Seller to conduct the Acquired Business (including, but not limited to, those obtained with respect to the HGEN Product) as it is currently conducted; |
| | (h)    to the extent not otherwise set forth in this Section 1.1, all assets of any nature, type or kind whatsoever consisting of or otherwise relating to the HGEN Products; |
| | (i)    all assets related to the Acquired Assets or the Assumed Liabilities (other than those identified as the Excluded Assets); |
| | (j)    all claims and causes arising under Chapter 5 of the Bankruptcy Code or similar non-bankruptcy law and any other claims, rights, actions or causes of action whatsoever whether under bankruptcy or non-bankruptcy law (including, without limitation, any rights to credits, refunds, rebates, allowances, adjustments, setoffs, or recoupments) against: (a) against any person or entity that is: (i) a counterparty to an Assigned Contract; or (ii) is a vendor or service provider with whom Purchaser anticipates doing business following the Closing, except for those vendors or service providers identified by Seller (and approved by Purchaser) set forth on Schedule 1.1(j), which schedule may be created or updated in form acceptable to Purchaser prior to Closing; (b) Cameron Durrant; or (c) Purchaser, except with respect to Purchaser's duties and obligations under this Agreement (collectively, all acquired claims, rights or causes of action set-forth in this sub-paragraph, the "**Acquired Causes of Action**"); and |
| | (k)    any other assets of Seller in each case related to the Acquired Business or to the Acquired Assets including all goodwill, payment |

| Provision | Summary |
|---|---|
| | intangibles and general intangible assets and rights of Seller to the extent associated with, held for use in, or otherwise relating to, useful in or necessary for the conduct of, the Acquired Business or the Acquired Assets and other than those assets specifically identified as Excluded Assets in Section 1.2 clauses (a) through (m). <br><br> Stalking Horse Agreement § 1.1. |
| **Assumed Liabilities** | On the terms and subject to the conditions set forth in this Agreement and the Sale Order, effective as of the Closing, Purchaser shall irrevocably assume from Seller (and from and after the Closing pay, perform, discharge or otherwise satisfy in accordance with their respective terms), and Seller shall irrevocably convey, transfer and assign to Purchaser, the following Liabilities (collectively, the **"Assumed Liabilities"**): <br><br>     (a)    all Liabilities and obligations of Seller under the Assigned Contracts first arising or first accruing after the Closing; <br>     (b)    unless otherwise specified in the DIP Loan Documents, all Liabilities arising out of the conduct of the Acquired Business or the ownership of the Acquired Assets, in each case, by Purchaser, first arising or accruing after the Closing Date; <br>     (c)    all Liabilities relating to amounts required to be paid, or actions to be taken or to be omitted to be taken, by Purchaser under this Agreement; <br>     (d)    to the extent lawfully transferable, all obligations, commitments and Liabilities under any Governmental Authorizations assigned to Purchaser hereunder and first arising or accruing after the Closing Date; and <br><br> Notwithstanding the foregoing and for the avoidance of doubt, Assumed Liabilities shall not include any Liability relating to or arising out of any violation of Law by, or any Action against, Seller or any breach, default or violation by Seller of or under any Assigned Contracts arising prior to Closing. <br><br> Stalking Horse Agreement § 1.3. |
| **Sale to Insider** <br><br> Local Rule 6004-1(b)(iv)(A) | As described above, and in the LoCascio Declaration, the Stalking Horse Bidder is a is an affiliate of a syndicate led by Dr. Cameron Durrant, the Debtor's Chairman, Chief Executive Officer, and Acting Chief Financial Officer. |

IMPAC 11080189v.8

| Provision | Summary |
|---|---|
| | Prior to the Petition Date, two independent directors were appointed to lead the Special Committee of the Debtor's Board in order to evaluate the Debtor's marketing process and potential sale, among other things.<br><br>The Debtor's management and advisors, at the direction of and in consultation with the Special Committee, engaged in extensive arms' length negotiations with the Stalking Horse Bidder regarding the Stalking Horse Agreement. The Special Committee ultimately determined, in consultation with the Debtor's advisors, that the Stalking Horse Agreement represented the highest and best offer available for the Assets.<br><br>At all times, the Stalking Horse Bidder has been represented by separate counsel in negotiations resulting in entry into the Stalking Horse Agreement. |
| **Agreements with Management**<br><br>Local Rule 6004-1(b)(iv)(B) | Not applicable. |
| **Releases**<br><br>Local Rule 6004-1(b)(iv)(C) | Not applicable. |
| **Private Sale/No Competitive Bidding**<br><br>Local Rule 6004-1(b)(iv)(D) | Not applicable. |
| **Closing and Other Deadlines**<br><br>Local Rule 6004-1(b)(iv)(E) | The Stalking Horse Agreement and the DIP Term Sheet (as that term is defined in the DIP Loan Documents) set forth the following bankruptcy milestones and deadlines:<br><br>• On or before January 5, 2024, Debtor shall have signed this Term Sheet;<br>• On or before the Petition Date, Debtor shall have signed definitive documentation for the DIP Financing and Purchase and Sale Documents and filed its Chapter 11 case and filed a Motion to approve the DIP Financing and Purchase and Sale Documents;<br>• Entry of the Interim DIP Order within three (3) days of the Petition Date; |

IMPAC 11080189v.8

| Provision | Summary |
|---|---|
| | • Entry of an order approving the procedures for bidding on substantially all of the assets of the Debtor on or before 23 days from the Petition Date;<br>• Bids for substantially all of the of the Debtor's assets on or before 45 days from the Petition Date;<br>• Entry of the Final DIP Order on or before 35 days from the Petition Date;<br>• Entry of an order approving substantially all of the Debtor's assets on or before 60 days after the Petition Date;<br>• Closing of sale of substantially all of the assets of the Debtor on or before 70 days after the Petition Date.<br><br>Stalking Horse Agreement §§ 5.2, 5.3, 5.4, 5.7, 8.1(c); DIP Term Sheet at p. 4. |
| **Good Faith Deposit**<br><br>Local Rule 6004-1(b)(iv)(F) | The Purchase Price is primarily comprised of the Credit Bid, the assumption of Assumed Liabilities, Cure Costs, and the Milestone Payments, if any. Accordingly, the Stalking Horse Agreement does not provide for a deposit.<br><br>Stalking Horse Agreement § 2.1(a). |
| **Interim Arrangements with Proposed Buyer**<br><br>Local Rule 6004-1(b)(iv)(G) | From the Effective Date until the Closing (or the earlier termination of this Agreement pursuant to Article VIII) (the "**Interim Period**"), Seller shall provide Purchaser and its authorized Advisors with reasonable access and upon reasonable advance notice and during regular business hours to the books and records of Seller and its Subsidiaries related to the Acquired Business (other than to the extent related to the Excluded Assets and/or Excluded Liabilities), in order for Purchaser and its authorized Advisors to access such information regarding the Acquired Business as Purchaser reasonably deems necessary in connection with effectuating the transactions contemplated by this Agreement; *provided* that (i) such access does not unreasonably interfere with the normal operations of Seller and its Subsidiaries, (ii) such access will occur in such a manner as Seller reasonably determines to be appropriate to protect the confidentiality of the transactions contemplated by this Agreement, (iii) all requests for access will be directed to Ronald Barliant, or such other Person(s) as Seller may designate in writing from time to time, and (iv) nothing herein will require Seller to provide access to, or to disclose any information to, Purchaser if such access or disclosure (A) would cause significant competitive harm to Seller or any of its Subsidiaries if the transactions contemplated by this Agreement are not consummated, (B) would require Seller or any of its Subsidiaries to disclose any financial or proprietary information of or regarding the Affiliates of |

13

| Provision | Summary |
|---|---|
| | Seller (other than the Subsidiaries of Seller) or otherwise disclose information regarding the Affiliates of Seller (other than the Subsidiaries of Seller) that Seller deems to be commercially sensitive, (C) would waive any legal privilege, or (D) would be in violation of applicable Laws or the provisions of any agreement to which Seller or any of its Subsidiaries is a party; *provided* that, in the event that Seller withholds access or information in reliance on the foregoing clause (C) or (D), Seller shall provide (to the extent possible without waiving or violating the applicable legal privilege or Law) notice to Purchaser that such access or information is being so withheld and shall use commercially reasonable efforts to provide such access or information in a way that would not risk waiver of such legal privilege or applicable Law.<br><br>Purchaser shall be permitted to contact any officer, manager, director, employee, customer, supplier, lessee, lessor, lender, noteholder or other material business relation of Seller or its Subsidiaries prior to the Closing with respect to Seller, its Subsidiaries, their business or the transactions contemplated by this Agreement with prior consent of the Special Committee of Humanigen, Inc. for each such contact and such request shall not be unreasonably denied or withheld; provided, however, that Dr. Cameron Durrant shall be permitted to contact any officer, manager, director, employee, customer, supplier, lessee, lessor, lender, noteholder or other material business relation of Seller or its Subsidiaries prior to the Closing with respect to Seller, its Subsidiaries, and their business in the ordinary course of business without the prior consent of Seller for each such contact.<br><br>Following the Effective Date, Purchaser and its authorized Advisors shall be permitted to review, inspect and make copies of any attorney-client, work product and other legal privileges owned by or within the control of Seller (including all documents and records of Seller that are entitled to, or were created under, any such privileges) that Purchaser requires to satisfy any obligation, requirement or demand from any Government agency, or any documents, communications or records reasonably related to any other investigation or action by a Government agency involving Purchaser or Dr. Cameron Durrant, whether ongoing as of the Effective Date or arising thereafter.<br><br>Stalking Horse Agreement §§ 6.2(a), (c), (d). |

| Provision | Summary |
|---|---|
| **Use of Proceeds**<br><br>Local Rule 6004-1(b)(iv)(H) | Not applicable. |
| **Tax Exemption**<br><br>Local Rule 6004-1(b)(iv)(I) | Applicable law shall apply. |
| **Record Retention**<br><br>Local Rule 6004-1(b)(iv)(J) | Excluded from the Acquired Assets:<br><br>all Documents (i) to the extent they relate solely to any of the Excluded Assets or Excluded Liabilities, or (ii) that Seller is required by Law to retain or is prohibited by Law from providing a copy thereof to Purchaser, provided, however, that to the extent that there are any Documents that are related to the Acquired Assets or Assumed Liabilities but which Seller is required by Law to retain (and is not prohibited by law from providing a copy to Purchaser), Seller shall provide copies of such Documents to the Purchaser.<br><br>(i) all attorney-client, work product and other legal privileges of Seller (including all documents and records of Seller that are entitled to, or were created under, any such privileges), (ii) all records and reports prepared or received by Seller or any of its Affiliates in connection with the sale of the Acquired Assets or any portion thereof, the Bankruptcy Case and the transactions contemplated hereby, including all analyses relating to the Acquired Assets or Purchaser or its Affiliates so prepared or received (but excluding any materials made available to Purchaser or its Affiliates and any financial information directly related to the Acquired Assets that would be reasonably required for the financial planning or reporting obligations of Purchaser), and (iii) all confidentiality agreements with prospective purchasers of the Acquired Assets or any portion thereof, and all bids and expressions of interest received from third parties with respect thereto.<br><br>Stalking Horse Agreement §§ 1.2(f), (k). |
| **Sale of Avoidance Actions**<br><br>Local Rule 6004-1(b)(iv)(K) | Acquired Assets include: all claims and causes arising under Chapter 5 of the Bankruptcy Code or similar non-bankruptcy law and any other claims, rights, actions or causes of action whatsoever whether under bankruptcy or non-bankruptcy law (including, without limitation, any rights to credits, refunds, rebates, allowances, adjustments, setoffs, or recoupments) against: (a) against any person or entity that is: (i) a |

| Provision | Summary |
|---|---|
| | counterparty to an Assigned Contract; or (ii) is a vendor or service provider with whom Purchaser anticipates doing business following the Closing, except for those vendors or service providers identified by Seller (and approved by Purchaser) set forth on <u>Schedule 1.1(j)</u>, which schedule may be created or updated in form acceptable to Purchaser prior to Closing; (b) Cameron Durrant; or (c) Purchaser, except with respect to Purchaser's duties and obligations under this Agreement (collectively, all acquired claims, rights or causes of action set-forth in this sub-paragraph, the "<u>Acquired Causes of Action</u>"); <br><br>Stalking Horse Agreement § 1.1(j). |
| **Requested Findings as to Successor Liability**<br><br>Local Rule 6004-1(b)(iv)(L) | The Stalking Horse Agreement provides for a requirement that the Sale Order include free and clear language. <br><br>*See* Stalking Horse Agreement § 5.7. |
| **Sale Free and Clear of Unexpired Leases**<br><br>Local Rule 6004-1(b)(iv)(M) | Not applicable.. |
| **Credit Bid**<br><br>Local Rule 6004-1(b)(iv)(N) | *See* Purchase Price/Consideration supra pp. 7-9. |
| **Relief from Bankruptcy Rule 6004(h)**<br><br>Local Rule 6004-1(b)(iv)(O) | As noted in this Motion, the Debtor is requesting relief from the 14-day stay imposed by Bankruptcy Rules 6004(h). |

15.     Importantly, the Stalking Horse Agreement provides for $100,000 in expense reimbursements in the event the Stalking Horse Bidder is not declared the winning bidder at the Auction and the Court approves an Alternative Transaction (the "**Expense Reimbursement**"). The Expense Reimbursement will be an allowed administrative expense claim against the Debtor's

bankruptcy estates pursuant to Sections 503(b), 507(a)(2), and 507(b) of the Bankruptcy Code. Given the Debtor's need to maximize the value of the Assets through a timely and efficient marketing and sale process, the ability to offer this modest Expense Reimbursement is justified, appropriate and essential.

## THE PROPOSED SALE

16.     The Debtor believes a prompt sale of the Assets represents the best, if not only, option available to maximize value for all stakeholders in the Chapter 11 Case. Moreover, it is critical for the Debtor to execute on any sale transaction as expeditiously as possible, as the Debtor is utilizing post-petition financing pursuant to the DIP Order to explore this sale process. Therefore, time is of the essence.

17.     By this Motion, the Debtor requests the Court approve the following general timeline, with the assumption that the Bankruptcy Court will enter an order granting this motion on shortened notice. These dates are subject to change in the event the Bankruptcy Court does not enter an order at that hearing:

---

(All times are prevailing Eastern Time)

**January 22, 2024:** Debtor to send Cure and Possible Assumption and Assignment Notices to All Contract Counterparties

**February 1, 2024 at 4:00 p.m.:** Cure or Assignment Objection Deadline

**February 7, 2024 at 4:00 p.m.:** Deadline to submit Bid to be considered for the Auction

**February 9, 2024 at 4:00 p.m.:** Sale Objection Deadline

**February 12, 2024 at 10:00 a.m.:** Auction (if necessary)

**As soon as practicable after the conclusion of the Auction:** Debtor to file notice of Successful Bidder

---

**February 15, 2024 at 4:00 p.m.:** Deadline to object to the Successful Bidder's offer of adequate assurance to perform

**February 16, 2024 at [__:__ a/p.m.]:** Sale Hearing

18.     The Debtor respectfully submits that the timeline set forth above is necessary under the circumstances of the Chapter 11 Case. Such timeline provides an approximately thirty-five-day period between the filing of this Motion and the Bid Deadline and is comparable to other timelines recently approved in this district. *See, e.g.*, *In re Winc, Inc.*, Case No. 22-11238 (LSS) (Bankr. D. Del. Dec. 22, 2022) (approving a sale timeline that provided an approximate five-week period between the filing of the motion and the bid deadline); *In re Fast Radius, Inc.*, Case No. 22-11051 (JKS) (Bankr. D. Del. Nov. 14, 2022) (approving a sale timeline that provided an approximate three-week period between the filing of the motion and the bid deadline); *In re Clarus Therapeutics Holdings Inc.*, Case No. 22-10845 (Bankr. D. Del. Sept. 22, 2022) (approving a sale timeline that provided a five-week period between the filing of the motion and the bid deadline). This timeline, which builds off the Debtor's months' long prepetition marketing process, will allow potential bidders sufficient time to evaluate the Assets, given the nature and complexity of the Assets, and formulate bids.

19.     The Debtor believes this timeline maximizes the prospect of receiving the highest and best offer without unduly prejudicing its estate. The proposed timeline is more than sufficient to complete a fair, open, and expedited sale process that will maximize the value received for the Assets. To further ensure the Debtor's proposed Auction and Sale process maximizes value for the benefit of the Debtor's estate, the Debtor and its professionals will use the time following the Petition Date to continue to actively market the Assets in an attempt to solicit the highest or otherwise best bids available. The Debtor believes the relief requested by this Motion is in the best

interests of its creditors, other stakeholders, and all other parties in interest, and should be approved.

20.     The Debtor believes an expedited sale process will minimize any further deterioration in the value of the Assets and is in the best interests of all stakeholders. Thus, the Debtor has determined that pursuing the potential Sale in the manner and within the time periods prescribed in the Bid Procedures is in the best interest of the Debtor's estate and will provide interested parties with sufficient opportunity to participate.

## THE BID PROCEDURES ORDER

### I.      The Bid Procedures

21.     To optimally and expeditiously solicit, receive, and evaluate bids in a fair and accessible manner, the Debtor has developed and proposed the Bid Procedures, attached as Exhibit 1 to the Bid Procedures Order. The Bid Procedures were developed to permit an expedited sale process, to promote participation and active bidding, and to ensure the Debtor receives the highest or otherwise best offer for the Assets. As such, the Debtor believes the timeline for consummating the sale process established pursuant to the Bid Procedures is in the best interest of its estate and all parties in interest.

22.     The Bid Procedures describe, among other things, the requirements for prospective purchasers to participate in the bidding process, the availability and conduct of due diligence, the deadline for submitting a competing bid, the method and factors for determining qualifying bids, and the criteria for selecting a successful bidder.

23.     The following summary describes the salient points of the Bid Procedures and discloses certain information required pursuant to Local Rule 6004-1(c)(i):[7]

---

[7] This summary of the Bid Procedures is qualified in its entirety by the Bid Procedures attached as Exhibit 1 to the Bid Procedures Order. All capitalized terms that are used in this summary but not otherwise defined herein shall have

| | |
|---|---|
| **Assets to be Sold** | The Debtor is offering for sale any and all of the Assets. Potential Bidders (as defined below) may bid on all or any number or combination of the Assets. |
| **Provisions Governing Qualification of Bidders**<br><br>Local Rule 6004-1(c)(i)(A) | Any person or entity that wishes to participate in the bidding process for the Assets (each, a "**Potential Bidder**") must first become a "**Qualifying Bidder.**" To become a Qualifying Bidder (and thus be able to conduct due diligence and gain access to the Debtor's confidential electronic data room concerning the Assets (the "**Data Room**")), a Potential Bidder must submit to the Debtor and its advisors:<br><br>(a) documentation identifying the interested party, its principals, and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated Transaction;<br><br>(b) an executed confidentiality agreement in form and substance reasonably satisfactory to the Debtor, which by its terms will inure to the benefit of the Successful Bidder(s);<br><br>(c) a statement and other factual support demonstrating to the Debtor's reasonable satisfaction that the interested party has a bona fide interest in consummating a Transaction; and<br><br>(d) sufficient information, as determined by the Debtor, to allow the Debtor to determine that the interested party (i) has, or can obtain, the financial wherewithal and any required internal corporate, legal, or other authorizations to close a Transaction, including, but not limited to, current audited financial statements of the interested party (or such other form of financial disclosure acceptable to the Debtor in its discretion) and (ii) can provide adequate assurance of future performance under any executory contracts and unexpired leases to be assumed by the Debtor and assigned to such bidder, pursuant to Bankruptcy Code section 365, in connection with a Transaction.<br><br>Each Potential Bidder shall comply with all reasonable requests for information and due diligence access by the Debtor, each of the Consultation Parties (as defined below), or their advisors |

---

the meanings set forth in the Bid Procedures. To the extent there are any conflicts between this summary and the Bid Procedures, the terms of the Bid Procedures shall govern.

IMPAC 11080189v.8

| | regarding the ability of such Potential Bidder, as applicable, to consummate its contemplated Transaction.<br><br>Notwithstanding anything to the contrary herein, and for the avoidance of doubt, for all purposes under the Bid Procedures: (i) the Stalking Horse Bidder shall be considered a Qualifying Bidder, and the Stalking Horse Agreement shall be considered a Qualifying Bid (as defined below); and (ii) in determining whether the Potential Bidders constitute Qualifying Bidders, the Debtor may, in consultation with the Consultation Parties, consider a combination of bids for the Assets. |
|---|---|
| **Due Diligence**<br><br>Local Rule 6004-1(c)(i)(A) | The Debtor will provide any Qualifying Bidder with reasonable access to the Data Room and any other additional information that the Debtor believes to be reasonable and appropriate under the circumstances. All additional due diligence requests shall be directed to: SC&H Group, Inc. (together with its subsidiaries and affiliates, "**SC&H**"), Matt LoCascio (mlocascio@schgroup.com).<br><br>The due diligence period shall extend through and including the Bid Deadline. The Debtor may, but shall not be obligated to, in its sole discretion, furnish any due diligence information after the Bid Deadline.<br><br>The Debtor reserves the right, in its reasonable discretion, to withhold or limit access to any due diligence information that the Debtor determines is business-sensitive or otherwise not appropriate for disclosure to a Qualifying Bidder. |
| **Right to Credit Bid**<br><br>Local Rule 6004-<br><br>1(b)(iv)(N) | Any Qualifying Bidder who has a valid and perfected lien on any Assets of the Debtor's estate that is not subject to an objection by the commencement of the Auction (a "**Secured Creditor**") shall have the right to credit bid all or a portion of the value of such Secured Creditor's claim within the meaning of Bankruptcy Code section 363(k) and to the extent demonstrated by the Secured Claim Documentation; *provided* that a Secured Creditor shall have the right to credit bid its claim only with respect to the collateral by which such Secured Creditor is secured. Notwithstanding anything else set forth herein, the Stalking Horse Bidder will be deemed a Qualifying Bidder, and may submit a credit bid for any Assets at any time before or during the Auction subject to section 363(k) of the Bankruptcy Code. |
| **Bid Deadline** | A Qualifying Bidder, other than the Stalking Horse Bidder, that desires to make a bid shall deliver a written and electronic copy of its bid in both PDF and MS-WORD format to the Notice |

| Local Rule 6004-1(c)(i)(B) | Parties so as to be received on or before **February 7, 2024 at 4:00 p.m. (prevailing Eastern Time)** (the "**Bid Deadline**"); *provided* that the Debtor may extend the Bid Deadline without further order of the Court. To the extent that the Bid Deadline is extended for all parties, the Debtor shall file a notice on the docket of the Chapter 11 Case indicating the same. **Any party that does not submit a bid by the Bid Deadline (including as extended in accordance with the prior two sentences) will not be allowed to (a) submit any offer after the Bid Deadline, or (b) participate in the Auction.** |
|---|---|
| **Provisions Governing Qualifying Bids**<br><br>Local Rule 6004-1(c)(i)(B) | As set forth below, Potential Bidders intending to submit bids must include with their bids an asset purchase agreement (a "**Purchase Agreement**"). The Purchase Agreement shall be in the form of the Stalking Horse Agreement included in the Data Room and include a redline marked against the form Purchase Agreement.<br><br>Other than in the case of the Stalking Horse Bid, to be deemed a "**Qualifying Bid**," a bid must be received from a Qualifying Bidder on or before the Bid Deadline and satisfy each of the following requirements, as determined by the Debtor in consultation with the Consultation Parties (each, a "**Bid Requirement**"):<br><br>(a) be in writing;<br><br>(b) fully disclose the identity of the Qualifying Bidder (and any other party participating in the bid) and provide the contact information of the specific person(s) whom the Debtor or its advisors should contact in the event that the Debtor has any questions or wish to discuss the bid submitted by the Qualifying Bidder;<br><br>(c) set forth the purchase price to be paid by such Qualifying Bidder;<br><br>(d) if a bid includes a credit bid under Bankruptcy Code section 363(k), other than a credit bid by the Stalking Horse Bidder, evidence of the amount of the claim, the Assets constituting the collateral securing the claim, and evidence of the grant, perfection, priority, and validity of the lien (the "**Secured Claim Documentation**");[8] |

---

[8] Parties intending to submit a credit bid are encouraged to provide their Secured Claim Documentation to the Debtor's counsel prior to the Bid Deadline to ensure that their Secured Claim Documentation is validated.

IMPAC 11080189v.8

(e) not propose payment in any form other than cash (except as otherwise expressly set forth in these Bid Procedures and the Bid Procedures Order);

(f) include an allocation of cash to each of the Assets proposed to be purchased;

(g) state the liabilities proposed to be paid or assumed by such Qualifying Bidder;

(h) specify the Assets that are included in the bid and state that such Qualifying Bidder offers to purchase the Assets, or a number or combination of the Assets, upon substantially the same terms as, or terms more favorable to the Debtor and its estate, than the terms set forth in the Stalking Horse Agreement, as applicable;

(i) state that such Qualifying Bidder's offer is formal, binding, and unconditional and is irrevocable until five (5) business days after the closing of the sale of the Assets;

(j) state that such Qualifying Bidder is financially capable of consummating the Transaction contemplated by the bid and provide written evidence in support thereof;

(k) contain such financial and other information to allow the Debtor to make a reasonable determination as to the Qualifying Bidder's financial and other capabilities to close the transactions contemplated by the proposal, including, without limitation, such financial and other information supporting the Qualifying Bidder's ability to comply with the requirements of adequate assurance of future performance under Bankruptcy Code section 365(f)(2)(B) and, if applicable, Bankruptcy Code section 365(b)(3), including the Qualifying Bidder's financial wherewithal to pay the full purchase price and otherwise operate the Acquired Business and willingness to perform under any contracts and leases that are assumed and assigned to the Qualifying Bidder, in a form that allows the Debtor to serve, within one (1) business day after such receipt, such information on any counterparties to any contracts or leases being assumed and assigned (or assumed) in connection with the Transaction that have requested, in writing, such information;

23

(l) identify with particularity each and every executory contract and unexpired lease the assumption and assignment of which is a condition to close the contemplated transaction(s);

(m) specify whether the Qualifying Bidder intends to operate all or a portion of the Debtor's business as a going concern;

(n) include a commitment to close the Transaction by February 20, 2024;

(o) Except as provided with respect to the Stalking Horse Bidder, not request or entitle such Qualifying Bidder to any break-up fee, termination fee, expense reimbursement, or other similar fee or payment;

(p) the aggregate consideration proposed by the Qualifying Bidder must equal or exceed the sum of the amount of (A) the purchase price under the Stalking Horse Agreement, and (B) $250,000.

(q) not contain any contingencies of any kind, including, without limitation, contingencies related to financing, internal approval, or due diligence;

(r) contain a written acknowledgement and representation that the Qualifying Bidder (i) has had an opportunity to conduct any and all due diligence regarding the Assets, (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and other information in making its Qualifying Bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any documents or other information provided in connection with the Bid Procedures and the proposed Transaction;

(s) confirms that the Qualifying Bidder acted in good with regard to the Seller, will continue to operate in good faith with respect to any bid on and/or proposed purchase of the Acquired Assets, has not violated any confidentiality agreement with the Seller, whether executed by the Qualifying Bidder or anyone working for or on behalf of the Qualifying Bidder;

(t) sets forth (i) a statement or evidence that the Qualifying Bidder has made or will make in a timely manner all

24

IMPAC 11080189v.8

necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, if applicable, and pay the fees associated with such filings and (ii) any regulatory and third-party approval required for the Qualifying Bidder to close the contemplated transactions, and the time period within which the Qualifying Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than five (5) days following execution and delivery of such Qualifying Bidder's Purchase Agreement, those actions the bidder will take to ensure receipt of such approval(s) as promptly as possible); provided that a Qualifying Bidder agrees that its legal counsel will coordinate in good faith with Debtor's legal counsel to discuss and explain Qualifying Bidder's regulatory analysis, strategy, and timeline for securing all such approvals as soon as reasonably practicable; provided, further that the offer contains a covenant to cooperate with the Debtor to provide pertinent factual information regarding the bidder's operations reasonably required to analyze issues arising with respect to any applicable antitrust laws and other applicable regulatory requirements;

(u) provides for the Qualifying Bidder to serve as a backup bidder (the "**Back-Up Bidder**") if the Qualifying Bidder's bid is the next highest and best bid (the "**Back-Up Bid**") after the Successful Bid (as defined below);

(v) includes written evidence of authorization and approval from the Qualifying Bidder's board of directors (or comparable governing body) with respect to the submission, execution, and delivery of the subject bid;

(w) provides a good faith cash deposit (the "**Deposit**") in an amount equal to ten percent (10%) of the purchase price provided for in the proposal (or such additional amount as may be determined by the Debtor in its reasonable discretion and in consultation with the Consultation Parties) to be deposited, prior to the Bid Deadline, with an escrow agent selected by the Debtor (the "**Escrow Agent**") pursuant to the escrow agreement to be provided by the Debtor to the Qualifying Bidders (the "**Escrow Agreement**"); and

(x) provides for liquidated damages in the event of the Qualifying Bidder's breach of, or failure to perform under, the Purchase Agreement equal to the amount of the Deposit.

IMPAC 11080189v.8

| | |
|---|---|
| | The Debtor reserves the right, in consultation with the Consultation Parties, to negotiate with any Qualifying Bidder in advance of the Auction to cure any deficiencies in a bid that is not initially deemed a Qualifying Bid.<br><br>Each Qualifying Bidder submitting a bid shall be deemed to: (a) acknowledge and represent that it is bound by all of the terms and conditions of the Bid Procedures; and (b) have waived the right to pursue a substantial contribution claim under Bankruptcy Code section 503 related in any way to the submission of its bid, the Bid Procedures, and the Sale. |
| **No Qualifying Bids**<br><br>Local Rule 6004-1(c)(i)(B) | If no timely Qualifying Bids other than any Stalking Horse Bidder's Qualifying Bid are submitted on or before the Bid Deadline, the Debtor shall not hold an Auction and may request at the Sale Hearing that the Stalking Horse Bidder be deemed the Successful Bidder (as defined herein) and that the Court approve the Stalking Horse Agreement and the transactions contemplated thereunder. |
| **Evaluation of Qualifying Bids**<br><br>Local Rule 6004-1(c)(i)(A)-(B) | The Debtor will deliver by no later than 9:00 a.m. (ET) on the day following the Bid Deadline, copies of all bids from Qualifying Bidders to each of the Consultation Parties.<br><br>The Debtor, in consultation with the Consultation Parties, shall make a determination regarding whether a timely submitted bid from a Qualifying Bidder is a Qualifying Bid, and shall notify all Qualifying Bidders whether their bids have been determined to be a Qualifying Bid by no later than 4:00 p.m. (ET) two (2) business days before the commencement of the Auction. In the event that a bid is determined not to be a Qualifying Bid, including with respect to any proposed credit bid amount, the Qualifying Bidder shall be notified by the Debtor and shall have until the commencement of the Auction to modify its bid to increase the purchase price or otherwise improve the terms of the Qualifying Bid for the Debtor and to provide additional Secured Claim Documentation; *provided* that any Qualifying Bid may be improved at the Auction as set forth herein.<br><br>Prior to commencing the Auction, the Debtor shall determine, in consultation with the Consultation Parties, which of the Qualifying Bids, at such time, is the highest or best bid for purposes of constituting the opening bid of the Auction (the "**Baseline Bid**" and the Qualifying Bidder submitting the Baseline Bid, the "**Baseline Bidder**"), and shall notify the Stalking Horse Bidder and all Qualifying Bidders with |

26

| | |
|---|---|
| | Qualifying Bids of the Baseline Bid no later than twenty-four (24) hours prior to the opening of the Auction. |
| **Provisions Providing Bid Protections to "Stalking Horse" or Initial Bidder**<br><br>Local Rule 6004-1(c)(i)(C) | The Stalking Horse Agreement provides for $100,000 in expense reimbursement in the event the Purchaser is not declared the winning bidder at the Auction and the Court approves an Alternative Transaction (the "**Expense Reimbursement**"). The Stalking Horse Agreement also provide for an initial overbid of $250,000 (the "**Initial Overbid**"). |
| **Auction**<br><br>Local Rule 6004-1(c)(ii) | If the Debtor timely receives one or more Qualifying Bids for any of the Assets (exclusive of the Stalking Horse Bidder's Qualifying Bid), then the Debtor shall conduct an auction (the "**Auction**"). Following the Auction, the Debtor will determine, in consultation with the Consultation Parties, which Qualifying Bid is the highest or best bid for the Assets, which will be determined by considering, among other things, the following non-binding factors: (a) the terms of the Purchase Agreement requested by each bidder; (b) the extent to which such terms are likely to delay closing of the Sale, the cost to the Debtor and its estate of such modifications or delay, and any incremental financing being offered to accommodate any delay; (c) the total consideration to be received by the Debtor and its estate; (d) the Transaction structure and execution risk, including conditions to, timing of and certainty of closing, termination provisions, availability of financing and financial wherewithal to meet all commitments, and required governmental or other approval; (e) the net benefit to the Debtor's estate; (f) the impact on employees, trade creditors and lease and contract counterparties; and (g) any other factors the Debtor or the Consultation Parties may reasonably deem relevant.<br><br>The Auction shall be governed by the following procedures:<br><br>(a) the Auction shall commence on February 12, 2024 at 10:00 a.m. (ET) (the "**Auction Date**"), at Potter Anderson & Corroon LLP, 1313 N. Market Street, Wilmington, Delaware 19801.<br><br>(b) only the Stalking Horse Bidder and the other Qualifying Bidders with Qualifying Bids (collectively, the "**Auction Bidders**") shall be entitled to make any subsequent bids at the Auction;<br><br>(c) the Auction Bidders shall appear in person at the Auction, or through a duly authorized representative; |

27

(d) only the Debtor, the Auction Bidders, the Consultation Parties, and the Debtor's creditors and equity holders, together with the professional advisors to each of the foregoing parties, may attend the Auction; provided that any creditors and equity holders desiring to attend the Auction must provide counsel for the Debtor one (1) business day's written notice of their intent to attend the Auction;

(e) the Debtor and its professional advisors shall direct and preside over the Auction, which shall be transcribed;

(f) the Auction Bidders shall confirm that they have not engaged in any collusion with respect to the Bid Procedures, the Auction or the Sale;

(g) bidding shall commence at the amount of the Baseline Bid, and the Auction Bidders may submit successive bids in increments of $50,000 of the current highest and best bid (or Baseline Bid for the first round) (the "**Minimum Overbid Increment**"); provided that: (i) each such successive bid must be a Qualifying Bid; (ii) if the then-highest and best bid is the Stalking Horse Bid, such bid must include the Initial Overbid amount of $250,000; (iii) any successive bid made by the Stalking Horse Bidder shall only be required to equal the sum of the amount of (A) the Baseline Bid or the then-highest and best bid, as applicable, plus (B) the Minimum Overbid Increment; and (iv) the Debtor shall retain the right to modify the bid increment requirements at the Auction; provided, further, that the Debtor, in consultation with the Consultation Parties, reserves the right to modify the Minimum Overbid Increment during the course of the Auction and shall do so on the record at the Auction;

(h) the Auction may include individual negotiations with any of the Auction Bidders, but all bids shall be made on the record and in the presence of all of the Auction Bidders;

(i) all material terms of the bid that is deemed to be the highest and best bid for each round of bidding shall be fully disclosed to the Auction Bidders, and the Debtor shall use reasonable efforts to clarify any and all questions that the Auction Bidders may have regarding the Debtor's announcement of the then-current highest and best bid;

(j) the Debtor and its professional advisors, in consultation with the Consultation Parties, may employ and announce at the Auction additional procedural rules that are reasonable under

28

the circumstances (e.g., the amount of time allotted to make subsequent bids) for conducting the Auction, provided that such rules are (i) not inconsistent with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or any applicable order of the Court entered in connection with the Chapter 11 Case, including, without limitation, the Bid Procedures Order, and (ii) disclosed to the Auction Bidders;

(k) each Auction Bidder shall (i) be deemed to have waived any right to a jury trial in connection with, and consented and submitted to the exclusive jurisdiction of the Court over, any actions or proceedings arising from or relating to the Bid Procedures, the Sale, the Auction, and the construction and enforcement of the contemplated transaction documents of the Auction Bidders, (ii) bring any such action or proceeding in the Court, and (iii) be deemed to have consented to the Court entering a final judgment determining any such action or proceeding and that such final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including any foreign jurisdictions) by suit on the judgment or in any other manner provided by applicable law;

(l) Auction Bidders shall have the right to make additional modifications to their respective Purchase Agreements or any Stalking Horse Agreement, as applicable, in conjunction with each Qualifying Bid submitted in each round of bidding during the Auction, provided that (i) any such modifications on an aggregate basis and viewed in whole, shall not, in the Debtor's discretion, in consultation with the Consultation Parties, be less favorable to the Debtor and its estate than the terms of the Auction Bidders' respective Purchase Agreements or the Stalking Horse Agreement, as applicable, and (ii) each Qualifying Bid shall constitute an irrevocable offer and shall be binding on the Auction Bidder submitting such bid until such party shall have submitted a subsequent Qualifying Bid at the Auction or the conclusion of the Sale Hearing, whichever occurs sooner, unless such bid is selected as the Successful Bid or the Back-Up Bid, which shall remain binding as provided for herein;

(m) the Debtor and the Consultation Parties shall have the right to request any additional financial information that will allow the Debtor and the Consultation Parties to make a reasonable determination as to an Auction Bidder's financial and other capabilities to consummate the transactions contemplated by their proposal or the Stalking Horse Agreement, as

29

<table>
<tr><td></td><td>applicable, as may be amended during the Auction, and any further information that the Debtor may believe is reasonably necessary to clarify and evaluate any bid made by an Auction Bidder during the Auction;

(n) upon the conclusion of the Auction, the Debtor shall determine, in consultation with the Consultation Parties, and subject to Court approval, the offer or offers for the Assets that is or are the highest or best from among the Qualifying Bids submitted at the Auction, which may be the Stalking Horse Agreement (the "**Successful Bid**"). In making this decision, the Debtor shall consider, in consultation with the Consultation Parties, the amount of the purchase price, the likelihood of the bidder's ability to close a transaction and the timing thereof, the nature and impact of any variances from the form Purchase Agreement requested by each bidder, and the net benefit to the Debtor's estate and its creditor constituencies. The bidder submitting such Successful Bid, which may be the Stalking Horse Bidder, shall become the "**Successful Bidder**," and shall have such rights and responsibilities of the purchaser as set forth in the subject Purchase Agreement, as applicable. The Debtor may, in its sole discretion, designate Back-Up Bids (and the corresponding Back-Up Bidders) to purchase the Assets in the event that the Successful Bidder does not close the Sale; and

(o) prior to the Sale Hearing, the Successful Bidder shall complete and execute all agreements, contracts, instruments, and other documents evidencing and containing the terms and conditions upon which the Successful Bid was made.

