**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>HUMANIGEN, INC.,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 24-10003 (___)<br><br>**Re: Docket No. 10** |

**DECLARATION OF MATT LOCASCIO IN SUPPORT OF**
**BID PROCEDURES AND SALE MOTION**

MATT LOCASCIO, pursuant to 28 U.S.C. § 1746, hereby declares as follows:

1.      I am a principal of SC&H Group, Inc. ("**SC&H**"). I maintain an office at 6011 University Blvd., Suite 490, Ellicott City, Maryland 21043. I am a FINRA Registered Investment Banking Representative (Series 79).

2.      SC&H has substantial experience in M&A transactions around the country, including in distressed situations. SC&H has completed over 600 transactions throughout the country, with approximately half of these transactions approved by Bankruptcy Courts in 72 different districts. SC&H has extensive experience in the life science industry, including with respect to the unique market and regulatory issues involved in the marketing and sale of pharmaceutical companies.

3.      I am submitting this declaration in the above-captioned Chapter 11 Case of the Debtor in support of the *Motion of Debtor for Entry of (I) an Order (A) Approving Bid Procedures in Connection with the Potential Sale of Substantially All of the Debtor's Assets, (B) Scheduling an Auction and a Sale Hearing, (C) Approving the Form and Manner of Notice Thereof, (D) Authorizing the Debtor to Enter Into the Stalking Horse Agreement, (E) Approving Procedures for*

---

[1] The Debtor's mailing address in this chapter 11 case is 533 Airport Boulevard, Suite 400, Burlingame, CA 94010 and the last four digits of the Debtor's federal tax identification number are 7236.

*the Assumption and Assignment of Contracts and Leases, and (F) Granting Related Relief; and (II) an Order (A) Approving the Sale of Substantially All of the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Contracts and Leases, and (C) Granting Related Relief* [Docket No. 10] (the "**Bid Procedures Motion**").[2]

4.    All facts set forth herein are based on my personal knowledge, on information supplied to me by others within the Debtor's organization, upon my review of relevant documents, or on my opinion based upon my experience and knowledge of the Debtor's operations, financial condition, and present liquidity needs. If I were called to testify, I could and would testify competently to the facts set forth herein.

**A.    The Debtor's Decision to Sell the Assets and the Marketing Process**

5.    The Debtor engaged SC&H on October 13, 2022, to evaluate market interest in the Debtor as a going concern and identify potential equity investors or purchasers of substantially all of the Debtor's assets. Since July 2023, SC&H has been working with, and reporting to, a special committee of the Debtor's board of directors (the "**Special Committee**") that consists of two independent directors, one of which is a former Bankruptcy Judge. The Stalking Horse Bidder is not part of, or subject to the discussions of, the Special Committee.

6.    The Debtor and SC&H conducted a broad marketing process using proprietary research tools and methods. Ultimately, this process identified 101 potential buyers based on their industry, size, acquisition history, and potential strategic angle. The list of potential buyers was supplemented with 55 potential buyers that management believed would have an interest in a transaction with the Debtor. SC&H prepared marketing materials and conducted an outreach

---

[2] Capitalized terms used, but not defined herein, shall have the meanings ascribed to such terms in the Bid Procedures Motion.

campaign that involved direct calls and emails to the groups identified, sending NDAs to 113 prospective bidders. In total, 14 groups signed NDAs and management conducted meetings with nine separate groups at the JP Morgan Healthcare Conference in San Francisco, CA in January 2023. This led to additional in-person meetings and video calls with the more interested prospects.

7.      During the first half of 2023, the Debtor was involved in exclusive negotiations relating to a proposed business combination with a privately held biopharmaceutical company (the "**Partner Company**"), which negotiations contemplated a tax-free stock-for-stock merger, that would result in the issuance of shares of Humanigen's capital stock to the Partner Company's stockholders, representing roughly two times the number of Humanigen's outstanding shares of common stock. The proposed terms for the business combination were subject to conditions, including that the Debtor received binding commitments for investment of additional capital that would have been necessary to fund the operations of the combined company and enable it to maintain a listing on a national securities exchange. In July of 2023, the Debtor's negotiations with the Partner Company concluded without execution of a definitive agreement.

