IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>HUMANIGEN, INC.,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 24-10003 (BLS)<br><br>Re: Docket Nos. 10, 53 & 59 |

**DEBTOR'S REPLY IN SUPPORT OF
THE BID PROCEDURES MOTION**

Humanigen, Inc., the debtor and debtor in possession (the "**Debtor**") in the above-captioned chapter 11 case (the "**Chapter 11 Case**"), respectfully submits this reply (the "**Reply**") in support of the *Motion of Debtor for Entry of (I) an Order (A) Approving Bid Procedures in Connection with the Potential Sale of Substantially All of the Debtor's Assets, (B) Scheduling an Auction and a Sale Hearing, (C) Approving the Form and Manner of Notice Thereof, (D) Authorizing the Debtor to Enter into the Stalking Horse Agreement, (E) Approving Procedures for the Assumption and Assignment of Contracts and Leases, and (F) Granting Related Relief; and (II) an Order (A) Approving the Sale of Substantially All of the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Contracts and Leases, and (C) Granting Related Relief* [Docket No. 10] (the "**Motion**")[2] and in response to the objections filed by the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") [Docket No. 53] (the "**UST Objection**") and the Official Committee of Unsecured Creditors (the "**Committee**") [Docket No. 59] (the "**UCC Objection**"

---

[1] The Debtor's mailing address in this chapter 11 case is 533 Airport Boulevard, Suite 400, Burlingame, CA 94010 and the last four digits of the Debtor's federal tax identification number are 7236.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in Motion.

and together with the UST Objection, the "**Objections**"). In support of the Reply, the Debtor relies upon the *Declaration of Matt LoCascio in Support of Bid Procedures and Sale Motion* [Docket No. 11], which is incorporated by reference herein (the "**LoCascio Declaration**"), and respectfully states as follows:

## REPLY

1. After more than a year of marketing the Debtor's Assets, the Debtor negotiated the Stalking Horse Bid and the related procedures through the Special Committee and its advisors, in good faith, at arm's length, with the goal of maximizing the value of its Assets. Accordingly, in an exercise of its business judgment, the Debtor entered into the Stalking Horse Agreement and has proposed the bidding procedures which are designed to maximize the value of the Debtor's estate while ensuring that any interested party would have ample opportunity to submit a competing bid.

2. The U.S. Trustee and the Committee seek to fit this case into a mold by objecting to the sale timeline without fully appreciating the downside to such an extension on the Debtor's estate. To be clear, it is not necessarily a liquidity issue that the Debtor faces with an extended sale timeline. *See* UCC Obj. ¶ 5. Rather, it is the incurrence of significant, additional operating expenses that could be avoided through a closing of the sale. Additionally, it is not the DIP Lender/Stalking Horse Bidder that "created" a liquidity issue or only provided "enough liquidity for a truncated process"—quite the opposite is true. *Id.* The Debtor would have run out of liquidity to operate without the DIP and the DIP offers the Debtor up to the total amount of the bid amount. Finally, to further drive home the point that the Stalking Horse Bidder is not pushing a truncated sale process, the DIP and Stalking Horse Agreement milestones would permit an extension of the proposed timeline—***the Debtor***, and not the Stalking Horse Bidder, in its business judgment, has

decided that the proposed timeline maximizes value and an extended timeline will only decrease (possibly significantly) the value of the estate.

3. Notwithstanding the foregoing, Debtor's counsel immediately engaged with Committee counsel once selected. The Debtor agreed to adjourn the initial hearing on the bid procedures to allow the Committee sufficient time to get up to speed on the facts and hopefully resolve all or as many issues as possible in advance of the adjourned hearing. Indeed, most of their issues have been addressed through revisions to the bid procedures and bid procedures order with a few critical issues remaining.[3] Specifically, the UCC objects to the (i) payment of the proposed Expense Reimbursement, and as a result, the Initial Overbid, and (ii) the sale timeline, all as further detailed in this Reply. Similarly, the U.S. Trustee also objected to the Expense Reimbursement and sale timeline. The Debtor intends to continue working with the Committee and the U.S. Trustee to resolve or narrow these issues in advance of the hearing on the Motion.