**THE SUCCESSFUL BID AND ANY BACK-UP BIDS SHALL CONSTITUTE AN IRREVOCABLE OFFER AND BE BINDING ON THE SUCCESSFUL BIDDER AND THE BACK-UP BIDDER, RESPECTIVELY, FROM THE TIME THE BID IS SUBMITTED UNTIL FIVE (5) BUSINESS DAYS AFTER THE SALE HAS CLOSED. EACH QUALIFYING BID THAT IS NOT THE SUCCESSFUL BID OR BACK-UP BID SHALL BE DEEMED WITHDRAWN AND TERMINATED AT THE CONCLUSION OF THE SALE HEARING.**</td></tr>
<tr><td>**Sale Hearing**</td><td>The Successful Bid and any Back-Up Bid (or if no Qualifying Bid other than that of the Stalking Horse Bidder is received, then the Stalking Horse Agreement) will be subject to approval by the Court. The hearing to approve such Successful Bid and any</td></tr>
</table>

IMPAC 11080189v.8

<table>
<tr><td></td><td>Back-Up Bid (the "**Sale Hearing**") shall take place, subject to the Court's availability, on **February 16, 2024 at __:__ a.m./p.m. (prevailing Eastern Time)**. The Sale Hearing may be adjourned by the Debtor from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing or by filing a hearing agenda or notice on the docket of the Debtor's Chapter 11 Case. **For the avoidance of doubt, by no later than the time of announcement of the Baseline Bid for the Auction, the Debtor may determine, in consultation with the Consultation Parties, to withdraw the Assets or any subset thereof, from the Auction and sale process, and adjourn the Sale Hearing with respect to these Assets on the terms set forth herein.**<br><br>At the Sale Hearing, the Debtor will seek entry of an order that, among other things: (i) authorizes and approves the Sale to the Successful Bidder (and, if applicable, the Back-Up Bidder), pursuant to the terms and conditions set forth in the applicable Stalking Horse Agreement or Purchase Agreement executed by the Successful Bidder (and, if applicable, the Back-Up Bidder), and that the Assets being transferred in such transaction shall be transferred free and clear of all liens, claims and Encumbrances pursuant to Bankruptcy Code section 363(f); (ii) unless otherwise ordered by the Court, directing that all Encumbrances on the Assets that are sold shall attach to the cash proceeds generated from the sale of such Assets in the same order of priority as they existed prior to the consummation of such sale; (iii) finding that the Stalking Horse Bidder or Successful Bidder, as applicable, is a good faith purchaser pursuant to Bankruptcy Code section 363(m); and (iv) as appropriate, exempting the Sale(s) and conveyance(s) of the Assets from any transfer tax, stamp tax, or similar tax, or deposit under any applicable bulk sales statute.</td></tr>
<tr><td>**Modification of the Bid and Auction Procedures**<br><br>Local Rule 6004-1(c)(i)(D)</td><td>Notwithstanding any of the foregoing, the Debtor and its estate reserve the right to, after consultation with the Consultation Parties, modify these Bid Procedures at or prior to the Auction, including, without limitation, to extend the deadlines set forth herein, allow for bidding on only a portion of the Assets and not all of them, modify bidding increments, waive terms and conditions set forth herein with respect to any or all potential bidders (including, without limitation, the Bid Requirements), impose additional terms and conditions with respect to any or all Potential Bidders, adjourn or cancel the Auction at or prior to the Auction, and adjourn the Sale Hearing.</td></tr>
</table>

IMPAC 11080189v.8

| | |
|---|---|
| **Closing with Alternative Backup Bidders**<br><br>Local Rule 6004-1(c)(i)(E) | Notwithstanding any of the foregoing, in the event that the Successful Bidder fails to close the Sale by February 20, 2024 (or such date as may be extended by the Debtor, in consultation with the Consultation Parties, and with the agreement of the Back-Up Bidder), the Back-Up Bid will be deemed to be the Successful Bid, the Back-Up Bidder will be deemed to be the Successful Bidder, and the Debtor will be authorized, but not directed, to close the Sale to the Back-Up Bidder subject to the terms of the Back-Up Bid without the need for further order of the Court and without the need for further notice to any interested parties, as soon as practicable thereafter. |
| **Return of Deposits** | All Deposits shall be returned to each bidder not selected by the Debtor as the Successful Bidder or the Back-Up Bidder no later than three (3) business days following the conclusion of the Sale Hearing. The deposit of the Successful Bidder or, if the Sale is closed with the Back-Up Bidder, the deposit of the Back-Up Bidder, shall be applied to the purchase price for the Sale. If the Successful Bidder (or, if the Sale is to be closed with the Back-Up Bidder, then the Back-Up Bidder) fails to consummate the Sale because of a breach or failure to perform on the part of such bidder, then, subject to the terms of the Purchase Agreement or the Stalking Horse Agreement, as applicable, the Debtor and its estate shall be entitled to retain the Deposit of the Successful Bidder (or, if the Sale is to be closed with the Back-Up Bidder, then the Back-Up Bidder) as part of the damages resulting to the Debtor and its estate for such breach or failure to perform. |
| **Notice and Consultation Parties** | (a) The term "**Notice Parties**" as used in these Bid Procedures shall mean: (i) proposed counsel to the Debtor, Potter Anderson & Corroon LLP, 1313 North Market Street, 6th Floor, Wilmington, Delaware 19801 (Attn: M. Blake Cleary (bcleary@potteranderson.com) and Aaron H. Stulman (astulman@potteranderson.com)); and (ii) investment banker to the Debtor, SC&H Group, Inc.; Matt LoCascio (mlocascio@schgroup.com).<br><br>(b) The term "**Consultation Parties**" as used in these Bid Procedures shall mean: counsel to any official committee appointed in the Debtor's Chapter 11 Case (the "**Committee**").<br><br>For the avoidance of doubt, any consultation rights provided to the Consultation Parties by these Bid Procedures shall not limit the Debtor's discretion in any way and shall not include the right |

<table>
<tr><td></td><td>to veto any decision made by the Debtor in the exercise of its business judgment.<br><br>If a member of the Committee submits a Qualifying Bid, the Committee will continue to have consultation rights as set forth in these Bid Procedures; <em>provided</em> that the Committee shall exclude such member from any discussions or deliberations regarding the sale of the Assets and shall not provide any information regarding the sale of the Assets to such member.</td></tr>
</table>

24.     Importantly, the Bid Procedures recognize the Debtor's fiduciary obligations to maximize the value of its assets and, as such, do not impair the Debtor's ability to consider all qualified bid proposals. Additionally, as noted above, the Bid Procedures preserve the Debtor's rights to modify the Bid Procedures as necessary or appropriate to maximize value of the Debtor's estate.

## II.     **The Auction and Sale**

25.     If one or more Qualifying Bids are received by the Bid Deadline, the Debtor will conduct an Auction to determine the highest and best Qualifying Bid. This determination shall take into account any factors the Debtor reasonably deems relevant to the value of the Qualifying Bid to the Debtor's estate, including, without limitation, the following:

a.     the amount and nature of the consideration;

b.     whether the Qualifying Bid intends to continue operations;

c.     the proposed assumption of any liabilities and/or executory contracts or unexpired leases, if any, and the excluded assets and/or executory contracts or unexpired leases, if any;

d.     the ability of the Qualifying Bidder to close the proposed transaction and the conditions related thereto, and the timing thereof;

e.     whether the bid is a bulk bid or a partial bid for only some of the Debtor's assets;

f.  the proposed closing date and the likelihood, extent, and impact of any potential delays in closing, including delays owing to regulatory uncertainty;

g.  any purchase price adjustments;

h.  the impact of the transaction on any actual or potential litigation;

i.  the net after-tax consideration to be received by the Debtor's estate; and

j.  the tax consequences of such bid (collectively, the "**Bid Assessment Criteria**").

26.  The Debtor seeks authority from the Court to schedule the Auction on a date as further described in the Bid Procedures.

**III.  Form and Manner of Sale Notice**

27.  On or within three (3) business days after entry of the Bid Procedures Order, the Debtor will cause the Sale Notice to be served on (a) the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**"); (b) counsel to the DIP Lender and Stalking Horse Bidder; (c) the holders of the twenty (20) largest unsecured claims against the Debtor; (d) all other parties who have expressed a written interest in the Assets; (e) the United States Attorney's Office for the District of Delaware; (f) the Internal Revenue Service; (g) the Attorney General for the State of Delaware; (h) the Securities and Exchange Commission; (i) all parties known or reasonably believed to have asserted an Interest in the Assets; (l) the Contract Counterparties; (m) the Department of Justice; (n) attorneys general in all states in which the Debtor operates; (o) all taxing authorities for jurisdictions to which the Debtor is subject; (p) all of the Debtor's known creditors (for whom identifying information and addresses are available to the Debtor); and (q) any party that has requested notice pursuant to Bankruptcy Rule 2002.

IMPAC 11080189v.8

28.     In addition, the Debtor will post a copy of the Sale Notice at the website of its proposed claims and noticing agent, Epiq Corporate Restructuring, LLC ("**Epiq**"), located at https://dm.epiq11.com/humanigen.

## IV.    Summary of the Assumption Procedures

29.     The Debtor is also seeking approval of certain procedures to facilitate the fair and orderly assumption and assignment of the Contracts in connection with the Sale (the "**Assumption Procedures**"). Pursuant to the Bid Procedures Order, notice of the proposed assumption and assignment of the Contracts to the Successful Bidder, the proposed cure amounts related thereto, and the right, procedures, and deadlines for objecting thereto, will be provided in a separate notice, attached to the Bid Procedures Order as <u>Exhibit 3</u> (the "**Cure and Possible Assumption and Assignment Notice**"). Generally, however, the Assumption Procedures: (i) outline the process by which the Debtor will serve notice to all Contract Counterparties regarding the proposed assumption and assignment and related cure amounts, if any, informing such parties of their rights, and the procedures, to object thereto, and (ii) establish objection and other relevant deadlines and the manner for resolving disputes relating to the assumption and assignment of the Contracts to the extent necessary.

## BASIS FOR RELIEF

## I.    The Relief Sought in the Bid Procedures Order Is in the Best Interests of the Debtor's Estate and Should Be Approved

### A.    The Proposed Notice of the Bid Procedures and the Sale Process Is Appropriate.

30.     The Debtor seeks authority to sell the Assets through an Auction and related sale process, subject to the Debtor's right to seek an alternative course of action to maximize the value of its estate. The Debtor and its advisors have conducted and will conduct an extensive marketing process. The Debtor has developed a list of "Contact Parties" who will receive a copy of the

"Information Package" (both as defined in the Bid Procedures). The list of Contact Parties will encompass those parties whom the Debtor believes may be potentially interested in pursuing a Sale and whom the Debtor reasonably believe may have the financial resources to consummate such a transaction. The Bid Procedures are designed to elicit bids from one or more parties and to encourage a robust auction of the Assets, thus maximizing the value of the Debtor's estate for the benefit of its creditors and other stakeholders.

31.     Under Bankruptcy Rule 2002(a) and (c), the Debtor is required to notify creditors of the proposed sale of the Assets, including a disclosure of the time and place of any auction, the terms and conditions of a sale, and the deadline for filing any objections.

32.     The Debtor respectfully submits the Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale, including: (i) the date, time, and place of the Auction (if one is held), (ii) the Bid Procedures, (iii) the deadline for filing objections to the Sale and entry of the Sale Order, and the date, time, and place of the Sale Hearing, (iv) a reasonably specific identification of the Assets, (v) a description of the Sale as being free and clear of liens, claims, encumbrances, and other interests other than Permitted Encumbrances and Assumed Liabilities, with all such liens, claims, encumbrances, and other interests attaching with the same validity and priority to the Sale proceeds, and (vi) notice of the proposed assumption and assignment of the Contracts to the Successful Bidder.

33.     The Debtor further submits that notice of this Motion and the related hearing to consider entry of the Bid Procedures Order, coupled with service of the Sale Notice, the Cure and Possible Assumption and Assignment Notice, as provided for herein, constitutes good and adequate notice of the Sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002. The Debtor further submits

the proposed notice procedures are designed to maximize the chance of obtaining the broadest possible participation in the Debtor's marketing process, while minimizing costs to the estate. Accordingly, the Debtor respectfully requests the Court find that the proposed notice procedures set forth in this Motion are sufficient, and no other or further notice of the Bid Procedures, Auction, Sale, or Sale Hearing is required.

### B. The Bid Procedures Are Appropriate and Will Maximize Value.

34.     Bid procedures should be approved when they provide a benefit to the debtor's estate by maximizing the value of the debtor's assets. *See In re Edwards*, 228 B.R. 552, 361 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."). Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets. *See, e.g., In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification'") (internal citations omitted)); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (quoting *Schipper*); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (same); *see also In re Integrated Resources, Inc.*, 147 B.R. 650, 656-57 (S.D.N.Y. 1992) (noting that bid procedures that have been negotiated by a trustee are to be reviewed in accordance with the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid").

35.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See Mushroom Transp. Co., Inc.*, 382 F.3d 325, 339 (3d Cir. 2004); *Official Comm. of Unsecured Creditors of Cybergenics, Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003); *see also In re Food Barn Stores, Inc.*, 101 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand");

*Integrated Resources*, 147 B.R. at 659 ("[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (internal citations omitted); *Edwards*, 228 B.R. at 561.

36.    To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore appropriate in the context of bankruptcy transactions. *See, e.g., In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999); *Integrated Resources*, 147 B.R. at 659 (bid procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

37.    The Debtor believes the proposed Bid Procedures will establish the parameters under which the value of the Sale may be tested at the Auction. The Bid Procedures will increase the likelihood the Debtor will receive the greatest possible consideration because they will ensure a competitive and fair bidding process.

38.    The Debtor believes the proposed Bid Procedures will promote active bidding from seriously interested parties and will elicit the highest or otherwise best offers available for the Assets. The proposed Bid Procedures will enable the Debtor to conduct the Sale in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who will offer the best package for the Assets and who can demonstrate the ability to close the transaction.

39.    Specifically, the proposed Bid Procedures contemplate an open auction process with minimum barriers to entry and provide potential bidding parties with sufficient time to

IMPAC 11080189v.8

perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

40.     At the same time, the proposed Bid Procedures provide the Debtor with a robust opportunity to consider competing bids and select the highest or otherwise best offer for the completion of the Sale. As such, creditors of the Debtor's estate can be assured the consideration obtained will be fair and reasonable and at or above the market.

41.     The Debtor submits the proposed Bid Procedures will encourage competitive bidding, are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings and are consistent with other procedures previously approved in this District. *See, e.g.*, *In re Winc, Inc.*, Case No. 22-11238 (LSS) (Bankr. D. Del. Dec. 22, 2022); *In re Fast Radius, Inc.*, Case No. 22-11051 (JKS) (Bankr. D. Del. Nov. 14, 2022); *In re Clarus Therapeutics Holdings Inc.*, Case No. 22-10845 (Bankr. D. Del. Sept. 22, 2022); *In re RTI Holding Co., LLC*, Case No. 20-12456 (JTD) (Bankr. D. Del. Nov. 20, 2020); *In re BL Restaurants Holding, LLC*, Case No. 20-10156 (MFW) (Bankr. D. Del. Feb. 28, 2020); *In re Forever 21, Inc.*, Case No. 19- 12122 (KG) (Bankr. D. Del. Feb. 4, 2020); *In re Consolidated Infrastructure Group, Inc.*, No. 19-10165 (BLS) (Bankr. D. Del. Apr. 24, 2019).[9]

42.     Thus, the Bid Procedures are reasonable, appropriate, and within the Debtor's sound business judgment under the circumstances because the Bid Procedures are designed to maximize the value to be received by the Debtor's estate.

---

[9] Because the number of orders cited is voluminous, individual orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtor's proposed counsel.

### C.    The Minimum Overbid Increment is Appropriate.

43.    One important component of the proposed Bid Procedures is the "Overbid" provision. If an Auction is to be held, pursuant to the Bid Procedures, bidding on the Assets must be in Minimum Overbid Increments of at least $50,000, following the Initial Overbid of $250,000.

44.    The Debtor believes such Initial Overbid and Minimum Overbid Increment is reasonable under the circumstances and will enable the Debtor to maximize the value received for the Assets while limiting any chilling effect in the marketing process.

### D.    The Proposed Notice Procedures for the Assigned Contracts and the Identification of Related Cure Amounts Are Appropriate.

45.    As set forth above, the Sale contemplates the potential assumption and assignment of the Contracts to the Successful Bidder arising from the Auction, if any. In connection with this process, the Debtor believes it is necessary to establish a process by which: (i) the Debtor and the Contract Counterparties can reconcile cure obligations, if any, in accordance with Bankruptcy Code sections 105(a) and 365, and (ii) such counterparties can object to the potential assumption and assignment of the Contracts and/or related cure amounts (the "**Assumption Procedures**").

46.    The Bid Procedures specify the process by which the Debtor will serve Cure and Possible Assumption and Assignment Notices and the procedures and deadline for Contract Counterparties to Assigned Contracts to file and serve Cure or Assignment Objections.

47.    Except as may otherwise be agreed to in the Successful Bid or by the parties to an Assigned Contract, at the closing of the Sale, the Successful Bidder shall cure those defaults under the Assigned Contracts that need to be cured in accordance with Bankruptcy Code section 365(b), by (i) payment of the undisputed cure amount (the "**Cure Amount**") and/or (ii) reserving amounts with respect to any disputed cure amounts.

48.     As set forth in the Bid Procedures Order, the Debtor also requests any party that fails to object to the proposed assumption and assignment of any Contract be deemed to consent to the assumption and assignment of the applicable Contract pursuant to Bankruptcy Code section 365, along with the Cure Amounts identified in the Cure and Possible Assumption and Assignment Notice. *See, e.g., In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to the Motion, a creditor is deemed to consent); *Pelican Homestead v. Wooten (In re Gabel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

49.     The Debtor believes the Assumption Procedures are fair and reasonable, provide sufficient notice to the Contract Counterparties of the potential assumption and assignment of its Contracts, and provide certainty to all parties in interest regarding their obligations and rights with respect thereof. Accordingly, the Debtor requests the Court approve the Assumption Procedures set forth in the Bid Procedures Order.

## II.     Approval of the Proposed Sale Is Appropriate and in the Best Interests of the Estate

### A.     The Sale of the Assets Should be Authorized Pursuant to Bankruptcy Code Section 363 as a Sound Exercise of the Debtor's Business Judgment.

50.     Bankruptcy Code section 363(b)(1) provides a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). A sale of the debtor's assets should be authorized pursuant to Bankruptcy Code section 363 if a sound business purpose exists for the proposed transaction. *See, e.g., Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) ("Under Section 363, the debtor-in-possession can sell property of the estate . . . if he has an 'articulated business justification' . . . ."); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (Bankr. D. Del. 1999); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 174 (Bankr. D. Del. 1991); *see also In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d

41

1063, 1070 (2d Cir. 1983); *In re Telesphere Commc'ns, Inc.*, 179 B.R. 544, 552 (Bankr. N.D. Ill. 1999).

51.     Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (i) whether a sound business justification exists for the sale, (ii) whether adequate and reasonable notice of the sale was given to interested parties, (iii) whether the sale will produce a fair and reasonable price for the property, and (iv) whether the parties have acted in good faith. *See Del. & Hudson*, 124 B.R. at 176; *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987).

52.     A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets for the estate, creditors, or interest holders. *See, e.g., In re Abbotts Dairies of Pa, Inc.*, 788 F.2d 143 (3d Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983).

53.     "Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). There is a presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." *In re Integrated Res.*, 147 B.R. at 656 (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *see also In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill. 1995) ("The business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action was in the best interests of the company.") (citations omitted); *In re Filene's Basement, LLC*, No.

42

11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate.") (citations omitted). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under Bankruptcy Code section 363(b)(1). Indeed, when applying the business judgment standard, courts show great deference to a debtor's business decisions. *See Pitt v. First Wellington Canyon Assocs. (In re First Wellington Canyon Assocs.)*, 1989 WL 106838, at *3 (N.D. Ill. 1989) ("Under this test, the debtor's business judgment . . . must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion.").

54.     As set forth above, and in the LoCascio Declaration, the Debtor has a sound business justification for selling the Assets. First, the Debtor believes the Sale will maximize the Assets' going-concern value by allowing a party to bid on business assets that would have substantially less value on a stand-alone or liquidation basis. Moreover, to the extent the Successful Bidder assumes certain of the Contracts, it will result in payment in full for a number of the Debtor's creditors. In addition, the sale may pave the way for the re-start of business operations and continued development of the Debtor's critical pharmaceutical products.

55.     Second, the sale of the Assets will be subject to competing bids, enhancing the Debtor's ability to receive the highest or otherwise best value for the Assets. The value of the Assets will be tested through the Auction conducted pursuant to and according to the Bid Procedures. Ultimately, the Successful Bid, after being subject to a "market check" in the form of the marketing process and Auction and accepted by the Debtor in the exercise of its reasonable business judgment, will constitute the highest or otherwise best offer for the Assets and the Debtor believes such Successful Bid will provide a greater recovery for its estate than any known or

practically available alternative. *See, e.g., In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not require an auction procedure . . . the auction procedure has developed over the years as an effective means for producing an arm's-length fair value transaction"). Consequently, the fairness and reasonableness of the consideration to be paid by the Successful Bidder ultimately will be demonstrated by adequate "market exposure" and an open and fair auction process — the best means for establishing whether a fair and reasonable price is being paid.

56.     Thus, absent a change in circumstances that causes the Debtor to abandon the sale process, the Debtor submits the Successful Bidder's purchase agreement will constitute the highest or otherwise best offer for the Assets and will provide a greater recovery for the Debtor's estate than would be provided by any other available alternative. As such, the Debtor's determination to explore selling the Assets through an Auction process and subsequently to enter into the asset purchase agreement with the Successful Bidder will be a valid and sound exercise of the Debtor's business judgment. The Debtor will submit evidence at the Sale Hearing to support these conclusions. Therefore, the Debtor requests the Court make a finding that the proposed sale of the Assets is a proper exercise of the Debtor's business judgment and is rightly authorized.

**B.      Adequate and Reasonable Notice of the Sale Will Be Provided.**

57.     As described above, the Sale Notice will: (i) be served in a manner that provides at least 21-days' notice of the date, time, and location of the Sale Hearing, (ii) inform parties in interest of the deadlines for objecting to the Sale or the assumption and assignment of the Contract, and (iii) otherwise include all information relevant to parties interested in or affected by the Sale. Significantly, the form and manner of the Sale Notice will have been approved by this Court pursuant to the Bid Procedures Order, after notice and a hearing, before it is served on parties in interest.

C.      **The Sale and Purchase Price Will Reflect a Fair-Value Transaction.**

58.      It is well-settled that, where there is a court-approved auction process, a full and

fair price is presumed to have been obtained for the assets sold, as the best way to determine value

is exposure to the market. *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,

526 U.S. 434, 457 (1999). The Debtor will continue to market the Assets and solicit offers

consistent with the Bid Procedures, including, without limitation, by providing acceptable Bidders

with access to the Data Room and requested information. In this way, the number of Bidders that

are eligible to participate in the competitive Auction process will be maximized. On the other hand,

if no Auction is held because no Auction is necessary, the Stalking Horse Agreement's purchase

price conclusively will have been demonstrated to be fair value.

D.      **The Sale of the Assets Should Be Free and Clear of Interests Pursuant to Bankruptcy Code Section 363(f).**

59.      The Debtor further submits it is appropriate to sell the Assets free and clear of all

liens, claims, encumbrances, and other interests (collectively, the "**Interests**") other than Permitted

Encumbrances and Assumed Liabilities pursuant to Bankruptcy Code section 363(f), with any

such Claims and Interests attaching to the net sale proceeds of the Assets, as and to the extent

applicable.

60.      Bankruptcy Code section 363(f) permits a debtor to sell property free and clear of

another party's interest in the property if (i) applicable nonbankruptcy law permits such a free and

clear sale, (ii) the holder of the interest consents, (iii) the interest is a lien and the sale price of the

property exceeds the value of all liens on the property, (iv) the interest is the subject of a *bona fide*

dispute, (v) the holder of the interest could be compelled in a legal or equitable proceeding to

accept a monetary satisfaction of its interest. *See* 11 U.S.C. § 363(f).

61.    Section 363(f) is drafted in the disjunctive. Thus, satisfaction of any of the requirements enumerated therein will suffice to permit the Debtor's sale of the Assets free and clear of all interests (*i.e.*, all liens, claims, rights, interests, charges, or encumbrances), except with respect to any interests that may be assumed liabilities under the applicable purchase agreement. *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); *see also In re Dundee Equity Corp.*, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. March 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); *Citicorp Homeowners Servs., Inc. v. Eliot (In re Eliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same); *Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating Bankruptcy Code section 363(f) is written in the disjunctive; holding the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) has been satisfied).

62.    The Debtor submits that, excluding assumed agreements, if any, the Assets may be sold free and clear of liens, claims, encumbrances, and other interests—all in accordance with at least one of the five conditions of Bankruptcy Code section 363(f). Consistent with Bankruptcy Code section 363(f)(2), each of the parties holding liens on the Assets, if any, will consent, or absent any objection to this Motion, will be deemed to have consented to, the Sale and transfer of the Assets. Furthermore, any party holding a valid lien against the Assets will be adequately protected by having its liens, if any, attach to the sale proceeds received by the Debtor from the sale of the Assets to the Successful Bidder, in the same order of priority, with the same validity, force, and effect such creditor had prior to such sale, subject to any claims and defenses the Debtor

46

and its estate may possess with respect thereto. Accordingly, Bankruptcy Code section 363(f) authorizes the sale and transfer of the Assets free and clear of any such Interests.

> ### E. The Assets and Assigned Contracts Should be Sold Free and Clear of Successor Liability.

63.     The Sale Order will provide that the Purchaser shall not have any successor liability related to Seller or the Assets to the maximum extent permitted by law. Extensive case law establishes that claims against a winning bidder may be directed to the proceeds of a free and clear sale of property, and may not subsequently be asserted against that buyer.

64.     Although Bankruptcy Code section 363(f) provides for the sale of assets "free and clear of any interests," the term "any interest" is not defined anywhere in the Bankruptcy Code. *Folger Adam Security v. DeMatteis/MacGregor JV*, 209 F.3d 252, 257 (3d Cir. 2000). In the case of *In re Trans World Airlines. Inc.*, 322 F.3d 283, 288-89 (3d Cir. 2003), the Third Circuit specifically addressed the scope of the term "any interest." The Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only in rem interests in property," the trend in modern cases is towards "a more expansive reading of 'interests in property' which 'encompasses other obligations that may flow from ownership of the property.'" *Id.* at 289 (citing 3 Collier on Bankruptcy 363.06[1]). As determined by the Fourth Circuit in *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581-82 (4th Cir. 1996), a case cited approvingly and extensively by the Third Circuit in *Folger*, the scope of section 363(f) is not limited to *in rem* interests. Thus, the Third Circuit in *Folger* cited *Leckie* for the proposition that debtors "could sell their assets under § 363(f) free and clear of successor liability that otherwise would have arisen under federal statute." *Folger*, 209 F.3d at 258.

65.     Courts have consistently held a buyer of a debtor's assets pursuant to a section 363 sale takes free from successor liability resulting from pre-existing claims. *See The Ninth Avenue*

*Remedial Group v. Allis-Chalmers Corp.*, 195 B.R. 716, 732 (Bankr. N.D. Ind. 1996) (stating a bankruptcy court has the power to sell assets free and clear of any interest that could be brought against the bankruptcy estate during the bankruptcy); *MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 837 F.2d 89, 93-94 (2d Cir. 1988) (channeling of claims to proceeds consistent with intent of sale free and clear under Bankruptcy Code section 363(f)); *In re New England Fish Co.*, 19 B.R. 323, 329 (Bankr. W.D. Wash. 1982) (transfer of property in free and clear sale was free and clear of Title VII employment discrimination and civil rights claims of debtor's employees); *In re Hoffman*, 53 B.R. 874, 876 (Bankr. D.R.I. 1985) (transfer of liquor license free and clear of any interest permissible even though the estate had unpaid taxes); *American Living Systems v. Bonapfel (In re All Am. of Ashburn, Inc.)*, 56 B.R. 186, 190 (Bankr. N.D. Ga. 1986) (product liability claims precluded from being asserted against his successor in a sale of assets free and clear); *WBQ P'ship v. Virginia Dept. of Medical Assistance Services (In re WBQ P'ship)*, 189 B.R. 97, 104-05 (Bankr E D. Va. 1995) (Commonwealth of Virginia's right to recapture depreciation is an "interest" as used in section 363(f)).

66.     The purpose and value of an order authorizing the transfer of the Assets would be frustrated if claimants thereafter could use the transfer as a basis to assert claims against the Purchaser. Under Bankruptcy Code section 363(f), the purchaser is entitled to know the Assets are not tainted by latent claims that could be asserted against the purchaser after the proposed transaction is completed. Absent that ruling, the value of the Assets could be severely compromised.

67.     Accordingly, consistent with the above-cited case law, the order approving the sale of the Assets should state the Successful Bidder is not liable as a successor under any theory of successor liability, for Interests that encumber or relate to the Assets.

F.      **The Sale Has Been Proposed in Good Faith and Without Collusion, and the Successful Bidder Will Be a "Good-Faith Purchaser" Entitled to the Full Protection of Bankruptcy Code Section 363(m); and the Sale of the Assets Does Not Violate Bankruptcy Code Section 363(n).**

68.     The Debtor requests the Court find that the Successful Bidder is entitled to the benefits and protections provided by Bankruptcy Code section 363(m) in connection with the sale of the Assets.

69.     Bankruptcy Code section 363(m) provides, in pertinent part:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

70.     Bankruptcy Code section 363(m) thus protects the purchaser of assets sold pursuant to Bankruptcy Code section 363 from the risk it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal, as long as such purchaser purchased or leased the assets in "good faith." While the Bankruptcy Code does not define "good faith," courts have held a purchaser shows its good faith through the integrity of its conduct during the course of the sale proceedings, finding that, where there is a lack of such integrity, a good-faith finding may not be made. *See, e.g., Abbotts Dairies of Pa.*, 788 F.2d at 147 ("Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *In the Matter of Andy Frain Servs., Inc.*, 798 F.2d 1113 (7th Cir. 1986) (same); *In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (same).

71.     The Debtor submits that the Successful Bidder would be a "good faith purchaser" within the meaning of Bankruptcy Code section 363(m), and the resulting purchase agreement would be a good-faith agreement on arm's-length terms entitled to the protections of Bankruptcy Code section 363(m).[10] *First*, as set forth in more detail above, the consideration to be received by the Debtor pursuant to the Sale will be subject to a market process by virtue of the Debtor's marketing efforts and the Auction, if one is held, and will be substantial, fair, and reasonable. *Second*, the asset purchase agreement entered into by the Debtor and the Successful Bidder will be the result of extensive arm's-length negotiations, during which all parties will have the opportunity to be, and the Debtor will be, represented by competent counsel, and any purchase agreement with a Successful Bidder will be the culmination of the Debtor's competitive market process and, if necessary, the Auction, in which all negotiations will be conducted on an arm's-length, good-faith basis. *Third*, where—as the Debtor anticipates will be the case here—there is no indication of any "fraud or collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or similar conduct, there is no cause that would permit the Sale to be avoided pursuant to Bankruptcy Code section 363(n). Moreover, with respect to potential bidders, the Bid Procedures are designed to ensure no party is able to exert undue influence over the process. *Finally*, the Successful Bidder's offer will be evaluated and approved by the Special Committee on behalf of the Debtor in consultation with the Debtor's advisors. Accordingly, the Debtor believes the Successful Bidder and the resulting purchase agreement should be entitled to the full protections of Bankruptcy Code section 363(m).