8.      The Debtor was unsuccessful in its subsequent attempts to find a suitable strategic or financial purchaser or to consummate an equity financing transaction that would enable the company to regain compliance with applicable Nasdaq listing requirements. As a result, on July 21, 2023, the Debtor notified the Nasdaq Hearings Panel (the "**Panel**") that it does not expect to be able to demonstrate compliance with all applicable criteria for listing on The Nasdaq Capital Market by the Debtor's compliance deadline of August 21, 2023. Accordingly, the Panel suspended trading in the Debtor's shares beginning Wednesday, July 26, 2023 and delisted the shares of the Debtor from the Nasdaq Capital Market beginning October 11, 2023.

9.      The suspension from trading and delisting from the Nasdaq Capital Market had a significant, adverse effect on the Debtor's already strained liquidity and its ability to raise

91049287.3

additional capital at a critical juncture. Accordingly, in the months before the Petition Date, the Debtor determined that, due to ongoing financial and strategic issues, pursuing a sale of the Assets through a chapter 11 bankruptcy proceeding would be the best method for maximizing the value of those Assets for the benefit of creditors.

10.     The culmination of the Debtor's months-long, arduous prepetition marketing process was the execution of the Stalking Horse Agreement with the Stalking Horse Bidder shortly before the commencement of the Debtor's bankruptcy case.

11.     I believe that the Debtor has a sound business justification for selling the Assets at this time through the process set forth in the Bid Procedures Motion. First, I believe that the proposed sale timeline will maximize the Assets' going-concern value by allowing a party to bid on the full value of the Assets as a going concern, as opposed to on a liquidation basis.  If a sale is not completed before February 20, 2024, the Debtor will exhaust its proposed post-petition credit facility and likely lack adequate cash to sustain itself due to significant expenses that may need to be funded in order to continue to operate the Debtor. All of these factors will force an immediate liquidation of the Assets. Second, once the Debtor determined that a sale was necessary, they have proposed a process to ensure that the sale of the Assets will be subject to competing bids, enhancing the Debtor's ability to receive the highest or otherwise best value for the Assets.  The value of the Assets—and the consideration in the Stalking Horse Agreement—will be tested through the Auction conducted pursuant to the Bid Procedures. Ultimately, the Successful Bid, after being subject to a "market check" in the form of the Auction, will constitute the highest and best offer for the Assets and will provide a larger recovery for the Debtor's creditors than any practical alternative available to the Debtor under the circumstances.

91049287.3

**B.**     **The Bid Procedures Provide a Robust and Fair Process for Maximizing the Value of the Assets.**

12.     I believe that a prompt sale of the Assets represents the best option available to maximize the value of the Assets for all stakeholders in the Chapter 11 Case. Moreover, it is critical for the Debtor to execute on any sale transaction as expeditiously as possible, as the Debtor is utilizing the DIP Lender's financing to explore this sale process. Time is of the essence to complete the marketing and sale process before the Debtor runs out of cash to sustain operations and is forced into a liquidation, rather than selling as a going-concern through chapter 11.

13.     The Bid Procedures are designed to ensure that the Debtor receives the highest and best offer for the Assets, while ensuring that the Debtor can close the sale no later than February 20, 2024, due to its cash needs and as is contemplated under the DIP Loan and Stalking Horse Agreement. Given the extensive prepetition marketing efforts by the Debtor and SC&H, I believe that the proposed timeline under the Bid Procedures is sufficient to complete a fair, robust, and open sale process that will maximize the value received for the Assets. To further ensure that the Debtor's proposed Auction and sale process maximizes value for the benefit of the Debtor's estate, and in accordance with the Stalking Horse Agreement, the Debtor and its professionals have been using and will continue to use the time following the Petition Date to actively market the Assets in an attempt to solicit the highest or best bids available.  As such, I believe that the Bid Procedures reflect a valid and sound exercise of the Debtor's business judgment.

14.     I also believe that the proposed Bid Procedures, including the Sale Notice and Assumption Procedures, will promote active bidding from seriously interested parties and will elicit the highest or best offers available for the Assets. The proposed Bid Procedures will enable the Debtor to conduct the Sale in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who will offer the best package for the Assets and who can demonstrate the ability to close the transaction. In furtherance of the goal of maximizing the

5

value of the Assets, I believe that the Sale Notice, coupled with service of the Cure and Possible Assumption and Assignment Notice, and publication of the Bid Procedures Notice, will provide all interested parties with timely and proper notice of the Bid Procedures and proposed sale, including: (i) the date, time, and place of the Auction (if one will be held), (ii) the requirements of the Bid Procedures, (iii) the deadline for filing objections to the sale and entry of the Sale Order, and the date, time, and place of the Sale Hearing, (iv) a reasonably specific identification of the Assets, (v) a description of the sale as being free and clear of liens, claims, encumbrances, and other interests other than Permitted Encumbrances and Assumed Liabilities (as such terms are defined in the Stalking Horse Agreement), with all such liens, claims, encumbrances, and other interests attaching with the same validity and priority to the sale proceeds, and (vi) notice of the proposed assumption and assignment of the Assigned Contracts to the Successful Bidder.