**I.     The Sale Timeline Is Necessary to Maximize Value of the Debtor's Estate.**

4. After further consultation with the Debtor's proposed investment banker, the Debtor submits that the Sale Timeline should be approved as proposed because (i) the prepetition marketing process was robust and thorough, and (ii) additional time will not maximize value of the Debtor's estate but instead will actually require the estate to incur additional, significant operating expenditures.

5. The Debtor recognizes that the timeline for the sale process is expedited. But this is by necessity; rather than by design or ill-intentions. The Debtor's proposed sale timeline was designed to achieve a sale process that, either with the original Stalking Horse Bid or a higher and better bid following a fulsome marketing and sale process, would maximize value of the Debtor's

---

[3] The Debtor intends to file a revised proposed bid procedures order and bid procedures in advance of the hearing along with redlines reflecting the agreements reached among the parties.

3

estate. (LoCascio Declaration ¶ 11).  The Debtor's Assets have been marketed prepetition for over one year with limited interest.  The Debtor's investment banker has left no stone unturned in search of interest for the Debtor's Assets and every potentially interested party has already received postpetition outreach as well.  (LoCascio Declaration ¶ 6).  In the Debtor's estimation, additional time will not yield better results.  The Debtor, in the exercise of its business judgment, and through the Special Committee and its advisors, has weighed the pros and cons of an extended sale process and believes that any perceived benefits of an extension of the proposed timeline will be significantly outweighed by the detriments.  That decision should be given significant weight.

6.      Moreover, the Debtor has a limited budget and negative cashflow that will not permit an extended stay in Chapter 11 pre-closing of the sale.  While the DIP and Stalking Horse Agreement milestones would permit a short extension of the postpetition sale process, as detailed in the LoCascio Declaration, consummating the proposed sale on or before February 20, 2024 will avoid significant additional operating expenses, including, among other things, the renewal of the Debtor's full suite of insurance policies. (LoCascio Declaration ¶ 11).  The Debtor received email confirmation from purchaser's counsel that the Stalking Horse Bidder intends to close the sale in advance of February 20, 2024 and the marketing process to date has not revealed any concern from any other prospective buyers with the sale timeline.  This additional, separate reason justifies the proposed sale timeline.

7.      In short, the proposed sale timeline appropriately balances the foregoing considerations by providing potential bidders with the most runway and opportunity to bid, minimizing the Debtor's expenditures, and ensuring a full, fair and transparent process.  Accordingly, the sale timeline should be approved as proposed.

II.   **The Expense Reimbursement is Necessary and Appropriate Under These Circumstances.**

8.  The Expense Reimbursement of $100,000 is reasonable, was negotiated at arm's length, and was an essential component of the Stalking Horse Bid. (LoCascio Decl. ¶ 17). As stated in the Motion, given the Debtor's need to maximize the value of the Assets through a timely and efficient marketing and sale process, the ability to offer this modest Expense Reimbursement is justified, appropriate and essential. (*See* Motion ¶ 79).