---

[10] The Debtor believes a finding of good faith within the meaning of Bankruptcy Code section 363(m) will be appropriate for the Successful Bidder arising from the Auction and the Bid Procedures. Pursuant to the Bid Procedures, any Successful Bidder will have had to present a proposal in accordance with the Bid Procedures. In addition, the Debtor will not choose as the Successful Bidder or the Backup Bidder any entity whose good faith under Bankruptcy Code section 363(m) can reasonably be doubted, and will be prepared to present the Court with sufficient evidence to allow the Court to find that the "good faith" standard of Bankruptcy Code section 363(m) has been satisfied.

72.     Moreover, because there will be absolutely no fraud or improper insider dealing of any kind, the Sale does not constitute an avoidable transaction pursuant to Bankruptcy Code section 363(n), and, as a result, the Purchaser should receive the protections afforded good faith purchasers by Bankruptcy Code section 363(m). Accordingly, the Debtor requests the Court make a finding at the Sale Hearing that the agreement reached with the Successful Bidder was at arm's length and is entitled to the full protections of Bankruptcy Code section 363(m). The Debtor will submit evidence at the Sale Hearing to support these conclusions.

**G.     Credit Bidding Should be Authorized Pursuant to Bankruptcy Code Section 363(k).**

73.     A secured creditor is allowed to "credit bid" the amount of its claims in a sale of assets in which it has a security interest. Bankruptcy Code section 363(k) provides, in relevant part, that unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of the sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. § 363(k). Even if a secured creditor is undersecured as determined in accordance with Bankruptcy Code section 506(a), section 363(k) allows such secured creditor to bid the total face value of its claim and does not limit the credit bid to the creditor's economic value. *See In re Submicron Sys. Corp.*, 432 F.3d 448, 459-60 (3d Cir. 2006) (explaining "[i]t is well settled . . . that creditors can bid the full face value of their secured claims under section 363(k)").

74.     In this District, absent cause for restriction on credit bidding, courts have consistently ruled in favor of reserving a secured creditor's right to credit bid its claim. *See In re MD Helicopters, Inc.*, No. 22-10263 (KBO) (Bankr. D. Del. April 26, 2022) (order authorizing secured creditors to credit bid); *In re Alpha Latam Management, LLC, et al.*, Case No. 21-11109 (JKS) (Bankr. D. Del. Sept. 15, 2021) (order approving bid procedures authorizing secured

creditors to exercise right under Bankruptcy Code § 363(k) to credit bid); *In re Avadim Health, Inc., et al.*, Case No. 21-10883 (CTG) (Bankr. D. Del. June 23, 2021) (order authorizing secured creditors to credit bid)*; In re RTI Holding Company, LLC*, Case No. 20-12456 (JTD) (Bankr. D. Del. Nov. 20, 2020) (order authorizing secured creditors to exercise right under Bankruptcy Code § 363(k) to credit bid); *see also Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 459-60 (3d Cir. 2006) (citations omitted).

75.    Thus, subject to the Bid Procedures, the Stalking Horse Bidder should be allowed to submit a credit bid.

### III.    The Expense Reimbursement Should be Approved

76.    The Debtor believes that the Expense Reimbursement is fair and reasonable under the circumstances. The Expense Reimbursement provided for in the Stalking Horse Agreement was negotiated at arms' length and in good faith and was a necessary inducement to the Stalking Horse Bidder's participation in the proposed sale transaction and willingness to subject its bid to a competitive auction process.  The Stalking Horse Bid sets a "floor" value for the Assets that maximizes the likelihood that the Debtor will receive the highest or otherwise best offer for the Assets to the benefit of the Debtor's estate.

77.    Approval of the Expense Reimbursement is governed by standards for determining the appropriateness of bid protections in the bankruptcy context.  Courts have identified at least two (2) instances in which bid protections may benefit the estate.  First, a break-up fee or expense reimbursement may be necessary to preserve the value of a debtor's estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited.*" Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 533 (3d Cir. 1999).  Second, if the availability of break-up fees and expense reimbursements were to induce a bidder to research the

value of the debtor and convert the value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth. *See id.*; *see also In re Reliant Energy Channel View LP*, 594 F.3d 200, 206-08 (3d Cir. 2010) (reasoning that a break-up fee should be approved if it is necessary to entice a party to make the first bid or if it would induce a stalking horse bidder to remain committed to a purchase).

78.    In *O'Brien*, the Third Circuit reviewed the following nine (9) factors set forth by the lower court as relevant in deciding whether to award a termination fee:

> (a) the presence of self-dealing or manipulation in negotiating the break-up fee;
>
> (b) whether the fee harms, rather than encourages, bidding;
>
> (c) the reasonableness of the break-up fee relative to the purchase price;
>
> (d) whether the unsuccessful bidder placed the estate property in a "sale configuration mode" to attract other bidders to the auction;
>
> (e) the ability of the request for a break-up fee to serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders or attract additional bidders;
>
> (f) the correlation of the fee to a maximum value of the debtor's estate;
>
> (g) the support of the principal secured creditors and creditors' committees of the break-up fee;
>
> (h) the benefits of the safeguards to the debtor's estate; and
>
> (i) the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee.

*See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d at 536.

79.    While none of the factors are dispositive, an application of the facts to several of such factors supports the approval of the Expense Reimbursement.  In particular, the Expense Reimbursement is necessary to preserve the value of the Debtor's estate because it will enable the Debtor to establish an adequate floor value for the Assets and to therefore insist that competing

bids be materially higher or otherwise better than the Stalking Horse Bid—a clear benefit to the Debtor's estate. The Stalking Horse Bidder would not agree to act as a stalking horse without the Expense Reimbursement given the substantial time and expense it has incurred in connection with negotiating definitive documentation and the risk that it will be outbid at the Auction. Without the Expense Reimbursement, the Debtor might lose the opportunity to obtain the highest or otherwise best offer for the Assets and would certainly lose the downside protection that will be afforded by the existence of the Stalking Horse Bidder. The bid of the Stalking Horse Bidder sends a message to all potential bidders that the Assets are at least worth the purchase price and puts pressure on potential competing bidders to "put their best foot forward" in formulating their bids. Therefore, without the benefit of the bid of the Stalking Horse Bidder, the bids received at auction for the Assets could be substantially lower than the bid offered by the Stalking Horse Bidder.

## IV.    <u>The Assumption and Assignment of the Contracts Should be Approved</u>

### A.    **The Assumption and Assignment of the Contracts Reflects the Debtor's Reasonable Business Judgment.**

80.    To facilitate and effectuate the sale of the Assets, the Debtor is seeking authority to assign the Assigned Contracts to the Successful Bidder to the extent required by such Successful Bidder.

81.    Bankruptcy Code section 365 authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the court, provided the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. *See* 11 U.S.C. § 365(b)(1).

82.    The standard applied by the Third Circuit in determining whether an executory contract or unexpired lease should be assumed is the "business judgment" test, which requires a debtor to determine that the requested assumption or rejection would be beneficial to its estate. *See*

*Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984) (describing business judgment test as "traditional") (superseded in part by 11 U.S.C. § 1113).

83.     Courts generally will not second-guess a debtor's business judgment concerning the assumption of an executory contract. *See In re Decora Indus., Inc.*, 2002 WL 32332749, at *8 (D. Del. 2002); *Official Comm. for Unsecured Creditors v. Aust (In re Network Access Solutions, Corp)*, 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule"); *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard"); *see also Phar Mor, Inc. v. Strouss Bldg. Assocs.*, 204 B.R. 948, 952 (N.D. Ohio 1997) ("Courts should generally defer to a debtor's decision whether to reject an executory contract.") (citation omitted). A debtor's decision to assume or reject an executory contract or expired lease will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. *See, e.g., Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pac. Ry. Co.*, 318 U.S. 523 (1943) (applying Bankruptcy Act section 77(b), predecessor to Bankruptcy Code section 365, and rejecting a test of whether an executory contract was burdensome in favor of determining whether rejection is within the debtor's business judgment); *see also Sharon Steel*, 872 F.2d at 40 (describing deference to a debtor's business judgment as "breathing space afforded [to] the debtor to consider whether to reject or assume executory contracts under the Code"); *Network Access Solutions*, 330 B.R. at 75; *Exide Techs.*, 340 B.R. at 239.

84.     Here, the Court should approve the decision to assume and assign the Assigned Contracts in connection with the Sale as a sound exercise of the Debtor's business judgment. *First*,

IMPAC 11080189v.8

the Assigned Contracts are necessary to operate the Assets and, as such, they are essential to inducing the best offer for the Assets. *Second*, it is unlikely any purchaser would want to acquire the Assets unless a significant number of the contracts and leases needed to manage the day-to-day operations were included in the transaction. *Third*, the Assigned Contracts will be assumed and assigned as part of a process approved by the Court pursuant to the Bid Procedures Order and, thus, will be reviewed by key constituents in the Chapter 11 Case. Accordingly, the Debtor submits the assumption and assignment of the Assigned Contracts, if required by the Successful Bidder, should be approved as a sound exercise of the Debtor's business judgment.

85.    A debtor in possession may assign an executory contract or an unexpired lease of the debtor if it assumes the agreement in accordance with Bankruptcy Code section 365(a), and provides adequate assurance of future performance by the assignee, whether or not there has been a default under the agreement. *See* 11 U.S.C. § 365(f)(2). Significantly, among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g.*, *In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (stating adequate assurance of future performance is present when the prospective assignee of a lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).

86.    The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *EBG Midtown South Corp. v. McLaren/Hart Envtl. Eng' g Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 592 (S.D.N.Y. 1992) (citations omitted), *aff'd*, 993 F.2d 300 (2d Cir. 1993); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

87.     Counterparties to Assigned Contracts will have the opportunity to object to adequate assurance of future performance by any of the Bidders. Accordingly, the Debtor submits the assumption and assignment of the Assigned Contracts as set forth herein should be approved.

88.     To assist in the assumption, assignment, and sale of the Assigned Contracts, the Debtor also requests the Sale Order approving the sale of the Assets provide that anti-assignment provisions in the Assigned Contracts shall not restrict, limit, or prohibit the assumption, assignment, and sale of the Assigned Contracts and are deemed and found to be unenforceable anti-assignment provisions within the meaning of Bankruptcy Code section 365(f).

89.     Bankruptcy Code section 365(f)(1) permits a debtor to assign unexpired leases and contracts free from such anti-assignment restrictions, providing, in pertinent part, that:

> [N]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection . . . .

11 U.S.C. § 365(f)(1).

90.     Bankruptcy Code section 365(f)(1), by operation of law, invalidates provisions that prohibit, restrict, or condition assignment of an executory contract or unexpired lease. *See, e.g., Coleman Oil Co., Inc. v. The Circle K Corp. (In re The Circle K Corp.)*, 127 F. 3d 904, 910-11 (9th Cir. 1997) ("no principle of bankruptcy or contract law precludes us from permitting the Debtor here to extend their leases in a manner contrary to the leases' terms, when to do so will effectuate the purposes of section 365"), *cert. denied*, 522 U.S. 1148 (1998). Bankruptcy Code section 365(f)(3) goes beyond the scope of Bankruptcy Code section 365(f)(1) by prohibiting enforcement of any clause creating a right to modify or terminate the contract or lease upon a proposed assumption or assignment thereof. *See, e.g., In re Jamesway Corp.*, 201 B.R. 73 (Bankr. S.D.N.Y. 1996) (Bankruptcy Code section 365(f)(3) prohibits enforcement of any lease clause

creating right to terminate lease because it is being assumed or assigned, thereby indirectly barring assignment by debtor; all lease provisions, not merely those entitled anti-assignment clauses, are subject to court's scrutiny regarding anti-assignment effect).

91.     Other courts have recognized provisions that have the effect of restricting assignments cannot be enforced. *See In re Rickel Home Ctrs., Inc.*, 240 B.R. 826, 831 (D. Del. 1998) ("In interpreting Section 365(f) [*sic*], courts and commentators alike have construed the terms to not only render unenforceable lease provisions which prohibit assignment outright, but also lease provisions that are so restrictive that they constitute de facto anti-assignment provisions."). Similarly, in *In re Mr. Grocer., Inc.*, the court noted that:

> [the] case law interpreting § 365(f)(1) of the Bankruptcy Code establishes that the court does retain some discretion in determining that lease provisions, which are not themselves ipso facto anti-assignment clauses, may still be refused enforcement in a bankruptcy context in which there is no substantial economic detriment to the landlord shown, and in which enforcement would preclude the bankruptcy estate from realizing the intrinsic value of its assets.

77 B.R. 349, 354 (Bankr. D.N.H. 1987). Thus, the Debtor requests any anti-assignment provisions be deemed not to restrict, limit, or prohibit the assumption, assignment, and sale of the Assigned Contracts, and be deemed and found to be unenforceable anti-assignment provisions within the meaning of Bankruptcy Code section 365(f).

92.     Orders granting motions to sell property and for the assumption and assignment of executory contracts frequently contain language explicitly stating the counterparty to the assumed contracts are barred from asserting against the debtor any default by reason of the closing, including any breach or right of termination relating to a change in control of the debtor. *See, e.g., In re Irish Bank Resolution Corp. Ltd.*, No. 13-12159 (CSS), 2014 WL 1759609, at *8 (Bankr. D. Del. Feb. 14, 2014) ("[n]o sections or provisions of the Contracts that purport to....declare a breach

or default as a result of a change in control in respect of the Debtor…shall have any force and effect, and such provisions constitute unenforceable anti-assignment provisions under 11 U.S.C. § 365(f) and/or are otherwise unenforceable under 11 U.S.C. § 365(e).").

## V.      Relief Pursuant to Bankruptcy Rule 6004(h) and 6004(d) Is Appropriate

93.      Bankruptcy Rule 6004(h) provides an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Additionally, Bankruptcy Rule 6006(d) provides an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." The Debtor requests that the Sale Order be effective immediately upon its entry by providing the 14-day stay under Bankruptcy Rules 6004(h) and 6006(d) be waived.

94.      The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay periods, the leading treatise on bankruptcy suggests the 14-day stay periods should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to procedure." 10 *Collier on Bankruptcy* ¶ 6004.10 (15th rev. ed. 2006). Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

95.      To maximize the value received from the Assets, and to ensure they are in compliance with the requirements of the DIP Order, the Debtor seeks to close the Sale as soon as

possible after the Sale Hearing. Accordingly, the Debtor hereby requests the Court waive the 14-day stay periods under Bankruptcy Rules 6004(h) and 6006(d).

## CONSENT TO JURISDICTION

96.     Pursuant to Local Rule 9013-1(f), the Debtor consents to the entry of a final judgment or order with respect to this Motion if it is determined that the Court would lack Article III jurisdiction to enter such final order or judgment absent consent of the parties.

## RESERVATION OF RIGHTS

97.     Nothing contained herein is or should be construed as: (a) an admission as to the validity of any claim against the Debtor or the existence of any lien against the Debtor's property; (b) a waiver of the Debtor's rights to dispute any claim or lien on any grounds; (c) a promise to pay any claim; (d) an implication or admission that any particular claim would constitute an allowed claim; (e) an assumption or rejection of any executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code; or (f) a limitation on the Debtor's rights under section 365 of the Bankruptcy Code to assume or reject any executory contract with any party subject to the Proposed Orders once entered. Nothing contained in the Proposed Orders will be deemed to increase, reclassify, elevate to an administrative expense status, or otherwise affect any claim to the extent it is not paid.

## NOTICE

98.     Notice of this Motion will be given to: (a) the U.S. Trustee; (b) counsel to the DIP Lender and Stalking Horse Bidder; (c) the holders of the twenty (20) largest unsecured claims against the Debtor; (d) all other parties who have expressed a written interest in the Assets; (e) the United States Attorney's Office for the District of Delaware; (f) the Internal Revenue Service; (g) the Attorney General for the State of Delaware; (h) the Securities and Exchange Commission; (i) all parties known or reasonably believed to have asserted a lien or security interest in the Assets

(for whom identifying information and addresses are available to the Debtor); (l) the Contract Counterparties; (m) the Department of Justice; (n) attorneys general in all states in which the Debtor operates; (o) all taxing authorities for jurisdictions to which the Debtor is subject; and (p) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtor believes that no further notice is required.

## NO PRIOR REQUEST

99.     No prior motion for the relief requested herein has been made to this or any other court.

**WHEREFORE**, the Debtor respectfully requests that the Court: (i) enter the Bid Procedures Order, the form of which is attached as Exhibit B hereto, (ii) enter the Sale Order after the Sale Hearing, and (iii) grant such other and further relief as is just and proper.

*[Remainder of Page Intentionally Left Blank]*

Dated:  January 4, 2024        Respectfully submitted,
       Wilmington, Delaware

*/s/ Aaron H. Stulman*

M. Blake Cleary (No. 3614)
Aaron H. Stulman (No. 5807)
Brett M. Haywood (No. 6166)
Maria Kotsiras (No. 6840)
Sameen Rizvi (No. 6902)
**POTTER ANDERSON & CORROON LLP**
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Facsimile:  (302) 658-1192
Email:  bcleary@potteranderson.com
       astulman@potteranderson.com
       bhaywood@potteranderson.com
       mkotsiras@potteranderson.com
       srizvi@potteranderson.com

*Proposed Counsel to the Debtor and Debtor in Possession*

IMPAC 11080189v.8

# **Exhibit A**

Stalking Horse Agreement

**ASSET PURCHASE AGREEMENT**

**DATED AS OF JANUARY 3, 2024**

**BY AND AMONG**

**TARAN THERAPEUTICS INC., AS PURCHASER**

**AND**

**HUMANIGEN, INC., AS SELLER**

---

## INDEX OF EXHIBITS

EXHIBIT A    FORM OF BILL OF SALE

EXHIBIT B    FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

EXHIBIT C    FORM    OF    INTELLECTUAL    PROPERTY    ASSIGNMENT
AGREEMENT

EXHIBIT D    FORM OF EQUITY INTEREST POWER

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "<u>Agreement</u>"), is made and entered into as of January 3, 2024 (the "<u>Effective Date</u>"), by and among Taran Therapeutics Inc., a Delaware corporation (including any legal successor or assignee of thereof, "<u>Purchaser</u>") and Humanigen, Inc., a Delaware corporation with its principal executive offices located at 830 Morris Turnpike, 4th Floor, Short Hills, NJ 07078 (including any legal successor or assignee thereof, "<u>Seller</u>"). Purchaser and Seller are referred to herein individually as a "<u>Party</u>" and collectively as the "<u>Parties</u>" ). Capitalized terms used herein shall have the meanings set forth herein or in <u>Article XI</u>.

## RECITALS

**WHEREAS,** Seller is a clinical stage biopharmaceutical company, developing its portfolio of proprietary Humaneered® anti-inflammatory immunology and immuno-oncology monoclonal antibodies, lenzilumab, ifabotuzumab and HGEN005;

**WHEREAS**, Seller is developing lenzilumab in chronic myelomonocytic leukemia, a rare blood cancer, for which the Precision Approach to Chronic Myelomonocytic Leukemia study is underway, and is continuing its plans for the Risk Adapted Therapy in Acute GvHD study in acute graft versus host disease that occurs in patients undergoing bone marrow transplant, in studies that are majority funded by its partners; a leading network of centers, The Mayo Clinics, is currently progressing with an investigator-initiated trial of lenzilumab in combination with CAR-T therapies; and Seller is developing ifabotuzumab, an EpAh-3 targeted monoclonal antibody, currently in Phase 1 development, as part of an antibody drug conjugate ("<u>ADC</u>"), for certain solid tumors; and Seller is developing HGEN005 for certain inflammatory conditions associated with an excess of certain eosinophils, a certain type of white blood cell (such business and development initiatives, and together with all of Seller's rights, interests, and assets wherever located throughout the world, the "<u>Acquired Business</u>");

**WHEREAS**, Seller has filed or will file a voluntary petition for relief under Chapter 11 of Title 11, United States Code, 11 U.S.C. §§ 101-1532 (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>", and Seller's Chapter 11 case administered in respect of such filing, the "<u>Bankruptcy Case</u>");

**WHEREAS**, Seller is continuing to manage its properties and operate its business and, to the extent the Bankruptcy Case has been filed, is doing so as "debtor-in-possession" under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code;

**WHEREAS**, Purchaser desires to purchase the Acquired Assets and assume the Assumed Liabilities from Seller, and Seller desires to sell, convey, assign and transfer to Purchaser the Acquired Assets together with the Assumed Liabilities, in a sale authorized by the Bankruptcy Court pursuant to the Sale Order and all on the terms and subject to the conditions set forth in this Agreement; and

**WHEREAS**, the Acquired Assets and Assumed Liabilities shall be purchased and assumed by Purchaser pursuant to the Sale Order approving such sale, free and clear of all Encumbrances (other than Permitted Encumbrances), pursuant to Sections 105, 363 and 365 of the Bankruptcy

Code, and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), which Sale Order will include the authorization for the assumption and assignment by Seller to Purchaser of the Assigned Contracts and certain of the Liabilities thereunder in accordance with Section 365 of the Bankruptcy Code, all in the manner and subject to the terms and conditions set forth in this Agreement and the Sale Order and in accordance with other applicable provisions of the Bankruptcy Code and the Bankruptcy Procedure and the local rules for the Bankruptcy Court (the "<u>Local Bankruptcy Rules</u>").

**NOW, THEREFORE**, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and intending to be legally bound, Purchaser and Seller hereby agree as follows:

**ARTICLE I**

**PURCHASE AND SALE OF THE ACQUIRED ASSETS;
ASSUMPTION OF ASSUMED LIABILITIES**

1.1    <u>Purchase and Sale of the Acquired Assets</u>.    Pursuant to the Bankruptcy Code, including sections 105, 363 and 365 of the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules, and on the terms and subject to the conditions set forth herein and in the Sale Order, at the Closing, Seller shall sell, transfer, assign, convey and deliver to Purchaser, and Purchaser shall purchase, acquire and accept from Seller, free and clear of all Encumbrances (other than Permitted Encumbrances), all of Seller's right, title and interest in and to all assets and property of the Seller (including Seller's bankruptcy estate) whatsoever and wherever located, including but not limited to all assets Related to (or constituting) the Acquired Business (but excluding the Excluded Assets), including the following assets (collectively, the "<u>Acquired Assets</u>"):

(a)    the Executory Contracts listed on <u>Schedule 1.1(a)</u> (the "<u>Assigned Contracts</u>"), which schedule may be updated prior to Closing as set forth in this Agreement, and all claims, rights, defenses, actions, causes of action and rights of set-off and recoupment arising under any Assigned Contract;

(b)    all Contracts entered into by Seller after the Petition Date and that are not expressly identified by Purchaser as an Excluded Asset on or prior to Closing (the "<u>Post-Petition Contracts</u>");

(c)    all Documents Related to the Acquired Business (including, without limitation, all documents related to the Acquired Assets or Assigned Contracts or Assumed Liabilities);

(d)    all tangible assets (including Equipment) of Seller, wherever located, including all inventories of the HGEN Products, together with all bulk drug substance and drug product, intermediates, other raw materials, component parts, work in process, finished drug product either distributed or available to be distributed, and packaging materials;

(e)    all of Seller's equity interests in the Foreign Subsidiary;

3

(f)      all Intellectual Property of Seller, including, without limitation, those assets listed on Schedule 1.1(f) (the "Acquired Intellectual Property"), and all rights and obligations under non-disclosure or confidentiality, invention or other Intellectual Property assignment agreements, restrictive covenant agreements, and other similar arrangements.  For purposes of clarity, Purchaser shall acquire all Intellectual Property of the Seller pursuant to this Agreement notwithstanding the omission of any particular Intellectual Property right of the Seller from Schedule 1.1(f);

(g)      all Governmental Authorizations required for Seller to conduct the Acquired Business (including, but not limited to, those obtained with respect to the HGEN Product) as it is currently conducted;

(h)      to the extent not otherwise set forth in this Section 1.1, all assets of any nature, type or kind whatsoever consisting of or otherwise relating to the HGEN Products;

(i)      all assets related to the Acquired Assets or the Assumed Liabilities (other than those identified as the Excluded Assets);

(j)      all claims and causes arising under Chapter 5 of the Bankruptcy Code or similar non-bankruptcy law and any other claims, rights, actions or causes of action whatsoever whether under bankruptcy or non-bankruptcy law (including, without limitation, any rights to credits, refunds, rebates, allowances, adjustments, setoffs, or recoupments) against: (a) against any person or entity that is: (i) a counterparty to an Assigned Contract; or (ii) is a vendor or service provider with whom Purchaser anticipates doing business following the Closing, except for those vendors or service providers identified by Seller (and approved by Purchaser) set forth on Schedule 1.1(j), which schedule may be created or updated in form acceptable to Purchaser prior to Closing; (b) Cameron Durrant; or (c) Purchaser, except with respect to Purchaser's duties and obligations under this Agreement (collectively, all acquired claims, rights or causes of action set-forth in this sub-paragraph, the "Acquired Causes of Action"); and

(k)      any other assets of Seller in each case related to the Acquired Business or to the Acquired Assets including all goodwill, payment intangibles and general intangible assets and rights of Seller to the extent associated with, held for use in, or otherwise relating to, useful in or necessary for the conduct of, the Acquired Business or the Acquired Assets and other than those assets specifically identified as Excluded Assets in Section 1.2 clauses (a) through (m).

1.2      Excluded Assets.  Notwithstanding anything to the contrary in this Agreement, in no event shall Seller sell, transfer, assign, convey or deliver, or be deemed to sell, transfer, assign, convey or deliver, and Seller shall retain, all right, title and interest to, in and under any assets other than the Acquired Assets (collectively, the "Excluded Assets") including such right, title or interest in the following:

(a)      any assets expressly excluded from the definition of Acquired Assets pursuant to Section 1.1 (including all subparts and clauses of Section 1.1);

(b)      all accounts receivable of the Seller;

4

(c)    all Cash and Cash Equivalents other than any expressly included in the definition of Acquired Assets;

(d)    the Madison JV Interest and any claim related thereto, as more fully described on Schedule 1.2(c);

(e)    all Executory Contracts of Seller that are not Assigned Contracts as of the Closing (or that are not assumed and assigned to Purchaser after Closing as set forth herein) or that are Post-Petition Contracts that Purchaser has, in writing, elected not to acquire;

(f)    all Documents (i) to the extent they relate solely to any of the Excluded Assets or Excluded Liabilities, or (ii) that Seller is required by Law to retain or is prohibited by Law from providing a copy thereof to Purchaser, provided, however, that to the extent that there are any Documents that are related to the Acquired Assets or Assumed Liabilities but which Seller is required by Law to retain (and is not prohibited by law from providing a copy to Purchaser), Seller shall provide copies of such Documents to the Purchaser;

(g)    except with respect to the Foreign Subsidiary, all shares of capital stock, limited liability company interests, or other equity interests of Seller and each of its respective Subsidiaries or securities convertible into, exchangeable or exercisable for any such shares of capital stock, limited liability company interests, or other equity interests;

(h)    all claims and causes of action held by Seller or its bankruptcy estate (including any related rights of setoff or recoupment) that are not among the Acquired Causes of Action, and including: (i) any rights, claims, or causes of action under Chapter 5 of the Bankruptcy Code that are not among the Acquired Causes of Action; (ii) any other claims or causes of action not arising under Chapter 5 of the Bankruptcy Code that are not among the Acquired Causes of Action; (iii) any claims against Seller or any Affiliate thereof or any director, officer or agent of Seller that are not among the Acquired Causes of Actions, and (iv) proceeds of any of the foregoing;

(i)    all policies of insurance held by Seller, including, without limitation, all commercial general liability, property and casualty, professional liability, cyber liability, director and officer liability, employment practices liability, errors and omissions liability, and all rights and benefits of Seller of any nature with respect to such insurance policies, including all insurance recoveries or proceeds thereunder and rights to assert claims or actions with respect to any such insurance recoveries or proceeds;

(j)    Seller's rights under this Agreement, including the Purchase Price hereunder, or any agreement, certificate, instrument or other document executed and delivered between Seller and Purchaser in connection with the transactions contemplated hereby, or any other agreement between Seller and Purchaser entered into on or after the Effective Date;

(k)    (i) all attorney-client, work product and other legal privileges of Seller (including all documents and records of Seller that are entitled to, or were created under, any such privileges), (ii) all records and reports prepared or received by Seller or any of its Affiliates in connection with the sale of the Acquired Assets or any portion thereof, the Bankruptcy Case and the transactions contemplated hereby, including all analyses relating to the Acquired Assets or

Purchaser or its Affiliates so prepared or received (but excluding any materials made available to Purchaser or its Affiliates and any financial information directly related to the Acquired Assets that would be reasonably required for the financial planning or reporting obligations of Purchaser), and (iii) all confidentiality agreements with prospective purchasers of the Acquired Assets or any portion thereof, and all bids and expressions of interest received from third parties with respect thereto;

(l)      each Seller Plan that is specifically set forth on <u>Schedule 1.2(l)</u> which schedule may be updated in form acceptable to Purchaser prior to Closing and all right, title and interest in any assets thereof or relating thereto; and

(m)      the properties and assets set forth on <u>Schedule 1.2(m)</u>.

1.3      <u>Assumption of Certain Liabilities</u>.  On the terms and subject to the conditions set forth in this Agreement and the Sale Order, effective as of the Closing, Purchaser shall irrevocably assume from Seller (and from and after the Closing pay, perform, discharge or otherwise satisfy in accordance with their respective terms), and Seller shall irrevocably convey, transfer and assign to Purchaser, the following Liabilities (collectively, the "<u>Assumed Liabilities</u>"):

(a)      all Liabilities and obligations of Seller under the Assigned Contracts first arising or first accruing after the Closing;

(b)      unless otherwise specified in the DIP Loan Documents, all Liabilities arising out of the conduct of the Acquired Business or the ownership of the Acquired Assets, in each case, by Purchaser, first arising or accruing after the Closing Date;

(c)      all Liabilities relating to amounts required to be paid, or actions to be taken or to be omitted to be taken, by Purchaser under this Agreement;

(d)      to the extent lawfully transferable, all obligations, commitments and Liabilities under any Governmental Authorizations assigned to Purchaser hereunder and first arising or accruing after the Closing Date; and

Notwithstanding the foregoing and for the avoidance of doubt, Assumed Liabilities shall not include any Liability relating to or arising out of any violation of Law by, or any Action against, Seller or any breach, default or violation by Seller of or under any Assigned Contracts arising prior to Closing.

1.4      <u>Excluded Liabilities</u>.  Notwithstanding any provision in this Agreement to the contrary, the Parties expressly acknowledge and agree that Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of Seller (including any Liens, Claims, Liabilities or Encumbrances of or against the Seller), whether liquidated, unliquidated, fixed, contingent, disputed or undisputed, as a result of any act, omission or circumstances taking place prior to the Closing, other than the Assumed Liabilities (all such Liabilities that Purchaser is not assuming are referred to collectively herein as the "<u>Excluded Liabilities</u>").

6

1.5    Contract Assumption and Assignment Procedures; Designation Rights.

(a)    (i) Schedule 1.1(a) shall set forth the list of Assigned Contracts that Purchaser would like to acquire and the projected Cure Costs as of the Closing Date and Purchaser shall (with the assistance of Seller) provide a proposed Schedule 1.1(a) to Seller no later than five (5) day prior to the Sale Hearing; (ii) Purchaser may, in its sole discretion (and without any change in the Purchase Price), add or delete Contracts to Schedule 1.1(a) at any time prior to Closing, subject to the terms of this Agreement and Seller represents that it has disclosed to Purchaser all Executory Contracts of which it is aware (and will immediately notify Purchaser in writing if it identifies any additional such Contracts); (iii) no later than ten (10) days prior to Closing, Purchaser shall in writing disclose to Purchaser a list of all Post-Petition Contracts (and will supplement such list again one (1) day prior to Closing to identify any further Post-Petition Contracts entered prior to Closing) so that Purchaser may elect to exclude any such Post-Petition Contract(s) as Acquired Assets. In addition, immediately following the Effective Date, Seller will diligently cooperate with Purchaser to provide information relevant to all Contracts of Seller, including Potential Assigned Contracts (including identifying such Contracts and any potential Cure Costs and any other information pertaining to such agreements). Notwithstanding the foregoing, following the Closing Date, Purchaser retains the right (without providing any further sale consideration to the Seller or its bankruptcy estate) to assume and assign any Contracts not previously listed on Schedule 1.1(a) on the Closing Date (and the Seller shall promptly file a motion to assume and assign any such Contract to Purchaser upon request), provided that, subject to the obligation of the Seller to pay Cure Costs up to the Cure Cap, Purchaser shall pay cash amounts that, pursuant to section 365 of the Bankruptcy Code, will be required to be paid as of the date of such assignment and assumption to cure any monetary defaults on the part of Seller under any such additional assumed Contracts;

(b)    No later than three (3) days after entry of the Bidding Procedures Order, Seller shall file with the Bankruptcy Court, and cause notice (the "Cure and Assignment Notice") to be provided to all counterparties to Executory Contracts that may be among the Assigned Contracts (the "Potential Assigned Contracts"), regarding the: (i) potential assumption and assignment to Purchaser of all of such Contracts, except for any such Contracts which Purchaser previously has advised Seller in writing that it affirmatively does not wish to assume, (ii) fixing of the Cure Costs associated with each Potential Assigned Contract as of the Closing Date (or as of such later date reasonably acceptable to Purchaser and Seller) and identifying the Seller's proposed Cure Costs (if any) for each such Contract; and (iii) setting a deadline of ten (10) days from the date of service of the Cure and Assignment Notice for such Party to object to the assumption and assignment of its executory contract/lease with the Seller, to the Purchaser of the Acquired Assets, or to the Cure Costs of any such Contract (the "Cure and Assignment Deadline"). Purchaser may insist that any such objection be resolved in full prior to or in connection with the Sale Hearing. Seller shall consult with, and give due consideration to, the views and concerns of, Purchaser prior to compromising or obtaining a decision of the Bankruptcy Court with respect to any Cure Costs required to be made under the Bankruptcy Code to effectuate the assumption of any such Assigned Contract, including using commercially reasonable efforts to provide three (3) days' notice of any such compromise to Purchaser. Notwithstanding anything herein to the contrary: (a) the Seller's fixing of any Cure Costs (whether by compromise, adjudication or otherwise) shall not result in any obligation of Purchaser to pay any Cure Costs arising on or prior to Closing except to the

extent that such amounts exceed the Cure Cap; and (b) the Purchaser shall direct Seller as to how much, and to whom, Seller should pay Cure Costs up to and including the Cure Cap.