15.     In connection with the sale process, I also believe that it is necessary for the Debtor to establish a process by which: (i) the Debtor and the Contract Counterparties to Assigned Contracts can reconcile cure obligations, if any, in accordance with the Bankruptcy Code, and (ii) such counterparties can object to the potential assumption and assignment of the Assigned Contracts and/or related cure amounts. I believe that the Assumption Procedures constitute the sound exercise of the Debtor's business judgment.  First, the Assumed Contracts are necessary to operate the Assets, and, as such, they are essential to inducing the best offer for the Assets. Second, it is unlikely that any purchaser would want to acquire the Assets unless a number of the contracts and leases needed to manage the day-to-day operations were included in the transaction.  Third, the Assigned Contracts will be assumed and assigned as part of a process approved by the Court pursuant to the Bid Procedures Order and, thus, will be reviewed by key constituents in the Chapter 11 Case.  I believe that the Assumption Procedures, if approved, will achieve all of these goals.

91049287.3

C.      **The Stalking Horse Agreement Constitutes a Reasonable Exercise of the Debtor's Business Judgment.**

16.      I believe that entering into the Stalking Horse Agreement with the Stalking Horse Bidder, as contemplated by the Bid Procedures Motion, constitutes a reasonable exercise of the Debtor's business judgment. The Stalking Horse Agreement was the result of extensive arm's-length negotiations between the Special Committee and the Stalking Horse Bidder, during which all parties were represented by competent counsel. Additionally, the Stalking Horse Agreement represents the highest and best offer received.  These negotiations occurred in good faith and without any fraud or collusion between the Debtor and the Stalking Horse Bidder. I believe that the Stalking Horse Agreement represented the best available terms for the Assets under the circumstances. The Stalking Horse Agreement will also allow the Debtor to obtain fair market value by making a minimum purchase price for the Assets available to the Debtor that will be tested in the marketplace.

17.      Additionally, I believe that the Expense Reimbursement set forth in the Stalking Horse Agreement is reasonable, was negotiated at arm's length, and was an essential component of the Stalking Horse Bid.  Therefore, I believe the Expense Reimbursement should be approved.

D.      **Making the Bid Procedures Order Effective Immediately is in the Best Interests of the Debtor's Estate and Its Creditors.**

18.      The Debtor believes that the auction process and time periods set forth in the Bidding Procedures are reasonable and will provide parties with sufficient time and information necessary to formulate a bid to purchase all or substantially all of the Assets. Given the Debtor's vigorous prepetition marketing efforts nearly a year before the Petition Date and the Debtor's entry into the Stalking Horse Agreement shortly before the Petition Date providing for the sale of substantially all of the Assets (with such agreement subject to this Court's approval)., the proposed timeline will facilitate a fair and open sale process that will maximize the value received for the

7

Assets. Moreover, the facts and circumstances of this Chapter 11 Case, including the fact that the Debtor has negotiated the consensual use of a DIP Facility on a limited budget, and the Debtor's ability to use the DIP Facility is conditioned upon adherence to strict milestones, justify the timeline proposed by the Debtor herein as it maximizes the prospect of receiving the highest and best offer for the Assets without unduly prejudicing the estate, and also ensures that the Debtor is able to close the sale no later than February 20, 2024.

19.    If the Bid Procedures are not heard on or about January 19, 2024 and approved until a later date, the Debtor may not have sufficient time to complete the bid solicitation and marketing process, resolve contract cure issues, conduct an auction, obtain a Sale Order, and close the Sale before February 20, 2024, thereby jeopardizing the Stalking Horse Agreement, and the success of the marketing process that has been underway since October of 2022. I, therefore, believe that it is prudent to obtain approval of the Bid Procedures as soon as possible to formalize the sale process that began almost a year ago, to provide Court supervision over the process, and to efficiently and expeditiously move forward to consummate a sale that is in the best interests of the Debtor's estate.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge, information, and belief.


Dated: January 4, 2024                                   */s/ Matt LoCascio*
                                                         Matt LoCascio
                                                         Principal