10. First, the Objections rely on the notion that the Debtor has not met its burden of establishing that the Expense Reimbursement constitutes an actual, necessary expense of preserving the Debtor's estate, as required under section 503(b) of the Bankruptcy Code, because the Stalking Horse Bidder allegedly did not need an incentive to make a bid. (*See* UST Obj. ¶ 14; UCC Obj. ¶ 26). However, the Stalking Horse Bidder had no obligation to serve in such capacity, and has incurred, and will continue to incur, significant expenses in connection with its role as Stalking Horse Bidder, including but not limited to costs relating to bankruptcy counsel fees, intellectual property counsel fees, any additional diligence that may be necessary, attending an auction (if necessary), and all other costs associated with completing and closing the transaction as contemplated in the Stalking Horse APA. Indeed, the Stalking Horse Bidder would not have agreed to act as a stalking horse without the Expense Reimbursement, which was an "essential component of the Stalking Horse Bid", given the substantial time and expense it has incurred in connection with negotiating definitive documentation and the risk that it will be outbid at the Auction. (LoCascio Declaration ¶¶ 11, 16). Moreover, by offering the Expense Reimbursement to the Stalking Horse Bidder, the Debtor's estate locked in a floor that will be subject to better and higher offers, which insures to the benefit of the Debtor's estate and all of its creditors. *See Calpine Corp. v. O'Brien Env't Energy Inc. (In re O'Brien Env't Energy, Inc.)*, 181 F.3d 527, 535 (3d Cir.

5

1999). Therefore, the U.S. Trustee's and Committee's assertions that Stalking Horse Bidder did not need to undertake any due diligence to make a bid or incentive to make a bid ignores the fact that: (i) a set of transactional documents were drafted and will be utilized and relied upon the Debtor and bidders during the sale process; (ii) independent negotiations between sophisticated parties and counsel were undertaken and necessary to finalize those documents before filing; (iii) pleadings were negotiated and prepared to gain approval of the sale process and transaction, for the benefit of the Debtor and its estate; and (iv) the Debtor will likely require further input and effort from the Stalking Horse Bidder in order to obtain the successful approval of the Stalking Horse Agreement and closing of the sale on the timeline proposed. Therefore, the Expense Reimbursement is appropriate and has been approved previously under similar circumstances by this Court. *See, e.g.*, *Genapsys, Inc.*, No. 22-10621 (BLS), Hr'g Tr. 33:7-15 (Bankr. D. Del. Aug. 22, 2022) (Docket No. 195) (The Court stated: "I'm under no illusions that even a familiar stakeholder is obliged to spend money on professionals to assist in formulating a bid. ***That would happen even with a management bid as a practical matter.*** And so I'm not going to fault a stalking horse for engaging or seeking reimbursement of those expenses and I would be prepared to approve them notwithstanding my ruling on the breakup fee") (emphasis added).[4]

---

[4] A copy of the relevant portion of the transcript is attached hereto as **Exhibit A**. Additionally, following *O'Brien Envtl. Energy*, numerous courts in this district have approved expense reimbursement provisions in situations where the stalking horse bidder was an insider or had certain prepetition connections with the debtor. *See, e.g., In re Pegasus Home Fashions*, No. 23-11235 (MFW) (Bankr. D. Del. Sept. 28, 2023) (D.I. 136) (approving an expense reimbursement to insider stalking horse bidder who was an affiliate of an equity holder of the debtor's parent and an affiliate of the collateral agent for the debtor's prepetition lenders); *In re AeroFarms, Inc.*, Case No. 23-10737 (MFW) (Bankr. D. Del. July 20, 2023) (D.I. 191) (approving expense reimbursement to insider stalking horse bidder who was owned by a number of the debtor's equity holders and also a board member); *In re Lucky Brand Dungarees, LLC et al.*, Case No. 20-11768 (CSS) (Bankr. D. Del July 30, 2020) (D.I. 251) (approving expense reimbursements to stalking horse bidders who were equity holders of the debtor); *In re ExGen Texas Power, LLC*, No. 17-12377 (BLS) (Bankr. D. Del. Nov. 30, 2017) (D.I. 99) (approving an expense reimbursement to a stalking horse bidder comprising of the sole member of the debtor LLC); *In re DirectBuy Holdings, Inc.*, No. 16-12435 (CSS) (Bankr. D. Del. Dec. 1, 2016) (D.I. 126) (approving expense reimbursement for a stalking horse that was established by the holders of the debtors' prepetition secured notes, who were also 100% equity owners of the debtor parent); *In re BPS US Holdings Inc.*, No. 16-12373 (KJC) (Bankr. D. Del. Nov. 30, 2016) (D.I. 233) (approving expense reimbursement for stalking horse bidder that was the largest shareholder of the debtor).