(c)    For the purpose of determining whether a Contract of Seller shall be included as an Assigned Contract or an Excluded Asset, from and after the filing of the Notice of Sale Hearing and Cure and Assignment Notice, all such Contracts shall be treated as follows:

(i)    no later than five (5) days prior to the Bid Deadline, Purchaser shall notify Seller in writing of those Executory Contracts which Purchaser desires to be designated to be assumed by Seller and assigned to Purchaser on the Closing Date, subject to Purchaser's right to later remove or add such Contracts from the list of Assigned Contracts at any time prior to the Closing;

(ii)    each Post-Petition Contract shall be designated to be assigned to Purchaser, unless Purchaser notifies Seller in writing at any time prior to the Closing that it will not take assignment of any such Contract, in which case such Contract shall not be assigned to Purchaser and shall be deemed an Excluded Asset; and

(iii)    notwithstanding any of the foregoing, no later than one (1) Business Day prior to the Closing Date, Purchaser shall notify Seller in writing of any Contracts which Purchaser elects, in its sole discretion, to add to the list of Assigned Contracts (subject to the counterparty's right to receive the Cure Costs associated with such contract(s)), or remove from the list of Assigned Contracts (which Contract(s) shall be Excluded Assets and may be rejected by Seller);

(d)    Purchaser shall provide, with respect to any Contract designated to be assumed and assigned hereunder, such information or documentation related to "adequate assurance of future performance" as shall be reasonably required in connection with the assumption and assignment of such Contract, and upon Bankruptcy Court approval for the assumption and assignment thereof to Purchaser, any such Contract so designated shall constitute an Acquired Asset hereunder.  Notwithstanding anything to the contrary set forth in this Agreement, to the extent that, prior to Closing, any Assigned Contract is not subject to an Order of the Bankruptcy Court with respect to the assumption and assignment of such Assigned Contract, any Liabilities of Seller related to such Assigned Contract shall be the responsibility of Seller until such Assigned Contract is either assumed by Seller and assigned to Purchaser or rejected by Seller;

(e)    No later than five (5) business days following Closing (or such earlier date(s) upon or following Closing as may be ordered by the Bankruptcy Court), to the extent not previously paid, Seller shall pay any and all Cure Costs in respect of Assigned Contracts (as such payments shall be directed by Purchaser) up to the Cure Cap with all other Cure Costs under Assigned Contracts to be paid by the Purchaser, provided, however, that, at Closing, Seller shall fund an escrow account in the amount of the Cure Cap to be used to pay Cure Costs (as such payments shall be directed by Purchaser).  To the extent that any Contract that is being sold to Purchaser under this Agreement is not an Executory Contract (regardless of whether such Contract is a Contract entered into prior to the Petition Date that is not subject to Section 365 of the Bankruptcy Code or such Contract is a Post-Petition Contract), Purchaser shall only be liable or responsible for any obligation arising under such Contract to the extent that such Contract gives

rise to an allowed post-Petition Date administrative expense priority claim against the Seller and shall not otherwise assume or be liable for any other Liability arising under such Contract prior to Closing (including any general unsecured claims arising under such Contract).

(f)    Nothing in this Agreement shall be construed as an attempt by Seller to assign any Contract to the extent that such Contract is not assignable under the Bankruptcy Code or otherwise without the consent of the other party or parties thereto, and the consent of such other party has not been given or received, as applicable.  With respect to any Contract for which the consent of a party thereto to the assignment thereof shall not have been obtained at Closing and any claim, right or benefit arising thereunder or resulting therefrom, prior to the Closing Date, if Purchaser (in its sole discretion) so elects, Seller and Purchaser shall use their reasonable good faith efforts to obtain as expeditiously as possible the written consent of the other party or parties to such Contract necessary for the assignment thereof to Purchaser.  Unless and until any such consent, waiver, confirmation, novation or approval is obtained, Seller and Purchaser shall cooperate to establish an arrangement reasonably satisfactory to Seller and Purchaser under which Purchaser would obtain the claims, rights and benefits and assume the corresponding Liabilities and obligations thereunder (including by means of any subcontracting, sublicensing or subleasing arrangement) to the extent such Liabilities arise after the Closing.  In such event, (i) Seller will hold in trust for and promptly pay to Purchaser, when received, all moneys received by them under any such Contract or any claim, right or benefit arising thereunder and (ii) Purchaser will promptly pay, perform or discharge, when due, any and all obligations and Liabilities arising thereunder after Closing, other than those being contested in good faith.  Purchaser acknowledges that no adjustment to the Purchase Price shall be made for any such Contracts that are not assigned and that Purchaser shall have no claim against Seller in respect of such unassigned Contracts.  Nothing in this Agreement shall be deemed a waiver of Purchaser's rights (or remedies) under this Agreement to receive (or insist upon receiving) an effective assignment of all of the Acquired Assets at, or as a condition of, Closing (including all Contracts to which Purchaser has elected to acquire or take assignment) nor shall any Contracts covered by this paragraph be deemed to constitute Excluded Assets solely by virtue of this paragraph. Seller's obligations under this paragraph shall terminate on the date that is ninety (90) days after the Closing Date; and

(g)    Promptly after the Closing, Purchaser shall file with the Bankruptcy Court a final list of Assigned Contracts.

## ARTICLE II

## CONSIDERATION; PAYMENT; CLOSING

2.1    <u>Consideration; Payment</u>.

(a)    The aggregate consideration (the "<u>Purchase Price</u>") to be paid by Purchaser for the purchase of the Acquired Assets shall be:

(i)    the assumption of Assumed Liabilities;

(ii)    a cash payment (the "<u>Cash Payment</u>") of Two Million Dollars ($2,000,000), which Cash Payment will be reduced on a dollar-for-dollar basis by all

DocuSign Envelope ID: 00E802BE-5952-4551-BA55-068E5E77A4E4

amounts due, owing and chargeable to the Seller or its bankruptcy estate in connection with the debtor-in-possession loan (the "DIP Loan") provided, or to be provided, by Purchaser to Seller and approved by one or more orders of the Bankruptcy Code (the "DIP Orders" and, together all agreements, term sheets, notes and other documents related to the DIP Loan, the "DIP Loan Documents"), including all outstanding interest, fees, costs, charges and other amounts due from Seller (or its bankruptcy estate) to Purchaser whatsoever under or in connection with the DIP Loan or the DIP Loan Documents (collectively, the "DIP Obligations"), which DIP Loan will be in the maximum principal amount of $2,000,000. The Purchaser shall be permitted and authorized to apply all DIP Obligations as one or more credit bids under section 363(k) of the Bankruptcy Code in connection with any sale of the Acquired Business or any portion thereof (the "Credit Bid"), including as follows with respect to the sale contemplated hereunder:

(A) to the extent that, as of the date of the Auction, the amount of the then-outstanding DIP Obligations is less than $2,000,000, the Purchaser shall be deemed to have submitted an initial Credit Bid in the amount of the then-existing amount of DIP Obligations pursuant to section 363(k) of the Bankruptcy Code (which Credit Bid amount shall apply to any subsequent bid it may make at the Auction), together with a commitment to pay a Cash Payment for the balance of the Purchase Price at Closing;

(B) to the extent that, as of the date of the Auction, the amount of the then-outstanding DIP Obligations exceeds $2,000,000, the Purchaser shall be deemed to have submitted an initial Credit Bid of $2,000,000 for the purchase of the Acquired Assets pursuant to section 363(k) of the Bankruptcy Code and shall be permitted to apply any outstanding DIP Obligations in excess of $2,000,000 as a Credit Bid (or Credit Bid portion) to any subsequent bid it may later make at such Auction with respect to the Acquired Assets; and

(C) Notwithstanding anything to the contrary in Subsections 2.1(a)(ii)(A) and (B) of this Agreement: (a) the Purchaser shall not be required to make any cash deposit prior to the Auction and shall, for all purposes relevant to this Agreement be deemed a Qualified Bidder at such Auction (should it occur) without the need to provide any further information or assurances; and (b) at Closing, the Purchaser shall be permitted to apply the actual amount of the DIP Obligations existing as of the Closing (or any portion thereof) as a Credit Bid against the Purchase Price;

(iii)    the Milestone Payments (if any); and

(iv)    Cure Costs to the extent Cure Costs exceed the Cure Cap.

(b)     If the Closing does not occur, then the DIP Loan shall be repaid in accordance with the terms of the DIP Loan Documents.  For the avoidance of doubt, if some or all of the Acquired Assets are sold in an Alternative Transaction, the proceeds of the sale of the Acquired Assets shall (except as otherwise agreed by Purchaser) first be used to satisfy any Expense Reimbursement owed to the Purchaser, and next to satisfy the DIP Obligations owed to the Purchaser.

(c)     At the Closing, Purchaser shall deliver, or cause to be delivered, to Seller the Cash Payment (if any), after taking into account any deductions to the Purchaser Price made through the application of the Purchaser's ultimate Credit Bid (the "Closing Date Payment").  The Closing Date Payment (if any) and any payment required to be made pursuant to any other provision hereof shall be made in cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by the applicable Party at least two (2) Business Days prior to the date such payment is to be made (provided that, to the extent such payment is received prior to Closing it shall be held in escrow pending the Closing).

2.2     Closing.  The closing of the purchase and sale of the Acquired Assets, the delivery of the Purchase Price (if any) and the assumption of the Assumed Liabilities (the "Closing" and, the date of such closing, the "Closing Date") will take place by telephone conference and electronic exchange of documents, at 9:00 a.m. Eastern Time on the second (2nd) Business Day following full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in Article VII (other than conditions that by their terms or nature are to be satisfied at the Closing), or at such other place and time as the Parties may agree.

2.3     Closing Deliveries by Seller.  At the Closing and unless otherwise waived in writing by Purchaser, Seller shall deliver or cause to be delivered to Purchaser the following:

(a)     the Acquired Business and the Acquired Assets, by making the Acquired Assets available to Purchaser at its present location;

(b)     a bill of sale substantially in the form of Exhibit A (the "Bill of Sale"), duly executed by Seller in favor of Purchaser;

(c)     an assignment and assumption agreement substantially in the form of Exhibit B (the "Assignment and Assumption Agreement,"), executed by Seller in favor of Purchaser;

(d)     an intellectual property assignment and assumption agreement with respect to the Acquired Intellectual Property, substantially in the form attached hereto as Exhibit C and executed accordingly by the Seller (the "Intellectual Property Assignment Agreement", and together with the Bill of Sale and Assignment and Assumption Agreement, the "Ancillary Agreements");

(e)     an acquired equity power and assignment conveying Seller's interest in the Foreign Subsidiary, in the form to be attached as Exhibit D (the "Equity Interest Power"), duly executed by Seller in favor of Purchaser;

(f)    a copy of resolutions duly adopted by the board of directors (or similar governing body) of Seller, authorizing and approving Seller's execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement, duly certified by an authorized officer of Seller;

(g)    certificates of existence and good standing of Seller from the State of Delaware, dated the most recent practicable date prior to the Closing Date;

(h)    a non-foreign Person affidavit of Seller, dated as of the Closing Date, in form and substance required by the Treasury Regulations issued pursuant to Section 1445 of the Tax Code stating that such Seller is not a "foreign person" as defined in Section 1445 of the Tax Code and, if applicable, a duly completed and executed IRS Form W-9;

(i)    an officer's certificate (or a certificate executed by, or on behalf of, any duly authorized special committee of the board of directors of the Seller), dated as of the Closing Date, executed by a duly authorized officer of Seller certifying that the conditions set forth in Sections 7.2(g) and 7.2(j) have been satisfied;

(j)    certificates of incumbency for the respective officers or directors of Seller executing this Agreement and the other Ancillary Agreements;

(k)    evidence satisfactory to Purchaser that Seller has paid, shall promptly pay (or has set aside and delivered in escrow to the Purchaser), or shall promptly pay when due, to the Assigned Contract counterparties all Cure Costs up to the Cure Cap (as such payments shall be directed by Purchaser);

(l)    such other documents as Purchaser may reasonably request that are not inconsistent with the terms of this Agreement and customary for a transaction of this nature and necessary to evidence or consummate the transactions contemplated by this Agreement; and

(m)    a certified copy of the Sale Order, as entered by the Bankruptcy Court.

2.4    Closing Deliveries by Purchaser.  At the Closing, and unless otherwise waived in writing by Seller, Purchaser shall deliver or cause to be delivered to Seller the following:

(a)    the Closing Date Payment (if any), by wire transfer of immediately available funds to an account designated in writing by Seller;

(b)    the Assignment and Assumption Agreement, duly executed by Purchaser;

(c)    the Intellectual Property Assignment Agreement, duly executed by Purchaser;

(d)    the Equity Interest Power, duly executed by Purchaser;

(e)    an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Purchaser certifying that the conditions set forth in Sections 7.3(b) and 7.3(c) have been satisfied; and

12

(f)    certificates of incumbency for the officer of Purchaser executing this Agreement and the Ancillary Agreements.

2.5    Milestone Payments

(a)    Milestone Payments.  Seller may be entitled to receive from Purchaser, and Purchaser may be obligated to pay to Seller, certain contingent payments in consideration for the Acquired Assets upon achievement of certain development and commercial milestones (the "Milestones") in accordance with the terms and conditions set forth in this Section 2.5 (each, a "Milestone Payment").

(b)    Notice and Payment.  Purchaser shall promptly notify Seller in writing following the achievement of each milestone event described in Section 2.5(c).  Thereafter, Seller shall submit to Purchaser an invoice for the corresponding Milestone Payment and within ninety (90) Business Days of Purchaser's receipt of any such invoice, Purchaser shall remit the applicable Milestone Payment to Seller.

(c)    Milestone Events. Subject to the foregoing, the Purchaser shall make the following Milestone Payments to Seller upon the achievement of the corresponding milestone events as follows:

| Milestone Event | Milestone Payment (U.S. Dollars) |
|---|---|
| First (1st) FDA approval of a BLA relating to Lenzilumab for CMML in the United States, provided such approval is granted within five (5) years following the Closing Date. | $3,000,000 |
| The next three (3) FDA approvals of a BLA relating to Lenzilumab for any follow-on indication to CMML in the United States provided such approval(s) is granted within seven (7) years following the Closing Date. | $1,000,000 for each Therapeutic Indication |
| First (1st) Regulatory Approval of any HGEN Product for a particular Therapeutic Indication for Lenzilumab in the United Kingdom, Germany, France, Italy, Spain or Australia (each, an "Approved Country"), provided such approval is granted within five (5) years following the Closing Date. | $1,000,000 for each Approved Country |

(d)    Annual Net Sales Milestones.  The three (3) potential Milestone Payments set forth in this Section 2.5(d) shall each be payable to Seller on a one-time only basis (for the first achievement of any Milestone set forth below), ninety (90) days after the end of the Annual Net Sales Period upon which the aggregate Annual Net Sales of any HGEN Product sold by Purchaser, its Affiliates, successors, and its sublicensees in any Territory for the first time reaches or exceeds the amounts set forth in the table below for any Annual Net Sales Period (which annual periods shall commence on the first day of the first fiscal quarter following the Closing Date and run for successive twelve month periods thereafter).  For purposes of clarity: (a) each of the potential Milestone Payments set forth below may only be paid one time for each Milestone achieved, such that Purchaser's maximum aggregate liability to Seller with respect to the achievement of each of the below listed Milestones shall, respectively, be $1,000,000, $2,000,000, and $3,000,000 (with a maximum aggregate liability of $6,000,000); (b) Seller may only be entitled to a Milestone Payment  arising under this Section 2.5(d) if Purchaser's Annual Net Sales for the Annual Sales Period for any HGEN Product in any Territory meets any of the below Milestone(s) and Annual Net Sales arising in different Territories (or for different HGEN Products) for a given Annual Sales Period shall not be aggregated for purposes of determining whether any Milestone has been achieved.

14

DocuSign Envelope ID: 00E802BE-5952-4551-BA55-068E5E77A4E1

| Milestone | Milestone Payment (U.S. Dollars) |
|---|---|
| Upon the first occasion that aggregate Annual Net Sales for any HGEN Product in any Territory is greater than $100,000,000, provided such Annual Net Sales are achieved within five (5) years after the first day of the first full fiscal quarter following the Closing Date. | $1,000,000 |
| Upon the first occasion that aggregate Annual Net Sales for any HGEN Product in any Territory is greater than $200,000,000, provided such Annual Net Sales are achieved within six (6) years after the first day of the first full fiscal quarter following the Closing Date. | $2,000,000 |
| Upon the first occasion that aggregate Annual Net Sales for any HGEN Product in any Territory is greater than $300,000,000 within seven (7) years after the first day of the first full fiscal quarter following the Closing Date. | $3,000,000 |

(e)     <u>Commercially Reasonable Efforts</u>.  Purchaser shall, and shall cause any of its licensees, sublicensees, transferees or assignees of, rights to any HGEN Product to, exercise Commercially Reasonable Efforts to achieve the milestone events set forth in <u>Section 2.5</u>.

(f)     <u>Yearly Reporting</u>.  With respect to each HGEN Product, within sixty (60) days following the end of each Annual Net Sales Period after the First Commercial Sale of such HGEN Product, Purchaser shall provide Seller with a report containing the following information for the applicable Annual Net Sales Period for each such HGEN Product:

(i)     the amount of gross sales of the HGEN Product during such Annual Net Sales Period (including identifying the dates such Annual Net Sales Period began and ended);

(ii)     an itemized calculation of the Annual Net Sales showing any applicable deductions taken from gross sales for such Annual Net Sales Period;

(iii)     a calculation of the Milestone Payment due on such Annual Net Sales, if any; and

        (iv)       a list of the types of HGEN Products sold.

   (g)      Right to Accounting/Financial Audit.

        (i)  In addition to the reporting obligations of Purchaser pursuant to <u>Section 2.5(f)</u>, Purchaser shall maintain complete and accurate books and records regarding the Milestones set forth in <u>Section 2.5(d).</u> At the request of Seller, no more than once each calendar year (following the end of any Annual Net Sales Period), Purchaser shall permit an independent certified public accounting firm mutually and reasonably acceptable to both the Purchaser and the Seller (the "<u>Auditor</u>"), at reasonable times and upon at least thirty (30) days' prior written notice, to audit the books and records in the location where such books and records are maintained, solely to confirm the accuracy of the Milestone Payments, if any, due hereunder in connection with <u>Section 2.5(d)</u> of this Agreement. An audit of the milestones contained in <u>Section 2.5(d)</u> shall be conducted no more than once each calendar year (an "<u>Audit</u>"), there shall be no more than one audit for any Annual Net Sales Period, and Seller shall only be entitled to audit Purchaser's books and records with regard to items and time periods not covered by a prior Audit conducted by the Auditor (or another auditor approved by the Parties hereunder).

       (ii) Notwithstanding the foregoing, Purchaser shall not have any reporting obligation with respect to any HGEN Product until after the First Commercial Sale of such HGEN Product.

     (iii)The Auditor will execute a written confidentiality agreement with the Purchaser and will disclose to Seller only such information as is necessary to provide Seller with information regarding any discrepancies that the Auditor has concluded exist between the amounts reported and actually paid and amounts the Auditor determines should be payable under this Agreement. The Auditor will deliver to Seller and Purchaser an Audit report (an "<u>Audit Report</u>") with respect to one more Annual Net Sales Period(s). The Audit Report sent to both Parties will include the methodology and calculations used to determine the results. The Seller shall bear the full cost of such audit, unless the Auditor concludes that Purchaser has underreported by more than $100,000 the payment obligations (if any) due to Seller for Milestones under this Agreement for the time periods covered by the Audit, in which case the Purchaser shall bear the cost of the Audit. If such Audit concludes that (a) additional Milestone Payments were owed

16

by Purchaser, Purchaser shall pay the additional amounts, with interest from the date originally due at the rate of prime plus two percent, or (b) excess payments were made by Purchaser, Seller shall reimburse such excess payments, with interest from the date originally due at the rate of prime plus two percent, in either case ((a) or (b)), within sixty (60) days after the date on which the Auditor's Report is delivered to Purchaser.

(iv) In the event of any dispute between the Parties (or their successors) with respect to this Section 2.5 (including any sub-parts hereof): (a) the Parties shall first confer to determine if they can resolve the dispute; and (b) in the event of litigation regarding such dispute, the party prevailing in such litigation shall be entitled to receive from the non-prevailing Party, costs and attorneys' fees with respect to such litigation.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the Schedules delivered by Seller concurrently herewith (or as and when set forth herein) and Section 10.10, Seller represents and warrants to Purchaser as follows as of the Effective Date and as of the Closing Date:

3.1    Organization and Qualification.  Seller (a) is an entity duly incorporated, in good standing, and validly existing under the Laws of its jurisdiction of incorporation, and (b) has the corporate power and authority to own and operate its properties and to carry on its businesses as now conducted, subject to the provisions of the Bankruptcy Code.

3.2    Authorization of Agreement.  The execution, delivery and performance of this Agreement by Seller, and the consummation by Seller of the transactions contemplated hereby, subject to requisite Bankruptcy Court approvals, have been duly and validly authorized by all requisite corporate action, and no other corporate proceedings on its part are necessary to authorize the execution, delivery or performance of this Agreement by Seller. This Agreement has been duly and validly executed and delivered by Seller and, subject to requisite Bankruptcy Court approvals and, assuming this Agreement is a valid and binding obligation of Purchaser, this Agreement constitutes a valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except as limited by the application of bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other Laws relating to or affecting creditors' rights or general principles of equity to the extent such other non-bankruptcy Laws are enforceable in the Bankruptcy Case (whether considered in a proceeding in equity or at law) (the "Enforceability Exceptions").

3.3    Title to Acquired Assets, Properties, and Intellectual Property.  Subject to requisite Bankruptcy Court approvals, and assumption by Seller of the applicable Assigned Contracts in accordance with applicable Law (including satisfaction of any applicable Cure Costs) and except

17

as a result of the commencement of the Bankruptcy Case, Seller and its Subsidiaries own good and valid title in and to, or hold a valid leasehold interest in, all of the Acquired Assets, including the tangible property necessary in the conduct of the Acquired Business as now conducted, free and clear of all Encumbrances except for Permitted Encumbrances, and other than any failure to own or hold such tangible property that is an Excluded Asset. With respect to the Acquired Intellectual Property, and without limiting or creating an exception or exclusion to the representations in this section, Seller owns all right, title and interest to, or are valid licensees with respect to, the Acquired Intellectual Property, and, at Closing, will convey the Acquired Intellectual Property to Purchaser free and clear of Encumbrances pursuant to the Sale Order. Seller further represents and warrants that (i) no Person is engaging in any activity that infringes, dilutes, misappropriates, or violates any Acquired Intellectual Property and (ii) no claim has been asserted to Seller that the use of any Acquired Intellectual Property or the operation of the Acquired Business infringes, dilutes, misappropriates, or violates the Intellectual Property of any third party.  The Acquired Intellectual Property and the rights under the Assigned Contracts include the rights to use all Acquired Intellectual Property required to operate the Acquired Business, and to continue to use the Acquired Assets.

3.4     Assigned Contracts. Schedule 1.1(a) contains a list of all Assigned Contracts that Purchaser has elected to purchase and take assignment to (as such schedule may be updated as of Closing and as provided in this Agreement) and that Seller has disclosed to Purchaser all Executory Contracts and all Cure Costs that Seller believes to exist with respect to such Contracts. Except for defaults that will be cured through the proposed Cure Costs listed on Schedule 3.4 attached hereto or defaults arising solely as a consequence of the commencement of the Bankruptcy Case, neither Seller nor, to the best of Seller's knowledge, any other party thereto is in default or breach in any material respect under the terms of any Assigned Contract and that the Cure Costs listed on Schedule 3.4 are accurate and represent the actual Cure Costs that currently exist and would need to be paid at Closing for any defaults to be cured under the Assigned Contracts pursuant to section 365 of the Bankruptcy Code.

3.5     Brokers.  Except for SC&H Group, all of whose fees and expenses will be borne solely by Seller, there is no investment banker, broker, finder or other intermediary which has been retained by or is authorized to act on behalf of Seller that might be entitled to any fee or commission in connection with the transactions contemplated by this Agreement.

3.6     Intellectual Property. Other than as set forth on Schedule 3.6 attached hereto, to the Seller's knowledge, (i) with respect to any Intellectual Property owned by Seller (as opposed to Intellectual Property of which Seller is a licensee), Seller has all right, title and interest to all such Intellectual Property, without any conflict known to Seller with the rights of others, (ii) no Person other than Seller has the right to use such Intellectual Property owned by Seller, and (iii) Seller has the valid right to use, pursuant to a license, sublicense or other agreement, any Intellectual Property used in Seller's Business that is owned by a party other than Seller.

3.7     No Other Representations or Warranties.  Except for the representations and warranties expressly made by Seller to Purchaser in this Article III (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) (the "Express Representations") (it being understood that Purchaser has relied only on such Express Representations), Purchaser acknowledges and agrees, that neither Seller nor

any other Person on behalf of Seller makes, and neither Purchaser nor any other Person on behalf of Purchaser has relied on, the accuracy or completeness of any express or implied representation or warranty with respect to the Acquired Business (including the Acquired Assets and the Assumed Liabilities) or with respect to any statement or information of any nature made or provided by any Person, any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in that certain datasite administered by Seller (the "Dataroom") or elsewhere, or Projections on behalf of Seller or any of its Affiliates or Advisors to Purchaser or any of its Affiliates or Advisors. Without limiting the foregoing, neither Seller nor any other Person will have or be subject to any liability whatsoever to Purchaser, or any other Person, resulting from the distribution to Purchaser or any of its Affiliates or Advisors, or Purchaser's or any of its Affiliates' or Advisors' use of or reliance on, any such information, including any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom or elsewhere, Projections or otherwise in expectation of the transactions contemplated by this Agreement or any discussions with respect to any of the foregoing information.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Seller as follows as of the Effective Date and as of the Closing Date:

4.1    Organization and Qualification.    Purchaser (a) is an entity duly incorporated, validly existing and in good standing under the Laws of the jurisdiction of its incorporation, (b) has all requisite power and authority to own and operate its properties and to carry on its businesses as now conducted and (c) is qualified to do business and is in good standing (or its equivalent) in every jurisdiction in which its ownership of property or the conduct of its business as now conducted requires it to qualify, except where a Material Adverse Effect(s) arising after the Effective Date would, individually or in the aggregate, prevent Purchaser from making any of the representations contained in this Section 4.1 or prevent or interfere with Purchaser's ability to consummate the transactions contemplated hereby.

4.2    Authorization of Agreement.    The execution, delivery and performance of this Agreement and the Ancillary Agreements by Purchaser, and the consummation by Purchaser of the transactions contemplated hereby and thereby, have been duly and validly authorized by all requisite corporate action, and no other corporate proceedings on its part are necessary to authorize the execution, delivery or performance of this Agreement and the Ancillary Agreements by Purchaser.  This Agreement has been duly and validly executed and delivered by Purchaser and, assuming this Agreement is a valid and binding obligation of Seller, this Agreement constitutes a valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except as limited by the Enforceability Exceptions.

4.3    Financing.    Purchaser will have at the Closing, sufficient immediately available funds in an aggregate amount necessary to pay the Purchase Price and all fees and expenses of Purchaser related to the transactions contemplated by this Agreement that are due at Closing, and will have at or after Closing, sufficiently immediately available funds necessary to perform the

Assumed Liabilities as they become due in accordance with their terms and to consummate all of the other transactions contemplated by this Agreement.

4.4     Adequate Assurances Regarding Assumed Executory Contracts.  As of the Closing, Purchaser will be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to adequate assurance of future performance under the Assigned Contracts.

4.5     Brokers.  There is no investment banker, broker, finder or other intermediary who has been retained by or is authorized to act on behalf of Purchaser or any Affiliate of Purchaser who might be entitled to any fee or commission in connection with the transactions contemplated by this Agreement, except for any fee or commission paid directly by Purchaser (or paid in connection with any such transaction with Purchaser) and not reducing the Purchase Price in any way.

**ARTICLE V**

**BANKRUPTCY COURT MATTERS**

5.1     Cure Costs.  Subject to entry of the Sale Order, Seller shall, on or promptly following the Closing, pay the Cure Costs for any Assigned Contracts that may be assumed by Seller and assigned to Purchaser up to the Cure Cap (subject to provision by Purchaser of adequate assurance of future performance as may be required under Section 365 of the Bankruptcy Code), and Purchaser shall pay all Cure Costs and accruals arising under Assigned Contracts above the Cure Cap in accordance with the provisions of Section 365 of the Bankruptcy Code and this Agreement.  Seller agrees that it will promptly take such commercially reasonable actions as are necessary to obtain a Final Order of the Bankruptcy Court providing for the assumption and assignment of all Assigned Contracts and shall pay all Cure Costs up to the Cure Cap (as directed by the Purchaser).

5.2     DIP Financing Motion.  Within one (1) day after the Petition Date (the "DIP Motion Deadline"), Seller shall file a motion (the "DIP Motion") with the Bankruptcy Court seeking interim and final approval of the DIP Loan and shall, within three (3) days after the Petition Date (the "Interim DIP Order Deadline"), obtain an interim Order from the Bankruptcy Court in a form acceptable to Purchaser approving the DIP Loan and DIP Obligations and authorizing borrowings of the Seller thereunder up to the amount of $1,000,000 (the "Interim DIP Order") and shall obtain a Final Order from the Bankruptcy Court, in a form acceptable to Purchaser, not later than thirty-five (35) days after the Petition Date (the "Final DIP Order Deadline" and, together with the DIP Motion Deadline and Interim DIP Order Deadline, the "DIP Deadlines") approving the DIP Loan and the DIP Obligations on a final basis and authorizing borrowings (including interim borrowings) of the Seller thereunder up to the maximum amount of $2,000,000.

5.3     Sale Motion and Bid Procedures.  Within three (3) Business Days after the Petition Date (the "Sale Motion Deadline"), Seller shall file a motion (the "Sale Motion") in form and substance acceptable to Purchaser seeking entry of Orders approving the transactions set forth in this agreement (the "Sale Order") and an Order (the "Bidding Procedures Order"): (a)  setting forth the deadlines, processes, and procedures that will be used to market and sell the Acquired Assets,

including the assumption and assignment of Assigned Contracts (the "<u>Bid Procedures</u>"); (b) requesting shortened notice for the time for the Court to consider approval of the Sale Motion; (c) designating Purchaser as the "stalking horse" purchaser for the Acquired Assets; and (d) approving the Bid Protections.  Within twenty-three (23) days after the Petition Date, the Bankruptcy Court shall have entered the Bidding Procedures Order in a form and substance acceptable to the Purchaser (the "<u>Bid Procedures Order Deadline</u>") and Seller shall use its best efforts to advocate for the entry of the Bidding Procedures Order prior to such deadline.

5.4     <u>Bid Procedures</u>.  The Bidding Procedures Order shall provide, among other things, that: (a) the deadline for prospective purchasers other than Purchaser to submit a competing bid for some or all of the Acquired Assets shall be no later than forty-five (45) days following the Petition Date (the "<u>Bid Deadline</u>"); (b) that for any bid to be deemed a Qualified Competing Bid (as defined in the Bidding Procedures Order) such bid, including any credit bid, must be in writing and accompanied by a cash deposit in an amount no less than 10% of the purchase price set forth in such bid as well as (i) evidence of the financial wherewithal of the bidder to pay the full purchase price and otherwise operate the Acquired Business; (ii) evidence of the bidder's prior experience owning/operating comparable businesses or such other applicable experience; and (iii) confirmation by the bidder that it has acted in good faith in all respects with regard to Seller, will continue to operate in good faith with respect to any bid on and/or proposed purchase of the Acquired Assets, has not violated any confidentiality agreement with the Seller, whether executed by the bidder or anyone working for or on behalf of the Bidder (c) in the event Seller receives a Qualified Competing Bid on or before the Bid Deadline, Seller shall hold an auction (the "<u>Auction</u>") to determine the winning bidder for the Acquired Assets no later than fifty (50) days after the Petition Date (the "<u>Auction Deadline</u>") and shall provide written copies of all materials submitted by all bidders to all parties entitled to attend the Auction no later than two (2) Business Days prior to the Auction; (d) each bid must clearly set forth the purchase price in U.S. dollars to be paid for the proposed purchased assets, including identifying separately any cash and non-cash components, and the cash component of such purchase price shall equal at least the sum of the Bid Protections (defined below); and (e) at least two (2) Business Days prior to the Auction, the Seller will notify Purchaser of the terms of the highest Qualified Bid and the identity of all Qualified Bidders (as defined in the Bidding Procedures Order) that intend to participate in the Auction.

5.5     <u>Bid Protections, and Expense Reimbursement</u>.  The Bidding Procedures Order shall provide that, in the event Purchaser is not declared the winning bidder at the Auction and the Bankruptcy Court approves an Alternative Transaction, Seller shall be required to pay to Purchaser the reasonable and documented expenses incurred by Purchaser prior to the conclusion of the Auction up to $100,000 (the "<u>Expense Reimbursement</u>").  Subject to approval of the Bankruptcy Court, the Expense Reimbursement shall be an allowed administrative expense claim against Seller's bankruptcy estates pursuant to Sections 503(b), 507(a)(2), and 507(b) of the Bankruptcy Code. The Bidding Procedures Order shall also provide, subject to the approval of the Bankruptcy Court, in the event of an auction, for an initial overbid protection in an amount equal to $250,000 (the "<u>Initial Overbid</u>") and minimum bid increments thereafter of $50,000 (the "<u>Minimum Subsequent Overbid Increments</u>", together with the Initial Overbid, and the Expense Reimbursement, the "<u>Bid Protections</u>"). For the avoidance of doubt, the Expense Reimbursement shall constitute an allowed administrative expense claim of the Purchaser upon the closing of an Alternative Transaction and, except as may be agreed by the Purchaser in writing, shall be paid to Purchaser by Seller immediately following, or as part of the closing of, such Alternative

Transaction and directly from the cash proceeds of such transaction. No further or additional Order from the Bankruptcy Court shall be required to give effect to such provisions relating to the terms of payment of the Expense Reimbursement, provided that nothing herein shall prevent or prejudice Purchaser with respect to its right to seek relief from the Bankruptcy Court if it does not promptly receive the Expense Reimbursement upon or immediately following the closing of the Alternative Transaction.

      5.6    Marketing Process.  Between the time the Sale Procedures Motion is filed and either (i) the date the Auction is held or (ii) in the event no Qualified Competing Bid is submitted, the Bid Deadline, Seller may contact, through whatever means are reasonable, other potential purchasers for the Acquired Assets and engage in discussions with such potential purchasers that would be higher and better than reflected in this Agreement.

      5.7    Sale Order.  No later than sixty (60) days after the Petition Date (the "Sale Order Deadline" and, together with the Sale Motion Deadline, Bidding Procedures Order Deadline, the Bid Deadline, the Auction Deadline, the Sale Order Deadline, and the Outside Date, the "Sale Deadlines"), the Bankruptcy Court shall have entered the Sale Order (in a form and substance acceptable to Purchaser).  The Sale Order shall, among other things, (a) approve, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by Seller of this Agreement, (ii) the sale of the Acquired Assets to Purchaser on the terms set forth herein and free and clear of all Encumbrances (other than Permitted Encumbrances) and approving the use of Purchaser's Credit Bid in accordance with section 365(k) of the Bankruptcy Code, up to the amount of the DIP Obligations as of the Closing Date, which Credit Bid may be applied against, and in full or partial satisfaction of, the Purchase Price, and (iii) the performance by Seller of its obligations under this Agreement, (b) authorize and empower Seller to assume and assign to Purchaser the Assigned Contracts pursuant to section 365 (including sections 365(b),(c) and (f)) of the Bankruptcy Code, (c) find that Purchaser is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code, (d) find that Purchaser is not a successor to Seller, and grant Purchaser the protections of section 363(m) of the Bankruptcy Code, (e) find that Purchaser shall have no Liability, obligation or responsibility for any Liabilities, Claims, Encumbrances or other obligation of Seller arising under or related to the Acquired Assets (other than as expressly set forth in this Agreement), including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, *de facto* merger, or substantial continuity, (f) find that Purchaser has provided adequate assurance (as that term is used in section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Assigned Contracts that are Executory Contracts, (g) find that Purchaser shall have no Liability for any Excluded Liability, (h) find that the consideration provided by Purchaser pursuant to this Agreement constitutes reasonably equivalent value and fair consideration for the Acquired Assets, (i) find that Purchaser and Seller did not engage in any conduct which would allow this Agreement to be set aside pursuant to section 363(n) of the Bankruptcy Code and (j) order that, notwithstanding the provisions of the Federal Rules of Bankruptcy Procedures 6004(h) and 6006(d), the Sale Order is not stayed and is effective immediately upon entry. Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (A) demonstrating that Purchaser is a "good faith" purchaser under

section 363(m) of the Bankruptcy Code and (B) establishing adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code.