11.     The Third Circuit Court of Appeals has made clear that an expense reimbursement may be approved so long as it provides some postpetition benefit to the debtor's estate. *See Calpine*, 181 F.3d at 536. Here, the Expense Reimbursement would be paid to a party that has provided a tangible and significant postpetition benefit to the Debtor's estate. The Stalking Horse Agreement sets a floor for a competitive, value-maximizing bidding process. Without the Expense Reimbursement, the Debtor might lose the opportunity to obtain the highest or otherwise best offer for the Assets and would certainly lose the downside protection that will be afforded by the existence of the Stalking Horse Bidder. The Stalking Horse Bidder also provides potential bidders with guidance as to a potential transaction structure and the Stalking Horse APA serves an important function in that it lays out a "roadmap" for potential bidders by proposing a structure to acquire the Debtor's assets. Furthermore, an expense reimbursement can provide a benefit to the estate where, among other things, "the bid protection induces a bidder to adhere to its bid through an auction process." *In re Energy Future Holdings Corp.*, 904 F.3d 298, 314 (3d Cir. 2018)); *see also In re Integrated Res., Inc.*, 147 B.R. 650, 661 (S.D.N.Y. 1992) (bid protections may "ensure that a bidder does not retract its bid."). Finally, the Stalking Horse Agreement provides a path forward for the Debtor that gives customers and vendors comfort as to the continuity of the Debtor's business in developing its product pipeline, with a closing contemplated within a short time frame after the Petition Date. Absent a stalking horse bidder, there may be no going-concern business or continued development of the Debtor's product pipeline, which would be value-destructive to this estate and detrimental to the Debtor's customers and vendors.

12.     The propriety of the Expense Reimbursement is determined on the same basis as other post-petition expenses under section 503(b) of the Bankruptcy Code in that the Debtor must demonstrate that the proposed Expense Reimbursement is necessary to preserve the value of the

estate. *In re Reliant Energy Channelview LP*, 594 F.3d 200, 208-09 (3d Cir. 2010) (affirming denial of break-up fee where third party asserted that it was prepared to make a higher and better offer prior to entry of the bid procedures order). Under the present circumstances, the Debtor has demonstrated that the Expense Reimbursement is necessary to preserve the value of the estate because the Stalking Horse Bidder came forward with the highest, best, and *only* offer for the Debtor's assets prior to the Petition Date.[5]

13.   Lastly, the U.S. Trustee proposes the Expense Reimbursement is denied because the Stalking Horse Bidder is the secured DIP lender and owned by Dr. Cameron Durrant, Humanigen's CEO. (*See* UST Ob. ¶ 10). The Committee similarly alleges the Expense Reimbursement increases the cost of an acquisition to other bidders to the advantage of an insider. (*See* UCC Obj. ¶ 29). However, as the Debtor began preparations for the filing of this Chapter 11 Case, the Debtor was obviously aware that being able to make decisions independent of and free from influence of any insiders would be critical for creditors and the Court in order to provide confidence and comfort that the Debtor was acting in the best interests of its estate. To that end, the Debtor ensured, through the Special Committee and its advisors, that the proposed transaction was the product of arms' length, good faith negotiations. (LoCascio Declaration ¶¶ 5, 17). The members of the Special Committee are not affiliated with the Stalking Horse Bidder.