       5.8   <u>Sale Related Court Filings</u>.  As soon as is practicable and no less than two (2) Business Days prior to filing any papers or pleadings in the Bankruptcy Case that relate primarily to this Agreement, the Sale, or Purchaser, including all pleadings intended to be filed on the Petition Date, or as soon as reasonably practicable under the circumstances, Seller shall provide Purchaser with a copy of such papers or pleadings for review and comment; provided the foregoing shall in all events be consistent with this Agreement in all material respects. Seller shall consider such changes thereto as reasonably requested by Purchaser or its representatives, provided that Purchaser shall make the final determination with respect to any agreement, document, paper schedule, procedure or order which has expressly been made subject to Purchaser's approval pursuant to this Agreement, the DIP Loan, or otherwise.

## ARTICLE VI

## COVENANTS AND AGREEMENTS

       6.1   <u>Conduct of Business of Seller</u>.  Until the earlier of the termination of this Agreement and the Closing, except (i) for any limitations on operations imposed by, and subject to any Orders entered or approvals or authorizations granted or required by or under, the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Case) or the DIP Loan, (ii) as required by applicable Law, (iii) to the extent related to the Excluded Assets and/or Excluded Liabilities, (iv) as otherwise required by or reasonably necessary to carry out the terms of this Agreement, or (v) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld, conditioned or delayed), Seller shall use commercially reasonable efforts to conduct and maintain the Acquired Business in all material respects in the Ordinary Course, and shall timely satisfy, through the Closing, all post-Petition Date obligations arising under any Potential Assigned Contract that it is permitted or required to satisfy under the Bankruptcy Code or any Order of the Bankruptcy Court, and shall not (except as expressly authorized by Purchaser, in writing) seek to reject any such contract, and shall not:

       (a)   terminate (other than by expiration), or amend or modify (other than by automatic extension or renewal) in any material respect any Potential Assigned Contract relating to the Acquired Business or the Acquired Assets;

       (b)   settle or compromise any pending or threatened material Action that could give rise to Liabilities of the Acquired Business that are not Excluded Liabilities;

       (c)   sell, assign, license, transfer, convey, lease, surrender, relinquish or otherwise dispose of any material portion of the Acquired Assets, other than pursuant to existing Contracts;

       (d)   subject any portion of the Acquired Assets that is material to the Acquired Business to any Encumbrance, except for Permitted Encumbrances; or

       (e)   agree or commit to do any of the foregoing.

Nothing contained in this Agreement is intended to give Purchaser or its Affiliates, directly or indirectly, the right to control or direct the business of Seller prior to the Closing.

6.2     Access to Information.

(a)     From the Effective Date until the Closing (or the earlier termination of this Agreement pursuant to Article VIII) (the "Interim Period"), Seller shall provide Purchaser and its authorized Advisors with reasonable access and upon reasonable advance notice and during regular business hours to the books and records of Seller and its Subsidiaries related to the Acquired Business (other than to the extent related to the Excluded Assets and/or Excluded Liabilities), in order for Purchaser and its authorized Advisors to access such information regarding the Acquired Business as Purchaser reasonably deems necessary in connection with effectuating the transactions contemplated by this Agreement; provided that (i) such access does not unreasonably interfere with the normal operations of Seller and its Subsidiaries, (ii) such access will occur in such a manner as Seller reasonably determines to be appropriate to protect the confidentiality of the transactions contemplated by this Agreement, (iii) all requests for access will be directed to Ronald Barliant or such other Person(s) as Seller may designate in writing from time to time, and (iv) nothing herein will require Seller to provide access to, or to disclose any information to, Purchaser if such access or disclosure (A) would cause significant competitive harm to Seller or any of its Subsidiaries if the transactions contemplated by this Agreement are not consummated, (B) would require Seller or any of its Subsidiaries to disclose any financial or proprietary information of or regarding the Affiliates of Seller (other than the Subsidiaries of Seller) or otherwise disclose information regarding the Affiliates of Seller (other than the Subsidiaries of Seller) that Seller deems to be commercially sensitive, (C) would waive any legal privilege, or (D) would be in violation of applicable Laws or the provisions of any agreement to which Seller or any of its Subsidiaries is a party; provided that, in the event that Seller withholds access or information in reliance on the foregoing clause (C) or (D), Seller shall provide (to the extent possible without waiving or violating the applicable legal privilege or Law) notice to Purchaser that such access or information is being so withheld and shall use commercially reasonable efforts to provide such access or information in a way that would not risk waiver of such legal privilege or applicable Law.

(b)     Following the Closing, so long as such access does not unreasonably interfere with Purchaser's business operations, Purchaser shall permit Seller's employees, agents, counsel, and other professionals employed in the Bankruptcy Case, or otherwise retained by Seller, as well as any successor-in-interest to Seller, including, but not limited, to a liquidating trustee, Chapter 7 trustee, or other successor fiduciary, reasonable access to the financial and other books and records relating to the Acquired Assets or the Acquired Business (whether in documentary or data form) for the purposes of facilitating the continuing administration of the Bankruptcy Case, preparing Tax Returns or responding to Tax-related inquiries, and other such administrative activities, including the investigation and potential prosecution of claims and causes of action, which access shall include the right of such professionals to copy, at Seller's expense, such documents and records as it may request in furtherance of the purposes described above.  Purchaser may, in its sole discretion, move any or all of the books and records relating to the Acquired Assets and/or the Acquired Business to a location of its designation; provided, however, if Purchaser moves any such documents or records from their present location, Seller has the right to require Purchaser to copy and deliver to Seller or its professionals such documents and records (or copies

of such documents and records) as they may request, but only to the extent Seller or any such professional (a) furnishes Purchaser with reasonably detailed written descriptions of the materials to be so copied and (b) Seller advances to Purchaser the costs and expenses thereof. The Parties acknowledge that Seller shall have the right to retain any documents and records provided to it by Purchaser. Following the Closing, Purchaser shall provide Seller and such of Seller's professionals as Seller shall have from time to time designated, with reasonable access to former management of the Acquired Business during regular business hours to assist Seller as set forth in this Section 6.2(b), *provided again* that such access does not unreasonably interfere with Purchaser's business operations. Purchaser shall not dispose of any such documents and records except as may be consistent with applicable Law; *provided further* that Purchaser shall provide Seller with reasonable advance written notice prior to the disposal of any such documents or records, together with the opportunity for Seller to preserve such documents or records at Seller's cost.

(c) Purchaser shall be permitted to contact any officer, manager, director, employee, customer, supplier, lessee, lessor, lender, noteholder or other material business relation of Seller or its Subsidiaries prior to the Closing with respect to Seller, its Subsidiaries, their business or the transactions contemplated by this Agreement with prior consent of the Special Committee of Humanigen, Inc. for each such contact and such request shall not be unreasonably denied or withheld; provided, however, that Dr. Cameron Durrant shall be permitted to contact any officer, manager, director, employee, customer, supplier, lessee, lessor, lender, noteholder or other material business relation of Seller or its Subsidiaries prior to the Closing with respect to Seller, its Subsidiaries, and their business in the ordinary course of business without the prior consent of Seller for each such contact.

(d) Following the Effective Date, Purchaser and its authorized Advisors shall be permitted to review, inspect and make copies of any attorney-client, work product and other legal privileges owned by or within the control of Seller (including all documents and records of Seller that are entitled to, or were created under, any such privileges) that Purchaser requires to satisfy any obligation, requirement or demand from any Government agency, or any documents, communications or records reasonably related to any other investigation or action by a Government agency involving Purchaser or Dr. Cameron Durrant, whether ongoing as of the Effective Date or arising thereafter.

6.3     [Reserved]

6.4     Regulatory Approvals.

(a) Seller shall use commercially reasonable efforts to (i) make or cause to be made all filings and submissions required to be made by Seller in connection with the Acquired Business under any applicable Laws for the consummation of the transactions contemplated by this Agreement set forth on Schedule 6.4, (ii) cooperate with Purchaser in exchanging such information and providing such assistance as Purchaser may reasonably request in connection with the foregoing, and (iii) (A) supply promptly any additional information and documentary material that may be reasonably requested in connection with such filings and (B) take all actions necessary to obtain all required clearances in connection with such filings.

(b)    Purchaser shall, and shall cause its Affiliates and Advisors to, use commercially reasonable efforts to (i) make or cause to be made all filings and submissions required to be made by Purchaser under any applicable Laws for the consummation of the transactions contemplated by this Agreement, (ii) cooperate with Seller in exchanging such information and providing such assistance as Seller may reasonably request in connection with all of the foregoing, and (iii) (A) supply promptly any additional information and documentary material that may be reasonably requested in connection with such filings and (B) take all actions necessary to obtain all required clearances.

(c)    Purchaser shall not, and shall not permit its respective Affiliates to, acquire or agree to acquire (by merging or consolidating with, or by purchasing a substantial portion of the assets of or equity in, or by any other manner), any Person or portion thereof, or otherwise acquire or agree to acquire any assets, if the entering into a definitive agreement relating to, or the consummation of, such acquisition, merger or consolidation could reasonably be expected to (i) impose any delay in the obtaining of, or increase the risk of not obtaining, any permits, Orders or other approvals of any Governmental Body necessary to consummate the transactions contemplated by this Agreement or the expiration or termination of any applicable waiting period, (ii) increase the risk of any Governmental Body entering an Order prohibiting the consummation of the transactions contemplated by this Agreement, or (iii) delay the consummation of the transactions contemplated by this Agreement.

6.5    <u>Reasonable Best Efforts; Cooperation</u>.

(a)    Subject to the other terms of this Agreement, each Party shall, and shall cause its Advisors to, use its reasonable best efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper or advisable under applicable Law to cause the transactions contemplated herein to be effected as soon as practicable, but in any event on or prior to the Outside Date, in accordance with the terms hereof and to cooperate with each other Party and its Advisors in connection with any step required to be taken as a part of its obligations hereunder.  The "reasonable best efforts" of Seller will not require Seller or any of its Affiliates or Advisors to expend any money to remedy any breach of any representation or warranty, to commence any Action, to waive or surrender any right, to modify any Contract or to waive or forego any right, remedy or condition hereunder, subject to Seller's obligation to pay Cure Costs related to the assumption and assignment to Purchaser of any Assigned Contracts (as directed by the Purchaser) hereunder up to and including the amount of the Cure Cap, provided, however, that nothing in this section shall limit the rights of Purchaser hereunder with respect to any representation or warranty the Seller is required to make as of Closing pursuant to this Agreement, nor shall it modify any conditions to Closing set forth in this Agreement.

(b)    The obligations of Seller pursuant to this Agreement, including this <u>Section 6.5</u>, shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Case), the DIP Loan and Seller's obligations as a debtor-in-possession to comply with any order of the Bankruptcy Court (the Sale Order) and Seller's duty to seek and obtain the highest or otherwise best price for the Acquired Assets as required by the Bankruptcy Code.

6.6     Further Assurances.  From time to time after the Closing, as and when requested by any Party and at such requesting Party's expense, any other Party will execute and deliver, or cause to be executed and delivered, all such documents and instruments and will take, or cause to be taken, all such further or other actions as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the transactions contemplated by this Agreement.

6.7     Acknowledgment by Purchaser.

(a)     Purchaser acknowledges and agrees that it has conducted to its full satisfaction an independent investigation and verification of the business, financial condition, results of operations, assets, Liabilities, properties, Contracts and prospects of Seller and the Acquired Assets and the Assumed Liabilities, and, in making its determination to proceed with the transactions contemplated by this Agreement, except as expressly provided in this Agreement, Purchaser has relied solely on the results of the Purchaser's own independent investigation and verification and has not relied on, is not relying on, and will not rely on, Seller, any Subsidiary, any information, statements, disclosures, documents (including, without limitation, confidential information memoranda or similar documents), projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom, Projections or any information, statements, disclosures or materials, in each case, whether written or oral, made or provided by, or as part of, any of the foregoing or Seller, or any failure of any of the foregoing to disclose or contain any information, except for the Express Representations (it being understood that Purchaser has relied only on the Express Representations). Purchaser acknowledges and agrees that (i) the Express Representations are the sole and exclusive representations, warranties and statements of any kind made to Purchaser and on which Purchaser may rely in connection with the transactions contemplated by this Agreement; and (ii) all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (1) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Representations) including in the Dataroom, Projections, meetings, calls or correspondence with Seller or any other Person on behalf of Seller or any of its respective Affiliates or Advisors and (2) any other statement relating to the historical, current or future business, financial condition, results of operations, assets (including the Acquired Assets), Liabilities (including the Assumed Liabilities) or the properties, Contracts, and prospects of Seller, are, in each case, specifically disclaimed by Seller.  Purchaser: (x) disclaims reliance on the items in clause (ii) in the immediately preceding sentence and (y) acknowledges and agrees that it has relied on, is relying on and will rely on only the items in clause (i) in the immediately preceding sentence. Without limiting the generality of the foregoing, Purchaser acknowledges and agrees, that neither Seller, nor any other Person, has made, is making or is authorized to make, and Purchaser hereby waives, all rights and claims it or they may have against Seller with respect to the accuracy of, any omission or concealment of, or any misstatement with respect to, (A) any potentially material information regarding Seller or any of its respective assets (including the Acquired Assets), Liabilities (including the Assumed Liabilities) or operations, and (B) any warranty or representation (whether in written, electronic or oral form), express or implied, as to the quality, merchantability, fitness for a particular purpose, or condition of the Seller's business, operations, assets (including the Acquired Assets), Liabilities (including the Assumed Liabilities), prospects or any portion thereof, except, in each case, solely to the extent expressly set forth in the Express Representations.  Except as expressly set forth herein, Purchaser

27

is acquiring the Acquired Assets and assuming the Assumed Liabilities on an "AS IS, WHERE IS" basis.

(b)    Without limiting the generality of the foregoing, in connection with the investigation by the Purchaser of Seller, Purchaser and its Advisors, have received or may receive, from or on behalf of Seller, certain projections, forward-looking statements and other forecasts (whether in written, electronic or oral form, and including in the Dataroom, management meetings, etc.) (collectively, "Projections").  Purchaser acknowledges and agrees that (i) such Projections are being provided solely for the convenience of Purchaser to facilitate its own independent investigation of Seller (ii) there are uncertainties inherent in attempting to make such Projections, (iii) Purchaser is familiar with such uncertainties, and (iv) Purchaser is taking full responsibility for making its own evaluation of the adequacy and accuracy of all Projections (including the reasonableness of the assumptions underlying such Projections).

(c)    Purchaser acknowledges and agrees that it will not assert, institute or maintain any Action that makes any claim contrary to the agreements and covenants set forth in this Section 6.7, including any such Action with respect to the distribution to Purchaser or Purchaser's use, of the Dataroom, Projections or any other information, statements, disclosures or materials, in each case whether written or oral, provided by Seller or any failure of any of the foregoing to disclose any information.

(d)    Purchaser acknowledges and agrees, that the covenants and agreements contained in this Section 6.7 (i) require performance after the Closing to the maximum extent permitted by applicable Law; and (ii) are an integral part of the transactions contemplated by this Agreement and that, without these agreements set forth in this Section 6.7, Seller would not enter into this Agreement.

6.8    Bankruptcy Court Approval; Executory Contracts.

(a)    Seller and Purchaser acknowledge that this Agreement and the sale of the Acquired Assets and the assumption of the Assumed Liabilities are subject to (i) the receipt of higher and/or better bids at or prior to the Auction (if any), and (ii) the entry of the Sale Order. Purchaser acknowledges that Seller must take reasonable steps to demonstrate that it has sought to obtain the highest or otherwise best price for the Acquired Assets, including giving notice thereof to the creditors of Seller and other interested parties, providing information about the Acquired Assets to prospective bidders, entertaining higher and/or better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Acquired Assets, conducting the Auction in accordance with the Bidding Procedures Order.

(b)    If Purchaser is the successful bidder for the Acquired Assets, Seller shall use commercially reasonable efforts to gain approval by the Bankruptcy Court of the purchase and sale of the Acquired Assets and the assumption and assignment of all Assigned Contracts contemplated hereby to the extent required by Sections 363 and 365 and all other applicable provisions of the Bankruptcy Code within the terms of the Bidding Procedures Order and Sale Order.

(c)     Seller shall make reasonable good faith efforts to consult and cooperate with Purchaser regarding (i) any material pleadings, motions, notices, statements, applications, schedules, reports, or other papers to be filed or submitted by Seller in connection with or related to this Agreement (including, without limitation, any pleadings relating to the Bidding Procedures Order or Sale Order), (ii) any discovery taken in connection with the Sale Order (including any depositions), and (iii) any hearing relating to the Sale Order, including the submission of any evidence, including witness testimony, in connection with such hearing.

## ARTICLE VII

## CONDITIONS TO CLOSING

7.1     <u>Conditions Precedent to the Obligations of Purchaser and Seller</u>.  The respective obligations of each Party to this Agreement to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by Seller and Purchaser) on or prior to the Closing Date, of each of the following conditions:

(a)     No court or other Governmental Body shall have issued, enacted, entered, promulgated or enforced any Law or Order (that is final and non-appealable and that has not been vacated, withdrawn or overturned) restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement; and

(b)     The Bankruptcy Court shall have entered the Sale Order, which shall (i) be in full force and effect, (ii) not be subject to any stay or appeal, (iii) not have been materially modified without the written consent of Purchaser and Seller (not to be unreasonably withheld, conditioned, or delayed), (iv) not have been reversed or vacated, and (v) unless waived by Purchaser, shall be a Final Order.

7.2     <u>Conditions Precedent to the Obligations of Purchaser</u>.  The obligations of Purchaser to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by Purchaser in its sole discretion), on or prior to the Closing Date (or on such later date as explicitly set forth herein), of each of the following conditions:

(a)      The conditions set forth in <u>Section 7.1(a)-(b)</u> shall have been satisfied;

(b)     Seller shall have delivered to Purchaser a copy of the Sale Order;

(c)     All things required to be done or accomplished in order to timely satisfy each of the respective Sale Deadlines shall have been timely and fully done or accomplished;

(d)     All things required to be done or accomplished in order to timely satisfy each of the respective DIP Deadlines shall have been timely and fully done or accomplished;

(e)     The Closing (including all materials obligations and duties of the Seller hereunder or in connection herewith) may be completed in the ordinary course of business by the Outside Date and the Seller shall be ready and able to convey all right, title and interest in the Acquired Assets to Purchaser and to pay the Cure Costs relating to Assigned Contracts, up to and

including the Cure Cap, upon, or promptly following, the Closing in accordance the Bankruptcy Code and any order of the Bankruptcy Court;

(f)    Each Schedule to this Agreement (which Schedules the Parties acknowledge and agree are not complete as of the Effective Date, and are subject to inclusion or modification following the Effective Date) shall be completed, accurate, and shall be, in form and substance, acceptable to the Purchaser as of the Closing;

(g)    the representations and warranties made by Seller in <u>Article III</u> shall be true and correct as of the Closing Date (disregarding all qualifications or limitations as to "materiality" or "Material Adverse Effect" and words of similar import set forth therein), in each case as of the Effective  Date and as of the Closing Date (or such later date as explicitly set forth herein) with the same force and effect as though such representations and warranties had been made on and as of the Closing Date (except that representations and warranties that are made as of a specified date need be true and correct only as of such date); *provided* that the representations set forth in <u>Sections 3.1</u> and <u>3.2</u> will be true and correct in all material respects;

(h)    Purchaser shall have been furnished with the documents set forth in <u>Section 2.3</u>;

(i)    there shall not have occurred a Material Adverse Effect between the Effective Date and the Closing Date; and

(j)    Seller shall have performed in all material respects all of the covenants and agreements required to be performed by Seller under this Agreement at or prior to the Closing.

7.3    <u>Conditions Precedent to the Obligations of the Seller</u>.  The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by Seller in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)    The conditions set forth in <u>Section 7.1(a)-(b)</u> shall have been satisfied;

(b)    Purchaser shall have delivered to Seller those items set out in <u>Section 2.4</u>;

(c)    the representations and warranties made by Purchaser in <u>Article IV</u> shall be true and correct in all material respects (without giving effect to any materiality or similar qualification contained therein), in each case as of the Effective Date and as of the Closing Date, with the same force and effect as though all such representations and warranties had been made as of the Closing Date (other than representations and warranties that by their terms address matters only as of another specified date, which shall be so true and correct only as of such other specified date), except where the failure of such representations or warranties to be  true and correct has not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; and

(d)    Purchaser shall have performed in all material respects all of the covenants and agreements required to be performed by it under this Agreement at or prior to the Closing.

7.4    <u>Waiver of Conditions</u>.  Upon the occurrence of the Closing, any condition set forth in this <u>Article VII</u> that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing, provided, however that nothing herein shall be deemed to waive or release either Party from their duty to perform any obligation arising hereunder that is to be performed after the Closing.  None of Purchaser or Seller may rely on the failure of any condition set forth in this <u>Article VII</u>, as applicable, to be satisfied if such failure was caused by such Party's breach of this Agreement or its failure to use, as required by this Agreement, its reasonable best efforts to consummate the transactions contemplated hereby.

## ARTICLE VIII

## TERMINATION

8.1    <u>Termination of Agreement</u>.  This Agreement may be terminated only in accordance with this <u>Section 8.1</u>.  This Agreement may be terminated at any time prior to the Closing:

(a)    by the mutual written consent of Seller and Purchaser;

(b)    by written notice of either Purchaser or Seller, upon the issuance by any Governmental Body of an Order restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or declaring unlawful the transactions contemplated by this Agreement, and such Order having become final, binding and non-appealable; *provided* that no termination may be made by a Party under this <u>Section 8.1(b)</u> if the issuance of such Order was caused by the breach or action or inaction under this Agreement of such Party;

(c)    by written notice of either Purchaser or Seller, if the Closing shall not have occurred on or before seventy (70) days after the Petition Date, or such later date as Seller and Purchaser may agree (the "<u>Outside Date</u>"); *provided* that a Party shall not be permitted to terminate this Agreement pursuant to this <u>Section 8.1(c)</u> if the failure of the Closing to have occurred by the Outside Date was caused by the breach or action or inaction of such Party;

(d)    by written notice of either Purchaser or Seller, if the Bankruptcy Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of Seller is appointed in the Bankruptcy Case;

(e)    by written notice from Seller to Purchaser, upon a breach of any covenant or agreement on the part of Purchaser, or if any representation or warranty of Purchaser will have become untrue, in each case, such that the conditions set forth in <u>Section 7.3(c)</u> or <u>7.3(d)</u> would not be satisfied, including a breach of Purchaser's obligation to consummate the Closing; *provided* that (i) if such breach is curable by Purchaser then Seller may not terminate this Agreement under this <u>Section 8.1(e)</u> unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) ten (10) Business Days after Seller notifies Purchaser of such breach and (ii) the right to terminate this Agreement pursuant to this <u>Section 8.1(e)</u> will not be available to Seller at any time that Seller is in material breach of any

covenant, representation or warranty hereunder (excluding any breach caused by Purchaser's breach);

(f)     by written notice from Purchaser to Seller, upon a breach of any covenant or agreement on the part of Seller, or if any representation or warranty of Seller will have become untrue, in each case, such that the conditions set forth in Sections 7.2(g) or 7.2(j) would not be satisfied, including a breach of Seller's obligation to consummate the Closing; *provided* that (i) if such breach is curable by Seller then Purchaser may not terminate this Agreement under this Section 8.1(f) unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) ten (10) Business Days after Purchaser notifies Seller of such breach and (ii) the right to terminate this Agreement pursuant to this Section 8.1(f) will not be available to Purchaser at any time that Purchaser is in material breach of any covenant, representation or warranty hereunder (excluding any breach caused by Seller's breach);

(g)     by written notice from Seller to Purchaser, if all of the conditions set forth in Sections 7.1 and 7.2 have been satisfied (and Seller is ready and able to satisfy any other than conditions that by their nature are to be satisfied at the Closing) or waived and Purchaser fails to complete the Closing by the Outside Date provided such Party giving written notice is not then in material breach of any representation, warranty, covenant or other agreement contained herein;

(h)     by written notice from Purchaser to Seller, if all of the conditions set forth in Sections 7.1 and 7.3 have been satisfied (and Purchaser is ready and able to satisfy any other conditions that by their nature are to be satisfied at the Closing) or waived and Seller fails to complete the Closing by the Outside Date, provided such Party giving written notice is not then in material breach of any representation, warranty, covenant or other agreement contained herein;

(i)     OMITTED.

(j)     by Purchaser, if the Sale Order shall not have been entered by the Sale Order Deadline;

(k)     by Purchaser, if the Closing shall not have been consummated by the Outside Date, provided that the right to terminate this Agreement under this Section 8.1(k) shall not be available to any party whose failure to fulfill any obligation under this Agreement has been a significant cause of, or resulted in, the failure of the Closing on or before the Outside Date;

(l)     by Purchaser, if the Interim DIP Order has not been entered by the Interim DIP Order Deadline;

(m)     by Purchaser, if the Final DIP Order has not been entered by the Final DIP Order Deadline;

(n)     by Purchaser, if Seller is in material default (after giving effect to all applicable cure periods) under the DIP Loan, if such notice is delivered while the default remains uncured or unwaived; or

(o)     by written notice of either Seller or Purchaser if Seller has agreed to enter into, in the manner provided for under this Agreement, an Alternative Transaction.

8.2     Effect of Termination.  In the event of termination of this Agreement pursuant to Section 8.1, this Agreement shall become null and void and there shall be no liability on the part of any Party or any of its partners, officers, directors or shareholders; *provided* that this Section 8.2, Article X, and Seller's obligations to pay the DIP Obligations, Bid Protections and Expense Reimbursements shall survive any such termination; *provided further* that no termination will relieve either Party from any liability for damages, losses, costs or expenses (including reasonable legal fees and expenses) resulting from any willful breach of this Agreement prior to the date of such termination (which, for the avoidance of doubt, will be deemed to include any failure by either Party to consummate the Closing if and when it is obligated to do so hereunder).

## ARTICLE IX

## TAXES

9.1     Transfer Taxes.  Any sales, use, value-added, goods and services, registration, conveyancing, purchase, transfer, franchise, deed, fixed asset, stamp, documentary, use or similar Taxes and recording charges which may be payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Liabilities under this Agreement or the transactions contemplated hereby (the "Transfer Taxes") shall be borne and timely paid by Purchaser, but only to the extent not exempt under the Bankruptcy Code, as applicable to the transfer of the Acquired Assets pursuant to this Agreement.  Seller shall timely file any Tax Returns as may be required to comply with the provisions of applicable Law in connection with the payment of such Transfer Taxes.

9.2     Allocation of Purchase Price.  Purchaser shall prepare an allocation of the Purchase Price and the Assumed Liabilities (plus other relevant items) among the Acquired Assets for all Tax purposes (the "Purchase Price Allocation") in accordance with the principles of Section 1060 of the Tax Code (and any similar provision of state, local, or non-U.S. law, as appropriate) and the methodologies set forth on Schedule 9.2.  Purchaser shall deliver such allocation to Seller within thirty (30) days following the Closing Date for Seller's review, comment and approval.  Purchaser and Seller shall work together to jointly agree to the final allocation.  Purchaser and Seller will report, act and file Tax Returns (including, but not limited to, Internal Revenue Service Form 8594) in all respects and for all purposes consistent with the Purchase Price Allocation.  The parties will not take any position (whether in audits, on any Tax Returns or otherwise) that is inconsistent with the Purchase Price Allocation unless required to do so by a "determination" as defined in Section 1313 of the Tax Code. Seller shall provide Purchaser and Purchaser shall provide Seller with a copy of any information required to be furnished to the Secretary of the Treasury under Tax Code Section 1060.

9.3     Cooperation.  Purchaser and Seller shall cooperate fully, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and any audit, litigation or other proceeding with respect to Taxes.  Purchaser and Seller further agree, upon request in writing from either Party, to use their commercially reasonable efforts to obtain any certificate or other document (including any resale exemption certification) from any Governmental Body or any other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed (including, but not limited to, with respect to the transactions

contemplated hereby); *provided* that the requesting Party shall reimburse the other Party for its reasonable out-of-pocket costs incurred in satisfying the request.

## ARTICLE X

## MISCELLANEOUS

10.1    <u>Non-Survival of Representations and Warranties and Certain Covenants</u>.  Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such party prior to or at the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing.  Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and nothing in this <u>Section 10.1</u> will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement.  Purchaser and the Seller acknowledge and agree that the agreements contained in this <u>Section 10.1</u> (a) require performance after the Closing to the maximum extent permitted by applicable Law; and (b) are an integral part of the transactions contemplated hereby and that, without the agreements set forth in this <u>Section 10.1</u>, none of the Parties would enter into this Agreement.

10.2    <u>Expenses</u>.  Whether or not the Closing takes place, except as otherwise provided herein (including, for the avoidance of doubt, excepted as provided in <u>Section 5.5</u> and <u>Section 8.2</u>), all fees, costs and expenses (including fees, costs and expenses of Advisors) incurred in connection with the negotiation of this Agreement and the other agreements contemplated hereby, the performance of this Agreement and the other agreements contemplated hereby and the consummation of the transactions contemplated hereby and thereby will be paid by the Party incurring such fees, costs and expenses; it being acknowledged and agreed that all Transfer Taxes will be allocated pursuant to <u>Section 9.1</u>.

10.3    <u>Notices</u>.  Except as otherwise expressly provided herein, all notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) when transmitted via by electronic mail (unless if transmitted after 5:00 P.M. Central time or other than on a Business Day, then on the next Business Day), (c) the day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third (3rd) Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective party at the number, electronic mail address or street address, as applicable, set forth below, or at such other number, electronic mail address or street address as such party may specify by written notice to the other Party. Notwithstanding the foregoing, in order to accomplish effective service, all notices must be sent by electronic mail on the same day that notice is first mailed or transmitted by any other means.

<u>Notices to Purchaser</u>:

Taran Therapeutics
5 Haines Cove Drive
Toms River, NJ 08753
Attention:    Cameron Durrant
Email:         camerondurrant@yahoo.com


with a copy to:

Law Office of Kristen A. Perry
1 Leigh Street
Clinton, NJ 08809
Attention:    Kristen A. Perry
Email:         kperry@kperrylaw.com

Pashman Stein Walder Hayden, P.C.
1007 North Orange Street, 4th Floor $183,
Wilmington, DE 19801
Attention:    Henry Jaffe and Joseph Barsalona
Email:         jbarsalona@pashmanstein.com, hjaffe@pashmanstein.com

<u>Notices to Seller</u>:

Humanigen, Inc.
2256 N. Lincoln Park West
Chicago, IL 60614
Attention:    Ronald Barliant
Email:         ronbarliant@comcast.net

with a copy to:

Potter Anderson & Corroon LLP
1313 N. Market Street, Sixth Floor
Wilmington, Delaware 19801
Attention:    M. Blake Cleary and Aaron Stulman
Email:         bcleary@potteranderson.com; astulman@potteranderson.com


      10.4   <u>Binding Effect; Assignment</u>. This Agreement shall be binding upon Purchaser and, subject to entry of the Sale Order, Seller and inure to the benefit of the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Case or any successor Chapter 7 case; *provided* that neither this Agreement nor any of the rights or obligations hereunder may be assigned or delegated without the prior written consent of Purchaser and Seller.

35

10.5    Amendment and Waiver.  Any provision of this Agreement or the Schedules or exhibits hereto may be (a) amended only in a writing signed by Purchaser and Seller or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought.  No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default.

10.6    Third-Party Beneficiaries.  Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement will be construed to give any Person other than the Parties any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

10.7    Non-Recourse.  (a) This Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement; and  (b) except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or Advisor of any party to this Agreement will have any liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any Action based upon, arising out of or related to this Agreement.

10.8    Severability.  Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction.

10.9    Construction.  The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Person.  The headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify any of the terms or provisions hereof.

10.10    Schedules; Schedule Supplement.

(a)    The disclosure schedules to this Agreement (the "Schedules") have been arranged for purposes of convenience in separately numbered sections generally corresponding to the sections of this Agreement; *provided* that each section of the Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Schedules. Capitalized terms used in the Schedules and not otherwise defined therein have the meanings given to them in this Agreement.  The Parties agree that: (i) as of the Effective Date, not all of the Schedules may be completed; (ii) the Seller shall cooperate with the Purchaser to provide all of the information necessary for the Schedules to be prepared on an expedited basis and consistent with the deadlines set forth in this Agreement, so that all Schedules may be finalized at Closing; and (iii) the final form of the Schedules shall be prepared in a form and substance acceptable to the Purchaser.  Any description of any agreement, document, instrument, plan, arrangement, or

other item set forth on any Schedule is a summary only and is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement or item which terms will be deemed disclosed for all purposes of this Agreement.  The information contained in this Agreement, in the Schedules and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of contract

(b)    With respect to any matter arising, or of which Seller becomes aware, after the Seller has disclosed information to the Purchaser sufficient to create any Schedule, Seller shall prepare a supplement or amendment to the relevant Schedules hereto (each a "Schedule Supplement") and deliver same to Purchaser and, in doing so, shall identify the nature of the change set forth in any such Schedule Supplement.

10.11  Complete Agreement.  This Agreement, and any other agreements expressly referred to herein, contains the entire agreement of the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the transactions contemplated by this Agreement and supersedes all prior understandings or agreements among the Parties (whether written or oral) respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the transactions contemplated by this Agreement.  In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parole evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

10.12  Specific Performance.  The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any Party fails to take any action required of it hereunder to consummate the transactions contemplated by this Agreement.  It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in Section 10.13 without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the transactions contemplated by this Agreement and without that right, neither Seller nor Purchaser would have entered into this Agreement.  The Parties acknowledge and agree that any Party pursuing an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this Section 10.12 will not be required to provide any bond or other security in connection with any such Order.  The remedies available to the Parties pursuant to this Section 10.12 will be in addition to any other remedy to which they were entitled at law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit either Party from seeking to collect or collecting damages.  If, prior to the Outside Date (or, if the Parties previously agreed that the Closing Date would occur on or within three (3) Business Days of the Closing Date, within five (5) Business Days after the Outside Date), any Party brings any action, in each case in accordance

with this <u>Section 10.12</u>, to enforce specifically the performance of the terms and provisions hereof by any other party, the Outside Date will automatically be extended (y) for the period during which such action is pending, <u>plus</u> ten (10) Business Days, or (z) by such other time period established by the court presiding over such action, as the case may be. In no event will this <u>Section 10.12</u> be used, alone or together with any other provision of this Agreement, to require Seller to remedy any breach of any representation or warranty of Seller made herein.