14.   Accordingly, the Sale and the terms of the Stalking Horse Agreement should be analyzed under the business judgment standard. The U.S. Trustee fails to cite *any* authority for the proposition that an insider of a debtor, or a lender to a debtor, is prohibited from receiving an expense reimbursement when it serves as a stalking horse bidder due solely to its status as an

---

[5] Of course, it is worth noting that the Stalking Horse Bidder is not entitled to any breakup fee that a stalking horse transaction might typically entail. *See Genapsys, Inc.*, No. 22- 10621 (BLS), Hr'g Tr. 33:1-6 (Bankr. D. Del. August 22, 2022) (finding that an expense reimbursement is qualitatively different from a breakup fee because it is a basic feature of putting together a transaction).

insider and/or lender. *See, e.g.*, *Pegasus Home Fashions, Inc.*, No. 23- 11235 (MFW), Hr'g Tr. 34-35 (Bankr. D. Del. Sept. 27, 2023) (Docket No. 195) (approving an expense reimbursement to an insider and stating "[w]hile the Court does look at any transaction with an insider either of the debtor or the pre-petition lenders, it is not an absolute bar to those entities serving as a stalking horse, nor is it an absolute bar to them receiving an expense reimbursement. But, again, it's a higher standard to establish that they are entitled to it.").

15.  Based on the foregoing, and for the reasons stated in the Motion and in the LoCascio Declaration, the Expense Reimbursement is appropriate under the circumstances because it is: (i) an actual and necessary cost and expense of preserving the Debtor's estate within the meaning of section 503(b) of the Bankruptcy Code; and (ii) otherwise reasonable and appropriate under the facts and circumstances of this case.

### III.  The Initial Overbid is Appropriate and Has the Effect of Maximizing Value.

16.  The Initial Overbid amount is appropriate and will ensure that if there is an overbid, that such bid will effectuate a net positive result for the Debtor's estate. While the Debtor is not necessarily opposed to reducing the Initial Overbid amount in theory, it cannot do so if the result will create a net negative result to the estate when there is an overbid. It would be axiomatic that an overbid should produce *more* value to the Debtor's estate, and not less. However, the UCC's request of reducing the Initial Overbid from $250,000 to $150,000 will ensure that result. That is because of the Expense Reimbursement of $100,000 as well as the Exit Fee of $100,000 that would be due to the Stalking Horse Bidder if an Alternative Transaction is approved. (*See* Motion ¶ 15; DIP Motion ¶ 32). Therefore, in order to "break even", the Initial Overbid must be at least $200,000, and thus, the $250,000 Initial Overbid provides an additional $50,000 of value for the estate. From this perspective, the Debtor cannot agree to reduce the Initial Overbid.

17.      It is also worth noting that the Minimum Overbid Increment is just $50,000. (*See* Motion ¶ 43). If there is a competing bidder that submits an Initial Overbid, the increments thereafter are minimal. This low threshold is intended to encourage bidding and maximize value for the estates. For all these reasons, the Initial Overbid amount should remain at $250,000 as proposed.

## **CONCLUSION**

**WHEREFORE**, for the reasons set forth herein and in the Bid Procedures Motion, the Debtor submits that the Court should overrule the Objections and enter the Bid Procedures Order.

[*Remainder of page intentionally left blank*]

| | |
|---|---|
| Dated: January 22, 2024<br>Wilmington, Delaware | Respectfully submitted,<br><br>*/s/ Aaron H. Stulman*<br>M. Blake Cleary (No. 3614)<br>Aaron H. Stulman (No. 5807)<br>Brett M. Haywood (No. 6166)<br>Maria Kotsiras (No. 6840)<br>Sameen Rizvi (No. 6902)<br>**POTTER ANDERSON & CORROON LLP**<br>1313 N. Market Street, 6th Floor<br>Wilmington, Delaware 19801<br>Telephone: (302) 984-6000<br>Facsimile:  (302) 658-1192<br>Email:  bcleary@potteranderson.com<br>           astulman@potteranderson.com<br>           bhaywood@potteranderson.com<br>           mkotsiras@potteranderson.com<br>           srizvi@potteranderson.com<br><br>*Proposed Counsel to the Debtor and Debtor in Possession* |