10.13    <u>Jurisdiction and Exclusive Venue</u>. Each of the Parties irrevocably agrees that any Action that may be based upon, arising out of or related to this Agreement or the negotiation, execution or performance of this Agreement and the transactions contemplated hereby brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) in the event the Bankruptcy Case is closed, or if the Bankruptcy Court is unwilling or unable to hear such Action, in the District Court for the District of Delaware and any state court sitting in the State of Delaware to which an appeal from the District Court for the District of Delaware may be validly taken (or, if the District Court for the District of Delaware declines to accept jurisdiction over a particular matter, any state or federal court within the State of Delaware) ((a) and (b), the "<u>Chosen Courts</u>"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any such Action arising out of or relating to this Agreement and the transactions contemplated hereby. Each of the Parties agrees not to commence any Action relating thereto except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any Chosen Court, and no party will file a motion to dismiss any Action filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non-conveniens*. The Parties irrevocably agree that venue would be proper in any of the Chosen Courts, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of such Action. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in <u>Section 10.3</u>. Nothing in this Agreement will affect the right of any Party to this agreement to serve process in any other manner permitted by Law.

10.14    <u>Governing Law; Waiver of Jury Trial</u>.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement, and any Action that may be based upon, arise out of or relate to this Agreement or the negotiation, execution or performance of this Agreement or the transactions contemplated hereby will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

(b)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT, THE DOCUMENTS AND AGREEMENTS CONTEMPLATED HEREBY AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL

38

BY JURY IN ANY ACTION BASED ON, ARISING OUT OF OR RELATED TO THIS AGREEMENT, ANY DOCUMENT OR AGREEMENT CONTEMPLATED HEREBY OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY.  EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH ACTION WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.  EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.15    <u>No Right of Set-Off</u>.  Purchaser and its respective successors and permitted assigns, hereby waives any rights of set-off, netting, offset, recoupment, or similar rights that Purchaser, or any of its respective successors and permitted assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by Purchaser pursuant to this Agreement or any other document or instrument delivered by Purchaser in connection herewith, *provided, however*, that nothing in this section or in any other provision of this Agreement shall in any way prevent, limit or restrict Purchaser's right to submit one or more Credit Bids (up to, in Purchaser's discretion,  the full amount of all DIP Obligations owing to Purchaser) to purchase the Acquired Assets in accordance with the terms of this Agreement.

10.16    <u>Counterparts and PDF</u>.  This Agreement and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one party, but all such counterparts taken together will constitute one and the same instrument.  Any counterpart, to the extent signed and delivered by means of a facsimile machine, .PDF or other electronic transmission, will be treated in all manner and respects as an original contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.  Minor variations in the form of the signature page to this Agreement or any agreement or instrument contemplated hereby, including footers from earlier versions of this Agreement or any such other document, will be disregarded in determining the effectiveness of such signature.  At the request of any party hereto or to any such contract, each other party hereto or thereto will re-execute original forms thereof and deliver them to all other parties.  No party hereto or to any such contract will raise the use of a facsimile machine, .PDF or other electronic transmission to deliver a signature or the fact that any signature or contract was transmitted or communicated through the use of facsimile machine, .PDF or other electronic transmission as a defense to the formation of a contract and each such party forever waives any such defense.

10.17    <u>Bulk Sales Laws</u>.  The Parties intend that pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any security interests in the Acquired Assets, including any liens or claims arising (or that would otherwise arise) out of the bulk transfer laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.  In furtherance of the foregoing, each Party hereby

39

waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the transactions contemplated by this Agreement.

10.18   Fiduciary Obligations.  Nothing in this Agreement, or any document related to the transactions contemplated hereby, will require Seller or Seller's board of directors, board of managers, directors, managers, officers or members, or other similar governing body or fiduciary, to take any action, or to refrain from taking any action, to the extent inconsistent with applicable Law or its or their fiduciary obligations under applicable Law.

10.19   Privileges.  Nothing in this Agreement shall in any way constitute a waiver or release or shall diminish any rights, if any, or ability of any third-party (including Dr. Cameron Durrant)  to seek or claim a privilege in any documents, communications, or records of Seller, nor to request or seek access to, any documents, communications or records of the Seller, nor to claim or waive a privilege any third party (including Dr. Cameron Durrant) may hold; nor shall anything in this Agreement prejudice the rights, if any, or constitute a waiver or release or shall diminish any rights, if any, or ability of any third-party (including Dr. Cameron Durrant) to assert or claim that Seller does not possess, exclusively or otherwise, a privilege in any documents, communications, or records.  For the avoidance of doubt, (i) the Seller's rights, if any, or ability to dispute or otherwise challenge with respect to any claim, request, or assertion by a third-party (including Dr. Cameron Durrant) of the foregoing in this section 10.19 are reserved; and (ii) this section 10.19 shall survive Closing.  To the extent there are conflicts between this section and any other terms in this Agreement, this section 10.19 shall control.

## ARTICLE XI

## ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS

11.1   Certain Definitions.

(a)      "Acquired Business" has the meaning set forth in the Recitals.

(b)      "Action" means any action, claim (including a counterclaim, cross-claim, or defense), complaint, grievance, summons, suit, litigation, arbitration, mediation, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, hearing, inquiry, inquest, audit, examination or investigation, of any kind whatsoever, regardless of the legal theory under which such liability or obligation may be sought to be imposed, whether sounding in contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body.

(c)      "Acquired Assets" has the meaning set forth in Section 1.1.

(d)      "Acquired Causes of Action" has the meaning set forth in Section 1.1(j).

(e)      "Acquired Intellectual Property" has the meaning set forth in Section 1.1(f).

(f)      "ADC" has the meaning set forth in the Recitals.

(g)    "Advisors" means, with respect to any Person, the accountants, attorneys, consultants, advisors, investment bankers, or other representatives of such Person as well as any Person from whom Purchaser is seeking to invest in or finance the Purchaser, including any party seeking or arranging such investment or financing.

(h)    "Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

(i)    "Agreement" has the meaning set forth in the Preamble.

(j)    "Alternative Transaction" means the sale, transfer, or other disposition, directly or indirectly, including through an asset sale, share sale, merger, or other similar transaction, including any plan of reorganization or plan of liquidation, or resulting from an auction, of any material portion of the Acquired Assets or all or substantially all of the equity interests of Seller or any Subsidiary or parent company owning any Acquired Assets, in a single transaction or a series of transactions, with one or more persons other than Purchaser and/or its Affiliate.

(k)    "Ancillary Agreements" has the meaning set forth in Section 2.3(d).

(l)    "Annual Net Sales" shall mean the gross sales revenue booked and actually received by Purchaser with respect to any particular HGEN Product (collectively, the "HGEN Product Gross Sales") in any particular Territory less cost of sales, returns, rebates, and chargebacks, and costs of commercialization (collectively, the "HGEN Product Deductions") in connection with such HGEN Product in such Territory (the HGEN Product Gross Sales less HGEN Product Deductions, "Net Sales"): (a) during the twelve month period commencing on the first day of the first full fiscal quarter following the Closing Date (the "Initial Annual Net Sales Period"); or (b) as applicable, during each twelve month period immediately following the conclusion of the Initial Annual Net Sales Period (each twelve month period set forth in this definition, including the Initial Annual Sales Period shall be an "Annual Net Sales Period").

(m)    "Assigned Contracts" has the meaning set forth in Section 1.1(a).

(n)    "Assignment and Assumption Agreement" has the meaning set forth in Section 2.3(c).

(o)    "Assumed Liabilities" has the meaning set forth in Section 1.3.

(p)    "Auction" has the meaning set forth in Section 5.4.

(q)    "Auction Deadline" has the meaning set forth in Section 5.4.

(r)    "Bankruptcy Case" has the meaning set forth in the Recitals.

DocuSign Envelope ID: 00E802D5-5952-45E4-BA55-96855F37A4E1

(s)    "<u>Bankruptcy Code</u>" has the meaning set forth in the Recitals.

(t)    "<u>Bankruptcy Rules</u>" has the meaning set forth in the Recitals.

(u)    "<u>Bid Deadline</u>" has the meaning set forth in <u>Section 5.4</u>.

(v)    "<u>Bid Procedures</u>" has the meaning set forth in <u>Section 5.3</u>.

(w)    "<u>Bid Protections</u>" has the meaning set forth in <u>Section 5.5</u>.

(x)    "<u>Bidding Procedures Order</u>" has the meaning set forth in <u>Section 5.3</u>.

(y)    "<u>Bidding Procedures Order Deadline</u>" has the meaning set forth in <u>Section 5.3.</u>

(z)    "<u>Bill of Sale</u>" has the meaning set forth in <u>Section 2.3(b).</u>

(aa)    "<u>BLA</u>" means a comprehensive, multi-volume application that includes, among other items, sufficient data establishing the safety, purity and potency of the proposed biological product for its intended indication, referred to as a "Biologics License Application."

(bb)    "<u>Business Day</u>" means any day other than a Saturday, Sunday or other day on which banks in New York, New York are authorized or required by Law to be closed.

(cc)    "<u>Cash and Cash Equivalents</u>" means all of Seller's cash (including petty cash and checks received prior to the close of business on the Closing Date), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities and any other cash equivalents, whether on hand, in transit, in banks or other financial institutions, or otherwise held.

(dd)    "<u>Cash Payment</u>" has the meaning set forth in <u>Section 2.1(a)(ii).</u>

(ee)    "<u>CMML</u>" shall mean chronic myelomonocytic leukemia.

(ff)    "<u>Chosen Courts</u>" has the meaning set forth in <u>Section 10.13</u>.

(gg)    "<u>Claim</u>" has the meaning ascribed by Bankruptcy Code Section 101(5), including all rights, claims, causes of action, defenses, debts, demands, damages, offset rights, setoff rights, recoupment rights, obligations and liabilities of any kind or nature under contract, at Law or in equity, known or unknown, contingent or matured, liquidated or unliquidated, and all rights and remedies with respect thereto.

(hh)    "<u>Closing</u>" has the meaning set forth in <u>Section 2.2</u>.

(ii)    "<u>Closing Date</u>" has the meaning set forth in <u>Section 2.2</u>.

(jj)    "<u>Closing Date Payment</u>" has the meaning set forth in <u>Section 2.1(c).</u>

(kk)   "<u>Commercially Reasonable Efforts</u>" means, with respect to the efforts to be expended, or considerations to be undertaken by Purchaser with respect to any objective, activity or decision to be undertaken with respect to an HGEN Product, reasonable, good faith efforts to accomplish such objective, activity or decision as such Purchaser would normally use to accomplish a similar objective, activity or decision under similar circumstances, it being understood and agreed that with respect to the development, manufacture, seeking and obtaining Regulatory Approval, or commercialization of an HGEN Product, such efforts and resources shall be consistent with those efforts and resources commonly used by Purchaser under similar circumstances for assets owned by it or to which it has similar rights, which compound or product, as applicable, is at a similar stage in its development or product life and is of similar market potential taking into account: (a) issues of efficacy, safety, and expected and actual approved labeling, (b) the expected and actual competitiveness of alternative products sold by third parties in the marketplace, (c) the expected and actual product profile of the compound or product, (d) the expected and actual patent and other proprietary position of the compound or product, (e) the likelihood of Regulatory Approval given the regulatory structure involved, including regulatory or data exclusivity, (f) the expected and actual profitability and return on investment of the compound or product, or other compounds or products in Purchaser's portfolio of compounds or products, taking into consideration, among other factors, expected and actual third party expenses and the pricing and reimbursement relating to the product(s); *provided, that*, Purchaser may not consider amounts due, or already paid, to Seller under this Agreement. Commercially Reasonable Efforts shall be determined on a country-by-country and indication-by-indication basis for an HGEN Product, and it is anticipated that the level of effort and resources that constitute "Commercially Reasonable Efforts" with respect to a particular country or indication will change over time, reflecting changes in the status of an HGEN Product and the country(ies) involved.

(ll)   "<u>Consent</u>" means any approval, consent, ratification, permission, waiver or authorization, or an Order of the Bankruptcy Court that deems or renders unnecessary the same.

(mm)   "<u>Contract</u>" means any contract, indenture, note, bond, lease, sublease, license or other agreement that is binding upon a Person or its property.

(nn)   "<u>Credit Bid</u>" has the meaning set forth in <u>Section 2.1(a)(ii).</u>

(oo)   "<u>Cure and Assignment Deadline</u>" has the meaning set forth in <u>Section 1.5(b).</u>

(pp)   "<u>Cure and Assignment Notice</u>" has the meaning set forth in <u>Section 1.5(b).</u>

(qq)   "<u>Cure Cap</u>" means the aggregate amount of $650,000 less any Post-Petition Contract Payments made by Seller.

(rr)   "<u>Cure Costs</u>" shall mean all cure costs required to be paid pursuant to section 365 of the Bankruptcy Code in order to cure all defaults existing under an unexpired lease or unexpired executory contract as of the date of assumption, or assumption and assignment, of such agreement.

(ss)   "<u>Dataroom</u>" has the meaning set forth in <u>Section 3.8.</u>

(tt)    "DIP Budget" shall mean the budget setting forth expense and cash flow projections for the Seller for the 13-week period beginning on the Petition Date, to be updated every four (4) weeks on a rolling basis, with reconciliation on a line-item basis of actual results to projections, and with narrative explanations prepared by the Seller of any material variances, to be certified by an authorized person of the Seller and approved in form and substance by the Purchaser.

(uu)    "DIP Deadlines" has the meaning set forth in Section 5.2

(vv)    "DIP Loan" has the meaning set forth in Section 2.1(a)(ii).

(ww)    "DIP Loan Documents" has the meaning set forth in Section 2.1(a)(ii).

(xx)    "DIP Motion" has the meaning set forth in Section 5.2.

(yy)    "DIP Motion Deadline" has the meaning set forth in Section 5.2.

(zz)    "DIP Orders" has the meaning set forth in Section 2.1(a)(ii).

(aaa)    "DIP Obligations" has the meaning set forth in Section 2.1(a)(ii).

(bbb)    "Documents" means all of the Seller's written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies and documents, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, maintenance schedules, functional requirements, operating instructions, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.) and other similar materials, in each case whether or not in electronic form, and also including any and all documents related to Acquired Business (including, without limitation, the Acquired Assets, Intellectual Property and/or the HGEN Product), including all documents in any format in the possession or control of the Seller as of the Closing, of all Regulatory Approvals, dossiers, quality specifications for the manufacture, import, release and testing of the HGEN Product and its components and all correspondence with, or reports or other materials submitted to, any Governmental Authority related to the HGEN Product, including all U.S. and non-U.S. regulatory applications, filings, submissions and approvals (including all INDs and NDAs with the FDA, and all complaint files, periodic safety reports and adverse drug experience reports) for the HGEN Product or use of any Purchased Asset or related to the Business, and all technical and other information contained therein, and all correspondence (including all regulatory correspondence including but not limited to, pre-INDs, INDs, pre-NDAs, NDAs, pre-EUAs, EUAs, pre-CMAs, CMAs, orphan drug designation, expedited programs including but not limited to accelerated review, priority review, breakthrough designation, conditional approval, provisional registration and any other such correspondence and documentation to, from and with FDA, MHRA, TSA, EMA and similar regulatory agencies globally and within individual countries or regulatory territories and all complaint files, periodic safety reports, adverse drug experience reports, outcomes of Drug Safety and Monitoring Boards or their equivalent, Scientific Advisory Boards or their equivalent, Advisory Committees) with any Governmental Authorities relating to any of

DocuSign Envelope ID: 00E802DE-5952-45E4-9A56-9695F537A4E3

the foregoing, including correspondence related to any serious adverse events associated with the HGEN Product.

(ccc)    "<u>Effective Date</u>" has the meaning set forth in the Preamble.

(ddd)    "<u>Encumbrance</u>" means any Lien (as defined in this Agreement), Claim (as defined in this Agreement), Liability (as defined in this Agreement), equity or ownership interest, or other similar interests, claims, liens, title defects, hypothecations, easements, rights of way, encroachments, imperfections or defects of title or any other restrictions or limitations on transfer or use.

(eee)    "<u>Enforceability Exceptions</u>" has the meaning set forth in <u>Section 3.2</u>.

(fff)    "<u>Equipment</u>" means any and all equipment, computers, furniture, furnishings, fixtures, office supplies, supply inventory, vehicles and all other fixed assets.

(ggg)    "<u>Equity Interest Power</u>" has the meaning set forth in <u>Section 2.3(e)</u>.

(hhh)    "<u>Excluded Assets</u>" has the meaning set forth in <u>Section 1.2.</u>

(iii)    "<u>Excluded Liabilities</u>" has the meaning set forth in <u>Section 1.4.</u>

(jjj)    "<u>Executory Contracts</u>" means unexpired executory contracts or leases subject to, and governed by, section 365 of the Bankruptcy Code and excluding unexpired executory contracts or leases entered into by the Seller on or after the Petition Date.

(kkk)    "<u>Expense Reimbursement</u>" has the meaning set forth in <u>Section 5.5</u>.

(lll)    "<u>Express Representations</u>" has the meaning set forth in <u>Section 3.8</u>.

(mmm)"<u>FDA</u>" means the U.S. Food and Drug Administration and any successor agency(ies) or authority having substantially the same function.

(nnn)    "<u>Final DIP Order Deadline</u>" has the meaning set forth in <u>Section 5.2</u>

(ooo)    "<u>Final Order</u>" means an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction entered by the clerk of the Bankruptcy Court or such other court on the docket in Seller's Bankruptcy Case or the docket of such other court, which has not been modified, amended, reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, reargument or rehearing shall then be pending or (b) if an appeal, writ of certiorari, motion for new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court or other court of competent jurisdiction shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of

Bankruptcy Procedure; *provided* that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause such order not to be a Final Order.

(ppp)    "First Commercial Sale" shall mean The date of commercial sale of the HGEN Product to a third-party in any Territory for a use/indication approved by the regulatory agency authorized to grant such approval in that Territory.

(qqq)    "Foreign Subsidiary" means Humanigen Australia Pty, Ltd., a proprietary limited company organized in Australia.

(rrr)    "GAAP" means United States generally accepted accounting principles as in effect from time to time.

(sss)    "Governmental Authorization" means any permit, license, certificate, approval, consent, permission, clearance, designation, qualification or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law.

(ttt)    "Governmental Body" means any government, quasi-governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator (public or private) of applicable jurisdiction.

(uuu)    "HGEN Product" means lenzilumab, ifabotuzumab and HGEN005 or the salts or precursors thereof, whether approved for commercial sale independently or as part of an ADC or as a companion therapeutic to another drug or biological product.

(vvv)    "Initial Overbid" has the meaning set forth in Section 5.5.

(www)    "Insurance Payment" means any Cash and Cash Equivalents received as proceeds in respect of any claim made by Seller on or prior to the date of this Agreement under any business interruption, casualty or other commercial insurance policy maintained by Seller; *provided, however* that any proceeds or disbursements made in respect of or pursuant to directors and officers insurance policies maintained by Seller, whether paid to Seller or any third party, shall not be deemed to be an Insurance Payment for purposes of this Agreement.

(xxx)    "Intellectual Property" means all of the following anywhere in the world and all legal rights, title or interest in the following : (i) all patents and applications for patents and all related reissues, reexaminations, divisions, renewals, extensions, provisionals, continuations and continuations-in-part, including any future applications or filings of the foregoing; (ii) all copyrights, copyright registrations and copyright applications, copyrightable works and all other corresponding rights; (iii) all mask works, mask work registrations and mask work applications and all other corresponding rights; (iv) all advertising material, trade dress and trade names, logos, Internet addresses and domain names, Trademarks and service marks and related registrations and applications, including any intent to use applications and common law marks, supplemental registrations and any renewals or extensions, all other indicia of commercial source

46

or origin and all goodwill associated with any of the foregoing; (v) all inventions (whether patentable or unpatentable and whether or not reduced to practice), know how, technology, technical data, trade secrets, confidential business information, manufacturing and production processes and techniques, research and development information, clinical trial data and information, safety data and pharmacovigilance data, financial, marketing and business data, pricing and cost information, business and marketing plans, advertising and promotional materials, customer, distributor, reseller and supplier lists and information, correspondence, records, and other documentation, and other proprietary information of every kind; (vi) all computer software (including source and object code), firmware, development tools, algorithms, files, records, technical drawings and related documentation, data and manuals; (vii) all databases and data collections; (viii) all licenses and permits to the extent transferable; (ix) all rights pertaining to the foregoing, including those arising under international treaties and convention rights; (x) all rights and powers to assert, defend and recover title to any of the foregoing; (xi) all rights to assert, defend, sue, and recover damages for any past, present and future infringement, misuse, misappropriation, impairment, unauthorized use or other violation of any rights in or to any of the foregoing; (xii) all proceeds, income, royalties, damages and payments now and/or hereafter due and payable under and/or in respect of all of the foregoing (including with respect to past, present or future infringement or violation thereof); (xiii) all administrative rights arising from the foregoing, including the right to prosecute applications and oppose, interfere with or challenge the applications of others, the rights to obtain renewals, continuations, divisions, and extensions of legal protection pertaining to any of the foregoing; and (xiv) all other intellectual property rights irrespective of not being registered or applied for registration.

(yyy)    "Intellectual Property Assignment Agreement" has the meaning set forth in Section 2.3(d).

(zzz)    "Interim DIP Order" has the meaning set forth in Section 5.2

(aaaa)    "Interim DIP Order Deadline" has the meaning set forth in Section 5.2.

(bbbb)    "Interim Period" has the meaning set forth in Section 6.2.

(cccc)    "Law" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, determination, decision, opinion or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body.

(dddd) "Liability" means, as to any Person, any debt, adverse claim, liability (including any liability that results from, relates to or arises out of tort or any other product liability claim), duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, disputed or undisputed, direct or indirect, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

(eeee) "Lien" means any possessory or non-possessory lien, license, claim or charge against or other interest in any property or assets, any "lien" as defined under Section 101(37) of the Bankruptcy Code, right of setoff or recoupment (whether or not such right is enforceable under the Bankruptcy Code), voluntary or involuntary and whether statutory or contractual, including any mortgage, deed of trust, deed to secure debt or claim, pledge, assignment, hypothecation, security interest, attachment, judgment, judgement lien, levy, conditional sale agreement, right of first refusal, right of first offer, option, other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use restriction of any kind, including any restriction on use, transfer, receipt of income or exercise of any other attribute of ownership or other arrangement, and including any agreement to give any of the foregoing.

(ffff) "Madison JV Interest" means Seller's limited liability company interest in Madison Joint Venture LLC, a Delaware limited liability company.

(gggg) "Material Adverse Effect" means any event, change, occurrence or effect (each, an "Effect") that, individually or in the aggregate with all other Effects, has, had, or would reasonably be expected to have a material adverse effect on the Acquired Business, Acquired Assets or Assumed Liabilities or the value thereof, taken as a whole, or would reasonably be expected to prevent or materially delay or impair the ability of either Party to consummate the transactions contemplated by this Agreement; *provided* that none of the following shall constitute, or be taken into account in determining whether or not there has been, a Material Adverse Effect: (i) Effects in, arising from or relating to general business or economic conditions affecting the industry in which Seller and its Subsidiaries operate, (ii) Effects in, arising from or relating to national or international political or social conditions, including the engagement by the United States in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, cyber or terrorist attack upon the United States, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, equipment or personnel of the United States, (iii) Effects in, arising from or relating to financial, banking, or securities markets (including (A) any disruption of any of the foregoing markets, (B) any change in currency exchange rates, (C) any decline or rise in the price of any security, commodity, contract or index, and (D) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the transactions contemplated by this Agreement), (iv) Effects in, arising from or relating to changes in, GAAP, (v) Effects in, arising from or relating to changes in, Laws or other binding directives or determinations issued or made by or agreements with or consents of any Governmental Body, *provided* such event, occurrence, or circumstance does not interfere with or prohibit Seller's or Purchaser's performance of each of its respective material obligations under this Agreement (or prevent, restrict or condition the participation of Dr. Durrant as principal or chief executive officer of Purchaser), (vi) Effects in, arising from or relating to (A) any actions specifically required to be taken or consented to pursuant to or in accordance with this Agreement by any Party, or at the request of Purchaser or its Affiliate, (B) the failure to take any action if such action is prohibited by this Agreement, or (C) Purchaser's failure to consent, as qualified in Section 6.1 to any of the actions restricted in Section 6.1, (vii) Effects in, arising from or relating to any existing event, occurrence, or circumstance with respect to which Purchaser has knowledge as of the Effective Date continuing through and including the Closing Date, including any matter set forth in the Schedules, *provided* such event, occurrence, or circumstance does not interfere with or prohibit Seller's or Purchaser's

performance of each of its respective material obligations under this Agreement (or prevent, restrict or condition the participation of Dr. Durrant as principal or chief executive officer of Purchaser), (viii) Effects that arise from any seasonal fluctuations in the business, (ix) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (but, for the avoidance of doubt, not the underlying causes of any such failure to the extent such underlying cause is not otherwise excluded from the definition of Material Adverse Effect), (x)  the matters set forth on the Schedules; or (xi) the commencement or pendency of the Bankruptcy Case.

(hhhh) "Milestones" has the meaning set forth in Section 2.5(a).

(iiii)    "Milestone Payments" has the meaning set forth in Section 2.5(a).

(jjjj)    "Minimum Subsequent Overbid Increments" has the meaning set forth in Section 5.5.

(kkkk) "Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body, including any Order entered by the Bankruptcy Court in the Bankruptcy Case (including the Sale Order).

(llll)    "Ordinary Course" means the ordinary and usual course of operations of the business of Seller and its Subsidiaries taken as a whole consistent with past practice, taking into account the commencement and pendency of the Bankruptcy Case.

(mmmm)     "Outside Date" has the meaning set forth in Section 8.1(c).

(nnnn) "Party" has the meaning set forth in the Preamble.

(oooo) "Permitted Encumbrances" means (i) Encumbrances for utilities or Taxes arising or accruing after the Closing Date, or the nonpayment of which is permitted or required by the Bankruptcy Code; (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Acquired Assets which do not, individually or in the aggregate, materially and adversely affect the operation of the Acquired Assets; (iii) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law which are not violated by the current use or occupancy of Seller at its office locations, provided that Purchaser shall not assume any Liabilities for any prior or future compliance with such laws, codes and restrictions at any office location not acquired by Purchaser; (iv) licenses granted on a non-exclusive basis that do not have a Material Adverse Effect on the Acquired Assets, Assigned Contracts, or the Assumed Liabilities; (v) such other Encumbrances or title exceptions as Purchaser may approve in writing in its sole discretion or which do not, individually or in the aggregate, have a Material Adverse Effect on the operation of the Acquired Assets, and (vi) any Encumbrances that will be removed or released by operation of the Sale Order.

(pppp) "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, estate, Governmental Body or other entity or group.

(qqqq) "<u>Petition Date</u>" means the date that Seller filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

(rrrr)    "<u>Post-Petition Contract Payments</u>" means any payment made by Seller after the Petition Date and on or prior to Closing (a) with respect to any Cure Costs for any Assigned Contracts, or (b) to any of the third parties listed under Schedule 11.1(rrrr) for valid, post-petition obligations arising under any Contract between such party and the Seller, subject to, and to the extent set forth in, the DIP Budget.

(ssss)    "<u>Post-Petition Contracts</u>" has the meaning set forth in <u>Section 1.1(b).</u>

(tttt)    "<u>Potential Assigned Contracts</u>" has the meaning set forth in <u>Section 1.5(b).</u>

(uuuu) "<u>Projections</u>" has the meaning set forth in <u>Section 6.7(b).</u>

(vvvv) "<u>Purchase Price</u>" has the meaning set forth in <u>Section 2.1(a).</u>

(wwww)      "<u>Purchase Price Allocation</u>" has the meaning set forth in <u>Section 9.2.</u>

(xxxx) "<u>Purchaser</u>" has the meaning set forth in the Preamble.

(yyyy) "<u>Qualified Bidders</u>" has the meaning set forth in the Bidding Procedures Order.

(zzzz) "<u>Qualified Competing Bid</u>" has the meaning set forth in the Bidding Procedures Order.

(aaaaa)"<u>Regulatory Approval</u>" means, with respect to a country or other jurisdiction, all approvals, licenses, registrations, or authorizations of any Governmental Body necessary to commercialize an HGEN Product in such country or other jurisdiction, including, where applicable, (a) any pricing approval in such country or other jurisdiction, (b) pre-and post-approval marketing authorizations (including any prerequisite manufacturing approval or authorization related thereto), and (c) approval of product labeling.

(bbbbb)      "<u>Related to the Acquired Business</u>", "<u>Relating to the Acquired Business</u>", "<u>Related to the Acquired to the Assets</u>" or "<u>Relating to the Acquired Assets</u>" means relating to, pertaining to, consisting of, or referring to any of the Acquired Assets, including, without limitation, the Acquired Business described in the Recitals to this Agreement.

(ccccc)"<u>Sale Deadlines</u>" has the meaning set forth in <u>Section 5.7.</u>

(ddddd)      "<u>Sale Hearing</u>" means any hearing set by the Bankruptcy Court to approve the sale pursuant to this Agreement.

(eeeee)"<u>Sale Motion</u>" has the meaning set forth in <u>Section 5.3.</u>

(fffff)  "<u>Sale Motion Deadline</u>" has the meaning set forth in <u>Section 5.3.</u>

50

(ggggg)    "Sale Order" means a Final Order of the Bankruptcy Court in form and substance acceptable to Seller and Purchaser, including, without limitation, all terms, condition and provisions set forth in Section 5.7.

(hhhhh)    "Sale Order Deadline" has the meaning set forth in Section 5.7.

(iiiii)    "Schedule Supplement" has the meaning set forth in Section 10.10(b).

(jjjjj)    "Schedules" has the meaning set forth in Section 10.10(a).

(kkkkk)    "Seller" has the meaning set forth in the Preamble.

(lllll)    "Seller Plan" means each "employee benefit plan" within the meaning of Section 3(3) of ERISA and all other compensation and benefits plans, policies, programs, or arrangements, including multiemployer plans within the meaning of Section 3(37) of ERISA, and each other stock purchase, stock option or equity incentive, severance, retention, employment, change-of-control, bonus or incentive, deferred compensation or any other material employee benefit plans or arrangements.

(mmmmm)    "Subsidiary" means, with respect to any Person, any corporation of which a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or any partnership, association or other business entity of which a majority of the partnership or other similar ownership interest is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof.

(nnnnn)    "Tax" means any federal, state, local, non-U.S. or other income, gross receipts, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, ad valorem/personal property, stamp, excise, occupation, sales, use, transfer, value added, import, export, alternative minimum or estimated tax, including any interest, penalty or addition thereto.

(ooooo)    "Tax Code" means the United States Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, as the same may be in effect from time to time.

(ppppp)    "Tax Return" means any return (including any information return), report, statement, declaration, estimate, schedule, notice, notification, form, election, certificate or other document or information (including any amendments thereto) that is, has been or may in the future be filed with or submitted to, or required to be filed with or submitted to, any Governmental Body in connection with the determination, assessment, collection or payment of any Tax or in connection with the administration, implementation or enforcement of or compliance with any Law relating to any Tax.

(qqqqq)    "Territory" shall mean any of the United States, or the United Kingdom, or France, or Germany, or Italy, or Spain or Australia.

(rrrrr)  "Therapeutic Indication" shall mean chronic myelomonocytic leukemia.

(sssss)  "Transfer Taxes" has the meaning set forth in Section 9.1.

11.2    Rules of Interpretation.  Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Schedules and any other certificate, instrument, agreement or other document contemplated hereby or delivered hereunder.

(a)    Accounting terms which are not otherwise defined in this Agreement have the meanings given to them under GAAP consistently applied.  To the extent that the definition of an accounting term defined in this Agreement is inconsistent with the meaning of such term under GAAP, the definition set forth in this Agreement will control.

(b)    The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement. Section, clause, Schedule and exhibit references contained in this Agreement are references to sections, clauses, Schedules and exhibits in or to this Agreement, unless otherwise specified.  All exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Schedule or exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(c)    Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

(d)    The words "to the extent" shall mean "the degree by which" and not "if."

(e)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded.  If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

(f)    Words denoting any gender will include all genders, including the neutral gender.  Where a word is defined herein, references to the singular will include references to the plural and vice versa.

(g)    The word "will" will be construed to have the same meaning and effect as the word "shall".  The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(h)    All references to "$" and dollars will be deemed to refer to United States currency unless otherwise specifically stated.

(i)    All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(j)    Any document or item will be deemed "delivered", "provided" or "made available" by Seller, within the meaning of this Agreement if such document or item (a) is included

52

DocuSign Envelope ID: 00E802DE-5952-4564-9A56-9685DF37A4F1

in the Dataroom, (b) actually delivered or provided to Purchaser or any of Purchaser's Advisors, or (c) made available upon request, including at Seller's or any of its Subsidiaries' offices.

(k)     Any reference to any agreement or contract will be a reference to such agreement or contract, as amended, modified, supplemented or waived.

(l)     Any reference to any particular Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; *provided* that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Code section or Law, the reference to such Code section or Law means such Code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(m)     All terms that are defined in the singular shall include the plural of such terms and all terms that are defined in the plural shall include the singular of such terms.

(n)     All references to a day or days shall be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided (such as, by way of example only, any reference to a Business Day or Business Days).

(o)     reference to such agreement or contract, as amended, modified, supplemented or waived.

(p)     Any reference to any particular Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; *provided* that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Code section or Law, the reference to such Code section or Law means such Code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(q)     All terms that are defined in the singular shall include the plural of such terms and all terms that are defined in the plural shall include the singular of such terms.

(r)     All references to a day or days shall be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided (such as, by way of example only, any reference to a Business Day or Business Days).

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**PURCHASER**

**TARAN THERAPEUTICS INC.**

By: _Cameron Durrant_
Name: Cameron Durrant
Title: Owner and Chief Executive Officer

**SELLER**

**HUMANIGEN, INC.**

By: _Ronald Barliant_
Name: Ronald Barliant
Title: Independent Director and Member of the Special Committee of Humanigen, Inc.

**Exhibit B**

Proposed Bid Procedures Order

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| HUMANIGEN, INC.,[1] | Case No. 24-10003 (___) |
| Debtor. | |
| | Re: Docket No. __ |

**ORDER (I) APPROVING BID PROCEDURES IN CONNECTION**
**WITH THE POTENTIAL SALE OF SUBSTANTIALLY ALL OF THE**
**DEBTOR'S ASSETS, (II) SCHEDULING AN AUCTION AND A SALE HEARING,**
**(III) APPROVING THE FORM AND MANNER OF NOTICE THEREOF,**
**(IV) AUTHORIZING THE DEBTOR TO ENTER INTO THE**
**STALKING HORSE AGREEMENT, (V) APPROVING PROCEDURES**
**FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS**
**AND LEASES, AND (VI) GRANTING RELATED RELIEF**

Upon the motion (the "**Motion**")[2] of the above-captioned debtor and debtor in possession

(the "**Debtor**") for entry of an order (this "**Order**") (i) authorizing and approving the Bid

Procedures attached hereto as Exhibit 1 (the "**Bid Procedures**") in connection with the sale (the

"**Sale**") of substantially all of the Debtor's assets (the "**Assets**"), (ii) scheduling an auction and

hearing to consider the Sale of the Assets, (iii) approving the form and manner of notice thereof,

(iv) authorizing, to the extent set forth herein, the Debtor to enter into the Stalking Horse

Agreement (as defined below), (v) approving procedures for the assumption and assignment of

executory contracts and unexpired leases in connection with the Sale (collectively, the

"**Contracts**"), and (vi) granting related relief, all as more fully set forth in the Motion; and upon

---

[1] The Debtor's mailing address in this chapter 11 case is 533 Airport Boulevard, Suite 400, Burlingame, CA 94010 and the last four digits of the Debtor's federal tax identification number are 7236.

[2] Capitalized terms used as defined terms herein but not otherwise defined shall have the meanings ascribed to them in the Motion or the Bid Procedures, as applicable. In the event there is a conflict between this Order and the Motion, this Order shall control and govern.

the First Day Declaration and the LoCascio Declaration; and this Court having reviewed the Motion and having heard statements in support of the Motion at a hearing held before this Court (the "**Hearing**"); and this Court having determined that the legal and factual bases set forth in the Motion, the First Day Declaration, the LoCascio Declaration, and at the Hearing establish just cause for the relief granted herein; and any objections to the relief requested in the Motion having been withdrawn or overruled on the merits; and after due deliberation thereon and good and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.

C.     This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). The Debtor has confirmed its consent, pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), to the entry of a final order by this Court in connection with the Motion, to the extent it is later determined this Court, absent the consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

D.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

E.      The bases for the relief requested in the Motion are sections 105, 363, 365, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014, and Local Rules 2002-1, 6004-1, and 9013-1(m).

F.      Notice of the Motion has been given to: (a) the U.S. Trustee; (b) counsel to the DIP Lender and Stalking Horse Bidder; (c) the holders of the twenty (20) largest unsecured claims against the Debtor; (d) all other parties who have expressed a written interest in the Assets; (e) the United States Attorney's Office for the District of Delaware; (f) the Internal Revenue Service; (g) the Attorney General for the State of Delaware; (h) the Securities and Exchange Commission; (i) all parties known or reasonably believed to have asserted a lien or security interest in the Assets (for whom identifying information and addresses are available to the Debtor); (l) the Contract Counterparties; (m) the Department of Justice; (n) attorneys general in all states in which the Debtor operates; (o) all taxing authorities for jurisdictions to which the Debtor is subject; and (p) any party that has requested notice pursuant to Bankruptcy Rule 2002.

G.      In the Motion and at the hearing on the relief set forth herein, the Debtor demonstrated that good and sufficient notice of the relief granted by this Order has been given and no further notice is required. A reasonable opportunity to object or be heard regarding the relief granted by this Order has been afforded to those parties entitled to notice pursuant to Bankruptcy Rule 2002 and all other interested parties.

H.      The Debtor has articulated good and sufficient reasons for this Court to (i) approve the Bid Procedures, (ii) schedule the bid deadlines and the Auction and the Sale Hearing, (iii) approve the form and manner of notice of the Auction and Sale Hearing, (iv) approve

procedures for the assumption and assignment of the Contracts, including notice of the proposed cure amounts, (v) authorize the Debtor to enter into the Stalking Horse Agreement, in the exercise of its reasonable business judgment. The entry of this Order is in the best interests of the Debtor, its estate, creditors, and other parties in interest.

I.      The Bid Procedures attached hereto as Exhibit 1 are reasonable, appropriate and represent the best method for maximizing value for the benefit of the Debtor, its estate, and its creditors. The Bid Procedures were negotiated at arm's length, in good faith, and without collusion. The Bid Procedures balance the Debtor's interests in emerging expeditiously from the Chapter 11 Case while preserving the opportunity to attract value-maximizing proposals beneficial to the Debtor, its estate, its creditors, and other parties in interest. The Bid Procedures comply with the requirements of Local Rule 6004-1(c).

J.      The Debtor has demonstrated compelling and sound business justifications for approval of, and authorization to perform under, that certain Asset Purchase Agreement, a copy of which is attached as Exhibit A to the Motion (the "**Stalking Horse Agreement**") by and among the Debtor and the Stalking Horse Bidder. The Stalking Horse Agreement represents the highest or otherwise best offer the Debtor has received to date as a result of its efforts to market the Assets for sale.

K.      The Debtor's performance of certain pre-closing obligations contained in the Stalking Horse Agreement is in the best interests of the Debtor, its estate, its creditors, and all other parties in interest, and represents a reasonable exercise of the Debtor's sound business judgment.

L.      The notice, substantially in the form attached hereto as Exhibit 2, provided by the Debtor regarding the Sale of the Assets by Auction and Sale Hearing (the "**Sale Notice**"), is reasonably calculated to provide interested parties with timely and proper notice of the proposed

Sale, including, without limitation: (i) the date, time, and place of the Auction (if one is held), (ii) the Bid Procedures and certain dates and deadlines related thereto, (iii) the deadline for filing objections to the Sale and entry of the Sale Order, and the date, time, and place of the Sale Hearing, (iv) reasonably specific identification of the assets for sale, (v) instructions for promptly obtaining a copy of the Stalking Horse Agreement, if any, (vi) a description of the Sale as being free and clear of liens, claims, interests, and other encumbrances, with all such liens, claims, interests, and other encumbrances attaching with the same validity and priority to the sale proceeds, and (vii) notice of the proposed assumption and assignment of Contracts to the Successful Bidder (as defined in the Bid Procedures) and the right, procedures, and deadlines for objecting thereto. No other or further notice of the Sale shall be required.

M.    The Motion, this Order, and the Assignment Procedures (as defined below) set forth herein are appropriate and reasonably calculated to provide counterparties to any Contracts to be assumed by the Debtor and assigned to the Successful Bidder with proper notice of the intended assumption and assignment of their Contracts, the procedures in connection therewith, and any cure amounts relating thereto.

N.    Neither the filing of the Motion, entry of this Order, the solicitation of bids or the conducting of the Auction in accordance with the Bid Procedures nor any other actions taken by the Debtor in accordance therewith shall constitute a sale of the Assets, which sale will only take place, if at all, following the Sale Hearing.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.    The Motion is GRANTED, as set forth herein.

2.    All objections, statements, and reservations of rights with respect to the relief requested in the Motion with respect to the Bid Procedures that have not been withdrawn, waived,

or settled, as announced to the Court at the hearing on the Motion or by stipulation filed with the Court, are overruled and denied on the merits with prejudice.

## I.    **The Bid Procedures**

3.    The Bid Procedures, attached hereto as <u>Exhibit 1</u>, are hereby approved in their entirety and fully incorporated into this Order. The Bid Procedures shall govern the submission, receipt, and analysis of all bids relating to the proposed Sale and any party desiring to submit a higher or better offer for the Assets must comply with the terms of the Bid Procedures and this Order. The Bid Procedures shall also govern the terms on which the Debtor will proceed with the Auction and/or Sale.

4.    The following dates and deadlines regarding competitive bidding are hereby established (subject to modification in accordance with the Bid Procedures):[3]

| |
|---|
| (All times are prevailing Eastern Time) |
| **January 22, 2024:** Debtor to send Cure and Possible Assumption and Assignment Notices to All Contract Counterparties |
| **February 1, 2024 at 4:00 p.m.:** Cure or Assignment Objection Deadline |
| **February 7, 2024 at 4:00 p.m.:** Deadline to submit Bid to be considered for the Auction |
| **February 9, 2024 at 4:00 p.m.:** Sale Objection Deadline |
| **February 12, 2024 at 10:00 a.m.:** Auction (if necessary) |
| **As soon as practicable after the conclusion of the Auction:** Debtor to file notice of Successful Bidder |
| **February 15, 2024 at 4:00 p.m.:** Deadline to object to the Successful Bidder's offer of adequate assurance to perform |
| **February 16, 2024 at [__:__ a/p.m.]:** Sale Hearing |

---

[3] All times are stated in prevailing Eastern Time, unless otherwise indicated.

**II.    Entry into Stalking Horse Agreement**

5.      Subject to Court approval at the Sale Hearing, the Debtor is authorized to enter into the Stalking Horse Agreement.

6.      The Debtor is authorized to perform all of its respective pre-closing obligations under the Stalking Horse Agreement; provided that for the avoidance of doubt, approval and consummation of the transactions contemplated by the Stalking Horse Agreement shall be subject to the terms and conditions herein and the entry of an order approving the Sale of the Assets and the satisfaction or waiver of the other conditions to closing on the terms set forth in the Stalking Horse Agreement.

**III.    The Auction**

7.      As further described in the Bid Procedures, if a Qualifying Bid (other than the Stalking Horse Bid) is received by the Bid Deadline, the Debtor will conduct the Auction at **10:00 a.m. (prevailing Eastern Time) on February 12, 2024**, at the offices of the Debtor's proposed counsel, Potter Anderson & Corroon LLP, 1313 N. Market Street, Wilmington, Delaware 19801, or such later time on such day or other place as the Debtor shall notify all Qualifying Bidders who have submitted Qualifying Bids, if a Qualifying Bid is timely received. The Debtor is authorized, subject to the terms of this Order and the Bid Procedures, to take actions reasonably necessary to conduct and implement the Auction.

8.      If the Debtor does not receive a Qualifying Bid (other than the Stalking Horse Bid): (a) the Debtor may cancel the Auction; (b) the Stalking Horse Agreement may be deemed by the Debtor to be the Successful Bid for the Assets; and (c) the Debtor shall be authorized to seek approval of the Stalking Horse Agreement as the Successful Bid at the Sale Hearing.

9.      Only Qualifying Bidders will be entitled to make any Bids at the Auction.

IMPAC 11080189v.8

10.     The Debtor and its professionals shall direct and preside over the Auction and the Auction shall be transcribed or videotaped.

11.     Each Qualifying Bidder participating in the Auction must confirm that it (a) has not engaged in any collusion with respect to the bidding or sale of any of the assets described herein, (b) has reviewed, understands, and accepts the Bid Procedures, and (c) has consented to the core jurisdiction of this Court and to the entry of a final order by this Court on any matter related to this Order, the Sale, or the Auction if it is determined that this Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

12.     To the fullest extent permissible under Bankruptcy Code section 363(k), the Stalking Horse Bidder may credit bid (a "**Credit Bid**"), as a Qualifying Bid or subsequent Bid, in its sole and absolute discretion, any portion and up to the entire amount of obligations owing in connection with the DIP Loans (as defined in the DIP Order), in the full amount of such obligations outstanding as of the date of the Auction on the Assets constituting DIP Collateral (as defined in the DIP Order). In the event the amount of the Credit Bid exceeds the total amount of the highest bids for the Assets subject to the Credit Bid, such Credit Bid will be deemed the highest and best bid and such Credit Bid will be accepted by the Debtor and be presented for approval to the Court.

13.     In the event of a competing Qualifying Bid, all Qualifying Bidders will be entitled, but not obligated, to submit Overbids.

14.     The Debtor may (i) determine, in consultation with the Consultation Parties, which Qualifying Bid or combination of Qualifying Bids is the highest or otherwise best offer, (ii) reject at any time before the entry of the Sale Order any Bid that, in the discretion of the Debtor, is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or the Bid Procedures, or (c) contrary to the best interest

of the Debtor, its estate, its creditors, interest holders, or other parties in interest, and (iii) at or

before the conclusion of the Auction may impose such other terms and conditions upon Qualifying

Bidders as the Debtor determines, in consultation with the Consultation Parties, to be in the best

interest of the Debtor's estate.

15.     No person or entity, other than the Stalking Horse Bidder, shall be entitled to any

expense reimbursement, breakup fee, topping or termination fee, or other similar fee or payment,

and, by submitting a Bid, such person or entity is deemed to have waived its right to request or file

with this Court any request for expense reimbursement or any other fee of any nature in connection

with the Auction and the Sale, whether by virtue of Bankruptcy Code section 503(b) or otherwise.

**IV.    Assumption and Assignment Notices & Procedures**

16.     The procedures set forth below regarding the assumption and assignment of the

executory contracts proposed to be assumed by the Debtor pursuant to Bankruptcy Code

section 365(b) and assigned to the Stalking Horse Bidder (or other Successful Bidder, if any)

pursuant to Bankruptcy Code section 365(f) in connection with the Sale (the "**Assignment

Procedures**") are hereby approved to the extent set forth herein. These Assignment Procedures

shall govern the assumption and assignment of all of the Contracts to be assumed and assigned in

connection with the Sale, subject to the payments necessary to cure any defaults arising under any

such Contracts.

17.     On or prior to **January 22, 2024**, the Debtor shall serve via overnight delivery on

all non-Debtor counterparties (each a "**Contract Counterparty**" and, collectively, the "**Contract

Counterparties**") to any Contract that may be assumed by the Debtor and assigned to the Stalking

Horse Bidder or other Successful Bidder after the results of the Auction, which notice shall be

substantially in the form attached hereto as Exhibit 3 (a "**Cure and Possible Assumption and

Assignment Notice**"). The Cure and Possible Assumption and Assignment Notice shall inform

9

each recipient of the timing and procedures relating to such assumption and assignment, and, to the extent applicable, (i) the title of the executory contract or unexpired lease, as applicable, (ii) the name of the counterparty to the executory contract or unexpired lease, as applicable, (iii) the Debtor's good faith estimate of the cure amount (if any) required in connection with the executory contract or unexpired lease, as applicable, (iv) the identity of the Successful Bidder (as assignee, if applicable), and (v) the Contract Objection Deadline (as defined below). The presence of a Contract on the Cure and Possible Assumption and Assignment Notice does not constitute an admission that such Contract is an executory contract or unexpired lease, and the presence of a Contract on any notice shall not prevent the Debtor from subsequently withdrawing such request for assumption or rejecting such Contract any time before such Contract is actually assumed and assigned pursuant to the Sale Order.

18.     Although the Debtor intends to make a good faith effort to identify all Contracts that may be assumed and assigned in connection with a Sale, the Debtor may discover certain executory contracts and unexpired leases inadvertently omitted from the list of Contracts, or Successful Bidders may identify other executory contracts and/or unexpired leases that they desire to assume and assign in connection with the Sale. Accordingly, the Debtor reserves the right, but only in accordance with the Stalking Horse Agreement, or as otherwise agreed to by the Debtor and the Successful Bidder, at any time before the closing of a Sale, to (i) supplement the list of Contracts with previously omitted executory contracts, (ii) remove Contracts from the list of executory contracts and unexpired leases ultimately selected as Contracts that a Successful Bidder proposes to be assumed and assigned to it in connection with a Sale, and/or (iii) modify the previously stated cure amount associated with any Contract. In the event the Debtor exercises any of the reserved rights, the Debtor will promptly serve a supplemental notice of contract assumption

and assignment (a "**Supplemental Assumption Notice**") on each of the counterparties to such Contracts and their counsel of record, if any; *provided*, *however*, the Debtor may not add an executory contract to the list of Contracts that has been previously rejected by the Debtor by order of the Court. Each Supplemental Assumption Notice will include the same information with respect to listed Contracts as was included in the Cure and Possible Assumption and Assignment Notice.

19.     Objections, if any, to the cure amount set forth on the Cure and Possible Assumption and Assignment Notice or the possible assignment of its executory contract or unexpired lease (each, a "**Contract Objection**") <u>**must**</u> (i) be in writing, (ii) comply with the applicable provisions of the Bankruptcy Rules and the Local Rules, and (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed cure amount, the correct cure amount alleged by the objecting counterparty, together with any applicable and appropriate documentation in support thereof, and (iv) be filed with the Bankruptcy Court and served on the following parties so as to be actually received on or before **February 1, 2024 at 4:00 p.m. (prevailing Eastern Time)** (the "**Contract Objection Deadline**"): (a) counsel for the Debtor, Potter Anderson & Corroon LLP, 1313 North Market Street, 6th Floor, Wilmington, Delaware 19801 (Attn: M. Blake Cleary (bcleary@potteranderson.com) and Aaron H. Stulman (astulman@potteranderson.com)); (b) counsel to the DIP Lender and Stalking Horse Bidder, Pashman Stein Walder Hayden, P.C., 1007 North Orange Street, 4th Fl., #183, Wilmington, Delaware 19801 (Attn: Joseph C. Barsalona II (jbarsalona@pashmanstein.com) and Henry Jaffe (hjaffe@pashmanstein.com)); (c) counsel to the Committee, if one is appointed; and (d) the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801 (Attention: Hannah McCollum (Hannah.McCollum@usdoj.gov)).

IMPAC 11080189v.8

20.     If a Contract Counterparty does not timely file and serve a Contract Objection, that party will be forever barred from objecting to (i) the Debtor's proposed cure amount, (ii) the assumption and assignment of that party's executory contract or unexpired lease (including the adequate assurance of future performance by the deadline set forth below), (iii) the related relief requested in the Motion, and (iv) the Sale. Such party shall be forever barred and estopped from objecting to the cure amount, the assumption and assignment of that party's executory contract or unexpired lease (including the adequate assurance of future performance), the relief requested in the Motion, whether applicable law excuses such counterparty from accepting performance by, or rendering performance to, the Stalking Horse Bidder or the Successful Bidder, as applicable, for purposes of Bankruptcy Code section 365(c)(1) and from asserting any additional cure or other amounts against the Debtor and the Stalking Horse Bidder or Successful Bidder, as applicable, with respect to such party's executory contract or unexpired lease.

21.     Where a Contract Counterparty to an Assigned Contract files a timely Contract Objection asserting a higher cure amount than the amount listed in the Cure and Possible Assumption and Assignment Notice, or objecting to the possible assignment of that Contract Counterparty's executory contract or unexpired lease, and the parties are unable to consensually resolve the dispute, the amount to be paid under Bankruptcy Code section 365 (if any) or, as the case may be, the Debtor's ability to assign the executory contract or unexpired lease to the Successful Bidder will be determined at the Sale Hearing or such later date that the Debtor and Successful Bidder shall determine in their discretion and upon notice to the objecting Contract Counterparty.

22.     The payment of the applicable cure amount by the Debtor or Stalking Horse Bidder (or other Successful Bidder), as applicable, shall (i) effect a cure of all defaults existing thereunder and (ii) compensate for any actual pecuniary loss to such counterparty resulting from such default.

23.     Objections to the proposed assumption or assignment of a Contract, the subject of which is the ability of the Successful Bidder to provide adequate assurance of future performance (each, an "**Adequate Assurance Objection**"), must (a) be in writing, (b) comply with the Bankruptcy Code, Bankruptcy Rules, and Local Rules, (c) state with specificity the legal and factual bases thereof, (d) be filed no later than **February 15, 2024 at 4:00 p.m. (prevailing Eastern Time)**, and (e) be served on: (i) counsel for the Debtor, Potter Anderson & Corroon LLP, 1313 North Market Street, 6th Floor, Wilmington, Delaware 19801 (Attn: M. Blake Cleary (bcleary@potteranderson.com) and Aaron H. Stulman (astulman@potteranderson.com)); (ii) counsel to the DIP Lender and Stalking Horse Bidder, Pashman Stein Walder Hayden, P.C., 1007 North Orange Street, 4th Fl., #183, Wilmington, Delaware 19801 (Attn: Joseph C. Barsalona II (jbarsalona@pashmanstein.com) and Henry Jaffe (hjaffe@pashmanstein.com)); (iii) counsel to the Committee, if one is appointed; and (iv) the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801 (Attention: Hannah McCollum (Hannah.McCollum@usdoj.gov)).

## V.    <u>Notice of the Sale Process</u>

24.     The Sale Notice and the Cure and Possible Assumption and Assignment Notice, in substantially the forms as annexed to this Order as <u>Exhibit 2</u> and <u>Exhibit 3</u>, respectively, are hereby approved.

25.     Within two (2) business days after the entry of this Order, the Debtor (or its agent) shall serve the Sale Notice by first-class mail upon: (a) the U.S. Trustee; (b) counsel to the DIP Lender and Stalking Horse Bidder; (c) the holders of the twenty (20) largest unsecured claims

13

against the Debtor; (d) all other parties who have expressed a written interest in the Assets; (e) the United States Attorney's Office for the District of Delaware; (f) the Internal Revenue Service; (g) the Attorney General for the State of Delaware; (h) the Securities and Exchange Commission; (i) all parties known or reasonably believed to have asserted a lien or security interest in the Assets (for whom identifying information and addresses are available to the Debtor); (l) the Contract Counterparties; (m) the Department of Justice; (n) attorneys general in all states in which the Debtor operates; (o) all taxing authorities for jurisdictions to which the Debtor is subject; (p) all of the Debtor's known creditors (for whom identifying information and addresses are available to the Debtor); and (q) any party that has requested notice pursuant to Bankruptcy Rule 2002.

26.     As soon as practicable thereafter, but in any event no later than seven (7) business days after entry of this Order, the Debtor may publish the Sale Notice, with such modifications as may be appropriate for purposes of publication, once in the National Edition of USA Today.

27.     As soon as practicable after the entry of this Order, but in no event later than two (2) business days after entry of this Order, the Debtor shall post the Sale Notice and the Bid Procedures on the website maintained by the Debtor's claims and noticing agent, Epiq Corporate Restructuring, LLC ("**Epiq**"), located at https://dm.epiq11.com/humanigen.

28.     Such publication notice as set forth herein shall be deemed sufficient and proper notice of the Auction, Sale Hearing, and Sale to any other interested parties whose identities are unknown to the Debtor.

29.     Service of the Sale Notice as set forth herein constitutes good and sufficient notice of the Auction and the Sale Hearing. No other or further notice is required.

## VI.    The Sale Hearing

30.     The Sale Hearing will be conducted on **February 16, 2024 at __:__ a.m./p.m (prevailing Eastern Time)**. The Debtor will seek entry of an order of the Court at the Sale Hearing

14

approving and authorizing the sale of the Assets to the Successful Bidder. Upon entry of this Order, the Debtor is authorized to perform any obligation intended to be performed prior to the Sale Hearing or entry of the Sale Order with respect thereto. The Sale Hearing may be adjourned from time to time without further notice other than such announcement being made in open court or a notice of adjournment filed on the Court's docket.

**VII.**    **Objections to the Sale**

31.    Objections, if any, to the relief requested in the Motion relating to the Sale (each, a "**Sale Objection**") must: (i) be in writing, (ii) comply with the Bankruptcy Rules and the Local Rules, (iii) be filed with the Court, and (iv) be served so it is actually received no later than **February 9, 2024 at 4:00 p.m. (prevailing Eastern Time)**, by (a) proposed counsel for the Debtor, Potter Anderson & Corroon LLP, 1313 North Market Street, 6th Floor, Wilmington, Delaware 19801 (Attn: M. Blake Cleary (bcleary@potteranderson.com) and Aaron H. Stulman (astulman@potteranderson.com)); (b) counsel to the DIP Lender and Stalking Horse Bidder, Pashman Stein Walder Hayden, P.C., 1007 North Orange Street, 4th Fl., #183, Wilmington, Delaware 19801 (Attn: Joseph C. Barsalona II (jbarsalona@pashmanstein.com) and Henry Jaffe (hjaffe@pashmanstein.com)); (c) counsel to the Committee, if one is appointed; and (d) the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801 (Attention: Hannah McCollum (Hannah.McCollum@usdoj.gov)).

32.    A party's failure to timely file a Sale Objection in accordance with this Order shall forever bar the assertion, at the applicable Sale Hearing or otherwise, of any objection to the relief requested in the Motion, or to the consummation of the Sale and the performance of the related transactions, including the transfer of the Assets to the applicable Successful Bidder(s), free and clear of all liens, claims, interests, and encumbrances pursuant to Bankruptcy Code section 363(f), and shall be deemed to be a "consent" for purposes of Bankruptcy Code section 363(f).

## VIII.    <u>Other Relief Granted</u>

33.    The Expense Reimbursement is approved in its entirety.  The obligation of the Debtor to pay the Expense Reimbursement shall (i) be subject to the terms of the Stalking Horse Agreement, (ii) be the joint and several obligation of the Debtor and its estate, (iii) constitute an administrative expense of the Debtor under section 364(c)(1) of the Bankruptcy Code, and (iv) survive the termination of the Stalking Horse Agreement, or dismissal or conversion of the Chapter 11 Case.

34.    Nothing in this Order, the Stalking Horse Agreement, or the Motion shall be deemed to or constitute the assumption or assignment of an executory contract or unexpired lease.

35.    The requirements of Bankruptcy Rules 6004(h) and 6006(d) are waived.

36.    The Debtor is hereby authorized to conduct the Sale without the necessity of complying with any state or local bulk transfer laws or requirements.

37.    The Debtor is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

38.    The terms and conditions of this Order shall be immediately effective and enforceable upon its entry, notwithstanding any provision in the Bankruptcy Rules or the Local Rules to the contrary, and the Debtor may, in its discretion and without further delay, take any action and perform any act authorized under this Order.

39.    The Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

16

**<u>Exhibit 1 to Bid Procedures Order</u>**

**Bid Procedures**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| HUMANIGEN, INC.,[1] | Case No. 24-10003 (___) |
| Debtor. | |

## BID PROCEDURES

On January 3, 2024 (the "**Petition Date**"), the above captioned debtor and debtor in possession (the "**Debtor**"), filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtor is operating its business and managing its properties as debtor in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

On January ___, 2024, the United States Bankruptcy Court for the District of Delaware (the "**Court**") entered an order [Docket No. ___] (the "**Bid Procedures Order**")[2], which, among other things, authorized the Debtors to solicit bids and approved these procedures (collectively, the "**Bid Procedures**") to be employed by the Debtor in connection with a sale of substantially all of its assets (collectively, the "**Assets**"), or components thereof, including but not limited to the Debtor's inventory remaining at the closing of such sale, real property, plants, equipment, leases of nonresidential real property, other personal property, and intellectual property. Any such sale shall be referred to as a "**Transaction**".

A stalking horse bid has been submitted for substantially all the Debtor's Assets by Taran Therapeutics Inc. (the "**Stalking Horse Bidder**" and its bid, the "**Stalking Horse Bid**"). The Stalking Horse Bidder has executed an agreement (the "**Stalking Horse Agreement**") with the Debtor for the Assets. The Stalking Horse Bid is subject to higher or better offers submitted in accordance with the terms and conditions of these Bid Procedures. These Bid Procedures describe, among other things: (i) the procedures for interested bidders to submit bids for the Assets; (ii) the manner in which bidders and bids become Qualifying Bidders and Qualifying Bids (each as defined herein); (iii) the negotiation of bids received; (iv) the conduct of an auction (the "**Auction**"), if one is to be held; and (v) the ultimate selection of the Successful Bidder(s) (as defined herein) and Court approval thereof.

**ANY PARTY INTERESTED IN BIDDING ON THE ASSETS SHOULD CONTACT THE DEBTOR'S INVESTMENT BANKER, SC&H GROUP, INC.; MATT LOCASCIO (mlocascio@schgroup.com).**

---

[1] The Debtor's mailing address in this chapter 11 case is 533 Airport Boulevard, Suite 400, Burlingame, CA 94010 and the last four digits of the Debtor's federal tax identification number are 7236.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Bid Procedures Order or the Motion requesting the relief granted therein, as applicable.

## SUMMARY OF IMPORTANT DATES

(All times are prevailing Eastern Time)

**January 22, 2024:** Debtor to send Cure and Possible Assumption and Assignment Notices to All Contract Counterparties

**February 1, 2024 at 4:00 p.m.:** Cure or Assignment Objection Deadline

**February 7, 2024 at 4:00 p.m.:** Deadline to submit Bid to be considered for the Auction

**February 9, 2024 at 4:00 p.m.:** Sale Objection Deadline

**February 12, 2024 at 10:00 a.m.:** Auction (if necessary)

**As soon as practicable after the conclusion of the Auction:** Debtor to file notice of Successful Bidder

**February 15, 2024 at 4:00 p.m.:** Deadline to object to the Successful Bidder's offer of adequate assurance to perform

**February 16, 2024 at [__:__ a/p.m.]:** Sale Hearing

I.    **Assets to be Sold**

The Debtor is offering for sale all of the Assets. Potential Bidders (as defined below) may bid on all or any number or combination of the Assets.

II.    **Participation Requirements**

Any person or entity that wishes to participate in the bidding process for the Assets (each, a "**Potential Bidder**") must first become a "**Qualifying Bidder.**" To become a Qualifying Bidder (and thus be able to conduct due diligence and gain access to the Debtor's confidential electronic data room concerning the Assets (the "**Data Room**")), a Potential Bidder must submit to the Debtor and its advisors:

    a.    documentation identifying the interested party, its principals, and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated Transaction;

    b.    an executed confidentiality agreement in form and substance reasonably satisfactory to the Debtor, which by its terms will inure to the benefit of the Successful Bidder(s);

c.     a statement and other factual support demonstrating to the Debtor's reasonable satisfaction that the interested party has a bona fide interest in consummating a Transaction; and

d.     sufficient information, as determined by the Debtor, to allow the Debtor to determine that the interested party (i) has, or can obtain, the financial wherewithal and any required internal corporate, legal, or other authorizations to close a Transaction, including, but not limited to, current audited financial statements of the interested party (or such other form of financial disclosure acceptable to the Debtor in its discretion) and (ii) can provide adequate assurance of future performance under any executory contracts and unexpired leases to be assumed by the Debtor and assigned to such bidder, pursuant to Bankruptcy Code section 365, in connection with a Transaction.

Each Potential Bidder shall comply with all reasonable requests for information and due diligence access by the Debtor, each of the Consultation Parties (as defined below), or their advisors regarding the ability of such Potential Bidder, as applicable, to consummate its contemplated Transaction.

Notwithstanding anything to the contrary herein, and for the avoidance of doubt, for all purposes under the Bid Procedures: (i) the Stalking Horse Bidder shall be considered a Qualifying Bidder, and the Stalking Horse Agreement shall be considered a Qualifying Bid (as defined below); and (ii) in determining whether the Potential Bidders constitute Qualifying Bidders, the Debtor may, in consultation with the Consultation Parties, consider a combination of bids for the Assets.

## III.    **Bankruptcy Court Jurisdiction**

Any Potential Bidders and Qualifying Bidders shall: (a) be deemed to have waived any right to a jury trial in connection with, and consented and submitted to the exclusive jurisdiction of the Court over, any actions or proceedings arising from or relating to the Bid Procedures, the respective Transaction proposed by each such party, the Auction (as defined below), and the construction and enforcement of the contemplated Transaction documents of such parties; (b) bring any such action or proceeding in the Court; and (c) be deemed to have consented to the Court entering a final judgment determining any such action or proceeding and that such final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including any foreign jurisdictions) by suit on the judgment or in any other manner provided by applicable law.

## IV.    **Form of Agreement**

As set forth below, Potential Bidders intending to submit bids must include with their bids an asset purchase agreement (a "**Purchase Agreement**"). The Purchase Agreement shall be in the form of the Stalking Horse Agreement included in the Data Room and include a redline marked against the form Purchase Agreement.

## V.    <u>Due Diligence</u>

The Debtor will provide any Qualifying Bidder with reasonable access to the Data Room and any other additional information that the Debtor believes to be reasonable and appropriate under the circumstances. All additional due diligence requests shall be directed to: SC&H Group, Inc. (together with its subsidiaries and affiliates, "**SC&H**"), Matt LoCascio (mlocascio@schgroup.com).

The due diligence period shall extend through and including the Bid Deadline. The Debtor may, but shall not be obligated to, in its sole discretion, furnish any due diligence information after the Bid Deadline.

The Debtor reserves the right, in its reasonable discretion, to withhold or limit access to any due diligence information that the Debtor determines is business-sensitive or otherwise not appropriate for disclosure to a Qualifying Bidder.

## VI.    <u>Bid Requirements</u>

Other than in the case of the Stalking Horse Bid, to be deemed a "**Qualifying Bid**," a bid must be received from a Qualifying Bidder on or before the Bid Deadline and satisfy each of the following requirements, as determined by the Debtor in consultation with the Consultation Parties (each, a "**Bid Requirement**"):

a.    be in writing;

b.    fully disclose the identity of the Qualifying Bidder (and any other party participating in the bid) and provide the contact information of the specific person(s) whom the Debtor or its advisors should contact in the event that the Debtor has any questions or wish to discuss the bid submitted by the Qualifying Bidder;

c.    set forth the purchase price to be paid by such Qualifying Bidder;

d.    if a bid includes a credit bid under Bankruptcy Code section 363(k), other than a credit bid by the Stalking Horse Bidder, evidence of the amount of the claim, the Assets constituting the collateral securing the claim, and evidence of the grant, perfection, priority, and validity of the lien (the "**Secured Claim Documentation**");[3]

e.    not propose payment in any form other than cash (except as otherwise expressly set forth in these Bid Procedures and the Bid Procedures Order);

f.    include an allocation of cash to each of the Assets proposed to be purchased;

---

[3]    Parties intending to submit a credit bid are encouraged to provide their Secured Claim Documentation to the Debtor's counsel prior to the Bid Deadline to ensure that their Secured Claim Documentation is validated.

g.    state the liabilities proposed to be paid or assumed by such Qualifying Bidder;

h.    specify the Assets that are included in the bid and state that such Qualifying Bidder offers to purchase the Assets, or a number or combination of the Assets, upon substantially the same terms as, or terms more favorable to the Debtor and its estate, than the terms set forth in the Stalking Horse Agreement, as applicable;

i.    state that such Qualifying Bidder's offer is formal, binding, and unconditional and is irrevocable until five (5) business days after the closing of the sale of the Assets;

j.    state that such Qualifying Bidder is financially capable of consummating the Transaction contemplated by the bid and provide written evidence in support thereof;

k.    contain such financial and other information to allow the Debtor to make a reasonable determination as to the Qualifying Bidder's financial and other capabilities to close the transactions contemplated by the proposal, including, without limitation, such financial and other information supporting the Qualifying Bidder's ability to comply with the requirements of adequate assurance of future performance under Bankruptcy Code section 365(f)(2)(B) and, if applicable, Bankruptcy Code section 365(b)(3), including the Qualifying Bidder's financial wherewithal to pay the full purchase price and otherwise operate the Acquired Business and willingness to perform under any contracts and leases that are assumed and assigned to the Qualifying Bidder, in a form that allows the Debtor to serve, within one (1) business day after such receipt, such information on any counterparties to any contracts or leases being assumed and assigned (or assumed) in connection with the Transaction that have requested, in writing, such information;

l.    contain evidence of the bidder's prior experience owning/operating comparable businesses or such other applicable experience;

m.    identify with particularity each and every executory contract and unexpired lease the assumption and assignment of which is a condition to close the contemplated transaction(s);

n.    specify whether the Qualifying Bidder intends to operate all or a portion of the Debtor's business as a going concern;

o.    include a commitment to close the Transaction by February 20, 2024;

p.    except as provided with respect to the Stalking Horse Bidder, not request or entitle such Qualifying Bidder to any break-up fee, termination fee, expense reimbursement, or other similar fee or payment;

5

q.   the aggregate consideration proposed by the Qualifying Bidder must equal or exceed the sum of the amount of (A) the purchase price under the Stalking Horse Agreement and (B) $250,000;

r.   not contain any contingencies of any kind, including, without limitation, contingencies related to financing, internal approval, or due diligence;

s.   contain a written acknowledgement and representation that the Qualifying Bidder (i) has had an opportunity to conduct any and all due diligence regarding the Assets, (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and other information in making its Qualifying Bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any documents or other information provided in connection with the Bid Procedures and the proposed Transaction;

t.   confirm that the Qualifying Bidder acted in good with regard to the Seller, will continue to operate in good faith with respect to any bid on and/or proposed purchase of the Acquired Assets, has not violated any confidentiality agreement with the Seller, whether executed by the Qualifying Bidder or anyone working for or on behalf of the Qualifying Bidder;

u.   set forth (i) a statement or evidence that the Qualifying Bidder has made or will make in a timely manner all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, if applicable, and pay the fees associated with such filings and (ii) any regulatory and third-party approval required for the Qualifying Bidder to close the contemplated transactions, and the time period within which the Qualifying Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than five (5) days following execution and delivery of such Qualifying Bidder's Purchase Agreement, those actions the bidder will take to ensure receipt of such approval(s) as promptly as possible); provided that a Qualifying Bidder agrees that its legal counsel will coordinate in good faith with Debtor's legal counsel to discuss and explain Qualifying Bidder's regulatory analysis, strategy, and timeline for securing all such approvals as soon as reasonably practicable; provided, further that the offer contains a covenant to cooperate with the Debtor to provide pertinent factual information regarding the bidder's operations reasonably required to analyze issues arising with respect to any applicable antitrust laws and other applicable regulatory requirements;

6

v.      provide for the Qualifying Bidder to serve as a backup bidder (the "**Back-Up Bidder**") if the Qualifying Bidder's bid is the next highest and best bid (the "**Back-Up Bid**") after the Successful Bid (as defined below);

w.     include written evidence of authorization and approval from the Qualifying Bidder's board of directors (or comparable governing body) with respect to the submission, execution, and delivery of the subject bid;

x.      provide a good faith cash deposit (the "**Deposit**") in an amount equal to ten percent (10%) of the purchase price provided for in the proposal (or such additional amount as may be determined by the Debtor in its reasonable discretion and in consultation with the Consultation Parties) to be deposited, prior to the Bid Deadline, with an escrow agent selected by the Debtor (the "**Escrow Agent**") pursuant to the escrow agreement to be provided by the Debtor to the Qualifying Bidders (the "**Escrow Agreement**"); and

y.      provide for liquidated damages in the event of the Qualifying Bidder's breach of, or failure to perform under, the Purchase Agreement equal to the amount of the Deposit.

The Debtor reserves the right, in consultation with the Consultation Parties, to negotiate with any Qualifying Bidder in advance of the Auction to cure any deficiencies in a bid that is not initially deemed a Qualifying Bid.

Each Qualifying Bidder submitting a bid shall be deemed to: (a) acknowledge and represent that it is bound by all of the terms and conditions of the Bid Procedures; and (b) have waived the right to pursue a substantial contribution claim under Bankruptcy Code section 503 related in any way to the submission of its bid, the Bid Procedures, and the Sale.

## VII.   <u>Bid Deadline</u>

A Qualifying Bidder, other than the Stalking Horse Bidder, that desires to make a bid shall deliver a written and electronic copy of its bid in both PDF and MS-WORD format to the Notice Parties so as to be received on or before **February 7, 2024 at 4:00 p.m. (prevailing Eastern Time)** (the "**Bid Deadline**"); *provided* that the Debtor may extend the Bid Deadline without further order of the Court. To the extent that the Bid Deadline is extended for all parties, the Debtor shall file a notice on the docket of the Chapter 11 Case indicating the same. **Any party that does not submit a bid by the Bid Deadline (including as extended in accordance with the prior two sentences) will not be allowed to (a) submit any offer after the Bid Deadline, or (b) participate in the Auction.**

## VIII.  <u>Evaluation of Qualifying Bids</u>

The Debtor will deliver by no later than 9:00 a.m. (ET) on the day following the Bid Deadline, copies of all bids from Qualifying Bidders to each of the Consultation Parties.

The Debtor, in consultation with the Consultation Parties, shall make a determination regarding whether a timely submitted bid from a Qualifying Bidder is a Qualifying Bid, and shall notify all Qualifying Bidders whether their bids have been determined to be a Qualifying Bid by no later than 4:00 p.m. (ET) two (2) business days before the commencement of the Auction. In the event that a bid is determined not to be a Qualifying Bid, including with respect to any proposed credit bid amount, the Qualifying Bidder shall be notified by the Debtor and shall have until the commencement of the Auction to modify its bid to increase the purchase price or otherwise improve the terms of the Qualifying Bid for the Debtor and to provide additional Secured Claim Documentation; *provided* that any Qualifying Bid may be improved at the Auction as set forth herein.

Prior to commencing the Auction, the Debtor shall determine, in consultation with the Consultation Parties, which of the Qualifying Bids, at such time, is the highest or best bid for purposes of constituting the opening bid of the Auction (the "**Baseline Bid**" and the Qualifying Bidder submitting the Baseline Bid, the "**Baseline Bidder**"), and shall notify the Stalking Horse Bidder and all Qualifying Bidders with Qualifying Bids of the Baseline Bid no later than twenty-four (24) hours prior to the opening of the Auction.

## IX.    No Qualifying Bids

If no timely Qualifying Bids other than any Stalking Horse Bidder's Qualifying Bid are submitted on or before the Bid Deadline, the Debtor shall not hold an Auction and may request at the Sale Hearing that the Stalking Horse Bidder be deemed the Successful Bidder (as defined herein) and that the Court approve the Stalking Horse Agreement and the transactions contemplated thereunder.

## X.    Right to Credit Bid

Any Qualifying Bidder who has a valid and perfected lien on any Assets of the Debtor's estate that is not subject to an objection by the commencement of the Auction (a "**Secured Creditor**") shall have the right to credit bid all or a portion of the value of such Secured Creditor's claim within the meaning of Bankruptcy Code section 363(k) and to the extent demonstrated by the Secured Claim Documentation; *provided* that a Secured Creditor shall have the right to credit bid its claim only with respect to the collateral by which such Secured Creditor is secured. Notwithstanding anything else set forth herein, the Stalking Horse Bidder will be deemed a Qualifying Bidder, and may submit a credit bid for any Assets at any time before or during the Auction subject to section 363(k) of the Bankruptcy Code.

## XI.    Auction

If the Debtor timely receives one or more Qualifying Bids for any of the Assets (exclusive of the Stalking Horse Bidder's Qualifying Bid), then the Debtor shall conduct an auction (the "**Auction**"). Following the Auction, the Debtor will determine, in consultation with the Consultation Parties, which Qualifying Bid is the highest or best bid for the Assets, which will be determined by considering, among other things, the following non-binding factors: (a) the terms of the Purchase Agreement requested by each bidder; (b) the extent to which such terms are likely to delay closing of the Sale, the cost to the Debtor and its estate of such modifications

or delay, and any incremental financing being offered to accommodate any delay; (c) the total consideration to be received by the Debtor and its estate; (d) the Transaction structure and execution risk, including conditions to, timing of and certainty of closing, termination provisions, availability of financing and financial wherewithal to meet all commitments, and required governmental or other approval; (e) the net benefit to the Debtor's estate; (f) the impact on employees, trade creditors and lease and contract counterparties; and (g) any other factors the Debtor or the Consultation Parties may reasonably deem relevant.

The Auction shall be governed by the following procedures:

a. the Auction shall commence on **February 12, 2024 at 10:00 a.m. (ET)** (the "**Auction Date**"), at Potter Anderson & Corroon LLP, 1313 North Market Street, 6th Floor, Wilmington, Delaware 19801;

b. only the Stalking Horse Bidder and the other Qualifying Bidders with Qualifying Bids (collectively, the "**Auction Bidders**") shall be entitled to make any subsequent bids at the Auction;

c. the Auction Bidders shall appear in person at the Auction, or through a duly authorized representative;

d. only the Debtor, the Auction Bidders, the Consultation Parties, and the Debtor's creditors and equity holders, together with the professional advisors to each of the foregoing parties, may attend the Auction; provided that any creditors and equity holders desiring to attend the Auction must provide counsel for the Debtor one (1) business day's written notice of their intent to attend the Auction;

e. the Debtor and its professional advisors shall direct and preside over the Auction, which shall be transcribed;

f. the Auction Bidders shall confirm that they have not engaged in any collusion with respect to the Bid Procedures, the Auction or the Sale;

g. bidding shall commence at the amount of the Baseline Bid, and the Auction Bidders may submit successive bids in increments of $50,000 of the current highest and best bid (or Baseline Bid for the first round) (the "**Minimum Overbid Increment**"); provided that: (i) each such successive bid must be a Qualifying Bid; (ii) if the then-highest and best bid is the Stalking Horse Bid, such bid must include the initial overbid amount of $250,000 (the "**Initial Overbid**"); (iii) any successive bid made by the Stalking Horse Bidder shall only be required to equal the sum of the amount of (A) the Baseline Bid or the then-highest and best bid, as applicable, plus (B) the Minimum Overbid Increment; and (iv) the Debtor shall retain the right to modify the bid increment requirements at the Auction; provided, further, that the Debtor, in consultation with the Consultation Parties, reserves the right to modify the Minimum Overbid

9

Increment during the course of the Auction and shall do so on the record at the Auction;

h.    the Auction may include individual negotiations with any of the Auction Bidders, but all bids shall be made on the record and in the presence of all of the Auction Bidders;

i.    all material terms of the bid that is deemed to be the highest and best bid for each round of bidding shall be fully disclosed to the Auction Bidders, and the Debtor shall use reasonable efforts to clarify any and all questions that the Auction Bidders may have regarding the Debtor's announcement of the then-current highest and best bid;

j.    the Debtor and its professional advisors, in consultation with the Consultation Parties, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make subsequent bids) for conducting the Auction, provided that such rules are (i) not inconsistent with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or any applicable order of the Court entered in connection with the Chapter 11 Case, including, without limitation, the Bid Procedures Order, and (ii) disclosed to the Auction Bidders;

k.    each Auction Bidder shall (i) be deemed to have waived any right to a jury trial in connection with, and consented and submitted to the exclusive jurisdiction of the Court over, any actions or proceedings arising from or relating to the Bid Procedures, the Sale, the Auction, and the construction and enforcement of the contemplated transaction documents of the Auction Bidders, (ii) bring any such action or proceeding in the Court, and (iii) be deemed to have consented to the Court entering a final judgment determining any such action or proceeding and that such final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including any foreign jurisdictions) by suit on the judgment or in any other manner provided by applicable law;

l.    Auction Bidders shall have the right to make additional modifications to their respective Purchase Agreements or any Stalking Horse Agreement, as applicable, in conjunction with each Qualifying Bid submitted in each round of bidding during the Auction, provided that (i) any such modifications on an aggregate basis and viewed in whole, shall not, in the Debtor's discretion, in consultation with the Consultation Parties, be less favorable to the Debtor and its estate than the terms of the Auction Bidders' respective Purchase Agreements or the Stalking Horse Agreement, as applicable, and (ii) each Qualifying Bid shall constitute an irrevocable offer and shall be binding on the Auction Bidder submitting such bid until such party shall have submitted a subsequent Qualifying Bid

10

at the Auction or the conclusion of the Sale Hearing, whichever occurs sooner, unless such bid is selected as the Successful Bid or the Back-Up Bid, which shall remain binding as provided for herein;

m.    the Debtor and the Consultation Parties shall have the right to request any additional financial information that will allow the Debtor and the Consultation Parties to make a reasonable determination as to an Auction Bidder's financial and other capabilities to consummate the transactions contemplated by their proposal or the Stalking Horse Agreement, as applicable, as may be amended during the Auction, and any further information that the Debtor may believe is reasonably necessary to clarify and evaluate any bid made by an Auction Bidder during the Auction;

n.    upon the conclusion of the Auction, the Debtor shall determine, in consultation with the Consultation Parties, and subject to Court approval, the offer or offers for the Assets that is or are the highest or best from among the Qualifying Bids submitted at the Auction, which may be the Stalking Horse Agreement (the "**Successful Bid**"). In making this decision, the Debtor shall consider, in consultation with the Consultation Parties, the amount of the purchase price, the likelihood of the bidder's ability to close a transaction and the timing thereof, the nature and impact of any variances from the form Purchase Agreement requested by each bidder, and the net benefit to the Debtor's estate and its creditor constituencies. The bidder submitting such Successful Bid, which may be the Stalking Horse Bidder, shall become the "**Successful Bidder**," and shall have such rights and responsibilities of the purchaser as set forth in the subject Purchase Agreement, as applicable. The Debtor may, in its sole discretion, designate Back-Up Bids (and the corresponding Back-Up Bidders) to purchase the Assets in the event that the Successful Bidder does not close the Sale; and

o.    prior to the Sale Hearing, the Successful Bidder shall complete and execute all agreements, contracts, instruments, and other documents evidencing and containing the terms and conditions upon which the Successful Bid was made.

**THE SUCCESSFUL BID AND ANY BACK-UP BIDS SHALL CONSTITUTE AN IRREVOCABLE OFFER AND BE BINDING ON THE SUCCESSFUL BIDDER AND THE BACK-UP BIDDER, RESPECTIVELY, FROM THE TIME THE BID IS SUBMITTED UNTIL FIVE (5) BUSINESS DAYS AFTER THE SALE HAS CLOSED. EACH QUALIFYING BID THAT IS NOT THE SUCCESSFUL BID OR BACK-UP BID SHALL BE DEEMED WITHDRAWN AND TERMINATED AT THE CONCLUSION OF THE SALE HEARING.**

**XII.** **Sale Hearing**

The Successful Bid and any Back-Up Bid (or if no Qualifying Bid other than that of the Stalking Horse Bidder is received, then the Stalking Horse Agreement) will be subject to approval by the Court. The hearing to approve such Successful Bid and any Back-Up Bid (the "**Sale Hearing**") shall take place, subject to the Court's availability, on **February 16, 2024 at __:__ a.m./p.m (prevailing Eastern Time)**. The Sale Hearing may be adjourned by the Debtor from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing or by filing a hearing agenda or notice on the docket of the Debtor's Chapter 11 Case. **For the avoidance of doubt, by no later than the time of announcement of the Baseline Bid for the Auction, the Debtor may determine, in consultation with the Consultation Parties, to withdraw the Assets or any subset thereof, from the Auction and sale process, and adjourn the Sale Hearing with respect to these Assets on the terms set forth herein.**

At the Sale Hearing, the Debtor will seek entry of an order that, among other things: (i) authorizes and approves the Sale to the Successful Bidder (and, if applicable, the Back-Up Bidder), pursuant to the terms and conditions set forth in the applicable Stalking Horse Agreement or Purchase Agreement executed by the Successful Bidder (and, if applicable, the Back-Up Bidder), and that the Assets being transferred in such transaction shall be transferred free and clear of all liens, claims and Encumbrances pursuant to Bankruptcy Code section 363(f); (ii) unless otherwise ordered by the Court, directing that all Encumbrances on the Assets that are sold shall attach to the cash proceeds generated from the sale of such Assets in the same order of priority as they existed prior to the consummation of such sale; (iii) finding that the Stalking Horse Bidder or Successful Bidder, as applicable, is a good faith purchaser pursuant to Bankruptcy Code section 363(m); and (iv) as appropriate, exempting the Sale(s) and conveyance(s) of the Assets from any transfer tax, stamp tax, or similar tax, or deposit under any applicable bulk sales statute.

**XIII.** **Back-Up Bidder**

Notwithstanding any of the foregoing, in the event that the Successful Bidder fails to close the Sale by February 20, 2024 (or such date as may be extended by the Debtor, in consultation with the Consultation Parties, and with the agreement of the Back-Up Bidder), the Back-Up Bid will be deemed to be the Successful Bid, the Back-Up Bidder will be deemed to be the Successful Bidder, and the Debtor will be authorized, but not directed, to close the Sale to the Back-Up Bidder subject to the terms of the Back-Up Bid without the need for further order of the Court and without the need for further notice to any interested parties, as soon as practicable thereafter.

**XIV.** **Return of Deposits**

All Deposits shall be returned to each bidder not selected by the Debtor as the Successful Bidder or the Back-Up Bidder no later than three (3) business days following the conclusion of the Sale Hearing. The deposit of the Successful Bidder or, if the Sale is closed with the Back-Up Bidder, the deposit of the Back-Up Bidder, shall be applied to the purchase price for the Sale. If the Successful Bidder (or, if the Sale is to be closed with the Back-Up Bidder, then the Back-Up

Bidder) fails to consummate the Sale because of a breach or failure to perform on the part of such bidder, then, subject to the terms of the Purchase Agreement or the Stalking Horse Agreement, as applicable, the Debtor and its estate shall be entitled to retain the Deposit of the Successful Bidder (or, if the Sale is to be closed with the Back-Up Bidder, then the Back-Up Bidder) as part of the damages resulting to the Debtor and its estate for such breach or failure to perform.

## XV.   Notice and Consultation Parties

a.   The term "**Notice Parties**" as used in these Bid Procedures shall mean: (i) proposed counsel for the Debtor, Potter Anderson & Corroon LLP, 1313 North Market Street, 6th Floor, Wilmington, Delaware 19801 (Attn: M. Blake Cleary (bcleary@potteranderson.com) and Aaron H. Stulman (astulman@potteranderson.com)); and (ii) investment banker to the Debtor, SC&H Group, Inc.; Matt LoCascio (mlocascio@schgroup.com).

b.   The term "**Consultation Parties**" as used in these Bid Procedures shall mean: counsel to any official committee appointed in the Debtor's Chapter 11 Case (the "**Committee**").

For the avoidance of doubt, any consultation rights provided to the Consultation Parties by these Bid Procedures shall not limit the Debtor's discretion in any way and shall not include the right to veto any decision made by the Debtor in the exercise of its business judgment.

If a member of the Committee submits a Qualifying Bid, the Committee will continue to have consultation rights as set forth in these Bid Procedures; *provided* that the Committee shall exclude such member from any discussions or deliberations regarding the sale of the Assets and shall not provide any information regarding the sale of the Assets to such member.

## XVI.   Reservation of Rights

Notwithstanding any of the foregoing, the Debtor and its estate reserve the right to, after consultation with the Consultation Parties, modify these Bid Procedures at or prior to the Auction, including, without limitation, to extend the deadlines set forth herein, allow for bidding on only a portion of the Assets and not all of them, modify bidding increments, waive terms and conditions set forth herein with respect to any or all potential bidders (including, without limitation, the Bid Requirements), impose additional terms and conditions with respect to any or all Potential Bidders, adjourn or cancel the Auction at or prior to the Auction, and adjourn the Sale Hearing.

**<u>Exhibit 2 to Bid Procedures Order</u>**

**Sale Notice**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>HUMANIGEN, INC.,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 24-10003 (____)<br><br>**Re: Docket No. __** |

**NOTICE OF BID PROCEDURES, AUCTION, HEARING,**
**AND DEADLINES RELATING TO THE SALE OF**
**SUBSTANTIALLY ALL OF THE ASSETS OF THE DEBTOR**

    **PLEASE TAKE NOTICE** that on January ___, 2024 the above-captioned debtor and debtor in possession (the "**Debtor**") in the above-captioned case (the "**Chapter 11 Case**"), filed its *Motion of Debtor for Entry of (I) an Order (A) Approving Bid Procedures in Connection with the Potential Sale of Substantially All of the Debtor's Assets, (B) Scheduling an Auction and a Sale Hearing, (C) Approving the Form and Manner of Notice Thereof, (D) Authorizing the Debtor to Enter Into the Stalking Horse Agreement, (E) Approving Procedures for the Assumption and Assignment of Contracts and Leases, and (F) Granting Related Relief; and (II) an Order (A) Approving the Sale of Substantially All of the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Contracts and Leases, and (C) Granting Related Relief* [Docket No.__] (the "**Bid Procedures and Sale Motion**").[2] The Debtor seeks to complete a sale (the "**Transaction**") of substantially all of its assets (the "**Assets**") to a prevailing bidder or bidders (the "**Successful Bidder**") at an auction free and clear of all liens, claims, encumbrances and other interests pursuant to Bankruptcy Code section 363 (the "**Auction**").

    **PLEASE TAKE FURTHER NOTICE** that, on January ___, 2024, the Bankruptcy Court entered an order [Docket No. __] (the "**Bid Procedures Order**") approving the Bid Procedures set forth in the Bid Procedures and Sale Motion, which set the key dates and times related to the sale of the Debtor's Assets. **All interested bidders should carefully read the Bid Procedures**. To the extent there are any inconsistencies between the Bid Procedures and the summary description of its terms and conditions contained in this notice, the terms of the Bid Procedures shall control.

    **PLEASE TAKE FURTHER NOTICE** that, pursuant to the Bid Procedures, the Debtor must receive a Qualifying Bid from interested bidders in writing, on or before **February 7, 2024 at 4:00 p.m. (prevailing Eastern Time)** or such later date as may be agreed to by the Debtor (the "**Bid Deadline**"). To be considered, Qualifying Bids must be sent to the following at or before the

---

[1] The Debtor's mailing address in this chapter 11 case is 533 Airport Boulevard, Suite 400, Burlingame, CA 94010 and the last four digits of the Debtor's federal tax identification number are 7236.

[2] Capitalized terms not otherwise defined herein shall have the meanings set forth in the Bid Procedures and Sale Motion.

Bid Deadline: (a) investment banker to the Debtor, SC&H Group, Inc. (Attn: Matt LoCascio (mlocascio@schgroup.com)); (b) counsel for the Debtor, Potter Anderson & Corroon LLP, 1313 North Market Street, 6th Floor, Wilmington, Delaware 19801 (Attn: M. Blake Cleary (bcleary@potteranderson.com) and Aaron H. Stulman (astulman@potteranderson.com)); and (b) counsel to the Committee, if one is appointed.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the terms of the Bid Procedures, if the Debtor receives one or more Qualifying Bids (other than the Stalking Horse Agreement) by the Bid Deadline, the Auction will be conducted on **February 12, 2024 at 10:00 a.m. (prevailing Eastern Time)** at Potter Anderson & Corroon LLP, 1313 North Market Street, 6th Floor, Wilmington, Delaware 19801, or at such other place, date and time as may be designated by the Debtor.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the terms of the Bid Procedures, the Debtor has designated certain Assigned Contracts that may be assumed or assumed and assigned to the Successful Bidder. By **January 22, 2024**, the Debtor shall send a notice to each counterparty to an Assigned Contract setting forth the Debtor's calculation of the cure amount, if any, that would be owing to such counterparty if the Debtor decided to assume or assume and assign such Assigned Contract, and alerting such nondebtor party that their contract may be assumed and assigned to the Successful Bidder (the "**Cure and Possible Assumption and Assignment Notice**").

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the terms of the Bid Procedures, any counterparty that objects to the cure amount set forth in the Cure and Possible Assumption and Assignment Notice or the possible assignment of their Assigned Contract(s) must file with the Bankruptcy Court and serve an objection (a "**Contract Objection**") so it is actually received on or before **February 1, 2024 at 4:00 p.m. (prevailing Eastern Time)**, by  (a) proposed counsel for the Debtor, Potter Anderson & Corroon LLP, 1313 North Market Street, 6th Floor, Wilmington, Delaware 19801 (Attn: M. Blake Cleary (bcleary@potteranderson.com) and Aaron H. Stulman (astulman@potteranderson.com)); (b) counsel to the DIP Lender and Stalking Horse Bidder, Pashman Stein Walder Hayden, P.C., 1007 North Orange Street, 4th Fl., #183, Wilmington, Delaware 19801 (Attn: Joseph C. Barsalona II (jbarsalona@pashmanstein.com) and Henry Jaffe (hjaffe@pashmanstein.com)); (c) counsel to the Committee, if one is appointed; and (d) the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801 (Attention: Hannah McCollum (Hannah.McCollum@usdoj.gov)). Where a counterparty to an Assigned Contract files a timely Cure or Assignment Objection asserting a higher cure amount than the amount listed in the Cure and Possible Assumption and Assignment Notice, or an objection to the possible assignment of that counterparty's Assigned Contract, and the parties are unable to consensually resolve the dispute, the amount to be paid under Bankruptcy Code section 365 (if any) or, as the case may be, the Debtor's ability to assign the Assigned Contract to the Successful Bidder will be determined at the Sale Hearing (as defined below).

**PLEASE TAKE FURTHER NOTICE** that a hearing will be held to approve the sale of the Assets to the Successful Bidder (the "**Sale Hearing**") before the Honorable [_____], U.S. Bankruptcy Court for the District of Delaware, 824 Market Street, Wilmington, Delaware 19801, _th Floor, Courtroom No. _, on **February 16, 2024 at __:__ a.m./p.m. (prevailing Eastern**

2

**Time)**, or at such time thereafter as counsel may be heard or at such other time as the Bankruptcy Court may determine. The Sale Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing or on the agenda for such Sale Hearing. Objections to the sale of the Assets to the Successful Bidder must be filed and served so they are received no later than **4:00 p.m. (prevailing Eastern Time) on February 9, 2024**, by (a) proposed counsel for the Debtor, Potter Anderson & Corroon LLP, 1313 North Market Street, 6th Floor, Wilmington, Delaware 19801 (Attn: M. Blake Cleary (bcleary@potteranderson.com) and Aaron H. Stulman (astulman@potteranderson.com));   (b) counsel to the DIP Lender and Stalking Horse Bidder, Pashman Stein Walder Hayden, P.C., 1007 North Orange Street, 4th Fl., #183, Wilmington, Delaware 19801 (Attn: Joseph C. Barsalona II (jbarsalona@pashmanstein.com) and Henry Jaffe (hjaffe@pashmanstein.com));   (c) counsel to the Committee, if one is appointed; and (d) the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801 (Attention: Hannah McCollum (Hannah.McCollum@usdoj.gov)).

      **PLEASE TAKE FURTHER NOTICE** that the Debtor is seeking to waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d) in order for the Sale to close as soon as practicable upon entry of the Sale Order by this Court.

      **PLEASE TAKE FURTHER NOTICE** that this notice is subject to the full terms and conditions of the Bid Procedures and Sale Motion, the Bid Procedures Order, and the Bid Procedures, which shall control in the event of any conflict, and the Debtor encourage parties in interest to review such documents in their entirety. A copy of the Bid Procedures and Sale Motion, the Bid Procedures and the Bid Procedures Order may be obtained (a) by contacting counsel for the Debtor, Potter Anderson & Corroon LLP, 1313 North Market Street, 6th Floor, Wilmington, Delaware 19801 (Attn: M. Blake Cleary (bcleary@potteranderson.com) and Aaron H. Stulman (astulman@potteranderson.com));.(b) for free by accessing the website of the Debtor's noticing agent, Epiq Corporate Restructuring, LLC ("**Epiq**"), located at https://dm.epiq11.com/humanigen; or (c) for a fee via PACER at http://www.deb.uscourts.gov.

Dated:  [_____], 2024          Respectfully submitted,
        Wilmington, Delaware

                                      */s/*
                                        M. Blake Cleary (No. 3614)
                                        Christopher M. Samis (No. 4909)
                                        Aaron H. Stulman (No. 5807)
                                        Sameen Rizvi (No. 6902)
                                        **POTTER ANDERSON & CORROON LLP**
                                        1313 N. Market Street, 6th Floor
                                        Wilmington, Delaware 19801
                                        Telephone: (302) 984-6000
                                        Facsimile:  (302) 658-1192
                                        Email:  bcleary@potteranderson.com
                                                     csamis@potteranderson.com
                                                     astulman@potteranderson.com
                                                     srizvi@potteranderson.com

                                        *Proposed Counsel to the Debtor and Debtor in Possession*

IMPAC 11080189v.8

**<u>Exhibit 3 to Bid Procedures Order</u>**

**Cure and Possible Assumption and Assignment Notice**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| HUMANIGEN, INC.,[1] | Case No. 24-10003 (___) |
| Debtor. | |

**NOTICE TO COUNTERPARTIES TO POTENTIALLY ASSUMED
EXECUTORY CONTRACTS AND UNEXPIRED LEASES REGARDING
CURE AMOUNTS AND POSSIBLE ASSIGNMENT TO THE STALKING HORSE
<u>BIDDER OR SUCH OTHER SUCCESSFUL BIDDER AT AUCTION</u>**

> **YOU ARE RECEIVING THIS NOTICE BECAUSE YOU OR ONE OF YOUR
> AFFILIATES MAY BE COUNTERPARTY TO ONE OR MORE EXECUTORY
> CONTRACTS AND/OR UNEXPIRED LEASES WITH THE DEBTOR.**
>
> **PARTIES RECEIVING THIS NOTICE SHOULD (1) READ THIS NOTICE
> CAREFULLY AS YOUR RIGHTS MAY BE AFFECTED BY THE
> TRANSACTIONS DESCRIBED HEREIN AND (2) LOCATE THEIR NAME AND
> CONTRACT AND/OR LEASE ON <u>APPENDIX I</u> HERETO**

**PLEASE TAKE NOTICE** that on January __, 2024, the above-captioned debtor and debtor in possession (the "**Debtor**") in the above-captioned case (the "**Chapter 11 Case**"), filed its *Motion of Debtor for Entry of (I) an Order (A) Approving Bid Procedures in Connection with the Potential Sale of Substantially All of the Debtor's Assets, (B) Scheduling an Auction and a Sale Hearing, (C) Approving the Form and Manner of Notice Thereof, (D) Authorizing the Debtor to Enter Into the Stalking Horse Agreement, (E) Approving Procedures for the Assumption and Assignment of Contracts and Leases, and (F) Granting Related Relief; and (II) an Order (A) Approving the Sale of Substantially All of the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Contracts and Leases, and (C) Granting Related Relief* [Docket No. __] (the "**Bid Procedures and Sale Motion**").[2]

**PLEASE TAKE FURTHER NOTICE** that, on January __, 2024, the Court entered an order [Docket No. __] (the "**Bid Procedures Order**"), which (a) set key dates, times, and procedures related to the Sale (the "**Sale**") of substantially all of the Debtor's assets (the "**Assets**")

---

[1] The Debtor's mailing address in this chapter 11 case is 533 Airport Boulevard, Suite 400, Burlingame, CA 94010 and the last four digits of the Debtor's federal tax identification number are 7236.

[2] Capitalized terms not otherwise defined herein shall have the meanings set forth in the Bid Procedures and Sale Motion.

pursuant to an auction (the "**Auction**") overseen by the Bankruptcy Court, which Auction is scheduled to occur on **February 12, 2024 at 10:00 a.m. (prevailing Eastern Time)**, (b) authorized the Debtor to enter into the stalking horse asset purchase agreement (the "**Stalking Horse Agreement**"), (c) established certain procedures relating to the Debtor's assumption and assignment of executory contracts and unexpired leases in connection with the Sale, and (d) granted related relief.[3] Approval of the Sale to the Stalking Horse Bidder or such other Successful Bidder (as defined in the Bid Procedures Order) after the results of the Auction and the Debtor's assumption and assignment of any executory contracts and unexpired leases in connection therewith, is scheduled to take place at a hearing before the Court on **February 16, 2024 at __:__ a.m./p.m. (prevailing Eastern Time)** (the "**Sale Hearing**"). The Sale Hearing may be adjourned by the Court or the Debtor without further notice other than such adjournment announced in open court or a notice of adjournment filed on the Court's docket.

       **PLEASE TAKE FURTHER NOTICE** that, in accordance with the Bid Procedures Order, the Debtor may assume and assign the executory contract(s) and/or unexpired lease(s) to which you may be a counterparty to the Stalking Horse Bidder or such other Successful Bidder after the outcome of the Auction, if one is held.

       **PLEASE TAKE FURTHER NOTICE** that the Debtor has conducted a review of its books and records and has determined the cure amount for unpaid monetary obligations under such contract or lease is set forth in the right-hand column on Appendix I (the "**Cure Amount**"). If you object to (a) the proposed assumption or disagree with the proposed Cure Amount, or (b) object to the possible assignment of such executory contract(s) or unexpired lease(s), **you must file an objection with the Court no later than February 1, 2024 at 4:00 p.m. (prevailing Eastern Time) (the "Objection Deadline") and serve such objection on the following parties**: (a) proposed counsel for the Debtor, Potter Anderson & Corroon LLP, 1313 North Market Street, 6th Floor, Wilmington, Delaware 19801 (Attn: M. Blake Cleary (bcleary@potteranderson.com) and Aaron H. Stulman (astulman@potteranderson.com));  (b) counsel to the DIP Lender and Stalking Horse Bidder, Pashman Stein Walder Hayden, P.C., 1007 North Orange Street, 4th Fl., #183, Wilmington, Delaware 19801 (Attn: Joseph C. Barsalona II (jbarsalona@pashmanstein.com) and Henry Jaffe (hjaffe@pashmanstein.com));  (c) counsel to the Committee, if one is appointed; and (d) the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801 (Attention: Hannah McCollum (Hannah.McCollum@usdoj.gov)).

       **PLEASE TAKE FURTHER NOTICE** that if no objection to the Cure Amount or the assignment of your Executory Contract(s) or Unexpired Lease(s) to the Successful Bidder is filed by the Objection Deadline, **you will be (a) forever barred from objecting to the Cure Amount or provision of adequate assurance of future performance and from asserting any additional cure or other amounts with respect to your contract(s) or lease(s), and the Debtor and the Stalking Horse Bidder or the Successful Bidder (as applicable) shall be entitled to rely solely upon the Cure Amount, (b) deemed to have consented to the assumption or assumption and assignment, and (c) forever barred and estopped from asserting or claiming defaults exist, that conditions to assignment must be satisfied under such contract(s) and/or lease(s) or that**

---

[3] To the extent there are any inconsistencies between the Bid Procedures Order and the summary description of the terms and conditions contained in this Notice, the terms of the Bid Procedures Order shall control.

**there is any objection or defense to the assumption and assignment of such contract(s) and/or lease(s).**

**PLEASE TAKE FURTHER NOTICE** that if you agree with the Cure Amount indicated on Appendix I and otherwise do not object to the Debtor's assumption or assumption and assignment of your contract(s) and/or lease(s), you need not take any further action.

**PLEASE TAKE FURTHER NOTICE** that copies of the Sale Motion, the Bid Procedures, and the Bid Procedures Order, as well as all related exhibits, including the proposed Sale Order, are available: (a) upon request from proposed counsel to the Debtor, Potter Anderson & Corroon LLP, 1313 North Market Street, 6th Floor, Wilmington, Delaware 19801 (Attn: M. Blake Cleary (bcleary@potteranderson.com) and Aaron H. Stulman (astulman@potteranderson.com)); (b) for free from the website of the Debtor's noticing agent, Epiq Corporate Restructuring, LLC ("**Epiq**"), located at https://dm.epiq11.com/humanigen; or (c) for a fee via PACER at http://www.deb.uscourts.gov.

| | |
|---|---|
| Dated:  [_____], 2024<br>         Wilmington, Delaware | Respectfully submitted,<br><br>*/s/* _____<br>M. Blake Cleary (No. 3614)<br>Aaron H. Stulman (No. 5807)<br>Brett M. Haywood (No. 6166)<br>Sameen Rizvi (No. 6902)<br>**POTTER ANDERSON & CORROON LLP**<br>1313 N. Market Street, 6th Floor<br>Wilmington, Delaware 19801<br>Telephone: (302) 984-6000<br>Facsimile:  (302) 658-1192<br>Email:  bcleary@potteranderson.com<br>            astulman@potteranderson.com<br>            bhaywood@potteranderson.com<br>            srizvi@potteranderson.com<br><br>*Proposed Counsel to the Debtor and Debtor in Possession* |

IMPAC 11080189v.8

**<u>Appendix I</u>**

| [Counterparty Name] | [Contract/Lease] | [Cure Amount] | [Proposed Assignee (if any)] |
|---|---|---|---|